### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| JAMES MONEY, et al., on behalf of themselves and all similarly situated individuals, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 20 C 2093 (Also Filed in Case. No. 20 C 1792) |
| J.B. PRITZKER, et al., | ) ) | |
| Defendants. | ) | |

### PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

Sheila A. Bedi
Luke Fernbach*
Emily M. Grant*
Terah Tollner*
Community Justice Civil Rights Clinic
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-2492
 *Law student licensed pursuant to Illinois
Supreme Court Rule 711

Vanessa del Valle
Roderick and Solange MacArthur Justice
Center
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-5932

Jennifer Soble
Illinois Prison Project
53 W. Jackson, Suite 1056
Chicago, IL 60616
(312) 324-4465

Sarah Grady
Steve Weil
Loevy & Loevy
311 North Aberdeen St., 3rd Floor
Chicago, IL 60607
(312) 243-5900

Alan Mills
Elizabeth Mazur
Uptown People's Law Center
4413 N. Sheridan
Chicago, IL 60640
(773) 769-1411

Amanda Antholt
Samantha Reed
Equip for Equality
20 N. Michigan Ave, Suite 300
Chicago, IL 60602
(312) 341-0022

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................2

I.   The COVID-19 Outbreak Has Created a National and Global Health Emergency............2

II.  Incarcerated People Are Particularly Vulnerable to Infection from COVID-19 ...............9

III. Reducing the Prison Population Is the Only Meaningfully Means to Prevent the Harm
     Caused by COVID-19 in Prisons and their Surrounding Communities ..........................14

IV.  IDOC and Governor Pritzker Are Failing to Take Necessary Precautions to Reduce the
     Spread of COVID-19 Within Prisons and Their Surrounding Communities, Placing
     People at an Increased Risk .........................................................................................25

V.   IDOC's Medical Care Program is Gravely Under-Resourced and Under- Functioning,
     and Is Not Capable of Managing COVID-19 ...............................................................31

VI.  Many of the Named Plaintiffs Are Vulnerable Prisoners Who, If Exposed To the Virus,
     Would Likely Suffer Severe Illness or Death ...............................................................33

NOTICE TO DEFENDANTS .............................................................................................37

ARGUMENT .....................................................................................................................38

I.   Plaintiffs Are Likely to Succeed on the Merits of Establishing a Constitutional
     Violation ......................................................................................................................40

     A.   Plaintiffs Are Likely to Succeed on the Merits on Their Constitutional
          Claims ..................................................................................................................40

     B.   Plaintiffs Are Likely to Succeed on the Merits on Their ADA Claims for
          Subclass 1............................................................................................................46

          1.   The IDOC Must Provide Reasonable Modifications to Prevent
               Discrimination Against People With Disabilities (Subclass 1) .................47

          2.   The IDOC Must Provide the Reasonable Modifications to Avoid the
               Disparate Harm to People With Disabilities (Subclasses 1 and 2) ...........48

II.  Infection With a Lethal Virus That Lacks Any Vaccine or Cure Constitutes Irreparable
     Harm ............................................................................................................................49

III.    There is a Strong Public Interest in Minimizing the Spread of COVID-19 Through Social
        Distancing and Hygiene Practices That Are Impossible in IDOC Prisons ...................... 51

IV.     The Balance of Equities Favors Releasing Vulnerable Plaintiffs Over Continued
        Detention in the Midst of this Public Health Crisis .......................................................... 53

V.      This Court Should Not Require Plaintiffs to Provide Security Prior to Issuing a
        Temporary Restraining Order ............................................................................................ 55

CONCLUSION ...................................................................................................................................... 55

## TABLE OF AUTHORITIES

*Aon Risk Servs. Cos. v. Alliant Ins. Servs., Inc.*, 415 F. Supp. 3d 843 (N.D. Ill. 2019)................39

*Austin v. Pa. Dep't of Corr.*, 1992 WL 277511 (E.D. Pa. Sept. 29, 1992)....................................50

*Basank, et al. v. Decker, et al.*, No. 20 C 2518, Dkt. 11 (S.D.N.Y. Mar. 26, 2020).....................44

*Boone v. Brown*, 2005 WL 2006997 (D.N.J. Aug. 22, 2005).........................................................50

*Brown v. Plata*, 563 U.S. 493 (2011)..........................................................................................39

*Complete Angler, L.L.C. v. City of Clearwater*, 607 F.Supp.2d 1326 (M.D. Fla. 2009).............. 55

*Coronel, et al. v. Decker, et al.*, No. 20 C 2472, Dkt. 26 (S.D.N.Y. Mar. 27, 2020) .............44, 50

*Davis v. Mineta*, 302 F.3d 1104 (10th Cir. 2002) .........................................................................55

*Farmer v. Brennan*, 511 U.S. 825 (1994) ....................................................................................40

*Flores, et al. v. Barr, et al.*, No. 85 C 4544, Dkt. 740 (Mar. 28, 2020).........................................44

*Frullati Franchise Sys., Inc. v. Dana Areece & Co.*, 2001 WL 743427
    (N.D. Ill. June 28, 2001) ........................................................................................................38

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079
    (7th Cir. 2008)......................................................................................................................... 49

*Gray v. Hardy*, 826 F.3d 1000 (7th Cir. 2016) .............................................................................41

*Green River Bottling Co. v. Green River Corp.*, 997 F.2d 359 (7th Cir. 1993)............................38

*Helling v. McKinney*, 509 U.S. 25 (1993)......................................................................................41

*Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721
    (7th Cir. 2009)......................................................................................................................... 39

*Hutto v. Finney*, 437 U.S. 678 (1978)...........................................................................................39

*Joelner v. Vill. of Washington Park, Ill.*, 378 F.3d 613 (7th Cir. 2004) ....................................... 51

*Jolly v. Coughlin*, 76 F.3d 468 (2d Cir. 1996) ..............................................................................50

*Jones'El v. Berge*, 164 F. Supp. 2d 1096 (W.D. Wisc. 2001) ...................................................... 39

*Lippert v. Jeffreys*, No. 10 cv 4603 (N.D. Ill.)........................................................................31, 32

*McCoy v. Tex. Dep't Crim. Justice*, 2006 WL 2331055 (S.D. Tex. Aug. 9, 2006)......................48

*McDonald v. Hardy*, 821 F.3d 882 (7th Cir. 2016) .................................................................... 41

*Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765 (7th Cir. 2011).........................................38

*Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249 (4th Cir.2003)......................................... 51

*Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775
    (7th Cir. 2002).................................................................................................................46

*Orr v. Shicker*, ___ F.3d ___, 2020 WL 1329659 (7th Cir. Mar. 23, 2020)................................. 49

*Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206 (1998) ...................................................................47

*Pocklington v. O'Leary*, 1986 WL 5748 (N.D. Ill. May 6, 1986).................................................55

*Powers v. Snyder*, 484 F.3d 929 (7th Cir. 2007)........................................................................41

*Preston v. Thompson*, 589 F.2d 300 (7th Cir. 1978).............................................................49, 51

*Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003) .......................................................................48

*Swan v. Bd. of Educ.*, No. 13 C 3623, 2013 WL 3872799 (N.D. Ill. July 25, 2013).................... 48

*Thaker, et al. v. Doll, et al.*, No. 20 C 0480, Dkt. 47 (M.D. Pa. Mar. 31, 2020) ..........................50

*Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840 (7th Cir. 1999) ........................51

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017) ........38

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ...........................................................38

*Wisc. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737 (7th Cir. 2006) ..............................48

**STATUTES**

28 C.F.R. § 35.130(b)(7)...........................................................................................................46, 47

42 U.S.C. § 12102(2) ......................................................................................................................46

42 U.S.C. § 12132..........................................................................................................................46

730 ILCS 5/3-11-1 .................................................................................................................... passim

730 ILCS 5/3-11-1(a)(2)............................................................................................................28, 45

730 ILCS 5/5-8A-3(b)................................................................................................29, 34

730 ILCS 5/5-8A-3(c)....................................................................................................29

730 ILCS 5/5-8A-3(d)..................................................................................29, 30, 35, 36

730 ILCS 5/5-8A-3(e)....................................................................................................29

# OTHER AUTHORITIES

AMEND. COVID-19 in Correctional Settings: Unique Challenges and Proposed Responses"
(March 23, 2020), https://amend.us/wp-content/uploads/2020/03/COVID-in-Corrections-
Challenges-and-Solutions-1.pdf...................................................................................................11

Bailey, Briana. *DOC Stops Accepting Newly Sentenced State Prisoners*, The Frontier (Mar. 22,
2020), https://www.enidnews.com/news/local_news/doc-stops-accepting-newly-sentenced-state-
prisoners/article_ea6a42a4-47c1-5dbc-9446-5dec46032c5d.html ................................................20

Barry, Kyle C. *Some Supreme Courts Are Helping Shrink Jails To Stop Outbreaks. Others Are
Lagging Behind*, The Appeal (Mar. 25, 2020), *available at*
https://theappeal.org/politicalreport/some-supreme-courts-are-helping-shrink-jails-coronavirus/ ...
..................................................................................................................................................24, 25

Baumgarten, April. *North Dakota paroles 56 prisoners early amid pandemic, including 3
convicted of sexual assault*, Grand Forks Herald (Mar. 20, 2020),
https://www.grandforksherald.com/news/crime-and-courts/5009882-North-Dakota-paroles-56-
prisoners-early-amid-pandemic-including-3-convicted-of-sexual-assault ....................................18

Beatty, Donald W. Memorandum. Chief Justice of South Carolina Supreme Court, to
Magistrates, Municipal Judges, and Summary Court Staff (Mar. 16, 2020), *available at*
https://www.sccourts.org/whatsnew/displayWhatsNew.cfm?indexId=2461 ...............................24

Billeaud, Jacques. *Tucson lawyers seek release of nonviolent inmates from jail,* Tucson.com
(Mar. 24, 2020), *available at* https://tucson.com/news/local/crime-and-courts/tucson-lawyers-
seek-release-of-nonviolent-inmates-from-jail/article_0cd49be4-6dd6-11ea-99d3-
576d60e1dae5.html....................................................................................................................21

Branch, Kayla. *Coronavirus in Oklahoma: Over 200 nonviolent offenders released from
Oklahoma County jail to limit COVID-19 spread,* The Oklahoman (Mar. 25, 2020), *available at*
https://oklahoman.com/article/5658504/coronavirus-in-oklahoma-over-200-non-violent-
offenders-released-from-oklahoma-county-jail-to-limit-covid-19-spread ....................................22

Buffon, Scott. *Coconino County jail releases nonviolent inmates in light of coronavirus
concerns,* Arizona Daily Sun (Mar. 20, 2020), *available at*
https://azdailysun.com/news/local/coconino-county-jail-releases-nonviolent-inmates-in-light-of-
coronavirus-concerns/article_a6046904-18ff-532a-9dba-54a58862c50b.html............................21

Cai J, Sun W, Huang J, Gamber M, Wu J, He G. Indirect virus transmission in cluster of
COVID-19 Cases, Wenzhou, China, 2020. Emerg Infect Dis. 2020 Jun., *available at*
https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article................................................. 4

Carissimo, Justin. 1,700 inmates released from Los Angeles County in response to coronavirus
outbreak, CBS News (Mar. 24, 2020), *available at* https://www.cbsnews.com/news/inmates-
released-los-angeles-county-coronavirus-response-2020-03-24/ ................................................20

CDC. Coronavirus Disease 2019 (COVID-19): Cases in U.S., Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fcases-in-us.html).....................................................................................................3

CDC. Interim Guidance for Coronavirus Disease 2019 (COVID-19), Guidance as of 3/15/2020, https://www.cdc.gov/coronavirus/2019-ncov/community/large-events/mass-gatherings-ready-for-covid-19.html ....................................................................................................8

CDC. Coronavirus Disease 2019 (COVID-19): How Coronavirus Spreads, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html........ 8

CDC. Coronavirus Disease 2019 (COVID-19): How It Spreads, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Ftransmission.html .....................................................................................5

CDC. Coronavirus Disease 2019 (COVID-19): How to Protect Yourself, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Fprevention.html .....................................................................................7

CDC. Coronavirus Disease 2019 (COVID-19): People Who Need Extra Precautions, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fhigh-risk-complications.html ...........................................................6

CDC. Coronavirus Disease 2019 (COVID-19): Situation Summary, CDC, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html.................................7

CDC. Coronavirus Disease 2019 (COVID-19), Symptoms of Coronavirus, CDC, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html..........................4

Cheves, John. *Chief justice pleads for Kentucky inmate releases ahead of COVID-19, but progress slow*, Lexington Herald Leader (Mar. 23, 2020), *available at* https://www.kentucky.com/news/coronavirus/article241428266.html .........................................23

State of Colorado, Executive Order D 2020 016, March 25, 2020, at pg. 2, *available at* https://drive.google.com/file/d/18o0yWHzZleHJ87hmgLuBmXwpM8R74Q5x/view .............. 19

Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") H.R. 748, at 633 (2020), *available at* https://assets.documentcloud.org/documents/6819239/FINAL-FINAL-CARES-ACT.pdf .........................................................................................................17

Circuit Court of Cook County, Administrative Order 2020-01 (amended Mar. 30, 2020), http://www.cookcountycourt.org/Portals/0/Order%203-30-20.pdf ................................9

Dehghanpisheh, Babak. Iran Temporarily Releases 70,000 Prisoners As Coronavirus Cases Surge, Reuters (Mar. 9, 2020), *available at* https://www.reuters.com/article/us-health-coronavirus-iran/iran-temporarily-releases-70000-prisoners-ascoronavirus-cases-surge-idUSKBN20W1E5.................................................................................................. 17

Drew, Karen. *Metro Detroit county jails reviewing cases to see which inmates could be released amid coronavirus (COVID-19) outbreak*, Click On Detroit (Mar. 24, 2020), *available at* https://www.clickondetroit.com/news/defenders/2020/03/25/metro-detroit-county-jails-reviewing-cases-to-see-which-inmates-could-be-released-amid-coronavirus-covid-19-outbreak/ (the two counties combined released more than 440 individuals).................................23

Evers, Governor Tony. Emergency Order # 9, Order to the Dep't of Corrections, Tony Evers, Gov. Wisconsin (Mar. 20, 2020) ................................................................20

Ezike, Dr. Ngozi. IDPH, *COVID-19 Press Update*, 23:30–23:48 (Mar. 30, 2020), *available at* http://www.dph.illinois.gov/topics-services/diseases-and-conditions/diseases-a-z-list/coronavirus/media-publications/daily-press-briefings.........................................42

Ezike, Dr. Ngozi. IDPH, *COVID-19 Press Update Video*, at 11:33-11:56 (Mar. 29, 2020), *available at* http://www.dph.illinois.gov/topics-services/diseases-and-conditions/diseases-a-z-list/coronavirus/media-publications/daily-press-briefings.........................................43

Fair and Just Prosecution, Joint Statement from Elected Prosecutors on COVID19 and Addressing the Rights and Needs of Those in Custody (Mar. 2020), https://fairandjustprosecution.org/wp-content/uploads/2020/03/Coronavirus-Sign-On-Letter.pdf ................................................................................................................18

Fink, Sheri. Worst-Case Estimates for U.S. Coronavirus Deaths, The New York Times, (Mar. 13, 2020), *available at* https://www.nytimes.com/2020/03/13/us/coronavirus-deaths-estimate.html..........................................................................................................3

George Washington University Hospital, GW Hospital Uses Innovative VR Technology to Assess Its First COVID-19 Patient, https://www.gwhospital.com/resources/podcasts/covid19-vr-technology.......................................................................................................................7

Goudie, Chuck, Markoff, Barb, Tressel, & Wediner, Ross. abc7 Chicago, Illinois Prisoners Sick with COVID-19 Overwhelm Joliet Hospital (video), available at https://abc7chicago.com/health/illinois-prisoners-sick-with-covid-19-overwhelm-joliet-hospital/6064085/................................................................................................13

The Governor's Press Conferences are available for streaming at: https://www.nbcchicago.com/news/local/watch-live-daily-coronavirus-briefing-from-illinois-health-officials/2234359/ (last visited March 31, 2020)..............................................30

Gubernatorial Disaster Proclamation, *available at*
https://www2.illinois.gov/sites/gov/Documents/APPROVED%20-
%20Coronavirus%20Disaster%20Proc%20WORD.pdf ............................................................... 3

Helmer, Katrina. M*etro Corrections releasing non-violent inmates to prevent coronavirus
spread*, WDRB.com (Mar. 18, 2020), *available at* https://www.wdrb.com/news/metro-
corrections-releasing-non-violent-inmates-to-prevent-coronavirus-spread/article_0fbed080-6968-
11ea-ada1-f73b721440b2.html ................................................................................................ 23

Heye, Bob. *Coronavirus and Crime: Jail releases, a rash of break-ins and one encouraging
trend,* KATU (Mar. 23, 2020), *available at* https://katu.com/news/coronavirus/coronavirus-and-
crime-jail-releases-a-rash-of-break-ins-and-one-encouraging-trend ........................................... 21

Higgins-Dunn,Noah.  Coronavirus: New York City to release 300 nonviolence inmates from
Rikers Island, CNBC (Mar. 24, 2020) https://www.cnbc.com/2020/03/24/coronavirus-new-york-
city-to-release-300-nonviolent-inmates-from-rikers-island.html ................................................. 23

Hoerner, Emily. Edlerly inmates are at high risk for coronavirus. Why are there so many of them
in Illinois's prisons?, InjusticeWatch, *available at*
https://www.injusticewatch.org/news/2020/elderly-inmates-are-at-high-risk-for-coronavirus-
why-are-there-so-many-of-them-in-illinoiss-prisons/........................................................... 26, 53

Illinois Department of Corrections.  COVID-19 Response, Illinois Department of Correction,
https://www2.illinois.gov/idoc/facilities/Pages/Covid19Response.aspx ...................................... 53

IDPH. Coronavirus Disease 2019 (COVID-19), Ill. Dept. of Pub. Health,
http://www.dph.illinois.gov/topics-services/diseases-and-conditions/diseases-a-z-list/coronavirus

IDPH, *Public Health Officials Announce 461 New Cases of Coronavirus Disease*, (Mar. 30,
2020), *available at* http://www.dph.illinois.gov/news/public-health-officials-announce-461-new-
cases-coronavirus-disease ...................................................................................................3, 42, 43

IDPH, *Public Health Officials Announce 330 New Cases of Coronavirus* Disease, (Mar. 25,
2020, *available at* http://www.dph.illinois.gov/news/public-health-officials-announce-330-new-
cases-coronavirus-disease ...................................................................................................52

*Illinois Prisoners Sick with COVID-19 "Overwhelm" Joliet Hospital*, ABC 7 NEWS,
(Mar. 30, 2020), *available at* https://abc7chicago.com/health/illinois-prisoners-sick-with-covid-
19-overwhelm-joliet-hospital/6064085/ .....................................................................................53

Johnson, Kevin. *Local jails releasing hundreds of prisoners amid coronavirus fears, up from
dozens just weeks ago,* USAToday (Mar. 26, 2020), *available at*
https://www.usatoday.com/story/news/politics/2020/03/26/jails-free-hundreds-prisoners-stop-
coronavirus/5077204002/ ...........................................................................................................23

Kindy, Kimberly, Brown, Emma & Bennett, Dalton. *'Disaster waiting to happen': Thousands of inmates released as jails and prisons face coronavirus threat,* Washington Post (Mar. 25, 2020), https://www.washingtonpost.com/national/disaster-waiting-to-happen-thousands-of-inmates-released-as-jails-face-coronavirus-threat/2020/03/24/761c2d84-6b8c-11ea-b313-df458622c2cc_story.html.................................................................................................................20

Kjolseth, Francisco. *Hundreds of Utah inmates will soon be released in response to coronavirus*, The Salt Lake Tribune (Mar. 20, 2020), *available at* https://www.sltrib.com/news/2020/03/21/hundreds-utah-inmates/ ............................................ 21

Kohler, Jeremy & Currier, Joel. *St. Louis city and county to release more than 140 inmates amid virus concerns*, St. Louis Post-Dispatch (Mar. 26, 2020), *available at* https://www.stltoday.com/news/local/crime-and-courts/st-louis-city-and-county-to-release-more-than-inmates/article_dd8b30f6-c3ea-5229-b7ac-0aa36ee8f14c.html........................................... 22

Legal Aid Society. *COVID-19 Infection Tracking in NYC Jails*, Legal Aid Society, *available at* https://www.legalaidnyc.org/covid-19-infection-tracking-in-nyc-jails/ ........................................43

Leiker, R. & Stavola, Michael. *So far, 200 jail inmates released over COVID-19 concerns, Sedgwick County DA says,* The Wichita Eagle (Mar. 26, 2020), *available at* https://www.kansas.com/news/local/crime/article241501106.html ..............................................22

Lyons, Brendan J. *NY to release 1,100 parole violators as coronavirus spreads,* Times Union (Mar. 27, 2020), *available at* https://www.timesunion.com/news/article/Deaths-surge-again-in-New-York-from-coronavirus-15160973.php.................................................................................19

Marchione, Marilynn. *Novel Coronavirus Can live on Some Surfaces for Up to 3 Days, New Tests Show.* TIME, *available at* https://time.com/5801278/coronavirus-stays-on-surfaces-days-tests/ (March 11, 2020) ...................................................................................................................4

Masterson, Matt. *COVID-19 Case at Cook County Jail Prompts More Calls for Mass Detainee Release,* WTTW News (Mar. 23, 2020), *available at* https://news.wttw.com/2020/03/23/covid-19-case-cook-county-jail-prompts-more-calls-mass-detainee-release ........................................ 25

Merriman, Anna, *'It's very difficult to control': Many Vermont inmates released so that those who remain can be spread out,* Valley News (Mar. 26, 2020), *available at* https://www.vnews.com/Vermont-NH-prisons-working-to-reduce-population-to-prevent-virus-spread-33512589 ...................................................................................................................19

McGrath, Mike. *Chief Justice of Montana Supreme Court, to Montana Courts of Limited Jurisdiction Judges* (Mar. 20, 2020), *available at* https://courts.mt.gov/Portals/189/virus/Ltr%20to%20COLJ%20Judges%20re%20COVID-19%20032020.pdf?ver=2020-03-20-115517-333 ......................................................................24

Metevia, Thomas. *Hillsborough County to free non-violent inmates in effort to prevent COVID-19 spread, ,* Click Orlando.com (Mar. 20, 2020), *available at* https://www.clickorlando.com/news/local/2020/03/19/hillsborough-county-to-free-non-violent-inmates-in-effort-to-prevent-covid-19-spread/ ..........................................................................24

Milano, Johnny. Infected but Feeling Fine: The Unwitting Coronavirus Spreaders, New York Times, https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html ..............................................................................................................................4

NBC Bay Area. *Sheriff Releases 314 Inmates to Reduce Coronavirus Risk at Alameda County Jail*, NBC Bay Area, (Mar. 19, 2020), *available at* https://www.nbcbayarea.com/news/coronavirus/sheriff-releases-314-inmates-to-reduce-coronavirus-risk-at-alameda-county-jail/2258026/.......................................................................20

NBC Chicago. March 29: Governor JB Pritzker Delivers Daily Coronavirus Briefing, NBC, *available at* https://www.nbcchicago.com/top-videos-home/march-29-governor-jb-pritzker-delivers-daily-coronavirus-briefing/2246851/ ...............................................................12

NBC Chicago. March 30: Governor JB Pritzker Delivers Daily Coronavirus Briefing, NBC, *available at* https://www.nbcchicago.com/top-videos-home/march-30-governor-jb-pritzker-delivers-daily-coronavirus-briefing/2247385/ ...............................................................13

NBC Chicago. Executive Order In Response to COVID-19 (COVID-19 Executive Order No.8), https://www2.illinois.gov/IISNews/21288-Gov._Pritzker_Stay_at_Home_Order.pdf; Illinois' Stay-at-Home Order Extended Through April, Pritzker Announces, NBCChicago (Mar. 31, 2020) https://www.nbcchicago.com/news/local/illinois-stay-at-home-order-expected-to-be-extended-sources/2247274/................................................................................................. 8

Newton Daily News. *Officials cut prison, jail numbers; Iowa virus cases hit 105,* Newton Daily News (Mar. 24, 2020), *available at* https://www.newtondailynews.com/2020/03/23/officials-cut-prison-jail-numbers-iowa-virus-cases-hit-105/acs5xbk/..............................................................18

Owen, Tess. *NYC Is Releasing Hundreds of Inmates to Stop the Spread of Coronavirus*, VICE News (Mar. 26,2020), *available at* https://www.vice.com/en_us/article/939j9a/nyc-is-releasing-hundreds-of-inmates-to-stop-the-spread-of-cornavirus ...............................................................23

Pace, Eileen. *Bexar County Jail Explores Early Releases, Ceasing Low-Level Arrests Amid Coronavirus*, Texas Public Radio (Mar. 20, 2020), *available at* https://www.tpr.org/post/bexar-county-jail-explores-early-releases-ceasing-low-level-arrests-amid-coronavirus.........................22

Petrella, Dan, St. Clair, Stacy, Johnson, Steve, & Pratt, Gregory. Gov. J.B. Pritzker issues order requiring residents to 'stay at home' starting Saturday, Chicago Tribune, Mar. 20, 2020, https://www.chicagotribune.com/coronavirus/ct-coronavirus-illinois-shelter-in-place-lockdown-order-20200320-teedakbfw5gvdgmnaxlel54hau-story.html ..........................................................9

Prtizker, Governor J.B. Executive Order 2020-13 (March 26, 2020), https://www2.illinois.gov/IISNews/21288-Gov._Pritzker_Stay_at_Home_Order.pdf ............8, 26

Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), *available at* https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ .....................................................................................................................3

Rocklov J., Sjodin H., Wilder-Smith A., COVID-19 Outbreak on the Diamond Princess Cruise Ship: Estimating the Epidemic Potential and Effectiveness of Public Health Countermeasures. Journal of Travel Medicine (Feb. 28, 2020), https://academic.oup.com/jtm/advance-article/doi/10.1093/jtm/taaa030/5766334 .......................................................................3

Sfondeles Tina. Illinois National Guard medics headed to Stateville as inmate coronavirus cases rise, Chicago Suntimes (Apr. 1, 2020), *available at* https://chicago.suntimes.com/coronavirus/2020/4/1/21202995/coronavirus-covid-19-illinois-prison-stateville-national-guard-field-hospital ...............................................................................33

Shedlock, Jerzy. *Clark County Jail releases nearly 200 inmates due to COVID-19*, The Columbian (Mar. 25, 2020), *available at* https://www.columbian.com/news/2020/mar/25/clark-county-jail-releases-nearly-200-inmates-due-to-covid-19/.........................................................21

Sissom, Tom. Washington County jail plans for release of 81 more inmates, Northwest Arkansas Democrat-Gazette (Mar. 26, 2020), *available at* https://www.nwaonline.com/news/2020/mar/26/washington-county-jail-plans-release-81-more-inmat/ ....................................................................................................................................22

St. John, Paige. *California to release 3,500 inmates early as coronavirus spreads inside prisons*, LATimes (Mar. 31, 2020), *available at* https://www.latimes.com/california/story/2020-03-31/coronavirus-california-release-3500-inmates-prisons ............................................................18

Tully, Tracey. *1,000 Inmates Will Be Released From N.J. Jails to Curb Coronavirus Risk*, NYTimes (Mar. 23, 2020), *available at* https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-release.html.................24

U.S. District Court for the Northern District of Illinois, 2d Am. Gen. Order 20-0012 (Mar. 30, 2020) ............................................................................................................9

U.S. District Court for the Southern District of Illinois, Admin. Order 263 (Mar. 30, 2020).........9

U.S. District Court for the Central District of Illinois, Am. Gen. Order 20-01 (Mar. 18, 2020) ..............................................................................................................9

Vermont Department of Corrections. https://doc.vermont.gov/sites/correct/files/documents/2020-03-23-DOC%20Staff%20Test.pdf ..............................................................................................................................................19

Wang, Tianbing, et al. Comorbidities and Multi-Organ Injuries in the Treatment of COVID-19, 395 Lancet 10228 (2020), available at https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30558-4/fulltext ...............7

Ward, Paula Reed, *485 Allegheny County jail inmates released over virus fears*, Pittsburgh Post-Gazette (Mar. 26, 2020), *available at* https://www.post-gazette.com/news/crime-courts/2020/03/26/Allegheny-County-jail-inmates-485-released-Pittsburgh-coronavirus-COVID-19-fears/stories/202003260184 .................................................................................................23

WCCO Minnesota. *Coronavirus In Minnesota: Hennepin County Jail Population Cut By 26% After Release Of Low-Risk Inmates To Prevent COVID-19 Spread*, CBS Minnesota (Mar. 23, 2020), *available at* https://minnesota.cbslocal.com/2020/03/23/coronavirus-in-minnesota-hennepin-county-jail-population-cut-by-26-after-release-of-low-risk-inmates-to-prevent-covid-19/ ......................................................................................................................... 21-22

WBNS. Officials taking steps to reduce county jail populations in Ohio, AP, WBNS (Mar. 21, 2020), *available at* https://www.10tv.com/article/officials-taking-steps-reduce-county-jail-populations-ohio-2020-mar ........................................................................................... 21

WDSU Digital Team. Orleans Criminal Court judges order release of certain inmates amid coronavirus crisis, WDSU News, (Mar. 26, 2020), *available at* https://www.wdsu.com/article/orleans-criminal-court-judges-order-release-of-certain-inmates-amid-coronavirus-crisis/31943462# ..........................................................................22

WHO. Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World Health Organization (Feb. 28, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf. ................................6

WHO. Q &A on Coronaviruses (COVID-19), World Health Organization, https://www.who.int/news-room/q-a-detail/q-a-coronaviruses ......................................................4

WHO. Rolling updates on coronavirus disease (COVID-19), World Health Organization, https://www.who.int/emergencies/diseases/novel-COVID-19-2019/events-as-they-happen..........2

WHO. Coronavirus disease 2019 (COVID-19) Situation Report – 72, World Health Organization (April 1, 2020), *available at* https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200401-sitrep-72-covid-19.pdf?sfvrsn=3dd8971b_2 ......................................................3

Williams, Brie, Ahalt, Cyrus, Cloud, David, Augustine, Dallas, Rorvig, Leah, & Sears, David. Correctional Facilities In The Shadow Of COVID-19: Unique Challenges And Proposed Solutions," Health Affairs Blog, March 26, 2020, *available at* https://www.healthaffairs.org/do/10.1377/hblog20200324.784502/full/ ......................................11

WorldOMeters. Age, Sex, Existing Conditions of COVID-19 Cases and Deaths Chart, https://www.worldometers.info/coronavirus/coronavirus-age-sex-demographics/ (date analysis based on WHO-China Joint Mission Report) .................................................................................5

## INTRODUCTION

COVID-19 has been declared a national pandemic, President Trump has declared a national emergency, and the Governor has issued a proclamation declaring a disaster in the State of Illinois. More than 823,000 people across the globe have been infected and the disease has caused more than 40,500 deaths. Nearly 37,000 people are incarcerated in Illinois, living in close quarters where all aspects of daily life, including healthcare and food service, take place. As with other congregate settings like nursing homes and long-term care facilities, social distancing guidelines can never be fully or effectively implemented in prison. And each day, thousands of staff must come and go from prison facilities, potentially carrying with them the novel coronavirus for days, even weeks, without ever showing symptoms. These settings pose a particular risk of spreading the virus, with catastrophic consequences not just to the prisoners and staff, but also to their communities and the hospitals that serve them.

The men and women in IDOC custody who have underlying serious medical conditions, and individuals over 55 years of age, face an even greater risk of severe illness and death if and when an outbreak occurs in the prison where they are currently housed. These prisoners are sitting ducks, waiting to see whether the lethal virus that has claimed so many lives is coming for theirs next. The virus is already at Stateville, and there is every reason to believe that it will appear in prisons throughout the State in the coming days and weeks, leaving death and severe illness in its wake. Defendants have the mechanisms available to temporarily transfer these vulnerable prisoners via a medical furlough so that they can self-isolate. But they have instead chosen inaction. To ensure that these vulnerable prisoners are not forced to die because of Defendants' politically motivated inaction, Plaintiffs respectfully request that this Court preliminarily certify Plaintiffs' proposed subclasses 1 and 2, grant Plaintiffs' request for a

temporary restraining order, and order Defendants to temporarily transfer the following

individuals to their homes to self-isolate via medical furlough:

    a.    People who have serious underlying medical conditions that put them at particular risk of serious harm or death from COVID-19, including but not limited to: those with chronic lung disease or moderate to severe asthma, people with heart disease, people who are immunocompromised due to cancer or other medical conditions or treatment, people with severe obesity, people with any other underlying serious medical conditions such as those with diabetes, renal failure, liver disease, and any other condition specifically identified by CDC either now or in the future as being a particular risk for severe illness and/or death caused by COVID-19 and who are eligible for medical furlough pursuant to 730 ILCS 5/3-11-1; and

    b.    People who are medically vulnerable to COVID-19 because they are 55 years of age and older and who are eligible for medical furlough pursuant to 730 ILCS 5/3-11-1.

The public interest in avoiding devastation in communities where IDOC prisons are located, and

the United States Constitution, demands it.

## FACTUAL BACKGROUND

**I.**    **The COVID-19 Outbreak Has Created a National and Global Health Emergency.**

We are living in the midst of an extreme, unprecedented worldwide health emergency

caused by the rapid spread of the coronavirus, COVID-19. The World Health Organization has

declared COVID-19 to be a global pandemic.[1] On March 9, 2020, Illinois Governor J.B. Pritzker

---

[1] Rolling updates on coronavirus disease (COVID-19), World Health Organization, https://www.who.int/emergencies/diseases/novel-COVID-19-2019/events-as-they-happen (last visited Mar. 29, 2020).

issued a proclamation declaring a disaster in the State of Illinois.[2] On March 13, 2020, President

Trump declared a national emergency.[3]

The number of known COVID-19 infections is increasing daily. As of April 1, 2020,

there were more than 823,000 reported COVID-19 cases throughout the world and more than

40,500 people had died as a result of the virus.[4] In the United States alone, there are over

186,000 confirmed cases and over 3,600 deaths.[5] In Illinois, there are over 6,900 confirmed cases

and 141 deaths.[6] The number of COVID-19 cases in the United States is expected to grow

exponentially. The Centers for Disease Control and Prevention ("CDC") projects that without

swift and effective public health interventions, over 200 million people in the U.S. could be

infected with COVID-19 over the course of the epidemic, with as many as 1.7 million deaths.[7]

---

[2] Gubernatorial Disaster Proclamation, *available at* https://www2.illinois.gov/sites/gov/Documents/APPROVED%20-%20Coronavirus%20Disaster%20Proc%20WORD.pdf (last visited Apr. 1, 2020).

[3] Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), *available at* https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last visited Apr. 1, 2020).

[4] Coronavirus disease 2019 (COVID-19) Situation Report – 72, World Health Organization (April 1, 2020), *available at* https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200401-sitrep-72-covid-19.pdf?sfvrsn=3dd8971b_2 (last visited Apr. 1, 2020).

[5] Coronavirus Disease 2019 (COVID-19): Cases in U.S., Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fcases-in-us.html (last visited Apr. 1, 2020).

[6] Coronavirus Disease 2019 (COVID-19), Ill. Dept. of Pub. Health, http://www.dph.illinois.gov/topics-services/diseases-and-conditions/diseases-a-z-list/coronavirus (last visited Apr. 1, 2020).

[7] Sheri Fink, Worst-Case Estimates for U.S. Coronavirus Deaths, The New York Times, (Mar. 13, 2020), *available at* https://www.nytimes.com/2020/03/13/us/coronavirus-deaths-estimate.html (last visited Apr. 1, 2020).

COVID-19 is a particularly contagious disease. A recent study showed that the virus can survive for up to three hours in the air, four hours on copper, up to twenty-four hours on cardboard, and up to two to three days on plastic and stainless steel.[8] Indeed, a new study of an early cluster of COVID-19 cases in Wuhan, China revealed the dangers of indirect transmission resulting from infected people contaminating common surfaces—in the study, it was a communal mall bathroom.[9]

Controlling the spread of COVID-19 is made even more difficult because of the prominence of asymptomatic transmission—people who are contagious but who exhibit no symptoms, rendering ineffective any screening tools dependent on identifying disease symptoms.[10]

There is no known vaccine or cure for COVID-19. No one is immune.

Common symptoms of COVID-19 include fever, cough, and shortness of breath.[11] Other symptoms include congestion, sneezing, fatigue, or diarrhea.[12] Many individuals who become infected with COVID-19 may have mild or moderate symptoms; some may experience no symptoms at all. Other patients may experience severe symptoms requiring intensive medical

---

[8] Novel Coronavirus Can live on Some Surfaces for Up to 3 Days, New Tests Show. TIME, *available at* https://time.com/5801278/coronavirus-stays-on-surfaces-days-tests/ (last visited Mar. 31, 2020).

[9] Cai J, Sun W, Huang J, Gamber M, Wu J, He G. Indirect virus transmission in cluster of COVID-19 Cases, Wenzhou, China, 2020. Emerg Infect Dis. 2020 Jun., *available at* https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article (last visited Mar. 31, 2020).

[10] Johnny Milano, Infected but Feeling Fine: The Unwitting Coronavirus Spreaders, New York Times, https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html (last visited Apr. 1, 2020).

[11] Coronavirus Disease 2019 (COVID-19), Symptoms of Coronavirus, CDC, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited Mar. 29, 2020).

[12] Q&A on Coronaviruses (COVID-19), World Health Organization, https://www.who.int/news-room/q-a-detail/q-a-coronaviruses (last visited Mar. 29, 2020).

intervention.[13] However, even with hospitalization and intensive treatment, thousands of individuals have died as a result of this infection. Regardless of the type of severity of symptoms, all infected persons are contagious and can rapidly transmit the virus from person to person without proper public health interventions.[14] The virus is known to spread from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.[15]

People over the age of fifty-five face greater chances of serious illness or death from COVID-19. In a February 29, 2020 WHO-China Joint Mission Report, the preliminary mortality rate analyses showed that individuals age 70-79 had an overall 8% mortality rate, individuals age 60-69 had a 3.6% mortality rate, and individuals age 50-59 had a 1.3% mortality rate. For individuals age 40-49, the mortality rate was 0.4%, and for individuals 40 years and younger, the mortality rate was as low as 0.2%.[16]

People of any age who suffer from certain underlying medical conditions are also at elevated risk, including people with respiratory conditions including chronic lung disease or moderate to severe asthma; people with heart disease or other heart conditions; people who are immunocompromised as a result of cancer, HIV/AIDS, or any other condition or related to treatment for a medical condition; people with chronic liver or kidney disease or renal failure

---

[13] *Id.*

[14] Coronavirus Disease 2019 (COVID-19): How It Spreads, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Ftransmission.html (last visited Mar. 29, 2020).

[15] *Id.*

[16] Age, Sex, Existing Conditions of COVID-19 Cases and Deaths Chart, https://www.worldometers.info/coronavirus/coronavirus-age-sex-demographics/ (date analysis based on WHO-China Joint Mission Report).

(including hepatitis and dialysis patients); people with diabetes, epilepsy, hypertension, blood disorders (including sickle cell disease), inherited metabolic disorders; and people who have had or are at risk of stroke.[17] The WHO-China Joint Mission Report indicates that the mortality rate for those with cardiovascular disease was 13.2%, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.[18]

For these vulnerable populations, the symptoms of COVID-19, particularly shortness of breath, can be severe, and complications can manifest at an alarming pace. Most people in higher risk categories who develop serious illness will need advanced support. This level of supportive care requires highly expensive and specialized equipment, including ventilators, that are in limited supply.[19]

Increasingly, and in the United States in particular, even some younger and healthier people who contract COVID-19 may require hospitalization for supportive care, including intravenous fluids and supplemental oxygen.[20] Medical providers and medical facilities are in peril of becoming completely overwhelmed and beyond capacity to provide this type of intensive care as COVID-19 continues to spread.[21]

---

[17] Coronavirus Disease 2019 (COVID-19): People Who Need Extra Precautions, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fhigh-risk-complications.html (last visited Mar. 29, 2020).

[18] Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World Health Organization (Feb. 28, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf.

[19] Ex. 1 (Dr. Robert Greifinger Declaration).

[20] Ex. 2 (Dr. Jamie Meyer Declaration).

[21] *Id.*

Even for those who survive COVID-19, recent clinical evidence indicates that in persons who suffer severe symptoms, the virus may also cause damage to organs such as the heart, the liver, and the kidneys, as well as to organ systems such as the blood and the immune system. This damage is so extensive and severe that it may be enduring. Among other things, patients who suffer severe symptoms from COVID-19 end up having damage to the walls and air sacs of their lungs, leaving debris in the lungs and causing the walls of lung capillaries to thicken so that they are less able to transfer oxygen going forward. Indeed studies of some recovered patients in China and Hong Kong indicate a declined lung function of 20% to 30% after recovery.[22]

The only way to prevent complications and the enormous risk to medically vulnerable people is to prevent them from becoming infected. Everyone is at risk of transmission of COVID-19. There is no available vaccine to protect against infection from COVID-19 and no medications approved to treat it.[23] The CDC and other public health agencies have universally prescribed social distancing—every person should remain at a distance of at least six feet from every other person—and rigorous hygiene—including regular and thorough hand washing with soap and water, the use of alcohol-based hand sanitizer, proper sneeze and cough etiquette, and frequent cleaning of all surfaces—as the only ways to meaningfully mitigate the spread of this virus.[24]

---

[22] Tianbing Wang, et al., Comorbidities and Multi-Organ Injuries in the Treatment of COVID-19, 395 Lancet 10228 (2020), available at https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30558-4/fulltext; George Washington University Hospital, GW Hospital Uses Innovative VR Technology to Assess Its First COVID-19 Patient, https://www.gwhospital.com/resources/podcasts/covid19-vr-technology (last visited Apr. 1, 2020).

[23] Coronavirus Disease 2019 (COVID-19): Situation Summary, CDC, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html (lasted visited Mar. 29, 2020).

[24] Coronavirus Disease 2019 (COVID-19): How to Protect Yourself, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-

The CDC has issued a guidance that gatherings of more than 10 people must not occur.[25] People in congregate environments, which are places where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19, as already evidenced by the rapid spread of the virus in cruise ships and nursing homes. The CDC also warns of "community spread" where the virus spreads easily and sustainably within a community where the source of the infection is unknown.[26]

On March 20, 2020, Illinois Governor Pritzker took the strictest measure yet to fight the virus's spread, issuing a "stay at home" executive order for all residents effective starting March 21, 2020 through at least April 7, 2020; which was then extended to April 30, 2020.[27] The order directs all non-essential business and operations to cease. People are allowed to leave their homes only for essential activities. Any gathering larger than 10 people is prohibited, and people are recommended to stay at least six feet away from others. Restaurants, bars, schools, parks, and libraries have all been shut down. In a statement to the public, Governor Pritzker explained that his order was based on his conversations with "some of the best medical experts,

---

sick/prevention.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Fprevention.html (last visited Mar. 29, 2020).

[25] Interim Guidance for Coronavirus Disease 2019 (COVID-19), Guidance as of 3/15/2020, https://www.cdc.gov/coronavirus/2019-ncov/community/large-events/mass-gatherings-ready-for-covid-19.html (last visited Apr. 1, 2020).

[26] Coronavirus Disease 2019 (COVID-19): How Coronavirus Spreads, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Apr. 1, 2020).

[27] Executive Order In Response to COVID-19 (COVID-19 Executive Order No.8), https://www2.illinois.gov/IISNews/21288-Gov._Pritzker_Stay_at_Home_Order.pdf; Illinois' Stay-at-Home Order Extended Through April, Pritzker Announces, NBCChicago (Mar. 31, 2020) https://www.nbcchicago.com/news/local/illinois-stay-at-home-order-expected-to-be-extended-sources/2247274/ (last visited Apr. 1, 2020).

epidemiologists, mathematicians, and modelers," and all recommended a stay at home order "to avoid the loss of potentially tens of thousands of lives."[28]

Governors around the country, including in California, New York, and Connecticut, have issued similar stay at home orders to curb the spread of the virus.[29]

Recognizing the imperative of social distancing, Circuit Court Chief Judge Timothy Evans ordered that the Cook County courts be largely closed to the public, that all hearings be conducted via videoconference wherever possible, and that all individuals in the courthouses maintain a minimum distance of six feet from all other individuals.[30] This Court, joined by other district courts in the state and across the country, have continued all criminal and civil jury trials because the imperative of social distancing "render[s] juror participation difficult or unsafe."[31]

## II.    Incarcerated People Are Particularly Vulnerable to Infection from COVID-19.

None of the recommended measures for mitigating the spread of COVID-19 are available for persons confined in correctional facilities and for those who must interact with them. Correctional facilities are inherently congregate environments, where large groups of people live, eat, and sleep in close contact with one another. It is impossible to achieve social distancing

---

[28] Gov. J.B. Pritzker issues order requiring residents to 'stay at home' starting Saturday, Chicago Tribune, Mar. 20, 2020, https://www.chicagotribune.com/coronavirus/ct-coronavirus-illinois-shelter-in-place-lockdown-order-20200320-teedakbfw5gvdgmnaxlel54hau-story.html (last visited Apr. 1, 2020).

[29] *Id.*

[30] Circuit Court of Cook County, Administrative Order 2020-01 (amended Mar. 30, 2020), http://www.cookcountycourt.org/Portals/0/Order%203-30-20.pdf (last visited Mar. 30, 2020).

[31] U.S. District Court for the Northern District of Illinois, 2d Am. Gen. Order 20-0012 (Mar. 30, 2020); *see also* U.S. District Court for the Southern District of Illinois, Admin. Order 263 (Mar. 30, 2020); U.S. District Court for the Central District of Illinois, Am. Gen. Order 20-01 (Mar. 18, 2020).

standards in these settings.[32] Therefore infectious diseases, particularly airborne diseases, such as COVID-19, are more likely to spread rapidly between individuals in correctional facilities.[33]

The risk of contracting an infectious disease is also higher in correctional facilities because the facilities are not sanitary environments. People share toilets, sinks, and showers, and often have limited access to soap, hand sanitizer, hot water, and other necessary hygiene items. Surfaces are infrequently washed, if at all, and cleaning supplies are in short supply.[34] These needs are now multiplied and also compounded by the lack of personal protective equipment (PPE) such as masks and gloves for either staff or prisoners. This means there are more people who are susceptible to getting infected all congregated together in a context in which fighting the spread of an infection is nearly impossible.

Given the history of epidemiologic outbreaks in correctional facilities, such as Tuberculosis, influenza, and MRSA, it is expected that COVID-19 will also readily spread in prisons, especially when people cannot engage in proper hygiene and adequately distance themselves from infected residents or staff. [35]

The people who live in these environments—environments that defy all current public safety standards— are themselves at high risk due to the high rates of chronic health conditions, substance use, mental health issues, and aging and chronically ill populations who may be vulnerable to more severe illnesses, and to death, after infection from COVID-19.[36] As Dr. Craig

---

[32] Ex. 1 (Greifinger Decl.); Ex. 3 (Dr. Craig Haney Declaration).

[33] Ex. 4 (Dr. Chris Beyrer Declaration); Ex. 2 (Meyer Decl.).

[34] Ex. 1 (Greifinger Decl.); Ex. 2 (Meyer Decl.); Ex. 3 (Haney Decl.); Ex. 4 (Beyrer Decl.).

[35] Ex. 4 (Beyrer Decl.).

[36] *Id.*

Haney, a correctional health expert, explains, prisoners are "unusually vulnerable to stress-related and communicable diseases. Formerly incarcerated persons suffer higher rates of certain kinds of psychiatric and medical problems. Incarceration leads to higher rates of morbidity (illness rates) and mortality (i.e., it lowers the age at which people die)."[37]

Additionally, many correctional facilities lack an adequate medical care infrastructure to address the spread of infectious disease, like COVID-19, and treat high-risk people in custody.[38] Prison health units are not equipped with sufficient emergency medical equipment, such as oxygen tanks, nasal cannulae, and oxygen face masks, to respond to an outbreak of patients with respiratory distress. For these reasons, among others, experts have warned that, "widespread community transmission of COVID-19 within a correctional institution is likely to result in a disproportionately high COVID-19 mortality rate."[39] Prisons and jails rely on outside community hospitals to provide more advanced and intensive medical care, and during an epidemic, this will not be possible, as those outside facilities will likely be at or over capacity themselves.[40]

Prisons are not closed environments. By necessity, members of the free community, including correctional officers, social workers, attorneys, medical personnel, and many others must enter and leave the prisons on a daily basis. Staff arrive and leave each facility three times a day in large numbers, and there is little to no ability to adequately screen staff for new,

---

[37] Ex. 3 (Haney Decl.).

[38] Ex. 1 (Greifinger Decl.) Ex. 2 (Meyer Decl.).

[39] "COVID-19 in Correctional Settings: Unique Challenges and Proposed Responses" (March 23, 2020), https://amend.us/wp-content/uploads/2020/03/COVID-in-Corrections-Challenges-and-Solutions-1.pdf; *see also* "Correctional Facilities In The Shadow Of COVID-19: Unique Challenges And Proposed Solutions," Health Affairs Blog, March 26, 2020, *available at* https://www.healthaffairs.org/do/10.1377/hblog20200324.784502/full/ (last visited Apr. 1, 2020).

[40] Ex. 2 (Meyer Decl.).

asymptomatic infection. When the COVID-19 virus occurs and spreads within a prison, all

persons, staff and prisoners alike, are at heightened risk of contracting the virus and, in turn,

spreading the virus to others with whom they come in contact in their own homes and

neighborhoods.[41]

At the Governor's March 29, 2020, daily briefing on the coronavirus situation, IDPH

Director Dr. Ngozi Ezike acknowledged the present danger that when the infection enters

prisons, the congregate nature of these facilities, with staff coming and going from the

community each day in large numbers, will "increase the rate of infection and its fast spread

through these facilities."[42]

On March 30, 2020, following the death of a COVID-19 patient at Stateville, Dr. Ezike

again acknowledged the heightened risk posed by correctional settings and the inability to

conform them to public health standards:

> Congregate settings such as Stateville, any other correctional center, pose unique
> challenges in stopping the spread of disease and protecting the health of
> individuals who live and work there. Those who are incarcerated obviously live
> and work and eat and study and recreate all within that same environment,
> heightening the potential for COVID-19 to spread really quickly once it's
> introduced.
>
> The options for isolation of COVID-19 cases are limited in this focused setting
> and it becomes very difficult depending on the size of the facility and the
> population that's already in the facility. Ideally, all cases should be isolated
> individually and close contact should be quarantined individually. I know our
> partners at the Department of Corrections are working innovatively to try to create
> the best situations for these, for these facilities. But some facilities and
> correctional centers do not have enough individual cells, and so we are

---

[41] Ex. 1 (Greifinger Decl.).

[42] March 29: Governor JB Pritzker Delivers Daily Coronavirus Briefing, NBC, *available at* https://www.nbcchicago.com/top-videos-home/march-29-governor-jb-pritzker-delivers-daily-coronavirus-briefing/2246851/ (last visited Apr. 1, 2020).

considering isolating multiple laboratory confirmed COVID-19 cases together as a group, or quarantining close contacts of a particular case together as a group.[43]

The devastating impact that a COVID-19 outbreak in IDOC will have on surrounding communities is already a reality. Stateville Correctional Center announced its first confirmed case on Wednesday, March 25, 2020, and by Monday evening, March 30, 2020, St. Joseph Hospital in Joliet was "overwhelmed" by inmates suffering from the effects of coronavirus and staff were "maxed out."[44] The hospital's medical director, Dr. John Walsh, said, "This is a disaster because what I most fear is that without some resolution, the number of cases coming in from Stateville will become excessive. We currently have nine inmates on ventilators, critically ill. There was four in the emergency department a couple of hours ago, and I believe the volume of patients there is huge. In addition, something has to be done at Stateville. You will have a huge epidemic, remembering that 20% of the people who contract this virus are probably gonna end up in hospital and a number of them are gonna die. This could end with up to 100 inmates dying if this is out of control, and they are not isolated well at this point."[45] St. Joseph Hospital is now caring for 17 prisoners from Stateville, 9 of whom are in intensive care on ventilators. Other prison communities throughout Illinois are similarly situated, many with far fewer intensive care beds available to provide care when an outbreak occurs. To prevent the crisis now occurring in Joliet from repeating and worsening across the state, effective mitigation measures must be taken now.

---

[43] March 30: Governor JB Pritzker Delivers Daily Coronavirus Briefing, NBC, *available at* https://www.nbcchicago.com/top-videos-home/march-30-governor-jb-pritzker-delivers-daily-coronavirus-briefing/2247385/ (last visited Apr. 1, 2020).

[44] abc7 Chicago, Illinois Prisoners Sick with COVID-19 Overwhelm Juliet Hospital (video), available at https://abc7chicago.com/health/illinois-prisoners-sick-with-covid-19-overwhelm-joliet-hospital/6064085/ (last visited Mar. 31, 2020).

[45] *Id.*

### III. Reducing the Prison Population Is the Only Meaningfully Means to Prevent the Harm Caused by COVID-19 in Prisons and their Surrounding Communities.

Because the public health and safety measures cannot be fully achieved in correctional facilities, other steps must be taken to save lives and protect the spread of the infection from these communities. Proactive risk mitigation, including eliminating close contact in congregate environments, is the only effective way to prevent the spread of the COVID-19 infection. In fact, a study published in the Journal of Travel Medicine found that the number of COVID-19 cases on the Diamond Princess cruise ship would have been more than eight times lower if the ship had been evacuated in a timely manner, rather than requiring the passengers to quarantine within the close confines of the ship.[46]

Public health experts with experience in correctional settings have similarly recommended the release from custody of people most vulnerable to COVID-19 to protect the communities inside and outside the prisons, and to slow the spread of the COVID-19 infection. Population reduction protects the people with the greatest vulnerability to COVID-19 from transmission of the virus, and also allows for greater risk mitigation for all people held or working in a correctional facility. Because prisons are often located in small rural communities, removing the most vulnerable people from custody also reduces the burden on those region's limited health care infrastructure by reducing the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time and require hospitalization in these small communities.

---

[46] Sandoiu, *supra* (Citing Rocklov J., Sjodin H., Wilder-Smith A., COVID-19 Outbreak on the Diamond Princess Cruise Ship: Estimating the Epidemic Potential and Effectiveness of Public Health Countermeasures. Journal of Travel Medicine (Feb. 28, 2020), https://academic.oup.com/jtm/advance-article/doi/10.1093/jtm/taaa030/5766334 (last visited Apr. 1, 2020).

Dr. Robert Greifinger, a correctional health expert, has concluded that "[r]isk mitigation is the only viable public health strategy available to limit transmission of infection, morbidity and mortality in prisons, and to decrease the likely public health impact outside of the prisons. Even with the best-laid plans to address the spread of COVID-19 in prisons, the release of individuals, prioritizing the most medically vulnerable individuals, is a key part of a risk mitigation strategy . . . Additionally, the release of detainees who present a low risk of harm to the community is also an important mitigation strategy as it reduces the total number of detainees in a facility."

Dr. Greifinger explains that reducing the prison population "has a number of valuable effects on public health and public safety: it allows for greater social distancing, which reduces the chance of spread if virus is introduced; it allows easier provision of preventive measures such as soap for handwashing, disinfecting supplies for surfaces, frequent laundering and showers, etc.; and it helps prevent overloading the work of detention staff, which will likely be reduced by illness, such that they can continue to ensure the safety of detainees."

Similarly, Dr. Craig W. Haney, a Distinguished Professor of Psychology and UC Presidential Chair at the University of California Santa Cruz, recommends that "adult prisons must reduce their populations urgently in order to allow the necessary social distancing in response to the COVID-19 Pandemic."[47]

Professor Chris Breyer, professor of Epidemiology at John Hopkins Bloomberg School of Public Health, has concluded: "While every effort should be made to reduce exposure in detention facilities, this may be extremely difficult to achieve and sustain. It is therefore an

---

[47] Ex. 3 (Haney Decl.).

urgent priority in this time of national public health emergency to reduce the number of persons in detention as quickly as possible."[48]

Dr. Jaimie Meyer, Assistant Professor of Medicine at Yale School of Medicine and Assistant Clinical Professor of Nursing at Yale School of Nursing, has concluded that "[r]educing the size of the population in jails and prisons can be crucially important to reducing the level of risk both for those within those facilities and for the community at large."[49] She explains that "[h]ealth in jails and prisons is community health. Protecting the health of individuals who are detained in and work in these facilities is vital to protecting the health of the wider community."[50]

Dan Pacholke, a corrections expert with more than 37 years of experience, has specific recommendations for steps IDOC can take to proactively respond to COVID-19 to protect the health and safety of people in IDOC custody and IDOC staff.[51] Mr. Pacholke explains: "Among those steps is considering how IDOC can exercise its authority and discretion . . . to reduce the prison population. This includes awarding good time credits, transferring people to home detention, and authorizing medical furloughs."[52] Mr. Pacholke further explains that "[a]ll of these and any other options should be fully utilized to allow individuals to maintain social

---

[48] Ex. 4 (Beyrer Decl.).

[49] Ex. 2 (Meyer Decl.).

[50] *Id.*

[51] Ex. 5 (Dan Pacholke Declaration).

[52] *Id.*

distancing and have better access to testing and treatment. This will also help mitigate the impact of staff shortages and lessens the burden on prison medical services."[53]

Internationally, governments have recognized the threat posed by COVID-19 in correctional facilities and have released detainees. In Iran, for example, about 70,00 people were temporarily released from jails to curb the spread of COVID-19.[54]

In the United States, the need to address the COVID-19 problem in prisons has been recognized on a national level. The COVID-19 stimulus package passed by Congress specifically includes funding for federal prisons to purchase personal protective gear and tests kits for COVID-19 because of the "density of the inmate population, the high traffic, the high volume of inmates, [and] the high rate of turnover of inmates and personnel."[55] The bill authorizes the Attorney General to lengthen the maximum amount of time that a federal prisoner can be placed in home confinement during the pandemic.[56]

On March 30, 2020, the United States House of Representatives Committee on the Judiciary recommended a similar plan of action, calling on the federal Bureau of Prisons to drastically increase its population reduction efforts, including through release where viable and increased use of home detention.[57]

---

[53] *Id.*

[54] Iran Temporarily Releases 70,000 Prisoners As Coronavirus Cases Surge, Reuters (Mar. 9, 2020), *available at* https://www.reuters.com/article/us-health-coronavirus-iran/iran-temporarily-releases-70000-prisoners-ascoronavirus-cases-surge-idUSKBN20W1E5 (last visited Apr. 2, 2020).

[55] Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") H.R. 748, at 633 (2020), *available at* https://assets.documentcloud.org/documents/6819239/FINAL-FINAL-CARES-ACT.pdf (last visited Apr. 1, 2020).

[56] *Id.* at 634.

[57] March 30, 2020 letter, *available at* https://judiciary.house.gov/uploadedfiles/3.30.20_letter_to_ag_barr_re_covid19.pdf?utm_source=The+M arshall+Project+Newsletter&utm_campaign=e6df8704ef-

Echoing the calls of advocates and medical professionals, a group of 35 elected prosecutors have called on leaders within the criminal legal system to "dramatically reduce the number of incarcerated individuals and the threat of disastrous outbreaks."[58]

A number of states have begun to take steps to protect people in prisons from the impending spread of COVID-19 by releasing people in an effort to reduce populations.

In California, Governor Newsom announced his plans to accelerate the release of 3,500 people from state prisons in an effort to reduce the population as COVID-19 infections continue to spread in the prisons.[59] This announcement comes in advance of a court hearing schedule to begin later this week to determine if more individuals should be released.

The Iowa Department of Corrections has announced that the DOC is expediting the release of about 700 prisoners, or 7% of its population, who are approved for parole or work release.[60]

---

EMAIL_CAMPAIGN_2020_03_31_11_34&utm_medium=email&utm_term=0_5e02cdad9d-e6df8704ef-174272961 (last visited Apr. 1, 2020).

[58] Fair and Just Prosecution, Joint Statement from Elected Prosecutors on COVID19 and Addressing the Rights and Needs of Those in Custody (Mar. 2020), https://fairandjustprosecution.org/wp-content/uploads/2020/03/Coronavirus-Sign-On-Letter.pdf (last visited Apr. 1, 2020).

[59] Paige St. John, *California to release 3,500 inmates early as coronavirus spreads inside prisons*, LATimes (Mar. 31, 2020), *available at* https://www.latimes.com/california/story/2020-03-31/coronavirus-california-release-3500-inmates-prisons (last visited Mar. 30, 2020).

[60] *Officials cut prison, jail numbers; Iowa virus cases hit 105,* Newton Daily News (Mar. 24, 2020), *available at* https://www.newtondailynews.com/2020/03/23/officials-cut-prison-jail-numbers-iowa-virus-cases-hit-105/acs5xbk/. Also, in North Dakota, the state parole board decided to release over fifty people, or about 2% of its prison population, on early parole. *See* April Baumgarten, *North Dakota paroles 56 prisoners early amid pandemic, including 3 convicted of sexual assault*, Grand Forks Herald (Mar. 20, 2020), https://www.grandforksherald.com/news/crime-and-courts/5009882-North-Dakota-paroles-56-prisoners-early-amid-pandemic-including-3-convicted-of-sexual-assault (last visited Mar. 30, 2020).

In New York, Governor Cuomo ordered the release of more than 1,000 people who are in prisons and jails across the state on the basis of a parole violation.[61]

In Colorado, Governor Polis issued an executive order that suspended the caps and criteria Colorado places on the accrual of good time credits in order to allow the DOC to award earned time credits to "facilitate the reduction of the population of incarcerated persons and parolees to prevent an outbreak in prisons."[62] Additionally, the Colorado governor suspended and relaxed the criteria for individuals to be released to Special Needs Parole.[63]

The Vermont Department of Corrections has worked to reduce its population: "[t]he goal is to reduce our (inmate) population so we can start spreading out the remaining population."[64] Jim Baker, commissioner for the Department, stated that they "started by looking at which inmates can be let out on furlough and who can be released on probation."[65] Since late February, the Vermont DOC has released over 200 prisoners (from a population of approximately 1600), with 100 prisoners being released in the past week.[66]

---

[61] Brendan J. Lyons, *NY to release 1,100 parole violators as coronavirus spreads,* Times Union (Mar. 27, 2020), *available at* https://www.timesunion.com/news/article/Deaths-surge-again-in-New-York-from-coronavirus-15160973.php (reporting on New York Governor Cuomo's order to release parole violators) (last visited Mar. 30, 2020).

[62] State of Colorado, Executive Order D 2020 016, March 25, 2020, at pg. 2, *available at* https://drive.google.com/file/d/18o0yWHzZleHJ87hmgLuBmXwpM8R74Q5x/view (last visited Mar. 30, 2020).

[63] *Id.*

[64] Anna Merriman, *'It's very difficult to control': Many Vermont inmates released so that those who remain can be spread out,* Valley News (Mar. 26, 2020), *available at* https://www.vnews.com/Vermont-NH-prisons-working-to-reduce-population-to-prevent-virus-spread-33512589 (last visited Apr. 1, 2020).

[65] *Id.*

[66] *Id.*; For population size, *see* https://doc.vermont.gov/sites/correct/files/documents/2020-03-23-DOC%20Staff%20Test.pdf (last visited Apr. 1, 2020).

Other states, like Oklahoma and Wisconsin, have taken more moderate, and thus less

effective, steps to reduce the populations in prisons by only halting new admissions from county

jails into state prison facilities.[67]

Several counties with significant jail populations have also undertaken measures to

reduce their facility's population in an effort to slow the spread of COVID-19. Many of these

steps have included drastically reducing the jail populations within a matter of weeks, or

sometimes days. Counties on the West Coast have been the sites of several large scale jail

population reductions. Counties in California in particular have seen significant reductions. The

Los Angeles County Sheriff decreased the jail population by ten percent by releasing 1,700

individuals within the last month.[68] In Alameda County in Northern California, more than 300

individuals have been released from jail in the span of two weeks, amounting to eleven percent

of the jail's population.[69] Oregon has similarly reduced its jail population in Washington County,

outside Portland, by more than 120 inmates (from a population of 574), freeing up enough space

for each remaining inmate to be housed in their own cell.[70] Washington State similarly released

---

[67] *DOC Stops Accepting Newly Sentenced State Prisoners*, The Frontier (Mar. 22, 2020), https://www.enidnews.com/news/local_news/doc-stops-accepting-newly-sentenced-state-prisoners/article_ea6a42a4-47c1-5dbc-9446-5dec46032c5d.html (Oklahoma DOC halting new admissions into the state prison system); Emergency Order # 9, Order to the Dep't of Corrections, Tony Evers, Gov. Wisconsin (Mar. 20, 2020).

[68] Justin Carissimo, 1,700 inmates released from Los Angeles County in response to coronavirus outbreak, CBS News (Mar. 24, 2020), *available at* https://www.cbsnews.com/news/inmates-released-los-angeles-county-coronavirus-response-2020-03-24/ (last visited Apr. 1, 2020).

[69] *Sheriff Releases 314 Inmates to Reduce Coronavirus Risk at Alameda County Jail*, NBC Bay Area, (Mar. 19, 2020), *available at* https://www.nbcbayarea.com/news/coronavirus/sheriff-releases-314-inmates-to-reduce-coronavirus-risk-at-alameda-county-jail/2258026/ ("The release of the 314 inmates reduces the number of inmates at Santa Rita to 2,40.") (last visited Apr. 1, 2020).

[70] Kimberly Kindy, Emma Brown & Dalton Bennett, *'Disaster waiting to happen': Thousands of inmates released as jails and prisons face coronavirus threat,* Washington Post (Mar. 25, 2020), https://www.washingtonpost.com/national/disaster-waiting-to-happen-thousands-of-inmates-released-as-jails-face-coronavirus-threat/2020/03/24/761c2d84-6b8c-11ea-b313-df458622c2cc_story.html

more than 400 individuals from county jails in Clark and King County over the course of a

couple of days.[71] In Arizona, Coconino County released ten percent of the jail population to

reduce the population to 400,[72] and the Pima County Sheriff has proposed releasing seven

percent of the jail population by releasing 135 inmates.[73] In Utah, about 200 individuals are in

the process of being released from the Salt Lake County jail over the coming days (a 10%

reduction in population), following the release of about 90 women from county jail.[74]

Cleveland, Ohio drastically reduced the Cuyahoga County jail's population by releasing

over 700 people from detention, a 35 percent reduction in population.[75] In Minnesota, the

Hennepin County jail released 26 percent of the individuals detained.[76] In New Orleans, judges

---

(Washington County jail reduced its population by 120 individuals) (last visited Apr. 1, 2020); Bob Heye, *Coronavirus and Crime: Jail releases, a rash of break-ins and one encouraging trend,* KATU (Mar. 23, 2020), *available at* https://katu.com/news/coronavirus/coronavirus-and-crime-jail-releases-a-rash-of-break-ins-and-one-encouraging-trend (last visited Apr. 1, 2020).

[71] Jerzy Shedlock, *Clark County Jail releases nearly 200 inmates due to COVID-19*, The Columbian (Mar. 25, 2020), *available at* https://www.columbian.com/news/2020/mar/25/clark-county-jail-releases-nearly-200-inmates-due-to-covid-19/ (last visited Apr. 1, 2020).

[72] Scott Buffon, *Coconino County jail releases nonviolent inmates in light of coronavirus concerns,* Arizona Daily Sun (Mar. 20, 2020), *available at* https://azdailysun.com/news/local/coconino-county-jail-releases-nonviolent-inmates-in-light-of-coronavirus-concerns/article_a6046904-18ff-532a-9dba-54a58862c50b.html (last visited Apr. 1, 2020).

[73] Jacques Billeaud, *Tucson lawyers seek release of nonviolent inmates from jail,* Tucson.com (Mar. 24, 2020), *available at* https://tucson.com/news/local/crime-and-courts/tucson-lawyers-seek-release-of-nonviolent-inmates-from-jail/article_0cd49be4-6dd6-11ea-99d3-576d60e1dae5.html (last visited Apr. 1, 2020).

[74] Francisco Kjolseth, *Hundreds of Utah inmates will soon be released in response to coronavirus*, The Salt Lake Tribune (Mar. 20, 2020), *available at* https://www.sltrib.com/news/2020/03/21/hundreds-utah-inmates/ (the total jail population in Salt Lake County jail was 1,964 people) (last visited Apr. 1, 2020).

[75] Officials taking steps to reduce county jail populations in Ohio, AP, WBNS (Mar. 21, 2020), *available at* https://www.10tv.com/article/officials-taking-steps-reduce-county-jail-populations-ohio-2020-mar (last visited Apr. 1, 2020).

[76] *Coronavirus In Minnesota: Hennepin County Jail Population Cut By 26% After Release Of Low-Risk Inmates To Prevent COVID-19 Spread*, CBS Minnesota (Mar. 23, 2020), *available at*

overseeing the local criminal court issued a "blanket order" to release a substantial number of individuals being held in pretrial detention.[77] The New Orleans jail population has subsequently been reduced by about 14 percent.[78] In Alabama, the jail population in Washington County is likely to reduce by over 40 percent: from more than 800 a few months ago to below 450.[79] Several other Midwestern and Southern counties have seen population reductions of 150 or more individuals from relatively small county jails, including: Oklahoma County, Oklahoma;[80] Sedgwick County, Kansas;[81] Bexar County, Texas;[82] St. Louis County, Missouri;[83] Macomb and

---

https://minnesota.cbslocal.com/2020/03/23/coronavirus-in-minnesota-hennepin-county-jail-population-cut-by-26-after-release-of-low-risk-inmates-to-prevent-covid-19/ (last visited Apr. 1, 2020).

[77] Orleans Criminal Court judges order release of certain inmates amid coronavirus crisis, WDSU News, (Mar. 26, 2020), *available at* https://www.wdsu.com/article/orleans-criminal-court-judges-order-release-of-certain-inmates-amid-coronavirus-crisis/31943462# (last visited Apr. 1, 2020).

[78] *Id.*

[79] Tom Sissom, Washington County jail plans for release of 81 more inmates, Northwest Arkansas Democrat-Gazette (Mar. 26, 2020), *available at* https://www.nwaonline.com/news/2020/mar/26/washington-county-jail-plans-release-81-more-inmat/ (last visited Apr. 1, 2020).

[80] Kayla Branch, *Coronavirus in Oklahoma: Over 200 nonviolent offenders released from Oklahoma County jail to limit COVID-19 spread,* The Oklahoman (Mar. 25, 2020), *available at* https://oklahoman.com/article/5658504/coronavirus-in-oklahoma-over-200-non-violent-offenders-released-from-oklahoma-county-jail-to-limit-covid-19-spread (releasing 200 people) (last visited Apr. 1, 2020).

[81] R. Leiker & Michael Stavola, *So far, 200 jail inmates released over COVID-19 concerns, Sedgwick County DA says,* The Wichita Eagle (Mar. 26, 2020), *available at* https://www.kansas.com/news/local/crime/article241501106.html (last visited Apr. 1, 2020).

[82] Eileen Pace, *Bexar County Jail Explores Early Releases, Ceasing Low-Level Arrests Amid Coronavirus*, Texas Public Radio (Mar. 20, 2020), *available at* https://www.tpr.org/post/bexar-county-jail-explores-early-releases-ceasing-low-level-arrests-amid-coronavirus (releasing more than 140 people) (last visited Apr. 1, 2020).

[83] Jeremy Kohler & Joel Currier, *St. Louis city and county to release more than 140 inmates amid virus concerns*, St. Louis Post-Dispatch (Mar. 26, 2020), *available at* https://www.stltoday.com/news/local/crime-and-courts/st-louis-city-and-county-to-release-more-than-inmates/article_dd8b30f6-c3ea-5229-b7ac-0aa36ee8f14c.html (last visited Apr. 1, 2020).

Wayne Counties in Michigan;[84] Kenton and Louisville Counties in Kentucky;[85] and Nashville, Tennessee.[86]

On the East Coast, Pittsburgh reduced the county jail population by 20 percent by releasing approximately 500 people.[87] New York City plans to release about 7% of Rikers Island's population by releasing 375 inmates who do not pose a threat to society, amidst a call from advocates for more releases given the ballooning rate of infection in Rikers Island.[88] A

---

[84] Karen Drew, *Metro Detroit county jails reviewing cases to see which inmates could be released amid coronavirus (COVID-19) outbreak*, Click On Detroit (Mar. 24, 2020), *available at* https://www.clickondetroit.com/news/defenders/2020/03/25/metro-detroit-county-jails-reviewing-cases-to-see-which-inmates-could-be-released-amid-coronavirus-covid-19-outbreak/ (the two counties combined released more than 440 individuals) (last visited Apr. 1, 2020).

[85] John Cheves, *Chief justice pleads for Kentucky inmate releases ahead of COVID-19, but progress slow*, Lexington Herald Leader (Mar. 23, 2020), *available at* https://www.kentucky.com/news/coronavirus/article241428266.html (last visited Apr. 1, 2020); Katrina Helmer, M*etro Corrections releasing non-violent inmates to prevent coronavirus spread*, WDRB.com (Mar. 18, 2020), *available at* https://www.wdrb.com/news/metro-corrections-releasing-non-violent-inmates-to-prevent-coronavirus-spread/article_0fbed080-6968-11ea-ada1-f73b721440b2.html (last visited Apr. 1, 2020).

[86] Kevin Johnson, *Local jails releasing hundreds of prisoners amid coronavirus fears, up from dozens just weeks ago,* USAToday (Mar. 26, 2020), *available at* https://www.usatoday.com/story/news/politics/2020/03/26/jails-free-hundreds-prisoners-stop-coronavirus/5077204002/ (last visited Apr. 1, 2020).

[87] Paula Reed Ward, *485 Allegheny County jail inmates released over virus fears*, Pittsburgh Post-Gazette (Mar. 26, 2020), *available at* https://www.post-gazette.com/news/crime-courts/2020/03/26/Allegheny-County-jail-inmates-485-released-Pittsburgh-coronavirus-COVID-19-fears/stories/202003260184 (last visited Apr. 1, 2020).

[88] Tess Owen, *NYC Is Releasing Hundreds of Inmates to Stop the Spread of Coronavirus*, VICE News (Mar. 26,2020), *available at* https://www.vice.com/en_us/article/939j9a/nyc-is-releasing-hundreds-of-inmates-to-stop-the-spread-of-cornavirus; Noah Higgins-Dunn, Coronavirus: New York City to release 300 nonviolence inmates from Rikers Island, CNBC (Mar. 24, 2020) https://www.cnbc.com/2020/03/24/coronavirus-new-york-city-to-release-300-nonviolent-inmates-from-rikers-island.html (last visited Apr. 1, 2020).

Florida county, which includes Tampa, also reduced its local jail population of 2,700 by releasing 6 percent, or 164 people, from the jail.[89]

Supreme courts in several states have collaborated in or led the efforts to reduce jail populations by issuing orders, demonstrating a growing consensus on the huge impact that the virus has within detention facilities. The Chief Justice of New Jersey ordered the release of approximately 1,000 individuals from New Jersey jails, which is nine percent of the population.[90] South Carolina's Chief Justice ordered the release of all individuals charged with a non-capital offense on their own recognizance, unless the individual presents an unreasonable danger to the community or is an extreme flight risk.[91] Nearly 200 people were released pursuant to this order.[92] In Montana, the Chief Justice instructed his state's judges to "review your jail rosters and release, without bond, as many prisoners as you are able, especially those being held for non-violent offenses."[93] In California, the Chief Justice instructed courts at sentencing or when

---

[89] Thomas Metevia, , *Hillsborough County to free non-violent inmates in effort to prevent COVID-19 spread, ,* Click Orlando.com (Mar. 20, 2020), *available at* https://www.clickorlando.com/news/local/2020/03/19/hillsborough-county-to-free-non-violent-inmates-in-effort-to-prevent-covid-19-spread/ (last visited Apr. 1, 2020).

[90] In re Request to Commute or Suspend County Jail Sentences, Dkt. No. 084230 (N.J. Mar. 22, 2020) (ordering the release of any inmate in New Jersey serving a county jail sentence as a condition of probation or as a result of a municipal court conviction); *see* Tracey Tully, *1,000 Inmates Will Be Released From N.J. Jails to Curb Coronavirus Risk,* NYTimes (Mar. 23, 2020), *available at* https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-release.html (last visited Apr. 1, 2020).

[91] Memorandum from Donald W. Beatty, Chief Justice of South Carolina Supreme Court, to Magistrates, Municipal Judges, and Summary Court Staff (Mar. 16, 2020), *available at* https://www.sccourts.org/whatsnew/displayWhatsNew.cfm?indexId=2461 (last visited Apr. 1, 2020).

[92] Kyle C. Barry, *Some Supreme Courts Are Helping Shrink Jails To Stop Outbreaks. Others Are Lagging Behind*, The Appeal (Mar. 25, 2020), *available at* https://theappeal.org/politicalreport/some-supreme-courts-are-helping-shrink-jails-coronavirus/ (last visited Apr. 1, 2020).

[93] Letter from Mike McGrath, Chief Justice of Montana Supreme Court, to Montana Courts of Limited Jurisdiction Judges (Mar. 20, 2020), *available at*

24

setting conditions of release to consider the person's "existing health conditions" and any "conditions existing at . . . the anticipated place of confinement that could affect the [person's] health."[94]

Recognizing the immediate threat of COVID-19 and the need to reduce the population of Cook County Jail to limit the risk of jail detainees and staff being exposed to COVID-19 and allow for people in the jail to practice social distancing, on March 23, 2020, Judge LeRoy Martin in the Circuit Court of Cook County issued an order for an expedited bond process for specific classes of defendants, including those charged with low-level felonies, those detained on a cash bond they cannot afford, medically-vulnerable detainees, those serving a jail sentence, and those locked up on a probation or parole violation warrant.[95]

## IV. IDOC and Governor Pritzker Are Failing to Take Necessary Precautions to Reduce the Spread of COVID-19 Within Prisons and Their Surrounding Communities, Placing People at an Increased Risk.

The IDOC operates 28 adult correctional facilities throughout the State of Illinois and houses around 37,000 individuals. There are 11,600 individuals employed by the IDOC.

Illinois prisons are on the cusp of an outbreak, but there is still time for urgent and decisive action that can prevent harm. The first confirmed cases of COVID-19 in IDOC occurred on Wednesday, March 25, 2020—three prisoners and three staff tested positive for COVID-19, and 10 additional prisoners were tested and were awaiting results.

---

https://courts.mt.gov/Portals/189/virus/Ltr%20to%20COLJ%20Judges%20re%20COVID-19%20032020.pdf?ver=2020-03-20-115517-333 (last visited Apr. 1, 2020).

[94] Kyle C. Barry, *Some Supreme Courts Are Helping Shrink Jails To Stop Outbreaks. Others Are Lagging Behind*, The Appeal (Mar. 25, 2020), *available at* https://theappeal.org/politicalreport/some-supreme-courts-are-helping-shrink-jails-coronavirus/ (last visited Apr. 1, 2020).

[95] Matt Masterson, COVID-19 Case at Cook County Jail Prompts More Calls for Mass Detainee Release, WTTW News (Mar. 23, 2020), *available at* https://news.wttw.com/2020/03/23/covid-19-case-cook-county-jail-prompts-more-calls-mass-detainee-release (last visited Apr. 1, 2020).

As of April 1, 2020, there are 52 confirmed prisoners who have COVID-19 in two different correctional centers (Stateville and North Lawndale ATC) and 25 confirmed staff who have the virus in seven different correctional centers (Stateville NRC, Stateville, Sheridan, North Lawndale ATC, Menard, Joliet Treatment Center, and Crossroads ATC).[96] There are 187 additional prisoners who were tested and are awaiting results.[97] However, the actual number of individuals with COVID-19 in IDOC is likely much higher.

On March 30, 2020, health officials announced that a prisoner in his 50s housed at Stateville Correctional Center had died from COVID-19.[98]

On March 26, 2020, the Governor acknowledged that "certain populations are at a higher risk of experiencing more severe illness as a result of COVID-19, including older adults and people who have serious chronic health conditions, such as heart disease, diabetes, lung disease or other mental or physical conditions."[99] The Governor also acknowledged that "the vast majority" of those housed within IDOC are in "close proximity and contact with each other in housing units and dining halls," making them "especially vulnerable to contracting and spreading COVID-19."[100] The Governor further acknowledged that "the IDOC currently has limited housing capacity to isolate and quarantine inmates who present as symptomatic of, or test

---

[96] COVID-19 Response, Illinois Department of Correction, https://www2.illinois.gov/idoc/facilities/Pages/Covid19Response.aspx (last visited April 1, 2020).

[97] *Id.*

[98] Emily Hoerner, Edlerly inmates are at high risk for coronavirus. Why are there so many of them in Illinois's prisons?, InjusticeWatch, *available at* https://www.injusticewatch.org/news/2020/elderly-inmates-are-at-high-risk-for-coronavirus-why-are-there-so-many-of-them-in-illinoiss-prisons/ (last visited Apr. 1, 2020).

[99] Executive Order 2020-13 (March 26, 2020), https://www2.illinois.gov/IISNews/21288-Gov._Pritzker_Stay_at_Home_Order.pdf (last visited Apr. 1, 2020).

[100] *Id.*

positive for, COVID-19."[101] The Governor stated that "to ensure that the Director of the IDOC may take all necessary steps, consistent with public health guidance, to prevent the spread of COVID-19 in the IDOC facilities and provide necessary healthcare to those impacted by COVID-19, it is critical to limit any increases in the number of inmates in the IDOC facilities."[102] In response, the Governor issued an emergency executive order that suspended admissions of new prisoners from county jails.[103] The Governor's order, however, failed to address the fact that hundreds of people will still come and go from the prisons every day, and does not speed up and extend the release of any of the current population.

Neither the Governor nor the IDOC have acted with the urgency or decisiveness that is required to quell this oncoming crisis. The Governor has not taken any steps to substantially reduce the population or expand IDOC's ability to release, furlough, or transfer to home detention even those who are medically vulnerable. IDOC has taken only limited steps to this end, releasing far fewer than it could even in cases of those who are medically vulnerable and close to the end of the incarceration period anyway.

Even before COVID-19 entered IDOC, activists, community organizers, and civil rights lawyers began advocating for de-population efforts in IDOC to curb the spread. On March 17, 2020, advocates sent a letter to Governor Pritzker urging him to order IDOC to release individuals who can be released from custody in a way that is consistent with public safety. The letter outlined a number of specific actions Governor Pritzker should take to protect the vulnerable individuals in IDOC custody, as well as the staff who work there, including: (1)

---

[101] *Id.*

[102] *Id.*

[103] *Id.*

immediately ordering the release of individuals whose release dates are within 120 days; (2) release all individuals in custody awaiting parole revocation hearings; (3) prioritize release for any individuals whose release plans are pending host site approval; (4) order IDOC to stop taking people into custody for parole violations unless they present a clear and present danger of imminent physical harm, and rescind all parole warrants; (5) release individuals with viable clemency petitions; (6) take all actions necessary to maximize good time credits; (7) evaluate individuals who are pregnant, postpartum, or living with their infants in IDOC programs; (8) evaluate individuals with HCU living assignments and chronic care needs for consideration of early release; (9) take steps to limit intake into IDOC facilities; and (10) ensure that the IDOC has the resources necessary to combat a possible COVID-19 outbreak in one or more IDOC facilities.[104]

Illinois law provides several established mechanisms for reducing the prison population, all of which are available to the Governor and Director in this emergency. The Governor and Director of IDOC have authority pursuant to various Illinois statues to reduce the population in Illinois prisons. Pursuant to 730 ILCS 5/3-11-1(a)(2), the IDOC may release a person from prison on medical furlough "to obtain medical, psychiatric or psychological services when adequate services are not otherwise available." The IDOC therefore has statutory authority to release on medical furlough individuals who are medically vulnerable to COVID-19 either due to age or pre-existing medical conditions.

Pursuant to the Electronic Monitoring and Home Detention Law, 730 ILCS 5/5-8A-1 *et seq.* ("Home Detention Law"), IDOC has the authority and obligation to implement procedures through which eligible prisoners may serve a portion or all of their custodial sentence in home

---

[104] Ex. 6 (Advocates' March 17, 2020 Letter).

detention. The Home Detention Law directs the Department to issue administrative directives to allow for specifically enumerated categories of state prisoners to serve portions of their sentence in home detention. Pursuant to 730 ILCS 5/5-8A-3(d), IDOC may place a prisoner in an electronic monitoring or home detention program if that person is over 55 years old, has 12 months or less to serve on their sentence, has served at least 25% of their sentenced prison term, and is serving a sentence for conviction of an offense other than for certain sex offenses.

Pursuant to 730 ILCS 5/5-8A-3(e), IDOC may place a person of any age serving a sentence for conviction of a Class 2, 3, or 4 felony offense which is not an excluded offense in an electronic monitoring or home detention program at any time.

Pursuant to 730 ILCS 5/5-8A-3(b) and (c), IDOC may place a person of any age serving a sentence for conviction of a Class 1 or Class X felony offense, other than an excluded offense, in an electronic monitoring or home detention program for a period not to exceed the last 90 days of incarceration.

Pursuant to the Administrative Code, 20 Ill. Adm. Code 107.210, the Director of IDOC may award to eligible prisoners up to 180 days of discretionary good conduct credit.

On March 23, 2020, advocates sent a detailed memo to the Governor's office, setting forth further details of who the IDOC could and should be releasing based on these relevant statutes and administrative directives. This memo emphasized that IDOC should identify and release as many individuals as possible who are medically vulnerable with regard to COVID-19 as well as people who are over the age of 55. The memo also urged the Governor's Office to order IDOC to immediately, *inter alia*: (1) transfer to home detention and electronic monitoring all eligible people serving sentences for Class 2-4 felonies pursuant to 730 ILCS 5/5-8A-3(e); (2) transfer to home detention and electronic monitoring all eligible people over the age of 55 who

have less than 12 months left to serve on their sentence pursuant to 730 ILCS 5/5-8A-3(d); and (3) award discretionary good time credit pursuant to 20 Ill. Adm. Code 107.210 to the furthest extent possible to all eligible individuals to facilitate immediate and continuing releases.[105]

Despite this pressure from advocates, and despite the Governor's own admissions that people in IDOC custody are especially vulnerable to contracting and spreading COVID-19, the IDOC is not utilizing its authority with any degree of urgency to identify and release medically vulnerable prisoners or prisoners who otherwise qualify for early release.

On March 31, 2020, officials publicly announced that IDOC has released around 300 individuals—or less than one percent of the prison population.[106] This number is far lower than the population reduction needed to protect those who remain in custody and the surrounding communities. Moreover, many who qualify for release and are medically vulnerable remain in custody, including named plaintiffs here, putting their lives in jeopardy.

Corrections expert Dan Pacholke has opined that IDOC should "determine who, including those still housed in prisons, and those on work release, is within the categories . . . that IDOC or other body has the legal authority to release or transfer, and establish objective criteria, such as having an appropriate release address, to establish who could safely be released or transferred to a non-prison setting, even though many might still remain in IDOC custody. The criteria adopted should be designed to significantly reduce the prison population."[107]

---

[105] March 23 Letter, Exhibit 7.

[106] The Governor's Press Conferences are available for streaming at: https://www.nbcchicago.com/news/local/watch-live-daily-coronavirus-briefing-from-illinois-health-officials/2234359/ (last visited March 31, 2020).

[107] Ex. 5 (Pacholke Decl.).

If IDOC does not act immediately to reduce its prison population, COVID-19 is likely going to spread rapidly throughout IDOC, overburdening IDOC's medical care program and resulting in likely deaths.[108]

## V.     IDOC's Medical Care Program is Gravely Under-Resourced and Under-Functioning, and Is Not Capable of Managing COVID-19.

Even before COVID-19, IDOC's medical care program was ill-equipped to meet the medical needs of prisoners in its care. For over a decade, IDOC has been mired in litigation over its consistent failure to maintain a minimally adequate system. *See Lippert v. Jeffreys*, No. 10 cv 4603 (N.D. Ill.). In 2014 and again 2018, the *Lippert* court appointed teams of independent experts to conduct exhaustive reviews of IDOC's medical system, both of which exposed a system in dire need of reform. In October 2018, the team of experts issued a 1200-page report, reaching the following the conclusions:

The clinical care provided within IDOC was "extremely poor" and "resulted in preventable morbidity and mortality"; IDOC lacked an adequate infections disease control program; IDOC's Infectious Disease Coordinator position was vacant and had been vacant since at least 2014; Systemic sanitation problems existed in at multiple IDOC facilities; IDOC's medical staff vacancy rates were "very high" and staffing was a "critical problem" throughout IDOC; Physician staffing at IDOC was "very poor," with "persistent and ongoing vacancies" in site medical director positions, high rates of turnover, and an over-reliance on "traveling" medical directors who go from site to site; and Physicians who worked at IDOC were improperly credentialed, which was "a major factor in preventable morbidity and mortality" and "significantly increase[ed] the risk of harm to patients within IDOC."[109]

---

[108] Ex. 3 (Haney Decl.).

[109] Ex. 8 (*Lippert* Expert Report, October 2018) at 9-10, 21-31, 84-91.

Less than one year ago, IDOC agreed to a consent decree, which was approved and entered by the Court in May 2019, to begin needed reforms. *See Lippert v. Jeffreys*, No. 10 cv 4603 (N.D. Ill.), Doc. No. 1238 (consent decree). The consent decree called for the appointment of an independent monitor and a near complete overhaul of IDOC's medical system.

In the nine months since the *Lippert* consent decree was entered, IDOC has taken preliminary steps to comply, but circumstances within the facilities remain largely unchanged. IDOC is still only in early stages of developing a compliance plan. There has been no meaningful on the ground change yet; facilities are still critically under-staffed and under-resourced. IDOC is simply unable to adequately meet the serious medical needs of IDOC's population even under non-pandemic circumstances.

Even before the COVID-19 outbreak, in November 2019, the *Lippert* court monitor warned that the prevalence of elderly and infirm individuals in IDOC was straining the system.[110] Regarding this population, the monitor noted: "It is the position of the monitor that in the short term additional IDOC resources must be directed to properly house and care for this population but in the near future the IDOC must take the lead to create a pathway to discharge those men and women whose mental and medical conditions make them no longer a risk to society to appropriate settings in the community."[111]

Since the outbreak of COVID-19, IDOC administrators have issued memos to prisoners notifying them that their medical resources were "stretched thin" and that they needed to focus "on [their] most vulnerable patients at this time."[112]

---

[110] Ex. 9 (*Lippert* Court Monitor Report, November 24, 2019) at 9-10.

[111] *Id.*

[112] Ex. 10 (IDOC Memorandum, COVID-19 Response).

As of the date of this filing, there are 48 confirmed COVID-19 cases at Stateville, with approximately 19 Stateville prisoners in outside hospitals—so many that they overwhelmed the outside hospital that typically serves Stateville residents. The situation at Stateville is so grave that the Governor had to activate Illinois National Guard service members to provide additional medical support at the prison.[113] At this point there are no confirmed prisoner cases at any other prison, but there is no reason to believe that COVID-19 will not reach the other prisons. Likewise there is no reason to believe that Stateville's tragic outcome will not repeat itself at other facilities. The time to act is now.

## VI. Many of the Named Plaintiffs Are Vulnerable Prisoners Who, If Exposed To the Virus, Would Likely Suffer Severe Illness or Death.

As set forth in Plaintiff's Complaint and motion for class certification, Plaintiffs seek to represent a class of individuals in IDOC custody. They do not, however, seek relief for all class members in this motion. Instead, Plaitiffs seek relief only for those class members who are members of subclass 1 and subclass 2:

**Subclass 1**: People who have serious underlying medical conditions that put them at particular risk of serious harm or death from COVID-19, including but not limited to people with respiratory conditions including chronic lung disease or moderate to severe asthma; people with heart disease or other heart conditions; people who are immunocompromised as a result of cancer, HIV/AIDS, or any other condition or related to treatment for a medical condition; people with chronic liver or kidney disease or renal failure (including hepatitis and dialysis patients); people with diabetes, epilepsy, hypertension, blood disorders (including sickle cell disease),

---

[113] Tina Sfondeles, Illinois National Guard medics headed to Stateville as inmate coronavirus cases rise, Chicago Suntimes (Apr. 1, 2020), *available at* https://chicago.suntimes.com/coronavirus/2020/4/1/21202995/coronavirus-covid-19-illinois-prison-stateville-national-guard-field-hospital (last visited Apr. 1, 2020).

inherited metabolic disorders; people who have had or are at risk of stroke; and people with any other condition specifically identified by CDC either now or in the future as being a particular risk for severe illness and/or death caused by COVID-19, and who are eligible for medical furlough pursuant to 730 ILCS 5/3-11-1.

**Subclass 2**: People who are medically vulnerable to COVID-19 because they are 55 years of age and older and who are eligible for medical furlough pursuant to 730 ILCS 5/3-11-1.

The men and women who are members of these subclasses have been convicted of one or more crimes. But these individuals are also human beings, with mothers and daughters, fathers and son, spouses and partners, or even simply friends on the outside who value them. And because of their particular vulnerabilities, they face an imminent risk of severe illness or death if they contract COVID-19. Those particularly vulnerable class members include, among others:

**James Money**, a 28-year-old man who is housed at Illinois River Correctional Center in Canton, Illinois. In 2016, Mr. Money was diagnosed with Stage 3 metastatic thyroid cancer. He has undergone several surgeries, most recently in January 2020, resulting in the removal of over 80 lymph nodes and a full thyroidectomy, and is now immunocompromised. He was scheduled to begin chemotherapy treatment on March 24, 2020, but IDOC cancelled his treatment, presumably to focus instead on COVID-19. Mr. Money has already served nearly 5 years of his sentence for residential burglary out of Adams County, and he is currently scheduled to be released on June 19, 2020. He is eligible for medical furlough pursuant to 730 ILCS 5/3-11-1 and discretionary good time pursuant to 20 Ill. Adm. Code 107.210. Mr. Money is also within 90 days of his release date, so he is eligible for transfer to home detention pursuant to 730 ILCS 5/5-8A-3(b). Mr. Money's parole conditions have already been determined and he is approved to

reside with his fiancée's residence in Warsaw, Illinois. His fiancée is fully prepared to provide for his medical needs.

**William Richard**, a 66 year-old man who lives in the healthcare unit at Dixon Correctional Center. Mr. Richard has COPD, emphysema, and heart disease, and uses a wheelchair for movement. His respiratory disease requires continuous oxygen and a breathing treatment two to three times per day. He shares his roughly 12 feet by 15 feet cell with three other individuals, making social distancing impossible—his bunk is less than 5 feet from his cellmate's bunk, and all four men share a toilet, sink, and the chuckhole through which they receive their meals. Mr. Richard has less than four months remaining on his sentence, and is eligible under 730 ILCS 5/5-8A-3(d) to transfer to home detention at his mother's home.

**Gerald Reed**, a 57-year-old man who is housed at the Northern Reception Center. Mr. Reed has heart failure, hypertension, and is pre-diabetic. Mr. Reed uses a wheelchair for mobility because of a decades-old leg injury that adversely affects his mobility. Within the last year, Mr. Reed has been hospitalized for a heart attack and for pneumonia. At the NRC, he is prohibited from accessing commissary and is only provided a single, small bar of soap. Pursuant to 730 ILCS 5/3-11-1, Mr. Reed is eligible for medical furlough at his mother's home.

**Tewkunzi Green**, a woman who currently is housed at Logan Correctional Center in Lincoln, Illinois. She has asthma and severe hypertension for which she takes multiple medications. In January 2019, she fainted related to hypertension and was held in the cardiology unit of an off-site hospital for several days. At Logan, Ms. Green shares a room with three other women. Ms. Green has a pending commutation petition, which was filed by the January 23, 2020, filing deadline; her hearing date of April 7, 2020 was postponed and she is now being scheduled for a non-public hearing. She is also eligible for medical furlough under 730 ILCS

35

5/3-11-1. Ms. Green has a stable housing plan in that her mother, who owns her own home in Peoria, Illinois, where she also cares for Tewkunzi's 13-year-old son, is willing and able to receive Ms. Green at any time.

**Danny Labosette**, a 56-year-old man who is currently housed at Robinson Correctional Center in Robinson, Illinois. Mr. Labosette is a double amputee; his left leg has been amputated above the knee, and his right foot has been amputated. Mr. Labosette uses a wheelchair. Mr. Labosette also has untreated Hepatitis C. Mr. Labosette is housed in the Transitions Unit, a treatment facility within Robinson Correctional Cell. Social distancing is impossible for Mr. Labosette—he resides in a dorm with roughly 20 other men. He sleeps in the bottom bunk of a bunk bed, which is 3 feet away from the neighboring beds. Mr. Labosette has less than six months remaining on his sentence, and is eligible under 730 ILCS 5/5-8A-3(d) to be transferred to home detention at his mother's home in Florida, which has already been modified to accommodate his disabilities.

**Carl Reed**, a 59-year-old man who is currently housed at Graham Correctional Center in Hillsboro, Illinois. Mr. Reed suffers from chronic kidney disease—requiring dialysis three days per week—diabetes, hypertension, and underlying neurological impairments. A doctor who is an expert in correctional health care has reviewed Mr. Reed's medical records and recommends his immediate release for Mr. Reed's health and safety. Mr. Reed has eight years left on his sentence, and he is eligible for medical furlough pursuant to 730 ILCS 5/3-11-1. He has a pending petition for executive clemency, and he has a stable housing plan for his release: he can live with his sister in Chicago.

**Carl "Tay Tay" Tate**, a 40-year-old transgender woman diagnosed with Gender Dysphoria, who is housed at Danville Correctional Center. Ms. Tate has almost six years left of

36

her sentence to serve. Ms. Tate lives with hypertension, for which she takes medication. Ms. Tate also lives with severe anxiety, and the COVID-19 outbreak has only increased her anxiety. She shares a small cell with one other person. Even with current limits on the number of people in the unit who are allowed out of their cells to use the communal dayroom, Ms. Tate estimates that around 24 people may be in the dayroom at a time. She estimates that around 75 people may be in the yard. Ms. Tate also works as a laundry porter, which places her in frequent contact with other prisoners and staff. She has asked for gloves to use, and has been denied. She has also asked for more cleaning supplies to clean the dayroom, including the phones, and has been denied. It is impossible for Ms. Tate to practice social distancing in her living situation. Ms. Tate has a pending clemency petition—which has the support of 40 organizations across the state— and her hearing date of April 7, 2020 was postponed and is being rescheduled. Ms. Tate has a stable housing plan in place for when she is released: she will live with her sister who resides in Lansing, Illinois.

These Named Plaintiffs, all of whom face particular risks when a COVID-19 outbreak occurs in their facility, represent other prisoners who, like them, are eligible for temporary medical furlough so that they can self-isolate.

## NOTICE TO DEFENDANTS

On April 1, 2020, counsel for Plaintiffs gave notice of their intent to file this action to the Office of the Governor, Chief Legal, Chief Legal Counsel for the IDOC, and the Office of the Attorney General.

## ARGUMENT

Plaintiffs are prisoners in the custody of the State of Illinois, and subclasses 1 and 2, for whom they seek relief, are prisoners who are especially vulnerable to COVID-19 because of their advanced age or underlying medical conditions. Although the larger world has taken radical steps to contain this disease, the Plaintiffs are powerless to adopt even simple protective measures to remain safe. Under current conditions, it is overwhelmingly likely that thousands of prisoners will contract a lethal virus with no cure. Without urgent action, countless prisoners will become seriously ill or die within a matter of weeks or months. The Plaintiffs therefore request that the Court grant a temporary restraining order or a permanent injunction to allow them to self-isolate at home via temporary medical furlough.

A plaintiff seeking a preliminary injunction or temporary restraining order "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 769 (7th Cir. 2011).

With regard to the first factor, "[f]or purposes of a TRO or preliminary injunction, a plaintiff need only establish a 'trivial chance of succeeding on the merits.'" *Frullati Franchise Sys., Inc. v. Dana Areece & Co.*, 2001 WL 743427, at *2 (N.D. Ill. June 28, 2001) (quoting *Green River Bottling Co. v. Green River Corp.*, 997 F.2d 359, 361 (7th Cir. 1993)); *see also Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017) (a party moving for a preliminary injunction need "only show that his chances to succeed on his claims are better than negligible" (internal quotation marks omitted)). In addition, "the more likely a plaintiff's success on the merits, the less the balance of harms needs to favor its side to

justify relief, while a greater showing that the balance of harms favors the plaintiff may offset a lower probability of success on the [merits]." *Aon Risk Servs. Cos. v. Alliant Ins. Servs., Inc.*, 415 F. Supp. 3d 843, 847 (N.D. Ill. 2019); *see also Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009) ("How strong a claim on the merits is enough depends on the balance of harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief.").

Once a plaintiff demonstrates entitlement to preliminary relief, courts have broad power to fashion equitable remedies to address constitutional violations in prisons. *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978). And although courts must "be sensitive to the State's interest[s]" in imprisonment, courts "must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners [and] . . . may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Brown v. Plata*, 563 U.S. 493, 511 (2011).

Action by this Court is necessary here. There is no vaccine or cure for COVID-19. And the conditions at IDOC inherently make social distancing and other imperative protective measures impossible. As such, the only way to protect against the imminent risk of substantial harm and possible death for the two subclasses of prisoners who are most vulnerable to the virus—people with serious underlying medical conditions eligible for medical furlough, and people over the age of 55 eligible for medical furlough—is to immediately transfer them on temporary medical furlough to their homes to shelter in place *before* they contract the virus. Injunctive relief is necessary because the danger here, vulnerable people condemned to prolonged illness and potential death, is the quintessential irreparable harm. *See, e.g.*, *Jones'El v. Berge*, 164 F. Supp. 2d 1096 (W.D. Wisc. 2001) ("[P]ain, suffering and the risk of death

constitute 'irreparable harm' sufficient to support a preliminary injunction in prison cases."). There is also an overwhelming public interest in limiting the spread of COVID-19, both to minimize further infections and to reduce strain on overwhelmed health systems. And, in light of the global COVID-19 pandemic, the balance of equities weighs heavily in favor of the vulnerable prisoners, who must be transferred on medical furlough to their homes to self-isolate, and against Defendants' interest in indefinitely confining the Plaintiffs in life-threatening conditions. This Court should order that people with serious underlying medical conditions eligible for medical furlough, and people over the age of 55 eligible for medical furlough be immediately transferred on medical furlough to home confinement.

I.      **Plaintiffs Are Likely to Succeed on the Merits of Establishing a Constitutional Violation.**

Plaintiffs are likely to establish that their conditions of confinement in IDOC custody place them at substantial risk of harm from COVID-19, in violation of their Eighth Amendment rights. Additionally, Plaintiffs are likely to also establish that the denial of medical furlough or home detention placement to subclass members who are medically vulnerable to COVID-19 (subclass 1), placing them at significant and disparate harm's way is a violation of the Americans with Disabilities Act.

   A.      **Plaintiffs Are Likely to Succeed on the Merits on Their Constitutional Claims.**

Plaintiffs are likely to establish that their conditions of confinement in IDOC custody render them at substantial risk of contracting COVID-19 and suffering prolonged injury and possible death. The Supreme Court has long held that when state officials "strip [prisoners] of virtually every means of self-protection and foreclose[] their access to outside aid, [they] are not free to let the state of nature take its course." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).

State officials instead have a responsibility under the Eighth Amendment to "take reasonable measures to guarantee the safety of the inmates . . . ." *Id.* at 832. The Seventh Circuit has held that the Eighth Amendment is violated by the conditions of a prisoner's confinement when "(1) there is a deprivation that is, from an objective standpoint, sufficiently serious that it results in the denial of the minimal civilized measure of life's necessities, and (2) where prison officials are deliberately indifferent to this state of affairs." *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (internal quotation marks omitted).

In *Helling v. McKinney*, 509 U.S. 25 (1993), the Supreme Court held that the Eighth Amendment forbids deliberate indifference to conditions that "pose an unreasonable risk of serious damage to . . . future health." *Id.* at 35. The Supreme Court in *Helling* addressed exposure to secondhand smoke, but it recognized that "deliberate indifference to the exposure of inmates to a serious, communicable disease" would similarly violate the Eighth Amendment, even if a prisoner *currently* shows no serious symptoms. *Id.* at 33. The Seventh Circuit has similarly recognized that the Eighth Amendment protects prisoners from known exposure to serious diseases, holding that in such a circumstance, "[t]he prison must be allowed to choose between removing the prisoner from the unhealthy environment and protecting him from its consequences . . . provided, of course, that the protection is efficacious." *Powers v. Snyder*, 484 F.3d 929, 931 (7th Cir. 2007); *see also McDonald v. Hardy*, 821 F.3d 882, 889 (7th Cir. 2016) (explaining that the Eighth Amendment does not excuse deliberate indifference simply because harms "have not yet reached the point of causing acute or life-threatening injuries").

The Plaintiffs in this case are being detained in conditions that dramatically increase the likelihood that they will contract COVID-19 and fall seriously ill because they cannot maintain adequate social distancing as mandated by the CDC. Plaintiffs are housed in close quarters,

forced to eat, sleep, bathe, and perform all daily life activities in a communal setting. Ex. 1 (Greifinger Decl.) ¶¶ 16-18; Ex. 3 (Haney Decl.) ¶ 6; Ex. 4 (Beyrer Decl.) ¶¶ 11-14. Illinois Department of Public Health (IDPH) Director Dr. Ngozi Ezike acknowledged that IDOC prisons are "[c]ongregate settings" where individuals "live and work and eat and study and recreate all within the same environment, heightening the potential for COVID-19 to spread really quickly once it's introduced." Dr. Ngozi Ezike, IDPH, *COVID-19 Press Update*, 23:30–23:48 (Mar. 30, 2020), *available at* http://www.dph.illinois.gov/topics-services/diseases-and-conditions/diseases-a-z-list/coronavirus/media-publications/daily-press-briefings (last visited Apr. 1, 2020). The risks posed by IDOC's congregate settings are exacerbated by lack of access to Personal Protective Equipment (PPE) for prisoners and many staff members, Ex. 1 (Greifinger Decl.) ¶¶ 19-21, 23), poor ventilation, Ex. 2 (Meyer Decl.) ¶ 9; Ex. 4 (Beyrer Decl.) ¶ 14, and a lack of per-use cleaning of shared items like toilets, sinks, and showers, which are almost always accessed by numerous individuals before they are sanitized. Ex. 1 (Greifinger Decl.) ¶ 17; Ex. 2 (Meyer Decl.) ¶ 9; Ex. 4 (Beyrer Decl.) ¶ 14; Ex. 3 (Haney Decl.) ¶ 8.

Prisoners simply cannot maintain proper social distancing given the nature of Illinois's facilities, whether housed with large numbers of people like Plaintiff Labosette (who is housed in a 20-person dorm), in a small cell with fewer people in close proximity like Plaintiff Richard (in a small four-person cell in the healthcare unit), or in a two-person cell, like Plaintiff Tate (who is never more than few feet from her cellmate). Prisoners share their dayrooms and showers, and must rely on multiple staff to prepare and deliver their meals and medications. Plaintiffs are at the mercy of security and medical staff, who may carry the virus without showing symptoms, and who often are not able to take even simple precautions like wearing face masks and disposable gloves. *See generally* Ex. 11 (Declarations from Class Members' Loved Ones); *see*

*also* Dr. Ngozi Ezike, IDPH, *COVID-19 Press Update Video*, at 11:33-11:56 (Mar. 29, 2020), *available at* http://www.dph.illinois.gov/topics-services/diseases-and-conditions/diseases-a-z-list/coronavirus/media-publications/daily-press-briefings ("As a former medical director in a correctional facility, I know all too well about the traffic of staff going in and out of the facilities daily, detained individuals leaving for court appearances, and the rate of turnover . . . all of these comingle and increase the rate of infection and its fast spread through these facilities.") (last visited Apr. 1, 2020); (Greifinger Decl. ¶ 18) ("Staff arrive and leave on a shift basis; there is little to no ability to adequately screen staff for new, asymptomatic infection.").

Plaintiffs are themselves at an especially high risk of harm from the virus due to the high rates of chronic health conditions, substance use, and mental health issues within the class. Ex. 3 (Haney Decl.) ¶ 7; Ex. 4 (Beyrer Decl.) ¶ 16. And history teaches that when an epidemic occurs nationally, people in custody experience a disproportionately high number of cases. Ex. 2 (Meyer Decl.) ¶ 19. At Rikers' Island, for example, the infection rate is nearly eight times the rate of infection for New York City, and 73 times higher than the national infection rate. *See COVID-19 Infection Tracking in NYC Jails*, Legal Aid Society, *available at* https://www.legalaidnyc.org/covid-19-infection-tracking-in-nyc-jails/ (last visited Mar. 31, 2020).

COVID-19 is already in IDOC facilities across the state: 25 IDOC employees have tested positive, 52 IDOC prisoners have tested positive, and 187 tests remain outstanding. *See COVID-19 Response*, IDOC, https://www2.illinois.gov/idoc/facilities/Pages/Covid19Response.aspx (last visited Apr. 1, 2020). That number has increased by double each day over the past week since the first positive test was announced on March 26. And all of the evidence indicates that the number of individuals with COVID-19 will increase by multiples in the coming days and weeks.

Under these circumstances, the two subclasses for which relief is sought in this motion—people with serious underlying medical conditions eligible for medical furlough, and people over the age of 55 eligible for medical furlough—are especially likely to succeed on the merits of their claims given their susceptibility to COVID-19. These vulnerable prisoners face a near-certain risk of serious illness and possible death if and when they contract the virus in IDOC custody.

Elderly prisoners and those with underlying medical conditions typically experience COVID-19 symptoms more severely and are far more likely to develop complications as a result of the virus. Ex. 1 (Greifinger Decl.) at ¶¶ 4–5, 8. Prisoners over the age of 55 without any underlying medical conditions face a 1.3–8% mortality rate. And as noted above, vulnerable prisoners who suffer from cardiovascular disease face a 13.2% mortality rate, hypertensive prisoners face an 8.4% mortality rate, and prisoners with chronic respiratory disease face an 8.0% mortality rate. In other words, a prisoner suffering from cardiovascular disease who contracts COVID-19 faces roughly the same odds of survival as he would playing Russian roulette. Additionally, individuals with certain conditions, such as those that affect the immune system, are also more likely to contract the disease.

Federal courts across the country have granted temporary restraining orders brought on behalf of vulnerable individuals in custody. *See, e.g.*, *Thaker, et al. v. Doll, et al.*, No. 20 C 0480, Dkt. 47 (M.D. Pa. Mar. 31, 2020); *Coronel, et al. v. Decker, et al.*, No. 20 C 2472, Dkt. 26 (S.D.N.Y. Mar. 27, 2020); *Basank, et al. v. Decker, et al.*, No. 20 C 2518, Dkt. 11 (S.D.N.Y. Mar. 26, 2020); *Flores, et al. v. Barr, et al.*, No. 85 C 4544, Dkt. 740 (Mar. 28, 2020). In *Thaker*, the district court recognized that "the *status quo* of a mere few weeks ago no longer applies. Our world has been altered with lightning speed, and the results are both unprecedented and

44

ghastly . . . . The choice we now make must reflect this new reality." *Thaker*, No. 20 C 0480, Dkt. 47 at 24. The district court found that even though the conditions in the local federal detention facilities were not insufficient because of intent or malice, "should we fail to afford relief" to medically vulnerable prisoners "we will be a party to an unconscionable and possibly barbaric result." *Id.*; *see also id.* ("Our Constitution and laws apply equally to the most vulnerable among us, particularly when matters of public health are at issue."). The district court accordingly granted a temporary restraining order requiring the immediate release of 11 prisoners in federal custody who suffer from chronic medical conditions and face a serious threat of injury or death if exposed to COVID-19. *Id.* at 2, 24–25.

Simply put, Plaintiffs are sitting in tinderboxes throughout the State of Illinois. Defendants are aware of this fact, and they are also aware that the only way to protect the vulnerable prisoners for whom relief is requested from serious harm is to immediately transfer them to their homes through a medical furlough to shelter in place. As discussed, the evidence in support is overwhelming. *Powers*, 484 F.3d at 931. Under Illinois law, Defendants have unlimited ability to act, 730 ILCS 5/3-11-1(a)(2), but have chosen instead to leave 99.2% of individuals in IDOC custody in their tinderboxes to suffer.[114] Such a failure to meaningfully act in the face of an unprecedented pandemic that is killing thousands is clear indifference that leaves Plaintiffs—and particularly the vulnerable Plaintiffs for whom emergency relief is sought—at imminent risk of serious harm and death.

---

[114] In relevant part, 730 ILCS 5/3-11-1 allows the IDOC to "extend the limits of the place of confinement of a committed person under prescribed conditions so that he may leave such place on furlough." 730 ILCS 5/3-11-1(a). Furlough may be granted for many reasons, including "obtain[ing] medical, psychiatric or psychological services when adequate services are not otherwise available . . . ." 730 ILCS 5/3-11-1(a)(2).

**B.** **Plaintiffs Are Likely to Succeed on the Merits on Their ADA Claims for Subclass 1.**

Defendants' failure to place prisoners with underlying medical conditions that make them particularly vulnerable to COVID-19 on furlough or home detention, where they could quarantine safely, is discrimination within the meaning of the Americans with Disabilities Act (ADA). IDOC is failing to provide a reasonable accommodation that is readily available and that would avoid the disparate impact (increased risk of infection, medical complications, and death) that will occur if IDOC continues to keep these medically vulnerable people in the prison facilities.

The ADA prohibits public entities, including state prisons, from discriminating on the basis of disability. Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Discrimination includes failing to make reasonable modifications (also termed "reasonable accommodations") that would allow a person with a disability to participate in a service, program or activity. 28 C.F.R. § 35.130(b)(7). "Program or activity" under Title II "applies to anything a public entity does." *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 782 (7th Cir. 2002).

Subclass 1 plaintiffs, those who have serious medical conditions that make them particularly vulnerable to COVID-19, are qualified individuals with disabilities under the ADA. The ADA defines disability as having an impairment that substantially limit "major life activities." 42 U.S.C. § 12102(2). "Major life activities" include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and

reproductive functions." *Id.* By definition, they have substantial physical impairments that already constitute disabilities under the ADA. By virtue of being incarcerated, they are qualified for the "program and service" of IDOC at issue, which is the safe care that IDOC has a duty to provide to those in custody. That safety is denied in this pandemic by IDOC's failure to provide them with the available accommodation of furlough or home detention.

Defendants are violating Title II of the ADA by holding subclass 1 plaintiffs in unduly dangerous conditions that place them at a disproportionate risk of medical complication and death despite the availability of a readily available modifications that would allow them to safely quarantine through furlough or home detention. In this regard, and for all the same reasons are described above relating to Plaintiffs' Eighth Amendment claims, Plaintiffs are likely to succeed on the merits of their ADA discrimination claim, under theories of either denial of reasonable accommodations or disparate impact.

### 1. The IDOC Must Provide Reasonable Modifications to Prevent Discrimination Against People With Disabilities (Subclass 1).

The Department of Corrections is a public entity required to make reasonable accommodations in order to avoid discrimination on the basis of disability. *See, e.g., Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 210 (1998). The regulations implementing Title II of the ADA require that a public entity:

> make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7).

The Seventh Circuit has held that public entities have an independent duty to take "prophylactic" steps to accommodate individuals with disabilities when necessary to avoid

47

discrimination. *Wisc. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006). In other words, a plaintiff can "demonstrate discrimination on the basis of disability by [the City's] refusal to make a reasonable accommodation." *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 848 (7th Cir. 1999). *See also McCoy v. Tex. Dep't Crim. Justice*, 2006 WL 2331055, at *7 and n. 6 (S.D. Tex. Aug. 9, 2006) ("failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners.").

### 2. The IDOC Must Provide the Reasonable Modifications to Avoid the Disparate Harm to People With Disabilities (Subclasses 1 and 2).

A disparate impact violation occurs where the entity, here IDOC, "adopt[ed] a policy or practice that is 'facially neutral in [its] treatment of different groups but that in fact fall[s] more harshly on one group than another and cannot be justified by [a nondiscriminatory] necessity.'" *Swan v. Bd. of Educ.*, No. 13 C 3623, 2013 WL 3872799, at *5 (N.D. Ill. July 25, 2013) (*citing Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003)).

While Defendants' COVID-19 practice relating to release and transfer is neutral on its face, it causes far more suffering and harm to prisoners who are medically vulnerable than to those who are not. *See McCoy v. Tex. Dep't Crim. Justice*, 2006 WL 2331055, at *7 n.6 (S.D. Tex. Aug. 9, 2006) ("failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than the non-disabled prisoner.").

## II.    Infection With a Lethal Virus That Lacks Any Vaccine or Cure Constitutes Irreparable Harm.

Plaintiffs have moved for a temporary restraining order and preliminary injunction for those prisoners who are most vulnerable because the difference of even just a few days is a matter of life and death. Cases of COVID-19 have increased exponentially in a matter of weeks. *See supra* pg. 4. And the virus has already spread to detention facilities throughout the state.

Given the deadliness of the disease and the state's already over-taxed medical system, there is a substantial possibility that absent immediate relief from the Court, vulnerable prisoners will be infected with COVID-19. And these vulnerable Plaintiffs are older adults or people with pre-existing medical conditions that increase the likelihood of severe illness or death if they contract COVID-19. For some of these vulnerable people, their chances of survival are approximately the same as the chance of survival while playing Russian roulette. Even for those who survive infection, there may be a prolonged recovery, including the need for extensive rehabilitation, neurological damage, and the loss of respiratory capacity.

These life-and-death stakes are sufficient to establish a likelihood of irreparable harm in support of injunctive relief. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1090 (7th Cir. 2008) (irreparable harm means that the plaintiff cannot be "prevented or fully rectified by the final judgment after trial"); *Orr v. Shicker*, ___ F.3d ___, 2020 WL 1329659, at *9 (7th Cir. Mar. 23, 2020) (irreparable harm is that which "cannot be repaired and for which money compensation is inadequate" (internal quotation marks omitted)). "The existence of a continuing constitutional violation constitutes proof of an irreparable harm." *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) (affirming grant of preliminary injunction in prison conditions case); *Jones'El v. Burge*, 164 F. Supp. 2d 1096, 1123 (W.D. Wis. 2001) ("Put more specifically, pain, suffering and the risk of death constitute irreparable harm

sufficient to support a preliminary injunction in prison cases." (internal quotation marks omitted)).

Even the failure to *test* for a disease has been sufficient to support a finding of irreparable harm. *See Boone v. Brown*, 2005 WL 2006997, at *14 (D.N.J. Aug. 22, 2005) (allegation of refusal to provide adequate testing for highly contagious infectious disease sufficient to demonstrate irreparable harm); *Austin v. Pa. Dep't of Corr.*, 1992 WL 277511, at *7 (E.D. Pa. Sept. 29, 1992) (granting preliminary injunction for prison to develop testing and protocol for Tuberculosis); *see also Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (state officials have an affirmative obligation to protect prisoners from infectious disease).

The risks here are even more extreme, and the IDOC's ongoing failure to provide conditions that allow people in its custody to perform the CDC-mandated protective measures, including social distancing, risks irreparable harm to Plaintiffs. *See Jones'El*, 164 F. Supp. 2d at 1125-26 (recognizing that constitutionally inadequate conditions at supermax justified granting injunctive relief). The Constitution does not require that the vulnerable Plaintiffs whose request for relief is at issue in this motion wait until they have contracted or been exposed to COVID-19 before obtaining injunctive relief. *Thaker*, Dkt. 47 at 8 ("Petitioners face the inexorable progression of a global pandemic creeping across our nation—a pandemic to which they are particularly vulnerable to due to age and underlying medical conditions. At this point, it is not a matter of *if* COVID-19 will enter Pennsylvania prisoners, but *when* it is finally detected therein."); *Coronel*, Dkt. 26 at 5 ("Due to their serious underlying medical conditions, all Petitioners face a risk of severe, irreparable harm if they contract COVID-19.").

A review of the medical conditions suffered by several of the Named Plaintiffs demonstrates the irreparable harm these vulnerable prisoners will face if this Court does not

grant them relief. Plaintiff Money, for example, suffers from Stage 3 metastatic thyroid cancer that renders him immunocompromised. Plaintiff Richard requires the use of a wheelchair and suffers from COPD, emphysema, and heart disease. Plaintiff Gerald Reed also requires the use of a wheelchair, and simultaneously suffers from hypertension and heart disease. Plaintiff Green suffers from severe respiratory and cardiovascular disease. Plaintiff Carl Reed suffers from chronic kidney disease and other ailments, including diabetes and hypertension, that render him medically vulnerable. Each one of these Named Plaintiffs, and several other unnamed putative class members, suffer an imminent risk of severe illness or death when a COVID-19 positive individual comes into the prison. Simply put, their lives are on the line and the harm they face is clearly irreparable.

### III. There is a Strong Public Interest in Minimizing the Spread of COVID-19 Through Social Distancing and Hygiene Practices That Are Impossible in IDOC Prisons.

It is always in the public interest to prevent the continuing violation of a plaintiff's constitutional rights. *See Joelner v. Vill. of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004) ("[s]urely upholding constitutional rights serves the public interest) (quoting *Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 261 (4th Cir.2003)); *see also Preston*, 589 F.2d at 303 n. 3 ("[t]he existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest."). And in this case the public interest in minimizing the spread of COVID-19 is overwhelming and nearly impossible to overstate.

As noted above, COVID-19 is highly contagious and has substantially higher mortality rates than any other disease with its rate of transmission. The disease has no vaccine or cure, meaning that each new infection may result in several more individuals becoming infected. Public health experts have thus unanimously agreed that the most critical actions that can be

taken are preventive measures like self-isolating, maintaining a distance of six feet from all other individuals, and frequent disinfection.

These measures are simply not possible within the confines of IDOC's prisons, which are inherently congregate settings that require close interactions between individuals, both prisoners and staff, throughout each day. Even attempts at sanitization within the IDOC risk the spread of COVID-19, since staff are only able to provide prisoners with buckets of watered down to clear their cells, and those buckets are passed between cells, from prisoner to prisoner. Prisoners are thus destined to become vectors of disease, and will inevitably infect several other prisoners, IDOC employees, prison medical staff, and eventually, healthcare workers in the community when critically infected prisoners are sent to nearby hospitals to be treated. The results will be devastating for the dozens of Illinois communities where IDOC prisons are located, and are a needless consequence of the conditions of confinement within the IDOC itself.

The situation at Stateville demonstrates this fact. IDOC announced its first confirmed case at Stateville on Wednesday, March 25, 2020. IDPH, *Public Health Officials Announce 330 New Cases of Coronavirus* Disease, (Mar. 25, 2020), *available at* http://www.dph.illinois.gov/news/public-health-officials-announce-330-new-cases-coronavirus-disease (last visited Apr. 1, 2020). Just five days later, IDPH Direct Dr. Ezike announced that 12 prisoners had been hospitalized with confirmed cases of COVID-19, with another 77 prisoners suffering symptoms of the virus. IDPH, *Public Health Officials Announce 461 New Cases of Coronavirus Disease*, (Mar. 30, 2020), *available at* http://www.dph.illinois.gov/public-health-officials-announce-461-new-cases-coronavirus-disease. The following day, Governor Pritzker announced that at least one prisoner had died from the virus. Emily Hoerner, Elderly inmates are at high risk for coronavirus. Why are there so many of them in Illinois's prisons?,

InjusticeWatch, *available at* https://www.injusticewatch.org/news/2020/elderly-inmates-are-at-high-risk-for-coronavirus-why-are-there-so-many-of-them-in-illinoiss-prisons/ (last visited Apr. 1, 2020). St. Joseph Hospital, the community hospital where Stateville prisoners with the disease had been taken, announced it was "overwhelmed" by individuals from Stateville, and that staff were already "maxed out." Chuck Goudie and Barb Markoff, *Illinois Prisoners Sick with COVID-19 "Overwhelm" Joliet Hospital*, ABC 7 NEWS, (Mar. 30, 2020), available at https://abc7chicago.com/health/illinois-prisoners-sick-with-covid-19-overwhelm-joliet-hospital/6064085/ (last visited Apr. 1, 2020). As of the date of this motion, 64 individuals who live and work at Stateville have tested positive for COVID-19, and hundreds of lab results remain outstanding. *See COVID-19 Response*, IDOC, https://www2.illinois.gov/idoc/facilities/Pages/Covid19Response.aspx (last visited Apr. 1, 2020).

The vulnerable prisoners at issue in this motion—prisoners with underlying medical conditions and those over the age of 55—are most likely to require hospitalization if and when they contract COVID-19 while in custody. It is essential to the public interest to permit these prisoners to return to their home through a temporary medical furlough to drastically reduce their risk of contracting the virus and overwhelming the State of Illinois's medical system. And the public interest is further served by the medical furloughs because it allows for all of the remaining Plaintiffs to practice greater social distancing and because it prevents overloading the work of detention staff, whose resources are already strained.

## IV.   The Balance of Equities Favors Releasing Vulnerable Plaintiffs Over Continued Detention in the Midst of this Public Health Crisis.

The balance of equities weighs in favor of ordering vulnerable prisoners—those with underlying medical conditions and those over the age of 55—to be transferred to their homes via a temporary medical furlough to self-isolate until the pressing risk of this pandemic has passed.

Plaintiffs acknowledge that they are in custody after having been found guilty of committing a crime, and accordingly do not seek their release. Instead, Plaintiffs ask simply that these particularly vulnerable individuals be transferred to their homes while still in IDOC custody being monitored via electronic monitoring to self-isolate until the emergency abates.

As the district court in *Thaker* noted, "the *status quo* of a mere few weeks ago no longer applies." Dkt. 47 at 24. These vulnerable prisoners' lives are on the line, as are the lives of the members of the community who face greater exposure as a result of the prisoners continued detention. These facts outweigh the Defendants' interests in retribution through incarceration in a place of their choosing. Defendants have already released some individuals through medical furloughs and transfer to home detention and electronic monitoring, demonstrating their ability to identify and place individuals in safe homesites even during this public health emergency.

Plaintiffs anticipate that Defendants will argue that a balance of equities does not favor Plaintiffs' request because it poses a public safety risk. Again, Plaintiffs do not ask this Court to release any individuals from IDOC custody. And although ensuring that these individuals return to custody once the pandemic abates is important, the risk of absconding is low. Many of these vulnerable prisoners lack the physical ability to abscond, and electronic monitoring helps to ensure that the individuals for whom Plaintiffs seek release will remain safely in their homes. The restricted state of travel within the United States and the around world during this pandemic makes the probability that prisoners will abscond even lower still.

For the vulnerable prisoners seeking relief—prisoners with underlying medical conditions who face a particular risk of severe illness and death from exposure to COVID-19, and those who are medically vulnerable because of their age—Plaintiffs' request is a matter of life and death. The balance of the equities in this case favors life.

**V.     This Court Should Not Require Plaintiffs to Provide Security Prior to Issuing a Temporary Restraining Order.**

Under Rule 65(c) of the Federal Rules of Civil Procedure, district courts have discretion to determine the amount of the bond accompanying a preliminary injunction, and this includes the authority to set a nominal bond. In this case, the Court should waive bond because Plaintiffs are indigent, the requested preliminary injunction is in the public interest, and the injunction is necessary to vindicate constitutional rights. *See Pocklington v. O'Leary*, 1986 WL 5748, at *2 (N.D. Ill. May 6, 1986) ("[B]ecause of [a prisoner's] indigent status, no bond under Rule 65(c) is required."); *Davis v. Mineta*, 302 F.3d 1104, 1126 (10th Cir. 2002) ("minimal bond amount should be considered" in public interest case); *Complete Angler, L.L.C. v. City of Clearwater*, 607 F.Supp.2d 1326, 1335 (M.D. Fla. 2009) ("Waiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right.").

## CONCLUSION

The country faces a public health crisis of epic proportions. COVID-19 presents risks to all of us, and has forced us to come together to make tough decisions that are necessary to reduce the number of fatalities caused by the virus. We must allow everyone to engage in practices that flatten the curve, including social distancing and rigorous hygiene—particularly for those among us who are most vulnerable. This is simply not possible in IDOC prisons today. Defendants have left highly vulnerable prisoners to sit in their cells and wait for this disease to rip through their prisons, leaving death and severe illness in its wake. The Constitution demands better. This Court should grant Plaintiffs' motion, preliminarily certify Plaintiffs' proposed subclasses 1 and 2, and order Defendants to transfer the following individuals to their homes to self-isolate via a temporary medical furlough:

c.      People who have serious underlying medical conditions that put them at particular risk of serious harm or death from COVID-19, including but not limited to: those with chronic lung disease or moderate to severe asthma, people with heart disease, people who are immunocompromised due to cancer or other medical conditions or treatment, people with severe obesity, people with any other underlying serious medical conditions such as those with diabetes, renal failure, liver disease, and any other condition specifically identified by CDC either now or in the future as being a particular risk for severe illness and/or death caused by COVID-19 and who are eligible for medical furlough pursuant to 730 ILCS 5/3-11-1; and

d.      People who are medically vulnerable to COVID-19 because they are 55 years of age and older and who are eligible for medical furlough pursuant to 730 ILCS 5/3-11-1.

Respectfully submitted,

/s/ Sarah Grady
Sarah Grady
Attorney for Plaintiffs

Sheila A. Bedi
Luke Fernbach*
Emily M. Grant*
Terah Tollner*
Community Justice Civil Rights Clinic
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-2492
sheila.bedi@law.northwestern.edu
LukeFernbach2021@nlaw.northwestern.edu
EmilyGrant2021@nlaw.northwestern.edu
ttollner@nlaw.northwestern.edu
 *Law student licensed pursuant to Illinois
Supreme Court Rule 711

Vanessa del Valle
Roderick and Solange MacArthur Justice
Center
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-5932
vanessa.delvalle@law.northwestern.edu

Jennifer Soble
Illinois Prison Project
53 W. Jackson, Suite 1056
Chicago, IL 60616
(312) 324-4465
jennifer@illinoisprisonproject.org

Alan Mills
Elizabeth Mazur
Uptown People's Law Center
4413 N. Sheridan
Chicago, IL 60640
(773) 769-1411
alan@uplcchicago.org
liz@uplcchicago.org

Sarah Grady
Steve Weil
Loevy & Loevy
311 North Aberdeen St., 3rd Floor
Chicago, IL 60607
(312) 243-5900
sarah@loevy.com

Amanda Antholt
Samantha Reed
Equip for Equality
20 N. Michigan Ave, Suite 300
Chicago, IL 60602
(312) 341-0022
amanda@equipforequality.org
samantha@equipforequality.org

**<u>CERTIFICATE OF SERVICE</u>**

       I, Sarah Grady, an attorney, hereby certify that on April 2, 2020, I caused a copy of the foregoing Plaintiffs' Emergency Motion for a Temporary Restraining Order or Preliminary Injunction to be filed using the Court's CM/ECF system. I further certify that I, or another one of Plaintiffs' attorneys, will promptly serve a copy of the same on IDOC's Chief Legal Counsel, Deputy Legal Counsel for the Office of the Governor, and the Illinois Attorney General's Chief Deputy.

                                      /s/ Sarah Grady
                                      Sarah Grady
                                      Attorney for Plaintiffs