# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | | |
|---|---|---|
| MONEY, *et al.*, | ) | |
| | ) | |
|     Plaintiffs, | ) | No. 20 cv 2093 |
|   v. | ) | |
| | ) | |
| PRITZKER, *et al.*, | ) | |
| | ) | |
|     Defendants. | ) | |

| | | |
|---|---|---|
| MONEY, *et al.*, | ) | |
| | ) | |
|     Petitioners, | ) | No. 20 cv 2094 |
|   v. | ) | |
| | ) | |
| JEFFREYS, | ) | |
| | ) | |
|     Respondent. | ) | |

## PLAINTIFFS' SUBMISSION ON THE
## APPLICABILITY AND EFFECT OF 18 U.S.C. § 3626

The COVID-19 pandemic presents an unprecedented—and hopefully never to be repeated—threat to the lives of people worldwide. Those of us who live outside of prisons have turned our lives upside down to protect ourselves, our families, and our communities from this dangerous threat. People who live inside of prisons, however, cannot do the same. COVID-19 has made its way into Illinois' prisons, is already wreaking deadly havoc inside Stateville Correctional Center, and is just getting through the door at major downstate facilities like Logan, Menard, Danville, Sheridan, and Graham Correctional Centers. These prisons can be analogized to buildings on fire: the fire is sure to spread, and certain people within these facilities are especially susceptible to getting burned. These people need this Court's urgent intervention to get them out—even if just on a temporary basis—so that they can survive this crisis.

**Procedural Background**

On April 2, 2020, Plaintiffs James Money, *et al.*, filed two separate actions concerning the COVID-19 crisis in the Illinois Department of Corrections (IDOC). *Money et al. v. Pritzer et al*, No. 20 cv 2093, is a Section 1983 action that seeks certification of six separate subclasses with different relief sought for each class. Broadly speaking, Subclasses 1 and 2 consist of medically vulnerable prisoners who seek furlough pursuant to the Illinois prisoner furlough statute so that they can follow guidelines issued by the Centers for Disease Control ("CDC") during the COVID-19 crisis, which they cannot do inside of IDOC prison walls. Subclasses 3-5 seek transfer to home confinement during the COVID-19 crisis pursuant to various Illinois statutes that allow home confinement for certain groups of prisoners. Subclass 6 seeks an award of 180 days sentencing credit, allowed under Illinois law, for prisoners within 180 days of release. *Money et al. v. Jeffreys*, No. 20 cv 2094, is an emergency petition for writs of habeas corpus that seeks relief parallel to that sought in the Section 1983 matter.

The same day, Plaintiffs also filed an emergency motion for a TRO/PI in the Section 1983 matter. *See Money v. Pritzker*, No. 20 cv 2093, Doc. 9. That motion seeks preliminary certification of Plaintiffs' Subclasses 1 and 2 and an order transferring those individuals to their homes or other approved placement to self-isolate via temporary medical furlough while remaining in the custody and control of IDOC. *Id.* The filed TRO/PI does not include, at this stage, relief for Subclasses 3-6.

On April 4, 2020, the Court directed Plaintiffs to supplement their TRO/PI motion to "provide their position regarding the applicability and effect of 18 U.S.C. § 3626 to their lawsuit and, in particular, to the relief they are requesting in the TRO/PI motion." *Money v. Pritzker*, No. 20 cv 2093, Doc. 22.

As Plaintiffs describe in further detail below, 18 U.S.C. § 3626 applies to their Section 1983 suit, but it has no application to the habeas action. Furthermore, the relief that Plaintiffs seek in the Section 1983 TRO/PI motion—placement of Subclasses 1 and 2 on medical furlough—does not implicate § 3626(a)(3) because it does not seek a prisoner release order. Plaintiffs request for relief also satisfies § 3626(1) and (2) because it is narrowly tailored to correct violations of federal rights.

I.      **The Relevant Provisions of 18 U.S.C. § 3626**

Requests for relief under 18 U.S.C § 3626 are governed by Subsection (a) of that statute, which contains three core provisions: Subsection (1) governs all prospective relief, Subsection (2) governs preliminary injunctions and temporary restraining orders, and Subsection (3) governs "prisoner release order[s]."

Subsection (1) requires that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a

2

particular plaintiff or plaintiffs," *id.* at (a)(1)(A), and instructs courts to "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief" when considering whether "such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id.* Further, the section prohibits courts from ordering a state official to exceed her authority under state law unless doing so is required by federal law to protect a federal right and no other relief will do so. *Id.* at (a)(1)(B). Courts refer to these requirements as the "needs-narrowness-intrusiveness" test. *E.g.*, *Fields v. Smith*, 653 F.3d 550, 558 (7th Cir. 2011).

Subsection (2) applies the narrow-tailoring requirements of Subsection (1) to requests for preliminary injunctions and temporary restraining orders, and further requires that all such relief "shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) [that the relief be narrowly tailored and minimally intrusive] . . . and makes the order final before the expiration of the 90-day period." *Id.* at (a)(2).

Finally, Subsection (3) governs "prisoner release order[s]." A "prisoner release order" is defined as "any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison." *Id.* at (g)(4). Subsection (3) imposes substantive and procedural requirements on prisoner release orders, including the appointment of a three-judge district court for any release order that involve remedies for overcrowding.

## II. Plaintiffs' TRO/PI Motion Does Not Seek a "Prisoner Release Order" Under 18 U.S.C. § 3626(a)(3)

Plaintiffs' TRO/PI motion seeks specific, narrowly tailored relief that does not implicate the release order provisions of the PLRA. The motion seeks relief for Subclasses 1 and 2 only:

medically vulnerable and over-55 people in IDOC custody who can be furloughed under 730 ILCS 5/3-11-1. In more concrete terms, Plaintiffs propose a remedial plan requiring the IDOC to: (1) identify eligible subclass members; (2) evaluate whether their transfer to medical furlough (or home detention, if IDOC prefers) would implicate public safety concerns and thus render them ineligible for furlough or detention; and (3) medically furlough (or transfer to home detention, if IDOC prefers) all eligible subclass members. *See e.g.*, Ex. A, Plaintiffs' Draft Remedial Plan.

Plaintiffs' requested relief is not a "prisoner release order" within the meaning of § 3626(a)(3) for three independent reasons. First, as discussed in Subsection A below, Plaintiffs do not request that IDOC release them from custody, but rather that IDOC act with urgency to identify, evaluate, and relocate appropriate and eligible class members. Individuals transferred to medical furlough or home detention as a result of IDOC's evaluations and determinations would remain in the custody and control of the IDOC and the IDOC would be free to impose restrictions pursuant to 730 ILCS 5/3-11-1 or 730 ILCS 5/5-8A-3. Second, as discussed in Subsection B below, the PLRA limits release orders by federal courts to remedy overcrowding. That provision is not implicated in this case, which does not relate to overcrowding but rather to the unique circumstance of a highly contagious virus that puts the lives of class members at increased risk so long as they are held in a prison setting. Third, as explained in Subsection C, even if there were ambiguity about whether § 3626(a)(3) reaches Plaintiffs' circumstances, the constitutional avoidance doctrine would require this Court to resolve the ambiguity in Plaintiffs' favor. To the extent that § 3626(a)(3) would deny relief, it would be unconstitutional as applied.[1]

---

[1] Plaintiffs' other proposed subclasses likewise do not seek a PLRA "prisoner release order." Just as medical furlough does not implicate § 3626(a)(1)(3), neither does transfer to home confinement. Plaintiffs can further address the applicability of § 3626(a)(1)(3) to Subclasses 3-6 at a later stage. The currently-pending TRO/PI motion does not seek relief for these subclasses.

4

### A. Plaintiffs Do Not Seek a Release Order, But Rather a Process to Mitigate the Threat of COVID-19 for Medically Vulnerable Prisoners, Evaluate Their Suitability for Medical Furlough, and Transfer Eligible Prisoners

By its very terms, 18 U.S.C. § 3626(a)(3) applies only to an order "that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison." § 3626(g)(4). Plaintiffs do not seek either of these things. Rather, they seek a process through which subclass members eligible for medical furlough will be identified and evaluated based on a balancing of public safety and public health needs, and transferred accordingly.

The plain language of Illinois' prison furlough statute defines a furlough not as release from confinement or custody, but as an extension of "the limits of the place of confinement of a committed person under prescribed conditions." 730 ILCS 5/3-11-1. Consistent with this concept, the Illinois Administrative Code treats prisoners on medical furlough as "committed persons," governed by the Code's "Authorized Absence" provisions. *See* 20 Ill. Admin. Code § 530.40. Prisoners on furlough are considered to remain under confinement for a variety of purposes, including election law and public benefits law. *See* 10 ILCS 5/3-5 ("Confinement . . . shall include any person convicted and imprisoned but granted a furlough as provided by Section 3-11-1 of the Unified Code of Corrections . . ."); Social Security Administration (SSA) Program Operations Manual System (POMS) PR 06805.016 Illinois ("a prisoner is considered 'confined' [] or 'a resident of a public institution' [] even if he is granted and/or released on a furlough, for purposes of suspension of benefits to prisoners").

When transferred, these Plaintiffs will still remain in IDOC custody, though their location will have changed. By way of illustration, all of the IDOC prisoners who have COVID-19 and are on ventilators at outside hospitals are on "medical furlough" status. Although not inside of a

5

specific correctional center, these people are still indisputably still in IDOC custody, as is clear from the IDOC profile of one these men, below:

 

**K77218 - WILSON, JOSEPH**
**Parent Institution:** STATEVILLE CORRECTIONAL CENTER
**Offender Status:** MEDICAL FURLOUGH
**Location:** FURLOUGH

IDOC still considers furloughed or transferred prisoners as being within the IDOC population, just as it would for someone who resides in the community on electronic monitoring or who resides behind prison walls. Recent data shows that IDOC has approximately 1500-1700 prisoners on medical furlough status at any given time. *See* Ex. B, IDOC, Operations and Management Report (OMR) Key Variables Fiscal Year 2020, 1.

The custodial status of furloughed prisoners is set forth in the nature and duration of furloughs: the statute contemplates temporary relocation to "(2) to obtain medical, psychiatric or psychological services when adequate services are not otherwise available." 730 ILCS 5/3-11-1(a)(2). Given the unique threat posed by COVID-19, furlough to a home setting—where social distancing, the only established approved mechanism to avoid infection, can be practiced—falls within the scope of the furlough statute. Once the threat posed by COVID-19 has been contained or mitigated, IDOC can recall these individuals back to correctional centers. Indeed, the medical furloughs Plaintiffs seek are necessarily temporary. 730 ILCS 5/3-11-1(a)(2) (authorizing IDOC

to furlough a prisoner for a limited period of time for medical reasons). Plaintiffs do not seek a release from custody, and § 3626(a)(3) does not apply.

> B. **The PLRA's Release Order Requirements for Mass Prisoner Releases and Population Caps Are Inapplicable Here**

Although Plaintiffs do not seek a prisoner release order within the meaning of the PLRA, even if they did, because they do not seek a remedy for overcrowding, the circumstances of today's pandemic are outside the scope of § 3626(a)(3). Both the plain language of the statute as a whole and the legislative history demonstrate that this provision is specific to federal court orders remedying violations primarily caused by overcrowding. *See* 18 U.S.C. § 3626(a)(3)(e) (limiting release orders to where "crowding is the primary cause of the violation of a Federal right"). The House Report accompanying the PLRA explained that it was intended to govern court imposed "prison caps." H.R. Rep. No. 104-21, p.25 (1995).

Nothing in the PLRA displaces district courts' "broad equitable powers to order the transfer of inmates to facilities better equipped to provide for their medical needs." *Reaves v. Dep't of Corr.*, 392 F. Supp. 3d 195, 209-10 (D. Mass. 2019) (citing *Johnson v. Harris*, 479 F. Supp. 333, 337-38 (S.D.N.Y. 1979) (ordering prison to either transfer prisoner to facility equipped to provide for his medical needs or to ensure he is provided with adequate care as remedy for prison's deliberate indifference to his serious medical needs); *see also United States v. Wallen*, 177 F. Supp. 2d 455, 458 (D. Md. 2001) (ordering transfer of pretrial detainee to a hospital since "the Marshal's Service cannot assure this Court that it will provide the medical care that the Constitution mandates so long as he is held at MCAC"); *see also* ABA Standards for Criminal Justice, 23-6.2 (3d ed. 2011) ("A prisoner who requires care not available in the correctional facility should be transferred to a hospital or other appropriate place for care."); *cf. Murphy v. Lane*, 833 F.2d 106 (7th Cir. 1987) (allowing plaintiff's claim for retaliatory transfer

to go forward based on prison officials' transfer of plaintiff to prison more poorly-equipped to handle his psychiatric needs).

For more than two decades, district courts have found that § 3626(a)(3) does not apply to orders remedying violations of federal rights other than overcrowding, even where that order requires prisoners to be moved out of their current facilities. In *Doe v. Younger*, No. 91-187 (E.D. Ky. Sept. 4, 1996), Op. and Order (attached as Ex. C) at 10-12, the district court banned the housing of juveniles for more than 15 days in jail, where conditions were unacceptable for children. The court held that this was not a prisoner release order under the PLRA, even where it had the effect of reducing the number of children in the facility: "[T]he court's order does not direct the release of any child. It is undisputed that counties . . . often house juveniles in need of a secure facility in other counties. In fact, such transfers from facilities in one county to facilities in another county or even another state are extremely common. Indeed, the Kentucky Juvenile Code specifically contemplates such transfers."

In a case directly on point to the present situation, *Plata v. Brown*, No. C01-1351, 2013 WL 3200587, at *9 (N.D. Cal. June 24, 2013), the court was faced with the sweeping transmission of coccidioidomycosis, or Valley Fever, "an infectious disease caused by inhalation of a fungus," in certain prisons within the California state prison system. *Plata*, at *2. The court granted an exclusionary order for medically vulnerable prisoners, rejecting the defendants' argument that the PLRA barred the requested relief unless issued by a three-judge court:

> Here, looking at the [PLRA] statute as a whole requires reading the definition of "prisoner release order" in conjunction with the requirements for entering one. One such requirement is that a three judge court must determine, by clear and convincing evidence, that "crowding is the primary cause of the violation of a Federal right," before it can enter a prisoner release order. 18 U.S.C. § 3626(a)(3)(E)(i). Consequently, adopting Defendants' interpretation of "prisoner release order" would mean that a court could only order that prisoners be transferred from one prison to another if overcrowding were the primary cause of the violation of those prisoners' rights, and not if any other reason were

8

causing the violation. Defendants have failed to point to anything in the legislative history that indicates an intent to limit the protection of inmates' constitutional rights in this manner . . . .

*Id*. at *9.

In the context of the relief requested here, the PLRA's legislative history review is not an academic exercise, but an imperative affirmation of this court's broad equitable authority to order relief for Subclasses One and Two. "'A statute should not be construed to displace courts' traditional equitable powers '[a]bsent the clearest command to the contrary.'" *Plata*, 2013 WL 3200587, at * 9 (citing *Gilmore v. California*, 220 F.3d 987, 997 n.12 (9th Cir. 2000), and *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982)) ("Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." (quotation marks and citations omitted)). As the PLRA's legislative history demonstrates, Congress did not intend to limit courts' ability to move or transfer prisoners as a result of other (non-crowding) constitutional violations—including those presented here. *See Reaves*, 404 F. Supp. 3d at 523 ("Accepting Defendants' argument would mean that the only way a district court can order the release of a prisoner is for a violation of his constitutional rights where overcrowding caused the violation, but not if any other reason caused the violation. Defendants have failed to present anything in the legislative history which evidences Congressional intent to limit the protection of inmates' constitutional rights in this way—presumably because there is no such history.").

As both the *Doe* and *Plata* courts concluded, the PLRA does not preclude court orders to transfer medically vulnerable prisoners, which is the relief Plaintiffs seek here. *See*, *e.g.*, *Plata*, 2013 WL 3200587, at *9 ("Sponsors of the PLRA were especially concerned with courts setting 'population caps' and ordering the release of inmates as a sanction for prison administrators'

failure to comply with the terms of consent decrees designed to eliminate overcrowding.") (citing *Gilmore*, 220 F.3d at 998 n.14); *Doe v. Younger*, attached as Ex. C, at 11 ("After reviewing the substantive provisions concerning prisoner release orders and the legislative history underlying this provision of the PLRA, it is clear that the prisoner release order provisions are directed at prison caps, *i.e.*, orders directing the release of inmates housed in a particular institution once that institution houses more than a specific number of persons. This is not that kind of case."). Senators who supported § 3626's restrictions did so explicitly in response to federal courts that were "dictat[ing] prison population size and order[ing] excess prisoners released." 142 Cong. Rec. S10576-02, 1996 WL 522797 (remarks of Sen. Abraham). The record evinces the overriding intent to limit the capacity of federal judges to impose "prison population cap[s]." 141 Cong. Rec. S14414 (daily ed. Sept. 27, 1995) (remarks of Sen. Dole) ("Perhaps the most pernicious form of micromanagement is the so-called prison population cap . . . . By establishing tough new conditions that a Federal court must meet before issuing a prison cap order, this bill will slam-shut the revolving prison door."); *see also* 142 Cong. Rec. S3703-01, 1996 WL 188576 (remarks of Sen. Abraham) (the purpose of the PLRA was to end such judicial orders as "a program of wholesale releases of up to 600 criminal defendants per week to keep the prison population down to what the judge considers an appropriate level"); Margo Schlanger, *Anti-Incarcerative Remedies for Illegal Conditions of Confinement*, 6 U. Miami Race & Soc. Just. L. Rev. 1, 27-28 (2016) (collecting congressional testimonies and reports identifying federal court-imposed prison population caps as the target of the PLRA).

Plaintiffs do not seek such mass release orders or population caps. Instead, Plaintiffs seek an expedited, individualized review and re-location of those people who are medically vulnerable and more likely to have serious complications or to die if they contract COVID-19.

The purpose of this expedited review is to evaluate their suitability for medical furlough or home detention—not release from IDOC custody. No court has ever held that relief of such deferential nature is in conflict with § 3626(a)(3).

### C. The Doctrine of Constitutional Avoidance Requires the Court to Interpret § 3626 Consistently With the Relief Sought by Plaintiffs

Even if there were ambiguity about whether § 3626(a)(3) applies to the relief Plaintiffs seek, the doctrine of constitutional avoidance requires resolving that ambiguity in Plaintiffs' favor. If § 3626(a)(3) is interpreted to preclude, or even to delay, relief sought by Plaintiffs in the face of an undisputed imminent risk of serious illness or death arising from a deadly virus, this provision would be unconstitutional as applied. Such an interpretation would unlawfully prevent courts from ordering relief urgently needed to protect prisoners' lives and federal rights in the face of an unprecedented pandemic, and must be avoided. *See Jones v. United States*, 529 U.S. 848, 857 (2000) (quoting U*nited States ex rel. Attorney General v. Delaware & Hudson Co*., 213 U.S. 366 (1909)) ("where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter."); *Gilmore v. California*, 220 F.3d 987, 998 (9th Cir. 2000) ("The courts will therefore not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it.") (citing *DeBartolo Corp v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *see also NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 500 (1979) ("[A]n Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available.").

In the unique circumstances of the COVID-19 pandemic, requiring the § 3626(a)(3) procedures and precluding relief because Plaintiffs' have not alleged that their rights are violated due to overcrowding, would be unconstitutional. Defendants here are well aware of the

11

immediate risks to Plaintiffs' lives and health from remaining in the congregate setting of prisons. *See* ECF No. 1, Complaint, ¶¶ 43-44. Every day of delay does not merely delay relief but increases the risk. At least two prisoners have already died. Reading the PLRA to prevent the courts from acting here would be unconstitutional, or at a minimum, raises serious constitutional concerns. *Jones*, 529 U.S. at 857 (courts should avoid statutory constructions that raise "grave and doubtful constitutional questions") (internal quotation marks and citation omitted).

### III. The Relief Plaintiffs Seek in the Section 1983 Matter Satisfies the "Needs-Narrowness-Intrusiveness" Requirements of § 3626(a)(1) & (a)(2)

The urgency of the risk posed to medically vulnerable Plaintiffs by COVID-19 cannot be overstated. Continued incarceration of Plaintiffs in Subclasses 1 and 2 puts them at substantial risk of imminent contraction of and death from COVID-19, in violation of the Eighth Amendment and the Americans with Disabilities Act.

Under the PLRA, any injunctive remedy must satisfy the "needs-narrowness-intrusiveness requirement." *See Fields v. Smith*, 653 F.3d 550, 558 (7th Cir. 2011). That means that a district court issuing a preliminary injunction must find that the relief (1) is narrowly drawn, (2) extends no further than necessary to correct the harm requiring preliminary relief, and (3) is the least intrusive means necessary to correct that harm. 18 U.S.C. § 3626(a)(2). The court must give "substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief." *Id.* The "needs-narrowness-intrusiveness" requirement is case-specific and "must be undertaken in light of both the magnitude of existing constitutional violations and the available alternative remedies." *Morales Feliciano v. Rullan*, 378 F.3d 42, 54 (1st Cir. 2004); *see also Brown v. Plata*, 563 U.S. 493, 531 (2011) ("Narrow tailoring requires a fit between the remedy's ends and the means chosen to accomplish those ends . . . . The scope of the remedy must be proportional to the scope of the

violation, and the order must extend no further than necessary to remedy the violation."). The unique circumstances of the COVID-19 pandemic, and the particular risks it poses for the medically vulnerable, requires immediate furlough or transfer for Subclasses 1 and 2.

Accordingly, this Court must order IDOC to implement a process similar to one included in Sections 1 and 2 of in the Plaintiffs' proposed Draft Remedial Plan, so that subclass members who pose no risk to public safety are transferred from facilities where the chances of contracting COVID-19 are incredibly high, to community placements where they can safely quarantine while remaining in IDOC custody. *Cf. Farmer v. Brennan*, 511 U.S. 825, 847 (1994) (prison official can be liable "for denying humane conditions of confinement" where "he knows inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."); *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) ("If a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it." (citations omitted).

### A. Relief Sought by Plaintiffs is Narrowly Drawn

The relief proposed in Plaintiffs' Draft Remedial Plan is narrowly drawn both in scope and in substance. While Plaintiffs' Section 1983 action is brought on behalf of all prisoners in the IDOC and six cognizable subclasses, they see preliminary relief for two subclasses only: those who are medically vulnerable due to age, and those who are vulnerable due to preexisting medical conditions. Urgent action is required to protect the lives of these prisoners by preemptively removing them from prison facilities before they contract COVID-19.

The relief itself is also narrowly tailored to meet the particular characteristics and circumstances of the COVID-19 pandemic. As detailed more fully in Plaintiffs' complaint, standards from the CDC and other public health experts indicate that all individuals, but

particularly those who are medically vulnerable, should avoid close contact with people who are sick or who are or may be contagious even if asymptomatic. *See* ECF No. 1, Complaint, ¶¶ 31-33. In Illinois prisons, Defendants have admitted that all aspects of daily life take place in a congregate setting making social distancing impossible. *See id.* ¶¶ 43-44. The only way for Defendants to ensure that medically vulnerable prisoners can keep their distance from others is by transferring them to a different environment.

      **B.**      **Relief Sought by Plaintiffs Does Not Extend Further Than Necessary to Correct the Violation of their Federal Rights**

The preliminary injunctive relief sought by Plaintiffs does not extend further than necessary to correct the constitutional violation at issue, given the nature of the violations of federal law and IDOC's inability to remedy the serious risk of harm in any other way. While the court's order for relief must be deliberately narrow to minimize intrusion into correctional operations, the relief ordered must also be sufficient to fulfill its function of remedying the violations at hand. *See Brown*, 563 U.S. at 511 ("Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration."). Here, the violations at hand include imminent risk of contracting COVID-19, which could lead to serious medical complications and death. The only adequate remedy for medically vulnerable prisoners is medical furlough or transfer.

The very nature of Illinois prisons renders IDOC incapable of protecting the medically vulnerable subclasses from COVID-19's spread if they remain within IDOC facilities. Illinois' Director of Public Health has admitted that IDOC facilities do not have enough individual cells to isolate prisoners with confirmed cases of the virus, and that prisons "pose unique challenges in stopping the spread of disease and protecting the health of individuals who live and work there." *See* ECF No. 1, Complaint, ¶ 43. If confirmed cases cannot be successfully quarantined within

IDOC facilities, the only way the IDOC can protect the lives of these vulnerable individuals is by immediately furloughing or transferring them to a site outside the prison.

This Court cannot not wait for the virus to spread to each IDOC facility before identifying eligible class members and granting them medical furlough. *Cf. Skinner v. Uphoff*, 234 F. Supp. 2d 1208, 1218 (D. Wyo. 2002) ("Of course, the remedy ordered by this Court shall extend no further than necessary to correct the violation of the Federal right, but if it is necessary to enact systemic and prophylactic measures in order to correct the violations found to exist in this instance, the Court may do so."). Once this dangerous virus enters the prison, it will spread rapidly from prisoner to prisoner and among staff. Catastrophe already has struck at Stateville, where the number of confirmed COVID-19 cases has grown exponentially in just a matter of days, sickening dozens of prisoners and staff and killing at least two prisoners. COVID-19 cases have now been confirmed among staff or prisoners at Stateville NRC, Menard, Logan, Danville, Sheridan, Graham, Joliet Treatment Center, and Kewanee. Action must be taken now to prevent devastation throughout prisons and prison communities across the state.

### C. The Relief Sought is the Least Intrusive Means to Remedy the Violation

Plaintiffs' proposed relief wholly respects the discretion of the IDOC and requires relocation only for those individuals who have medical vulnerabilities to COVID-19 and pose no threat to public safety. This relief is authorized by state law and is the least intrusive means to protect the life and rights of the medically vulnerable Plaintiff subclasses.

The Illinois legislature created medical furlough as a mechanism to allow for temporary change in confinement under special circumstances, and one would be hard pressed to find a more dire special circumstance than the current global pandemic. Under Illinois' medical furlough statute, the IDOC is authorized to "extend the limits of the place of confinement of a

committed person under prescribed conditions, so that he may leave such place on a furlough."
730 ILCS 5/3-11-1(a). The COVID-19 pandemic has already claimed the lives of at least two Illinois prisoners and sent more than a dozen to a hospital intensive care unit. Medical furlough is an appropriately tailored remedy to protect the lives of prisoners who are most at risk of death from COVID-19 due to their age and preexisting medical conditions.

### IV. PLRA Has No Application to Petitions for Writs of Habeas Corpus

Petitioners request emergency action in their request for writs of habeas corpus; as in the Section 1983 suit, Petitioners seek immediate furlough or transfer of Subclasses 1 and 2. The PLRA has no application to a habeas petition. *Walker v. O'Brien*, 216 F.3d 626, 634 (7th Cir. 2000) ("[W]e conclude that cases properly brought under §§ 2241 or 2254 as habeas corpus petitions are not subject to the PLRA. In so doing, we bring this circuit into line with all of our sister circuits who have ruled on the matter.") (citing *Davis v. Fechtel*, 150 F.3d 486, 488-90 (5th Cir. 1998); *McIntosh v. U.S. Parole Comm'n*, 115 F.3d 809, 811-12 (10th Cir. 1997); *Blair-Bey v. Quick*, 151 F.3d 1036, 1039-41 (D.C. Cir. 1998)); *see also Greyer v. Ill. Dep't of Corr.*, 933 F.3d 871, 878 (7th Cir. 2019) (observing that "habeas corpus petitions do not give rise to a strike under the PLRA"). This conclusion is fully supported by the two separate statutory schemes enacted by Congress to govern § 1983 actions (the PLRA) and habeas petitions (the Anti-Terrorism and Effective Death Penalty Act). *See Blair-Bey*, 151 F.3d at 1041 (noting that the PLRA and AEDPA were enacted two days apart, "strongly suggest[ing] that Congress intended to make its changes to habeas proceedings via the AEDPA, and to alter procedure in prisoner civil rights litigation in the PLRA").

Dated: April 6, 2020                                    Respectfully submitted,

/s/Elizabeth Mazur
One of the Attorneys for the Plaintiffs

| | |
|---|---|
| Sheila A. Bedi | Amanda Antholt |
| Luke Fernbach* | Samantha Reed |
| Emily M. Grant* | Equip for Equality |
| Terah Tollner* | 20 N. Michigan Avenue, Suite 300 |
| Community Justice Civil Rights Clinic | Chicago, IL 60602 |
| Northwestern Pritzker School of Law | (312) 241-0020 |
| 375 East Chicago Avenue | |
| Chicago, IL 60611 | Sarah Grady |
| (312) 503-2492 | Steve Weil |
| *Law student licensed pursuant to Illinois | Loevy & Loevy |
|  Supreme Court Rule 711 | 311 N. Aberdeen Street, 3rd Floor |
| | Chicago, IL 60607 |
| Vanessa del Valle | (312) 243-5900 |
| Roderick and Solange MacArthur Justice Center | |
| Northwestern Pritzker School of Law | Alan Mills |
| 375 East Chicago Avenue | Elizabeth Mazur |
| Chicago, IL 60611 | Uptown People's Law Center |
| (312) 503-5932 | 4413 N. Sheridan |
| | Chicago, IL 60640 |
| Jennifer Soble | (773) 769-1411 |
| Illinois Prison Project | |
| 53 W. Jackson, Suite 1056 | |
| Chicago, IL 60616 | |
| (312) 324-4465 | |

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Elizabeth Mazur, an attorney, certify that I served this pleading on all counsel of record by filing it through CMECF system.

/s/Elizabeth Mazur