IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES MONEY, *et al.*, | |
| Plaintiffs, | No. 20-C-2093 |
| | (Also filed in case no. 20-C-1792) |
| v. | |
| J.B. PRITZKER, *et al.*, | Honorable Robert M. Dow, |
| Defendants. | Emergency Judge |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

The Court and the public need only watch Governor Pritzker's daily press briefing, or review the websites of the Illinois Department of Corrections, the Illinois Department of Public Health, and any number of other state offices and agencies, to see that the Governor, the Department, and the State have implemented immediate and drastic steps to address the COVID-19 public health emergency to protect all Illinois citizens, including those incarcerated in state prisons.[1]

This response in opposition to plaintiffs' emergency motion will address in detail the fundamental legal flaws with plaintiffs' claims and why they do not—and cannot—support the immediate release and transfers to their homes that plaintiffs seek. First and foremost, however, given the unprecedented public health emergency

---

[1] A court may take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see also Hill v. Capital One Bank (USA), N.A.*, No. 14-CV-6236, 2015 WL 468878, at *5 (N.D. Ill. Feb. 3, 2015) (citing *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (noting that contents of government websites are a proper item of which to take judicial notice)).

taking place throughout the country, and as the Court expressly requested (*see* Dkt. 14, directing defendants "to give special attention to explaining exactly what measures, if any, are currently being taken in Illinois 'to protect people in prisons from the impending spread of COVID-19 by releasing people in an effort to reduce populations'") the Governor and the Acting Director (the "Director") detail below the actions they have taken and continue to take to ensure the safety of those incarcerated in the Department of Corrections.

The Governor issued a disaster proclamation on March 9, 2020, four days before the federal government announced a national emergency.[2] The Department of Corrections followed immediately by enacting strict measures, consistent with CDC guidelines,[3] to protect those who are housed and work in Illinois prisons. These actions include adoption of a pandemic response plan consistent with CDC guidance (including a separate plan specific to Stateville), enhanced screening and testing for COVID-19, increased hygiene and sanitation, new limits (and now a prohibition) on outside visitors, and increased separation of prisoners through an administrative quarantine.[4] And well before plaintiffs filed this action, defendants were already

---

[2]     Dkt. 1 ¶ 20, citing Gubernatorial Disaster Declaration.

[3]     CDC, Coronavirus Disease 2019 (COVID-19): Guidance Documents, CDC, https://www.cdc.gov/coronavirus/2019-ncov/communication/guidance-list.html?Sort=Date%3A%3Adesc.

[4]     CDC, Coronavirus Disease 2019 (COVID-19): Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, CDC, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html; *see also* COVID-19 Response, Illinois Department of Corrections, https://www2.illinois.gov/idoc/facilities/Pages/Covid19Response.aspx (last visited Apr. 5, 2020).

systematically reviewing prisoners, including the groups identified in the complaint, to determine who could be released safely under Illinois law.

Although the Court need not look beyond plaintiffs' pleading to reject their request for emergency relief, the Court can take judicial notice of the facts showing that over the past several weeks, defendants' unprecedented and extraordinary measures to mitigate the risk of COVID-19 in Illinois prisons include the following:

- As plaintiffs admit (Dkt. 1 ¶ 73; Dkt. 9 at 27), the Governor has suspended admissions of new prisoners from all Illinois county jails, with limited exceptions at the sole discretion of the Director. Executive Order 2020-13;[5] *see also* Executive Order 2020-18 (extending Executive Order 2020-13 through April 30, 2020).[6]

- Plaintiffs also admit the Governor has activated the Illinois National Guard to provide additional medical support at Stateville. Dkt. 1 ¶¶ 91; Dkt. 9 at 48.

- The Governor is continuing to review and grant commutation petitions.[7]

- The Department created a population management task force, which includes members from the Prison Review Board, solely for the purpose of prioritizing the review of individuals for possible release through statutorily permissible means.

- As of April 6, 2020, the Department has released approximately 450 prisoners through various forms of sentence credit, restoration of credit,

---

[5]     Pritzker, Governor J.B., Executive Order 2020-13 (Mar. 26, 2020), https://www2.illinois.gov/Documents/ExecOrders/2020/ExecutiveOrder-2020-13.pdf.

[6]     Pritzker, Governor J.B., Executive Order 2020-18 (Apr. 1, 2020), https://www2.illinois.gov/Documents/ExecOrders/2020/ExecutiveOrder-2020-18.pdf.

[7]     For example, on March 30, 2020, Thomas Franzen, a 37-year-old cancer patient was released from Stateville to his Sugar Grove home to serve 2 years of parole. He was serving a 4-year sentence for possession of >5,000 grams of marijuana. https://www.dailyherald.com/news/20200331/cancer-patient-serving-4-years-for-thc-chocolates-out-of-prison-thanks-to-governor.

and electronic detention.[8] The Department has provided an additional 65 furloughs since the creation of the population management task force.

- Between March 2 and April 6, 2020, the Department reduced its population by more than 1,000 prisoners.[9]

- The Department is continuing to award up to 180 days of Earned Discretionary Sentencing Credit (EDSC) for eligible offenders pursuant to 730 ILCS 5/3-6-3(a)(3). The sentencing credit is within the sole discretion of the Director, but must be based on the results of a risk or needs assessment, circumstances of the crime, any history of conviction for a forcible felony, the offender's behavior and disciplinary history, and the inmate's commitment to rehabilitation, including participation in programming. *Id.* The Director is prohibited from awarding discretionary sentencing credit to any inmate unless the inmate has served a minimum of 60 days. *Id.*

- On April 6, 2020 (today), the Department filed an emergency rule change to amend the Administrative Code, 20 Ill. Admin. Code § 107.20, to relax the award of Earned Disciplinary Sentence Credit (EDSC) for those with 100-level disciplinary tickets.

- The Department is continuing to identify offenders within nine months of their release date and conducted individualized reviews to determine whether they are eligible for early release. The review requires staff to examine an offender's file for disciplinary history, commitment to rehabilitation, and criminal history. Offenders with forcible felonies, violent criminal histories, significant disciplinary issues, and outstanding warrants are not approved for the sentencing credit. The Department continues to generate a list of offenders every week and continues to conduct daily reviews of these offenders' files.

- The Department is continuing to review revocation of good conduct credit and has restored sentence credit where appropriate.

- The Department is continuing to place offenders on electronic monitoring or home detention pursuant to 730 ILCS 5/5-8A-3. The Department has

---

[8] *Id.* at 6:54-8:06; *see also* @IDOC_Illinois, TWITTER (Apr. 4, 2020, 2:50 PM), https://twitter.com/IDOC_Illinois/status/1245800734651752450; @IDOC_Illinois, TWITTER (Apr. 5, 2020, 4:00 PM), https://twitter.com/IDOC_Illinois/status/1246905474013966338.

[9] This number was 1,069 (since February 1, 2020) as of Governor Pritzker's March 31, 2020 press briefing. *See* Pritzker, Governor J.B., IDPH, *COVID-19 Press Update Video*, at 5:34-6:07 (Mar. 31, 2020), *available at* http://www.dph.illinois.gov/topics-services/diseases-and-conditions/diseases-a-z-list/coronavirus/media-publications/daily-press-briefings.

already placed 16 of 21 pregnant and postpartum offenders on home detention, and is now concentrating its efforts on those who are 55 years or older, have served at least 25% of the sentence and are within 12 months of release.[10] Although this category is permitted under 730 ILCS 5/5-8A-3(d), the Department must conduct individual assessments to ensure placement outside of a secure facility is appropriate.[11]

- To allow for faster releases of prisoners, the Governor has suspended the required 14-day notification to State's Attorneys for inmates released early as a result of earned sentence credit for good conduct. Executive Order 2020-11;[12] *see also* Executive Order 2020-18 (extending Executive Order 2020-11 through April 30, 2020).[13]

- To provide greater flexibility for the use of medical furloughs, on April 6, 2020, the Governor filed an additional Executive Order (EO 2020-21) to suspend the 14-day limit for medical furloughs and allow furloughs for medical purposes at the Director's discretion and consistent with the guidance of the Department's medical director.

- The Prisoner Review Board continues to conduct daily hearings by telephone and video conference to set the conditions of mandatory supervised release for all individuals pending release.

- The PRB has notified those affected by the cancellation of the April 2020 clemency docket and new dates are being secured. The PRB is also notifying affected parties that they can request to convert to a non-public hearing, which could be heard based upon the paper submissions, if all affected parties agree. In addition, the PRB continues to conduct informational interviews of incarcerated petitioners by videoconference as usual, and the July docket is still set to proceed as planned at this time.

- The PRB continues to conduct release revocation hearings. As always, each case is reviewed on an individual basis, with consideration of the facts and circumstances of each alleged violation or set of violations, including the protection of victims, the safety of those in the State's custody, and the

---

[10]     IDPH, *COVID-19 Press Update Video*, at 6:54-8:38 (Mar. 31, 2020), *available at* http://www.dph.illinois.gov/topics-services/diseases-and-conditions/diseases-a-z-list/coronavirus/media-publications/daily-press-briefings.

[11]     *Id.*

[12]     Pritzker, Governor J.B., Executive Order 2020-11 (Mar. 23, 2020), https://www2.illinois.gov/Documents/ExecOrders/2020/ExecutiveOrder-2020-11.pdf.

[13]     Pritzker, Governor J.B., Executive Order 2020-18 (Apr. 1, 2020), https://www2.illinois.gov/Documents/ExecOrders/2020/ExecutiveOrder-2020-18.pdf.

overall public health concerns currently facing the State. The PRB is also taking into account the nature of the current extraordinary circumstances in all cases as a result of COVID-19, while recognizing that each decision must be made with the goals of protecting public safety and safely and restoring releasees to productive lives.

- The Governor's Office is working with outside groups such as the SAFER Foundation and TASC to identify and secure safe host sites and provide wrap-around services to support potential releases.

- Lt. Governor Julia Stratton, along with the SAFER Foundation, has developed the Prison Emergency Early Release Response (PEERR) team. The PEERR team is a coordinated effort to facilitate the successful reentry of people leaving our state prisons and returning to Cook County. The PEERR team is currently developing a referral network of human services, healthcare, housing, and reentry providers that are open for business, whether in person or remotely, and have capacity to deliver services to people being released from IDOC custody. These services may include food, clothing, financial assistance, telehealth substance use and mental health services, physical healthcare, medication continuity, employment services, and housing.

- The Governor and the Director continue to monitor these efforts, and the Department continues to make necessary changes as the situation evolves.

These are the actions of officials who are responding quickly and aggressively to combat COVID-19—actions that are the opposite of deliberate indifference. Plaintiffs nevertheless assert the bald conclusion that the Governor and Director have not acted with sufficient "urgency or decisiveness" and have "failed to take reasonable measures" to reduce the prison population "substantially" to their satisfaction. *Id.* ¶¶ 74, 111. These allegations do not present a plausible claim for deliberate indifference, let alone a claim with any likelihood of success.

Plaintiffs' motion should be denied, not only because they cannot show a likelihood of success on the merits in light of their inability to surmount the many procedural and substantive legal hurdles discussed below, but also because plaintiffs'

alleged "possibility" of harm, *see* Dkt. 9 at 64, does not outweigh the definite harm to the State and the public if the Court were to order the immediate release of the thousands of prisoners in plaintiffs' proposed subclasses 1 and 2. Plaintiffs' request that they and the Court substitute their own judgment for the Department's in determining who may be safely released from prison and on what conditions, is neither responsible nor in keeping with the public interest. This is particularly so here, where the Department is already evaluating prisoners for whether they can be released without undue risk to public safety and whether each prisoner would have suitable housing if released.

Critical decisions about the release of prisoners are committed to the State and its officials; they are in the best position to weigh how to manage the prison population and balance the safety of prisoners, prison staff, and the public. For that reason, federal law restricts the authority of federal judges to order prisoner releases. The Prison Litigation Reform Act does not allow it except when ordered by a designated three-judge panel, and even then only after a court has already entered less intrusive relief addressing the same problem. These PLRA requirements defeat plaintiffs' case.

Supreme Court precedent also bars prisoners from using a § 1983 action to seek a "quantum change" in their conditions of confinement. By seeking immediate release from prison, plaintiffs are seeking the kind of quantum change that is not allowed.

And while prisoners may sue to protect themselves from cruel and unusual punishment, a right protected by the Eighth Amendment, they must allege and ultimately prove that prison officials are "deliberately indifferent" to a recognized risk that those prisoners face substantial harm. Plaintiffs' pleading does not plausibly show that the Governor or the Director have been deliberately indifferent to the risks posed by COVID-19. Plaintiffs do not allege the kind of subjective indifference—amounting to criminal recklessness—to sustain a plausible claim under the Eighth Amendment. That claim is particularly specious here, where it is clear that defendants not only recognize the risk of harm to prisoners and prison staff from COVID-19, but have also taken and continue to take immediate and significant actions to address that risk. Plaintiffs likewise do not present a plausible claim giving them a likelihood of success under the ADA. They do not plausibly allege to be "qualified" under the ADA, nor do they plausibly allege any discrimination against them by reason of any claimed disability

There is no question that COVID-19 poses unprecedented risks to the health of all citizens, including prisoners. And while courts may issue temporary emergency relief in appropriate cases, the Court cannot do so here, where the underlying legal claims lack a likelihood of success and where the requested relief—here an unprecedented mandatory immediate prison release of as many as 16,000 convicted felons—is manifestly against the State's and the public's interests.

## BACKGROUND

Plaintiffs are ten individuals convicted of a range of felonies, including aggravated kidnapping and murder. None claim to have COVID-19. Two of them (Gerald Reed and Patrice Daniels) are housed at facilities (the Stateville Northern Reception Center [NRC] and the Joliet Treatment Center, respectively), where someone on staff (no prisoners) allegedly tested positive for COVID-19. Dkt. 1 ¶¶ 71, 95, 101. Only one of those plaintiffs, Gerald Reed, is a member of the proffered subclasses 1 and 2 seeking a release through the requested "temporary restraining order."[14] Dkt. 9 at 1–2. The complaint defines subclasses 1 and 2 to encompass those who, based on their age or medical condition, are "eligible for medical furlough pursuant to 730 ILCS 5/3-11-1," Dkt. 1 ¶ 103(a) & (b). By plaintiffs' math, these two groups constitute approximately 16,000 prisoners. Dkt. 1 ¶ 105.

Plaintiffs base their requested relief, which they characterize at times as either a temporary restraining order or a preliminary injunction, *e.g.*, Dkt. 9 at 1–2, 38 (it is more akin to a preliminary injunction), on two legal claims: Count I alleging deliberate indifference in violation of the Eighth Amendment, and Count III alleging a violation of the ADA. *Id.* at 40. As discussed below, plaintiffs are not likely to succeed on either claim.[15]

---

[14]    Daniels is 45 years old and does not identify any medical vulnerability. Dkt. 1 ¶ 101. Seven of the named plaintiffs (Money, Richard, G. Reed, Green, Labosette, C. Reed, and Tate) claim to be in subclasses 1 and/or 2 seeking immediate release from prison based on their age and/or medical condition.

[15]    Although plaintiffs are not seeking emergency relief based on their procedural due process claim in Count II, that claim also has no likelihood of success on the merits because plaintiffs lack any liberty or property interest in being granted a furlough or home detention. As discussed more fully in Respondent's Response to Emergency Petition for Writs of Habeas Corpus in case 2094, the

## ARGUMENT

The standards for deciding whether a temporary restraining order is appropriate are "analogous to the standards applicable when determining whether preliminary injunctive relief is appropriate." *YourNetDating, Inc. v. Mitchell*, 88 F. Supp. 2d 870, 871 (N.D. Ill. 2000). Injunctive relief is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original); *see also Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 823 (7th Cir. 1998) (same); *see also Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380, 389 (7th Cir. 1984).

To obtain a temporary restraining order or preliminary injunction, plaintiffs must make a clear showing that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) that the injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008); *Judge v. Quinn*, 612 F.3d 537, 546 (7th Cir. 2010). Additionally, the court "must balance the competing

---

courts have consistently held that a statute providing for release from prison to a less restrictive form of custody (such as parole or, here, home detention) does not create a liberty or property interest unless the statute contains "'*explicitly mandatory language*,' *i.e.*, specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Ky. Dept. of Corr. v. Thompson*, 490 U.S. 454, 463 (1989) (emphasis added); *see also Grennier v. Frank*, 453 F.3d 442, 444 (7th Cir. 2006) ("It takes mandatory language (and thus an entitlement contingent on facts that could be established at a hearing) to create a liberty or property interest in an opportunity to be released on parole."). Here, the Illinois home detention and medical furlough statutes are discretionary. *See* 730 ILCS 5/5-8A-3 and 730 ILCS 5/3-11-1. Therefore, petitioners have no liberty or property interest in home detention and Count II is meritless. *See, e.g., Thompson*, 490 U.S. at 463; *Grennier*, 453 F.3d at 444.

claims of injury and must consider the effect on each party of granting or withholding the requested relief," paying "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.

Plaintiffs' burden in this case is even greater than usual because, rather than seeking to preserve the *status quo*, they seek *mandatory* interim relief directing the certification of their proposed subclasses 1 and 2, and directing defendants to release approximately 16,000 offenders. *See* Dkt. 1 ¶ 105. Mandatory injunctions are "rarely issued," interlocutory mandatory injunctions are "even more rarely issued," and neither should be issued "except upon the clearest equitable grounds." *W.A. Mack, Inc. v. Gen. Motors Corp.*, 260 F.2d 886, 890 (7th Cir. 1958); *see also Graham v. Med. Mut. of Ohio*, 130 F.2d 293, 295 (7th Cir. 1997) ("mandatory preliminary writs are ordinarily cautiously viewed and sparingly issued"); *Chicago United Indus. v. City of Chicago*, 445 F.3d 940, 945–46 (7th Cir. 2006).

Besides seeking mandatory relief, plaintiffs in subclasses 1 and 2 also seek to obtain a temporary restraining order or preliminary injunction that would give them substantially all the relief they seek through this lawsuit. That makes plaintiffs' burden even higher. *See, e.g.*, *Boucher*, 134 F.3d at 827 n.6 ("A preliminary injunction that would give the movant substantially all the relief he seeks is disfavored, and courts have imposed a higher burden on a movant in such cases."); *W.A. Mack,* 260 F.2d at 890 ("A preliminary injunction does not issue which gives to a plaintiff the actual advantage which would be obtained in a final decree.").

Plaintiffs' motion should be denied not only because they cannot show a likelihood of success on the merits in light of their inability to surmount the multiple procedural and substantive legal hurdles discussed below, but also because they have not demonstrated that the possible harm they face from COVID-19 outweighs the State's and the public's interests. The Court also should reject plaintiffs' request to provisionally certify subclasses 1 and 2.

## I.     Plaintiffs Are Unlikely to Succeed on the Merits.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits." *Winter*, 555 U.S at 20. To meet their initial burden, plaintiffs must show that they have a "better than negligible" chance of success on the merits. *Roland Mach. Co.*, 749 F.2d at 387. Where it is more likely than not that a defendant will prevail, injunctive relief is improper, particularly where the balance of harms tips decidedly in favor of the defendant. *See Boucher*, 134 F.3d at 826–27, 829 (vacating preliminary injunction as to expelled high school student). Even if a plaintiff makes the required showing, the court must determine how likely it is that the plaintiff actually will succeed: "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Roland Mach. Co.*, 749 F.2d at 387. Moreover, when there are "two equally credible versions of the facts the court should be highly cautious in granting an injunction without the benefit of a full trial." *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1440 (7th Cir. 1986) (citation omitted).

The Court can and should deny plaintiffs' motion based on several procedural bars that defeat plaintiffs' claims, even before addressing their failure to plead plausible Eighth Amendment and ADA claims.

### A. The PLRA, *Heck*, *Rizzo* Abstention, and Plaintiffs' Failure to Exhaust their Administrative Remedies Give Plaintiffs No Likelihood of Success.

#### 1. The Prison Litigation Reform Act bars this Court from ordering plaintiffs' release from prison under the guise of medical furloughs.

At the outset, plaintiffs have no likelihood of success on the merits because the Prison Litigation Reform Act does not allow this Court to grant the releases and transfers to their homes that plaintiffs seek.

The PLRA is principally codified at 42 U.S.C. § 1997e, but it also encompasses the provisions of 18 U.S.C. § 3626 concerning appropriate prison condition remedies. *See Davis v. Streekstra*, 227 F.3d 759, 761 (7th Cir. 2000); *Berwanger v. Cottey*, 178 F.3d 834, 836 (7th Cir 1999). Although § 3626 of the PLRA allows federal courts in limited instances to issue a "prisoner release order," § 3626(a)(3)(A) unequivocally provides that "no court shall enter a prisoner release order unless—(i) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and (ii) the defendant has had a reasonable amount of time to comply with the previous court orders." 18 U.S.C. § 3626(a)(3)(A); *see also U.S. v. Cook County, Illinois*, 761 F. Supp. 2d 794, 796 (N.D. Ill. 2011). Section 3626 also mandates that a prisoner release order may be entered "only by a three-judge court," and "only if the court finds by clear and convincing evidence that—(i) crowding is the primary cause

of the violation of a Federal right; and (ii) no other relief will remedy the violation of the Federal right." 18 U.S.C. §§ 3626(a)(3)(B), (E); *see also Cook County*, 761 F. Supp. 2d at 796 (three-judge panel reviewing request for prisoner release order).

This Court cannot issue plaintiffs' requested relief because only a three-judge panel can issue the relief they seek. And even a three-judge panel could not grant plaintiffs' requested relief because no court has previously entered a less intrusive order—or any order at all—that attempted to remedy the threat only recently posed by COVID-19. Indeed, just this last Saturday the three-judge panel assigned to oversee a prior prisoner release order in California refused to grant the class's request to order an additional release of prisoners because of the COVID-19 threat. *Plata v. Newsom*, No. 01 C 1351, Dkt. 361, at 9. The class cited that prior order in an effort to satisfy § 3626, but the court concluded that the prior order dealt with "longstanding system constitutional deficiencies in California's prison health care delivery system" and that any additional prisoner release would have to be specifically "based on shortcomings" in California's response to COVID-19. *Id.*

These PLRA requirements apply to both legal claims (under the Eighth Amendment and ADA) that plaintiffs cite to support their requested emergency relief. Section 3626(g)(2) expressly applies to any "civil action with respect to prison conditions," defined as "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but does not include habeas corpus proceedings challenging the fact or duration of confinement in prison[.]" 18 U.S.C. § 3626(g)(2).

14

Thus, plaintiffs must satisfy § 3626 not only for their § 1983 claim, but also for their ADA claim. *See Gillette v Prosper*, 858 F.3d 833, 837 (3rd Cir. 2017) (reviewing district court's denial of request for three-judge panel for both § 1983 and ADA claims).

Plaintiffs original brief cites four federal court orders from late last month in an attempt to show that it is now common for courts to order the release of detainees and prisoners to minimize the risks posed by COVID-19. Dkt. 9 at 44. However, all four cases—*Thaker v. Doll*, No. 20-CV-0480, Dkt. 47 (M.D. Pa. Mar. 31, 2020); *Coronel v. Decker*, No. 20 C 2472, Dkt. 26 (S.D.N.Y. Mar. 27, 2020); *Basank v. Decker*, No. 20-CV-2518, Dkt. 11 (S.D.N.Y. Mar. 26, 2020); *Flores v. Barr*, No. 85-CV-4544, Dkt. 740 (C.D. Cal. Mar. 28, 2020)—concern immigration detainees in federal detention centers, not "prisoners" as plaintiffs mischaracterize them in their brief. Dkt. 9 at 45. The PLRA's requirements do not apply to immigration detainees because they do not fall under the PLRA's definition of a prisoner. *See Cohen v. Clemens*, 321 Fed. Appx. 739, 743 (10th Cir. 2009); *Agyeman v. INS*, 296 F.3d 871, 886 (9th Cir. 2002); *LaFontant v. INS*, 135 F.3d 158, 165 (D.C. Cir. 1998); *Ojo v. INS*, 106 F.3d 680, 683 (5th Cir. 1997); *see also* 18 U.S.C. § 3626(g)(3) (defining "prisoner" as "any person subject to incarceration, detention, or admission to any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law…."). Thus, while the immigration detainees in *Thaker, Coronel, Basank,* and *Flores* did not have to satisfy § 3626's requirements, plaintiffs here do, and their inability to do so defeats their requested relief.

The immigration detainee cases are also inapposite because those courts were analyzing a "much more protective" and objective Fourteenth Amendment clause standard that "differs significantly from the standard relevant to convicted prisoners" who are subject to punishment. *See Unknown Parties v Nielsen,* No. 15 C 250, 2020 WL 813774, at *2–3 (D. Ariz. Feb. 19, 2020). As argued below, plaintiffs do not and cannot satisfy the subjective deliberative indifference test that applies to prison conditions cases.

Plaintiffs' supplemental brief filed today makes two critical errors. First, they insist that they are not seeking the release of any prisoners from any prison, but rather just a request that certain subclass members be "identified and evaluated based on a balancing of public safety and public health needs, and transferred accordingly." Dkt. 24 at 5. Plaintiffs' motion flatly contradicts this backpedaling. Their motion seeks an order for "Defendants to transfer [approximately 16,000 class members] *to their homes* to self-isolate via a temporary medical furlough." Dkt. 9 at 55 (emphasis added). The entire thrust of plaintiffs' complaint and motion is to ask the Court to order the Department to release thousands of prisoners to their homes to allow them to try to avoid COVID-19 there.

Plaintiffs claim that what they are seeking does not qualify as a "prisoner release order" as defined in the PLRA, 18 U.S.C. § 3626(g)(4), because anyone released pursuant to the order would remain under some state control. Dkt. 24 at 5–6. Both the text of § 3626(g)(4) and the *Plata/Coleman* cases that plaintiffs rely on refute this argument. A noted above, a prisoner release order is any order that

"directs the release from or nonadmission of prisoners to a prison." 18 U.S.C. § 3626(g)(4). Nothing in § 3626(g)(4) suggests the definition does not apply when the order has the effect of releasing prisoners to some other less-restrictive environment. Moreover, the *Plata/Coleman* three-judge panel expressly ruled that even orders of release that require supervision fall within the PLRA. Dkt. 361, at 5 (denying prisoner release order even though the class requested parole and community supervision).

Plaintiffs also err by arguing that § 3626 does not apply because prisoner release orders by their nature redress prison overcrowding, which they claim is not their concern here. Dkt. 24 at 7. This is nonsense. The threat of COVID-19 exists in virtually every corner of this planet. But plaintiffs' case is predicted on their contention that the Governor "has not taken any steps to substantially reduce the prison population" through expanded releases, furloughs, and transfers, Dkt.1 ¶ 74, resulting in crowded prisons that expose prisoners to greater risks of contracting COVID-19.

Plaintiffs cite several cases that are inapposite because, unlike this case, they were not based on alleged harms associated with crowded prisons. Four of the cases simply involved individual medical or mental health claims and had nothing to do with crowding. *See Reaves v. Dep't of Corr.*, 392 F. Supp. 3d 195, 209–10 (D. Mass. 2019); *United States v. Wallen*, 177 F. Supp. 2d 455, 458 (D. Md. 2001) (also distinguishable because plaintiff was pretrial detainee); *Murphy v. Lane*, 833 F.2d 106 (7th Cir. 1987); *Johnson v. Harris*, 479 F. Supp. 333, 337-38 (S.D.N.Y. 1979). *Doe*

17

*v. Younger*, Dkt. 24 at Ex. C, concerned a broad class of juveniles, but that opinion focused on the inappropriateness of keeping juveniles in adult prisons for too long and also had nothing to do with crowding. The same is true for the specific ruling in the *Plata* lawsuit relating to "valley fever" at two California prisons. There is no indication that crowding was the reason why certain inmates needed to be transferred elsewhere in the prison system. *See Plata v. Brown*, 01 C 1351, 2013 WL 3200587, at *9 (N.D. Cal. June 24, 2013) (only reference to crowding was citation to state's own conclusion that overall system crowding would make transfers—necessitated by other issues—difficult to achieve).

The PLRA bars plaintiffs' requested relief precisely because the Court's order would qualify as a prisoner release order that is geared to redressing the alleged close connection between prison crowding and the potential spread of COVID-19.

### 2. Plaintiffs' requested relief is *Heck*-barred.

Plaintiffs' Eighth Amendment and ADA claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), because it is apparent from their requested relief that plaintiffs are challenging the *fact* of their current confinement in Illinois prisons, rather than any conditions at those facilities. In *Heck*, the Supreme Court drew a line between claims that must proceed under the federal habeas statute and claims that are cognizable under § 1983. Specifically, the Court held that a § 1983 claim that necessarily requires a prisoner to establish the invalidity of his conviction or sentence does not accrue until the prisoner has obtained the favorable termination of that conviction or sentence through federal habeas or similar state remedies. *Id.* at 486–

87. Later decisions refined that doctrine and clarified that any § 1983 action that, if successful, would necessarily imply the invalidity of the fact or duration of a prisoner's confinement is barred. *Wilkinson v. Dotson*, 544 U.S. 74, 81–82 (2005). *Heck* thus bars actions challenging the fact or duration of a prisoner's confinement, but it does not prohibit § 1983 claims challenging the conditions of that confinement. *Savory v. Cannon*, 947 F.3d 409, 422–34 (7th Cir. 2020) (en banc); *see also Muhammad v. Close*, 540 U.S. 749, 754–55 (2004). The relevant question for purposes of deciding if a claim must be brought under habeas or § 1983 is whether the prisoner is challenging the fact or duration of his confinement, or merely its conditions.

In *Graham v. Broglin*, 922 F.2d 379, 381 (7th Cir. 1991), the Seventh Circuit noted that it can sometimes be difficult to determine whether a prisoner is challenging the fact of confinement or its conditions, especially when "the prisoner is seeking not earlier freedom, but transfer from a more to a less restrictive form of custody." In that circumstance, courts should ask if the prisoner is seeking "a quantum change in the level of custody," in which case habeas is the proper remedy, or if the prisoner is just seeking transfer to a different program, location, or environment, in which case § 1983 is appropriate. *Id.* A prisoner seeks a quantum change in custody when, for example, he requests "freedom subject to the limited reporting and financial constraints of bond or parole or probation, or the run of the prison in contrast to . . . disciplinary segregation." *Id.*

Applying *Graham*, the First Circuit has held that an action by prisoners challenging their re-incarceration after having been on electronic supervision fell on

19

the habeas side of the line because the difference between incarceration and electronic supervision "can fairly be described as a quantum change in the level of custody." *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 873 (1st Cir. 2010). The court noted that, unlike incarcerated prisoners, those on electronic supervision could "live with family members, work daily jobs, attend church, and reside in their own homes." *Id.* at 873–74. By contrast, claims challenging a transfer to a different location within the prison system do not seek a quantum change in the level of custody. *See Johnson v. Litscher*, 260 F.3d 826, 831 (7th Cir. 2001); *Pischke v. Litscher*, 178 F.3d 497, 499 (7th Cir. 1999); *Falcon v. U.S. Bureau of Prisons*, 52 F.3d 137, 139 (7th Cir. 1995).

In this case, plaintiffs are seeking three types of relief: immediate medical furlough for subclasses 1 and 2 (the subject of the motion); immediate transfer to home detention for subclasses 3–5; and an immediate award of 180 days of sentencing credit for subclass 6. Dkt. 1 at 46–47. Each of these requests for relief seeks a quantum change in the level of the relevant class members' custody.

Although plaintiffs do not seek preliminary relief for subclass 6, their claim that the members of subclass 6 should receive 180 days of sentencing credit is barred under a basic *Heck* analysis because awarding that credit would shorten the length of those prisoners' sentences. *See Edwards v. Balisok*, 520 U.S. 641, 646–47 (1997) (claim seeking reinstatement of good-time credits is barred). That claim directly challenges the duration of the prisoners' confinement.

Plaintiffs' claims for transfer to home detention (subclasses 3–5, also not part of the present motion) are barred because the differences between incarceration and

home detention "can fairly be described as a quantum change in the level of custody." *Gonzalez-Fuentes*, 607 F.3d at 873. Unlike an incarcerated prisoner, those on home detention can live with family members in their own homes and may leave their homes to, among other things, go to work or school and attend religious services. 730 ILCS 5/5-8A-4(A). Relief for those in subclasses 3–5 is barred because plaintiffs in those groups are seeking freedom subject to limited reporting and constraints. *See Graham*, 922 F.2d at 381.

The claims for medical furlough for those in subclasses 1 and 2 (the subject of the requested emergency relief) are barred because those plaintiffs seek freedom from a prison facility to live in various locations (one in Florida) with limited oversight and reporting. *See* Dkt. 1 at 36–39. Indeed, medical furlough may be an even greater change in the level of custody than home detention because it does not impose the same limits on the ability to leave the home. *Compare* 730 ILCS 5/3-11-1 (furloughs) *with* 730 ILCS 5/5-8A-4 (home detention). Consequently, all three types of relief that plaintiffs request cannot be obtained under § 1983 without violating *Heck*.

Although plaintiffs claim their rights have been violated because they have been deprived of "reasonably safe living conditions," Dkt. 1 at 43–46, they fail to seek any relief that would improve those allegedly unsafe conditions. Instead, they seek immediate release from prison, whether through medical furlough, home detention, or a shortening of their sentences. *Id.* at 46–47. And while a claim that, if successful, might lead to a speedier release does not necessarily render it *Heck*-barred, *see Wilkinson*, 544 U.S. at 82; *Richmond v. Scibana*, 387 F.3d 602, 605 (7th Cir. 2004),

21

plaintiffs here are directly seeking immediate release from prison. Plaintiffs are therefore challenging the fact of their confinement, rather than any conditions that have been imposed, and such claims are not cognizable under § 1983.

In addition, the potential availability of a prisoner release order, entered by a three-judge court after other less intrusive relief has proved unsuccessful, under the PLRA, 18 U.S.C. § 3626(a)(3), does not alter the *Heck* analysis. In *Brown v. Plata*, 563 U.S. 493, 517–522 (2011), the Supreme Court upheld prisoner release orders based on the finding that overcrowding had caused a shortfall in prison resources that in turn led to unsafe living conditions and ineffective medical care. The release order thus served the purpose of improving prison conditions by reducing the demand for existing services and thereby increasing the proportional availability of those resources. Here, by contrast, plaintiffs are not seeking the release of other prisoners to improve the conditions that they encounter in prison but are instead seeking their own release. Consequently, they are challenging the fact of their confinement and their section 1983 action is barred under *Heck*.

### 3. The Court should abstain from interfering in the administration of Illinois prisons.

Given the extraordinary nature of the injunctive relief that plaintiffs seek, the Court should abstain pursuant to *Rizzo v. Goode*, 423 U.S. 362 (1976), where the Supreme Court instructed that to obtain injunctive relief on a matter traditionally reserved to the discretion of a state or local government agency, a plaintiff must overcome the steep hurdle set by "the well-established rule that the Government has traditionally been granted the widest latitude in the 'dispatch of its own internal

22

affairs.'" *Id.* at 378–79 (quotations omitted). In such cases, federal courts are to issue injunctions "sparingly, and only in a clear and plain case." *Id.* at 378. This strong preference against intrusive injunctive relief is primarily founded on "delicate issues of federal state relationships" (*Id.* at 380 (quotation omitted)), which are premised on "the principles of equity, comity, and federalism." *Id.* at 379 (quotation omitted).

The Seventh Circuit recently affirmed the continuing relevance of *Rizzo* as an extension of the *Younger* abstention doctrine, which "limit[s] federal court review of local executive actions." *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1071 (7th Cir. 2018). The plaintiffs in *Courthouse News* sought a preliminary injunction compelling the Cook County Clerk to immediately make all complaints filed available to the press, rather than waiting for a period until the complaints were processed. The Seventh Circuit rejected the injunction, observing that "federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'" *Id.* at 1073 (quoting *Rizzo*, 423 U.S. at 378).

The considerations of federalism and comity underlying *Rizzo* weigh especially heavily when considering the administration of a state prison system, where the Supreme Court has noted that "[i]t is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons. . . . Since these internal problems of state prisons involve issues so peculiarly within state authority

and expertise, the States have an important interest in not being bypassed in the correction of those problems." *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 (1973).

Courts in this circuit have relied on *Rizzo* when declining to interfere in decisions affecting the administration of state prisons. As Judge Durkin recently explained, "the courts do not generally second-guess inmate housing decisions" because it is "not 'the task of federal courts to oversee discretionary housing decisions made by state prison officials.'" *Boykin v. Fischer*, No. 16-CV-50160, 2019 WL 6117580, at *14 (N.D. Ill. Nov. 18, 2019) (quoting *Del Rio v. Schwarzenegger*, No. 09-CV-0214, 2010 WL 347888, at *5 (C.D. Cal. Jan. 20, 2010)). "Where a plaintiff requests an award of remedial relief that would require a federal court to interfere with the administration of a state prison, 'appropriate consideration must be given to principles of federalism in determining the availability and scope of [such] relief.'" *Id.* (quoting *Rizzo*, 423 U.S. at 379); *see also Cornille v. Lashbrook*, No. 19-CV-002, 2019 WL 366562, at *6 (S.D. Ill. Jan. 30, 2019) (denying TRO seeking a transfer to another prison); *Conway v. Wagnor*, No. 19-CV-036, 2019 WL 183903, at *1–2 (S.D. Ill. Jan. 14, 2019) (denying TRO seeking immediate medical treatment with a specialist and a transfer); *Boykin v. Dixon Mental Health Servs.*, No. 16-CV-50160, 2018 WL 8806095, at *3 (N.D. Ill. Oct. 15, 2018) ("the courts are not engaged in the business of supervising inmate housing decisions").

The injunctive relief plaintiffs seek in this case is far more intrusive than in any of the cases cited above. Rather than seeking a transfer for a single prisoner, plaintiffs seek to compel the Department to release approximately 16,000 prisoners

immediately, with no consideration of the Department's administrative, safety, and security concerns. The Court is not in a better position than the Department to determine who may safely be released on home detention or medical furlough and who may not. Consistent with the Supreme Court's directive in *Rizzo*, this Court should exercise judicial restraint and deny plaintiffs' motion.

### 4. Plaintiffs do not and cannot allege they have exhausted their administrative remedies.

Plaintiffs' motion also should be denied because plaintiffs do not and cannot allege they exhausted their administrative remedies. The PLRA requires an inmate to exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions. *Ross v. Blake*, 136 S. Ct. 1850, 1854–55 (2016) (citing 42 U.S.C. § 1997e(a)). The unavailability of remedies is the only exception to the exhaustion requirement. *Id.* at 1856–57 (rejecting any additional exception under "special circumstances" and explaining that the mandatory exhaustion regime forecloses judicial discretion). The Court in *Ross* identified three circumstances where a grievance procedure could be deemed unavailable: (1) prison officials consistently refuse to provide any relief to inmates; (2) an ordinary prisoner is unable to figure out the procedure; and (3) prison officials use intimidation or misrepresentation to thwart any ability for inmates to use the procedure. *Id.* at 1859–60. Plaintiffs do not suggest any of those circumstances exist here.

IDOC regulations provide the grievance procedures committed persons must follow. *See* 20 Ill. Adm. Code § 504.800, *et seq.* A prisoner may submit an emergency grievance directly to the warden, and the warden may determine that the grievance

should be handled on an emergency basis. *Id.* §§ 504.840(a), (b). Plaintiffs do not allege that any of them filed a grievance over COVID-19 or that IDOC's grievance procedure is unavailable to them. And although prisoners need not plead they have met the exhaustion requirement (an affirmative defense) to bring a claim, *see Jones v. Bock*, 549 U.S. 199, 216 (2007), the Court should not grant plaintiffs what amounts to their ultimate relief through mandatory medical furloughs before defendants can move for a *Pavey* hearing. *See Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008) (exhaustion issue should be decided at early stage of lawsuit).

### B. Plaintiffs Are Not Likely to Succeed on their Eighth Amendment and ADA Claims Because They Do Not Meet the Plausibility Standard.

#### 1. Plaintiffs do not allege the Governor or Director recklessly disregarded a recognized risk to an inmate's health or safety.

The Eighth Amendment prohibits cruel and unusual punishments. U.S. Const. amend. VIII. Among the punishments the amendment forbids is the "unnecessary and wanton" infliction of suffering caused by an official's deliberate indifference to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). To establish deliberate indifference, prisoners must prove that the prison official both knew of and disregarded an excessive risk to their health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Courts therefore perform a two-step analysis: "first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately

indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc).

Although defendants do not dispute their awareness that COVID-19 poses serious risks to prisoners and prison staff, they absolutely dispute that plaintiffs have plausibly alleged that the Governor (even assuming he is a proper defendant) or the Department's Director was deliberately indifferent to that risk generally, let alone indifferent to any specific risk to any particular plaintiff. Plaintiffs do not allege that any of them has COVID-19 or has been deprived of any necessary care based on any of their particular medical conditions.

Deliberate indifference "describes a state of mind more blameworthy than negligence." *Farmer*, 511 U.S. at 835; *accord Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) ("evidence of medical negligence is not enough to prove deliberate indifference"). To establish a constitutional violation, the prisoner must show that the response was so deficient that it constituted criminal recklessness. *Farmer*, 511 U.S. at 839-40; *see also Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008) (providing that "negligence or even gross negligence is not enough; the conduct must be reckless in the criminal sense"). The deliberate indifference standard imposes a "high hurdle" and requires a showing "approaching a total unconcern for the prisoner's welfare." *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012) (internal quotations and citation omitted).

An official's response to a risk of harm can defeat an allegation of deliberate indifference even if the risk is not ultimately averted. *Farmer*, 511 U.S. at 844.

Accordingly, a defendant is "not required to take perfect action or even reasonable action." *Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir. 2003). This standard ensures that "the mere failure . . . to choose the best course of action does not amount to a constitutional violation." *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002).

Ignoring these established holdings, plaintiffs predicate their case on a disagreement about what they believe to be the best course of action to protect them and other prisoners from possible exposure to COVID-19. Plaintiffs acknowledge the Department has released at least 300 prisoners, Dkt. 1 ¶ 83, but they complain the Governor and Director have not acted with more "urgency or decisiveness" to release "substantially" more. *Id.* ¶¶ 73–74. Plaintiffs plainly based their case on what they believe is reasonable, asserting that defendants have "failed to take reasonable measures" to secure more early releases through various means. *Id.* ¶ 111. By basing their claim on what they believe to be a reasonable course of conduct, plaintiffs improperly seek to equate their Eighth Amendment claim with malpractice, contrary to the Court's directive in *Estelle*, 429 U.S. at 106 ("malpractice does not become a constitutional violation merely because the victim is a prisoner").

In short, plaintiffs' focus on the reasonableness of defendants' actions is legally insufficient to make a plausible showing that defendants were and continue to be subjectively and recklessly indifferent. Their allegations do not make the required "clear showing" that they are likely to succeed on their deliberate indifference claim.

Although the Court can and should deny plaintiffs' motion based solely on the defects in plaintiffs' unverified pleading (based heavily on inadmissible hearsay

exhibits), the Court also can take judicial notice of the public actions taken by the Governor and the Department of Corrections to combat COVID-19 within the State of Illinois generally, and within the Department of Corrections specifically. Those actions, summarized above, refute any notion that defendants' responses to COVID-19 may be fairly or plausibly characterized as recklessly indifferent. Plaintiffs have no likelihood of success on their deliberate indifference claim.

### 2. Plaintiffs are not "qualified individuals" under the ADA and do not plausibly allege they are being denied services *because* of their alleged disabilities.

Title II of the ADA prohibits public entities from discriminating against qualified individuals with disabilities by depriving them of opportunity to participate in the services, programs, or activities of the public entity because of their disabilities. 42 U.S.C. § 12132.

Title II of the ADA applies to prisons, *see Pennsylvania Dept. of Corrections v. Yeskey,* 524 U.S. 206 (1998), and prisoners may sue state officials in their official capacity for prospective injunctive relief under Title II. *Brueggeman ex rel. Brueggeman v. Blagojevich,* 324 F.3d 906, 912 (7th Cir. 2003). But to assert a valid claim under Title II, plaintiffs must have a "qualifying disability" and must show a denial of benefits of services, programs, or activities through discrimination "by reason of" their disability. *Culvahouse v. City of LaPorte,* 679 F. Supp. 2d 931, 937 (N.D. Ind. 2009) (quoting *Frame v. City of Arlington,* 575 F.3d 432, 435 (5th Cir. 2009)); *see also Love v. Westville Corr. Ctr.,* 103 F.3d 558, 560 (7th Cir. 1996).

The ten plaintiffs here cannot clearly establish that they meet the required "otherwise qualified" standard. "An otherwise qualified person is one who is able to meet all of a program's requirements *in spite of* his handicap." *Southeastern Community College v. Davis*, 442 U.S. 397, 406 (1979) (emphasis added). Plaintiffs seek release under the Illinois medical furlough statute, 730 ILCS 5/3-11-1. This statute permits the release of offenders on a medical furlough for purposes of obtaining medical services that are not otherwise available. The Governor's Executive Order issued on April 6, 2020 removes the "not otherwise available" requirement and allow the Director discretion to permit the release of offenders on a medical furlough more generally for purposes of obtaining medical, psychiatric or psychological services. But regardless, plaintiffs make no allegations suggesting that any one of them, let alone others in subclasses 1 and 2 (medically vulnerable and over age 55), qualify for a furlough under the statute even as modified by the Executive Order. To the contrary, plaintiffs admit they are seeking release not to obtain medical, psychiatric or psychological services, but rather so they can leave prison to live in another location in an effort to avoid contracting COVID-19. Dkt. 9 at 54; Dkt. 1 ¶¶ 93–100. Accordingly, plaintiffs are not "qualified" under the ADA because they have not alleged anything suggesting that they are eligible for a furlough under 730 ILCS 5/3-11-1.

Plaintiffs also do not plausibly allege any discrimination against them by reason of any claimed disability. A plaintiff "may establish discrimination by presenting evidence that the defendant intentionally acted on the basis of the

disability, the defendant refused to provide a reasonable modification, or the defendant's denial of benefits disproportionately impacts disabled people." *Culvahouse,* 679 F. Supp. 2d at 937 (relying upon *Washington v. Ind. High Sch. Athletic Assn., Inc.,* 181 F.3d 840, 847 (7th Cir. 1999)). Plaintiffs bring their ADA claims under two different theories: reasonable modification or accommodation, and disparate impact. Both theories fail.

The ADA requires state and local entities to make "reasonable modifications" to policies, rules, and practices so that people with disabilities can participate in public programs and services. 42 U.S.C. § 12131(2). Whether a modification is considered reasonable depends on the specific circumstances and modifications sought. To decide what constitutes a "reasonable modification" for a prisoner, courts weigh the needs of prisoners with disabilities against the structural, financial, and administrative concerns of the prison. In particular, courts consider (1) whether the modification will "fundamentally alter" a program or activity, (2) the cost of the modification, and (3) the burden the modification would have on administration of the prison. 28 C.F.R. §§ 35.130(b)(7), 35.150(a)(3), 35.164. Courts also may consider concerns relating to prison management, prisoner rehabilitation, and safety. *See, e.g., Randolph v. Rodgers,* 170 F.3d 850, 859 (8th Cir. 1999) (prison could present evidence that providing an interpreter for a deaf prisoner at disciplinary hearings created safety and security concerns); *Love*, 103 F.3d at 561 (prison could justify its refusal to make reasonable accommodations because of the overall demands of running a prison).

Here, there are obvious administrative, safety, and security concerns posed by plaintiffs' request for a release of some 16,000 offenders in subclasses 1 and 2 at once. First, the administrative effort needed to accomplish this task would be massive. IDOC staff are currently working around the clock to take all measures necessary to prevent and treat COVID-19. To redirect resources to release all plaintiffs in subclasses 1 and 2 on medical furlough would significantly hinder these efforts. Second, even a "temporary" release of approximately 16,000 offenders, with limited or no oversight, would present significant safety and security concerns for the prisoners themselves and for the public at large.

Plaintiffs contend that defendants' current practice related to releases and transfers to combat COVID-19 disparately impact them because they are medically vulnerable. Dkt. 9 at 48. But plaintiffs fail to provide any appropriate comparables necessary to create a plausible inference of any disparate effect on them.

"Unlike a claim for disparate treatment, a claim for disparate impact doesn't require proof of intentional discrimination." *Albuquerque Pub. Sch.*, 813 F.3d at 1298 (internal quotation marks and citations omitted). Instead, to "prove a case of disparate impact discrimination, the plaintiff must show that a specific policy caused a significant disparate effect on a protected group." *Id.* (internal quotation marks and citation omitted). "This is generally shown by statistical evidence involving the appropriate comparables necessary to create a reasonable inference that any disparate effect identified was caused by the challenged policy and not other causal factors." *Id.* (internal quotation marks and citation omitted). "Moreover,

a disparate impact claim must allege a pattern or practice of discrimination, not merely an isolated instance of it." *Id.* (citation omitted).

Plaintiffs fail to provide any appropriate comparables necessary to create a plausible inference of any disparate effect. Instead, plaintiffs rely entirely on conclusory claims about the unprecedented impact of COVID-19. In doing so, plaintiffs admit that any disparate effect is caused by COVID-19, not defendants' policies. Their assertions are facially insufficient to establish a plausible disparate impact claim.

The Court should deny plaintiffs' motion because they cannot clearly establish a likelihood of success on the merits of their deliberate indifference or ADA claims.

## II.   Plaintiffs Have Not Demonstrated They Face the Kind of Irreparable Harm Necessary to Warrant Their Requested Extraordinary Relief.

Plaintiffs' motion also should be denied because they cannot establish irreparable harm. *Winter*, 555 U.S. at 22. Plaintiffs argue that there is a "*possibility* that absent immediate relief from the Court, vulnerable prisoners will be infected with COVID-19." Dkt. 9 at 64 (emphasis added). But the Supreme Court in *Winter* confirmed that the "possibility" of irreparable harm is not enough; plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of an injunction." 555 U.S. at 22 (emphasis in original).

In *Orr v. Shicker*, 2020 WL 1329659, at *8–10 (7th Cir. Mar. 23, 2020), the Seventh Circuit recently adhered to *Winter* by striking down a preliminary injunction and reversing class certification of two classes of Illinois prisoners who complained about lack of treatment for the hepatitis C virus (HCV). The court instructed that

irreparable harm is a harm that "cannot be repaired," and a plaintiff "must demonstrate that he will *likely* suffer irreparable harm absent obtaining preliminary injunctive relief." *Id.* at \*9 (citing *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017)). The court rejected the district court's preliminary injunction based on the alleged possibility of harm caused by HCV; the court noted that injunctive relief based on a possibility of harm "is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* (citing *Winter*, 555 U.S. at 22).

Here, defendants do not underestimate the possible risk COVID-19 poses to the IDOC prison population and staff. But, like the plaintiffs in *Orr*, plaintiffs' case is flawed because it is based on the possibility that a substantial risk might arise from COVID-19 generally, not that any named plaintiff faces a particular probable harm.

## III. The Harm to the State and Public if an Injunction Issues Outweighs the Possible Harm to Plaintiffs Absent an Injunction.

Under the "balance of harms" portion of the analysis, plaintiffs must establish that "the harm they would suffer without the injunction is greater than the harm that preliminary relief would inflict on the defendants." *Mich. v. U.S. Army Corps of Eng'g*, 667 F.3d 765, 769 (7th Cir. 2011). Where, as here, a movant shows a low likelihood of success on the merits, the movant "must compensate for the lesser likelihood of prevailing by showing the balance of harms tips *decidedly* in favor of the movant." *Boucher*, 134 F.3d at 826 n.5 (emphasis in original).

The court also should consider whether a preliminary injunction would cause harm to the public interest. *Platinum Home Mort. Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 726 (7th Cir. 1998). As discussed above, even a "temporary" release of approximately 16,000 convicted felons, with limited or no oversight, and without the detailed risk assessment performed by the Department before any prisoner is released, would present significant safety and security concerns for the prisoners themselves and for the public at large.

Plaintiffs' requested relief also is not in the public interest because it would drastically interfere with the State's ability to manage its own prison system. *Rowe v. Finnan*, No. 11-CV-524, 2013 WL 74609, at *2 (S.D. Ind. Jan. 4, 2013). As discussed above, the Court should "afford appropriate deference and flexibility to state officials trying to manage a volatile environment." *Id.* (quoting *Sandin v. Conner*, 515 U.S. 472, 483 (1995)). "Any injunction issued against prison officials dealing with the day-to-day operation of the prison system may cause substantial harm to both public and private interests." *Id.* The injunction sought here, which would strip the Department of the most basic control over its prison system—the power to determine who may be safely released—would cause substantial harm to the public interest, as well as to the interests of the victims of plaintiffs' crimes. It also would interfere with the Department's efforts to make sure prisoners are properly released to a safe home or host site. Plaintiffs' request that they and the Court substitute their own judgment for the Department's in determining who may be safely released from prison and on what conditions, is not responsible or in keeping with the public interest.

Although defendants do not minimize the possibility that prisoners may contract COVID-19 (and in fact are taking significant actions to prevent the spread of COVID-19), that possibility does not outweigh the harm to the public if the Court were to interfere with the Department's current efforts to protect prisoners and prison staff, including through the release of prisoners in a manner that is as safe as possible and consistent with Illinois law. The balance of equities weighs against granting plaintiffs' requested relief.

## IV.   The Court Should Not Provisionally Certify Subclasses 1 and 2.

In their motion, plaintiffs ask the Court to "preliminarily certify Plaintiffs' proposed subclasses 1 and 2." Dkt. 8 at 6, 21; Dkt. 9 at 55. The Court should decline that request.

Plaintiffs bear the burden of establishing the propriety of class certification by a preponderance of the evidence. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997); *Orr*, 2020 WL 1329659, at *4. Rule 23 provides several requirements for class certification, and the failure to satisfy even one of them precludes class certification. *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008).

When deciding whether to certify a class, courts must conduct a rigorous analysis, including consideration of merits evidence where appropriate. For example, in *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675 (7th Cir. 2001), the Seventh Circuit admonished the district court for ignoring evidence that undermined class certification and accepting the allegations of the complaint as true. In short, "a district court must make whatever factual and legal inquiries are necessary to ensure

that requirements for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits of the case." *Am. Honda Motor Co.*, 600 F.3d at 815; *see also Spano v. Boeing Co.*, 633 F.3d 574, 583 (7th Cir. 2011).

In this case, plaintiffs have presented no actual evidence about the proposed class. They rely on the allegations of their complaint and multiple hearsay exhibits, but that is not enough. *Szabo*, 249 F.3d at 675. The Court should deny preliminary certification for this reason alone.

Moreover, the proposed subclasses clearly lack commonality and typicality. To meet the commonality requirement, plaintiffs' claims "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Orr*, 2020 WL 1329659, at *5 (quoting *Wal-Mart*, 564 U.S. at 350). "What matters to class certification . . . is not the raising of 'common' questions—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Chicago Teachers Union, Local No. 1 v. Bd. of Ed. of City of Chicago*, 797 F.3d 426, 434 (7th Cir. 2015) (quoting *Wal-Mart*, 564 U.S. at 350 (emphasis in original)). "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Orr*, 2020 WL 1329659, at *5 (quoting *Wal-Mart*, 564 U.S. at 350).

Plaintiffs here posit three common questions: whether COVID-19 poses a substantial risk of harm, whether defendants have measures available to them to reduce the prison population, and whether defendants have failed to use those measures effectively. Dkt. 8 at 11. These are not common questions because the answers to them would not "drive the resolution of the litigation." Even if the Court were to determine that the answer to each of these questions is yes, that would not establish that every member of subclasses 1 and 2 should be released on a medical furlough. There are important differences among the individual members of the proposed subclasses that preclude any common resolution of this case. These differences include whether the prisoner can obtain necessary medical care within the prison system; whether the prisoner can be safely furloughed; whether the prisoner has a safe host site; whether that host site poses less risk of infection than the prisoner's current facility; and whether the class member might potentially put a vulnerable family member at risk of infection at the host site. The Department should be able to evaluate these factors before deciding whether to grant any furlough. Thus, resolution of plaintiffs' asserted common questions would not resolve this case.

Typicality is lacking for the same reasons. To meet the typicality requirement, a class representative must be part of the class and must "possess the same interest and suffer the same injury" as the other class members. *Orr*, 2020 WL 1329659, at *6 (quoting *Wal-Mart*, 564 U.S. at 348). The commonality and typicality requirements "tend to merge." *Spano,* 633 F.3d at 586 (quoting *General Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 157 n.13 (1982)).

38

Here, even the limited information alleged about the proposed representatives of subclasses 1 and 2 shows they have significant differences from the rest of the class, defeating typicality. These include the following:

- *The safety risk that the class member poses both to his/her immediate family and to the public.* For example, Gerald Reed is serving a life sentence for murder, and was convicted of aggravated kidnapping and attempted robbery in the same event.[16] Tewkunzi Green has 21 years left on a 34-year sentence for murder,[17] and Carl Reed has eight years left on a 27-year sentence for murder.[18] These plaintiffs may argue they do not pose a safety risk to the public, but the Department is entitled to make its own determination on this point.

- *Whether the class member has a safe host site.* Danny Labosette alleges that he is "eligible to be transferred to home detention at his mother's home in Florida." Dkt. 8 at 16–17. But any transfer to Florida would require the approval of Florida's Department of Parole under the Interstate Compact for Adult Supervision, and Florida is not accepting any discretionary transfers at this time. *See* https://www.interstatecompact.org/covid19. Plaintiffs do not indicate that Mr. Labosette would be considered a "returning resident" of Florida, nor that he has been approved for transfer by Florida.

- *Whether the class member might potentially put a vulnerable family member at risk.* William Richard (age 66), Gerald Reed (age 57), and Danny Labosette (age 56) all plan to live with their mothers upon release. Dkt. 8 at 15–16. These plaintiffs' mothers are likely much older than these plaintiffs and therefore more at risk of infection.

In summary, there are significant differences among members of the proposed subclasses 1 and 2 that impede any single injunctive remedy. Because commonality and typicality are lacking, neither the class nor the proposed subclasses should be certified.

---

[16] *See* https://www.idoc.state.il.us/subsections/search/inms_print.asp?idoc=N32920.

[17] *See* https://www.idoc.state.il.us/subsections/search/inms_print.asp?idoc=R84568.

[18] *See* https://www.idoc.state.il.us/subsections/search/inms_print.asp?idoc=R48993.

## CONCLUSION

Defendants have moved quickly and aggressively to take concrete actions to protect the health and safety of prisoners, prison staff, and the public. But neither defendants nor the Court can or should, as plaintiffs suggest, release thousands of prisoners under the medical furlough statute simply because they are over 55 years old or have underlying medical conditions. This is against the public interest, and it is prohibited by the PLRA and binding case law.

Plaintiffs have not presented plausible claims giving them a likelihood of success on the merits on their Eighth Amendment and ADA claims, and they have not demonstrated more than a possibility of harm. That possibility does not outweigh the State's and the public's interest in ensuring that any released prisoners, and the communities they might go, to are appropriately protected through the measures the Department is already taking consistent with Illinois law.

For all of these reasons, the Court should deny plaintiffs' motion for a temporary restraining order or a preliminary injunction.

Dated: April 6, 2020                          Respectfully Submitted,

KWAME RAOUL                                */s/ R. Douglas Rees*
Attorney General of Illinois               R. DOUGLAS REES

Nicholas S. Staley                         Deputy Attorney General, Civil Litigation
Colleen Shannon                            Office of the Illinois Attorney General
Office of the Illinois Attorney General    100 West Randolph Street, 13th Floor
100 West Randolph Street                    Chicago, Illinois 60601
Chicago, Illinois 60601                     (312) 814-3498
                                            *drees@atg.state.il.us*