**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**


MONEY, *et al.*,　　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiffs,　　　　)　　　　No. 20 cv 2093
　　　　v.　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
PRITZKER, *et al.*,　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　Defendants.　　　　)


**PLAINTIFFS' REPLY IN SUPPORT OF THEIR EMERGENCY MOTION
<u>FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

I.  Defendants' List of Steps They Are Taking In Response to COVID-19 Demonstrates
    Why Subclasses 1 and 2 Need Relief From This Court ...................................................1

II. Plaintiffs' Motion for a TRO/PI Should Be Granted ....................................................5

    A.  Subclasses 1 and 2 Are Likely To Succeed on The Merits of Their Claims ...........5

        1.  The Claims of Subclasses 1 and 2 are Not Procedurally Barred .....................5

            a.  Subclasses 1 and 2 Do Not Seek a § 3626 "Prisoner Release Order" .........5

            b.  The Claims of Subclasses 1 and 2 are not *Heck* Barred .............................7

            c.  *Rizzo* Abstention Does Not Apply .............................................................12

            d.  Defendants Will Lose an Exhaustion Affirmative Defense.......................15

        2.  Subclasses 1 and 2 Have Pled a Plausible Eighth Amendment Claim ...........16

            a.  Deliberate Indifference Does Not Require Plaintiffs To Prove Defendants
                Subjectively Intend to Harm Them...........................................................16

            b.  The Continued Placement of Medically Vulnerable Plaintiffs in Highly
                Dangerous Settings Where Safety and Health Standards Cannot Be
                Achieved Meets the Deliberate Indifference Standard ..............................17

            c.  The Court Need Not, and Cannot, Wait for the Named Plaintiffs to Test
                Positive for COVID-19 to Act ..................................................................19

        3.  Subclass 1 Has Pled a Plausible ADA Claim  .................................................19

            a.  Plaintiffs are Otherwise Qualified ...........................................................21

                i.   Members of Subclass 1 are Otherwise Qualified for the IDOC
                     Program/Service at Issue: Safe Custody .............................................22

                ii.  Plaintiffs are also "Otherwise Qualified" and Eligible for Medical
                     Furlough...........................................................................................23

            b.  Disparate Impact .......................................................................................25

            c.  Plaintiffs State a Meritorious Discrimination Claim for Failure to
                Accommodate ............................................................................................26

B.     Plaintiffs Have Demonstrated That They Face Irreparable Harm ........................29

C.     The Balance of Equities Weighs in Favor of Plaintiffs ..........................................31

III.   The Court Should Preliminarily Certify Subclasses 1 and 2 .............................................33

A. Plaintiffs Seek Preliminary Class Certification for the Limited Purpose of Ensuring
that Emergency Relief Benefits Each Member of Subclasses 1 and 2 ......................33

B. Plaintiffs Have Proffered Sufficient Evidence
To Carry Their Burden Under Rule 23 .......................................................................35

C. Plaintiffs Meet the Commonality and Typicality Requirements of Rule 23 ..............40

## TABLE OF AUTHORITIES

*Abdi v. Duke*, 280 F. Supp. 3d 373 (W.D.N.Y. 2017) ...................................................35

*Alexander v. Choate*, 469 U.S. 287 (1985) ......................................................22, 28

*Arenas v. Georgia Dep't of Corr.* (S.D. Ga. Feb. 20, 2018) .................................23

*Barden v. City of Sacramento*, 292 F.3d 1073 (9th Cir. 2002) ............................22

*Basank v. Decker* (S.D.N.Y. 2020) ..................................................................37

*Billman v. Ind. Dep't of Corr.*, 56 F.3d 785 (7th Cir. 1995)...............................17

*Boykin v. Dixon Mental Health Servs.*, No. 16-CV-50160 (N.D. Ill. Oct.15, 2018) ...................15

*Boykin v. Fischer*, No. 16-CV-50160 (N.D. Ill. Nov. 18, 2019) ...........................15

*Braggs v. Dunn*, 317 F.R.D. 634 (M.D. Ala. 2016).............................................40

*Brown v. Budz*, 398 F.3d 904 (7th Cir. 2005) ....................................................31

*Carroll v. DeTella*, 255 F.3d 470 (7th Cir. 2001)..............................................20

*Conway v. Wagnor*, No. 19-CV-036 (S.D. Ill. Jan. 14, 2019)..............................15

*Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378 (D. Colo. 1993) ...........................41

*Cornille v. Lashbrook*, No. 19-CV-002 (S.D. Ill. Jan 30, 2019) ..........................15

*Courthouse News Services v. Brown*, 908 F.3d 1063 (7th Cir. 2018) ..................... 14-15

*Cox v. Mass, Dep't of Correction*, 18 F. Supp. 3d 38 (D. Mass. 2014)....................23

*Culvahouse v. City of LaPorte*, 679 F. Supp. 2d 931 (N.D. Ind. 2009)...................29

*Dixon v. County of Cook*, 819 F.3d 343 (7th Cir. 2016)......................................17

*DL v. D.C.*, 860 F.3d 713, 726 (D.C. Cir. 2017)................................................40

*Doe v. Trump*, 418 F. Supp. 3d 573 (D. Or. 2019) ............................................39

*Edwards v. Balisok*, 520 U.S. 641 (1997) ...........................................................8

*Eubanks v. Billington*, 110 F.3d 87 (D.C. Cir. 1997) .........................................41

*Farmer v. Brennan*, 511 U.S. 825 (1994).......................................................... 17-18

*Farnam v. Walker*, 593 F. Supp. 2d 1000 (C.D. Ill. 2009) ..................................29

*Fish v. Kobach*, 189 F. Supp. 3d 1107 (D. Kan. 2016 .......................................35

*Flynn v. Doyle*, 630 F. Supp. 2d 987 (E.D. Wis. 2009) ......................................29

*Franco-Gonzales v. Napolitano*, No. CV 10-02211 DMG DTBX (C.D. Cal. Nov. 21, 2011) ....41

*FTC v. Lifewatch Inc.*, 176 F. Supp. 3d 757 (N.D. Ill. 2016) .............................36

*Gonzalez-Fuentes v. Molina*, 607 F.3d 864 (1st Cir. 2010)................................11

*Gooch v. Life Investors Ins. Co. of America*, 672 F.3d 402 (6th Cir. 2012) .................35

*Graham v. Broglin*, 922 F.2d 379 (7th Cir. 1991) ......................................10, 30, 38

*Gray v. Hardy*, 826 F.3d 1000 (7th Cir. 2016) .........................................16, 19, 38

*Greeno v. Daley*, 414 F. 3d 645 (7th Cir. 2005) ........................................16, 20

*Harris v. Graddick*, 593 F. Supp. 128 (M.D. Ala. 1984) ...................................34

*Heck v. Humphrey*, 512 U.S. 477 (1994) ........................................................ 7-10

*Helling v. McKinney*, 509 U.S. 25 (1993)....................................................17, 20

*Hernandez v. Dart*, 814 F.3d 836 (7th Cir. 2016).............................................16

*Ill. League of Advocates for the Developmentally Disabled v.*
*Ill. Dept. of Human Services* (N.D. Ill. 2013) ............................................... 34

*Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894 (7th Cir. 1999) ...........................41

*Jones et al, v Wolf et al.* (W.D.N.Y. 2020).......................................................29

*Jones'El v. Burge*, 164 F. Supp. 2d 1096 (W.D. Wis. 2001) ..............................38

*Kaba v. Stepp*, 458 F.3d 678 (7th Cir. 2006)...................................................15

*LaBrec v. Walker*, 948 F.3d 836 (7th Cir. 2020) ..............................................18

*LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48 (2d Cir. 2004) ...................................35
*Lee v. Orr* (N.D. Ill. 2013) .............................................................................................................34
*Ligon v. City of New York*, 288 F.R.D. 72 (S.D.N.Y. 2013) ........................................................34
*Maddox v. Love*, 655 F.3d 709 (7th Cir. 2011) ............................................................................15
*Malam v. Adducci,*(E.D. Mich. 2020) ...........................................................................................38
*Meyer v. Portfolio Recovery Associates*, LLC, 707 F.3d 1036 (9th Cir. 2012) ...........................34
 *Moran v. Sondalle*, 218 F.3d 647 (7th Cir. 2000) ........................................................................11
*Morrison v. Heckler*, 602 F. Supp. 1485 (D.C. Minn. 1985) .......................................................34
*Muhammad v. Close*, 540 U.S. 749 (2004).................................................................................. 7-9
*Muhammad, Nelson v. Campbell*, 541 U.S. 637 (2004) ............................................................ 9-10
*Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775 (7th Cir. 2002) ...22
*Orr v. Shicker*, -- F.3d -- (7th Cir. 2020) .....................................................................................30
*Oshana v. Coca-Cola, Co.*, 472 F.3d 506 (7th Cir. 2006)............................................................42
*Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).............................................................17, 19
*Phipps v. Sheriff of Cook Ctny.*, 249 FRD 298 (N.D. Ill. 2008) ..................................................30
*Pischke v. Litscher*, 178 F.3d 497 (7th Cir. 1999) .......................................................................10
*Plata v. Brown*, 563 U.S. 493 (2011).............................................................................................14
*Plata v. Newsom*, No. 01 C 1351 ......................................................................................................6
*Preiser v. Rodriguez*, 411 U.S. 475 (1973)............................................................................ 7-8, 13
*Radaszewski v. Maram*, 383 F.3d 599 (7th Cir. 2004) .................................................................28
*Ramirez v. Young*, 906 F.3d 530 (7th Cir. 2018) .........................................................................16
*Rench v. TD Bank, N.A.* (S.D. Ill. Jan. 2, 2018) .........................................................................40
*Rizzo v. Goode*, 423 U.S. 362 (1976)....................................................................................... 12-15
*Robert L. Meinders D.C., Ltd v. Emery Wilson Corp.* (S.D. Ill. June 21, 2016) .........................40
*Rodriguez v. Hayes*, 591 F.3d 1105 (9th Cir. 2010) ....................................................................41
*Rodriguez v. Providence Community Corrections*, *Inc.*,
       155 F. Supp. 3d 758 (M.D. Tenn. 2015) ............................................................................35
*Ross v. Blake*, 136 S. Ct. 1850 (2016).............................................................................12, 15, 19
*Savory v. Cannon*, 947 F.3d 409 (7th Cir. 2020) (*en banc*)................................................... 9-10
*SEC v. Cherif*, 933 F.2d 403 (7th Cir. 1991) ...............................................................................35
*Sellers v. Henman*, 41 F.3d 1100 (7th Cir. 1994) ........................................................................19
*Sherrod v. Lingle*, 223 F.3d 605 (7th Cir. 2000)..........................................................................19
*Sinn v. Lemmon*, 911 F.3d 412 (7th Cir. 2018)............................................................................18
*Skinner v. Switzer*, 562 U.S. 521 (2011).........................................................................................9
*Spano v. The Boeing Co.*, 633 F.3d 574 (7th Cir. 2011)...............................................................40
*Thakker et al v. Doll* (M.D. Pa. 2020) .........................................................................................37
*United States of America v. Cubie* (E.D. Wis. 2020) ...................................................................37
*United States v. Davis* (D. Md. 2020) ..........................................................................................38
*United States v. Fellela* (D. Conn. 2020) .....................................................................................37
*United States v. Perez* (S.D.N.Y. 2020).......................................................................................37
*United States v. Ramos* (D. Mass. 2020) .....................................................................................37
*United States v. Rodriguez* (E.D. Pa. 2020) ................................................................................37
*Vance v. Peters*, 97 F.3d 987 (7th Cir. 1996) ..............................................................................17
*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) .................................................................41
*Washington v. Indiana High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840 (7th Cir. 1999)..................21
*Wellman v. Faulkner*, 715 F.2d 269 (7th Cir. 1983) ...................................................................19

*Westefer v. Neal*, 682 F.3d 679 (7th Cir. 2012) .........................................................................14
*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017) .......30
*Wilkinson v. Dotson*, 544 U.S. 74 (2005) ....................................................................................9
*Woodford v. Ngo*, 548 U.S. 81 (2006) ........................................................................................15
*Yahoo Mail Litig.*, 308 F.R.D. 577 (N.D. Cal. 2015) .................................................................41
*Young v. Cnty of Cook*, No. 06 C 552 (N.D. Ill. Apr. 25, 2007) .................................................42

**Statutes**

18 U.S.C. § 3626 .........................................................................................................................5
18 U.S.C. §3626(a)(1)(A) ..........................................................................................................13
18 U.S.C. §3626(a)(1)(B) ..........................................................................................................14
20 Ill. Admin. Code § 504.810(b). .............................................................................................13
42 U.S.C. § 12131(2) ............................................................................................................21, 23
730 ILCS 5/3-11-1(a)(2) ............................................................................................................23
28 C.F.R. §§ 35.130(b)(7) ..........................................................................................................34
75 ILCS 5/3-11-1 .......................................................................................................................36
Fed. R. Evid. 201 .......................................................................................................................37

Rather than confront the grave danger that thousands of sick and elderly people in IDOC's custody are currently facing, defendants present the Court with misleading, inaccurate, and incomplete argument and urge the Court to do nothing. Most notably, defendants repeatedly mischaracterize the relief plaintiffs are seeking, suggesting that plaintiffs seek to unleash a tsunami of dangerous "felons" on unwitting communities, when in reality no such thing is true. Defendants also assert that they cannot possibly be found deliberately indifferent to plaintiffs because they have taken some minimal action to benefit some prisoners, but that the law does not support that conclusion. Finally, defendants completely fail to consider the public's strong interest in avoiding clusters of COVID-19 outbreaks in Illinois prisons, the effects of which could be catastrophic on prison communities. As explained in further detail below, defendants' arguments are unavailing, and plaintiffs' motion should be granted.

## I. Defendants' List of Steps They Are Taking In Response to COVID-19 Demonstrates Why Subclasses 1 and 2 Need Relief From This Court

At the outset, defendants ask the Court to take judicial notice of a long series of bullet points, *see* Doc. 26 at 3-6, that they claim demonstrate that they are acting "quickly and aggressively to combat COVID-19." While plaintiffs acknowledge that defendants are taking many of the actions they list, defendants are simply not moving quickly or broadly enough protect members of the plaintiff class from the high risk of serious (and possibly fatal) harm they face as the COVID-19 spreads through the prison system. At this point, defendants have transferred only 515 prisoners inside of prison facilities, a number that is less than 2% of the Illinois prison population.[1]

---

[1] Defendants also use the figure 1,000 people released, but that is misleading. They refer to the drop in the total prison population from March 2 through April 6. *See* Doc. 26 at 4. The fact is that most of this drop simply reflects the natural fluctuation in prison population as new prisoners arrive and old prisoners are released in the ordinary course.

1

In the meantime, the number of confirmed COVID-19 cases among people in the custody of IDOC has mushroomed from zero cases on March 25 to 101 cases on April 6, and the rate of increase continues to climb; the very day defendants filed their brief, the number of confirmed cases among prisoners skyrocketed from 62 to 101, by far the largest increase to date. None of this is surprising, as defendants themselves have acknowledged, and at this rate, by next week, the number of new COVID-19 cases among prisoners will outstrip the number of releases. What the defendants list of "actions" demonstrates is not that they are acting expeditiously to protect plaintiffs, but rather that Court's intervention is necessary to prod the defendants to act more quickly, to prevent a looming humanitarian disaster in our prisons of unprecedented proportions. The graph below reflects IDOC's reported cases from Stateville alone over the past several days, portending a bleak future.



According to the *New York Times*, Stateville Correctional Center has the twelfth-largest known cluster of COVID-19 cases in the country. *See* Exhibit A (Coronavirus in the US: Latest Map and Case Count, N.Y. Times, *visited* April 8, 2020).

Throughout their brief, defendants attack plaintiffs for not supporting their motion with evidence (which of course, plaintiffs actually did, with a series of sworn declarations from nationally recognized experts, among other things), yet defendants provide no evidence at all to support any of their assertions about what they are doing. Many of the defendants' assertions are vague, misleading, or overstated, and certainly not susceptible to being judicially noticed.

The most glaring example is defendants' assertion that the Prisoner Review Board (PRB) continues to hold hearings on alleged parole violations, Doc. 26 at 5. In fact, the PRB canceled its parole revocation hearings at Stateville last week and has provided no information about whether those hearings will be rescheduled. *See* Exhibit B (Adam Kaney declaration). Stateville is where the vast majority of parolees are held pending their hearings. This cancellation means that parolees are confined to IDOC based solely on allegations, without any determination of whether those allegations are true, and even if true, whether the violations are sufficiently serious to warrant revocation of parole. These individuals now face a serious risk of harm solely, which is exactly what deliberate indifference looks like.

Similarly, defendants tout the fact that the Governor continues to review and grant commutation petitions, *see* Doc. 26 at 3, yet they cite only one example of an individual released to parole who had been convicted of possession of marijuana. One petition (or even a handful of petitions) granted comes nowhere near meeting the scope of the emergency. Furthermore, defendants admit, *see* Doc. 26 at 5, that the PRB cancelled its April clemency docket in its entirety. And whatever clemency petitions may be granted will almost certainly be only for those

prisoners fortunate enough to have a legal advocate lobbying individually on their behalf. Most prisoners are not so lucky.

More generally, defendants fail to provide the Court with any details regarding their alleged efforts to protect members of the plaintiff class. They provide no detail as to how many people have been released using each of the mechanisms they discuss, what criteria they are applying, how many people are reviewing prisoners for release, how many prisoners are in the pool of people they are reviewing, how that pool was selected, how long they expect the process to take, or whether there is any prospect that the rate of release will increase over the next few days. They also provide no explanation for why people like named plaintiffs William Richard and Carl Reed are still in IDOC custody—both are extremely medically vulnerable, are near the end of their sentences, and have safe homes waiting for them in the community. Without these details, what the defendants have provided is a list of the mechanisms they *could* use to protect members of the putative plaintiff class from harm, rather than evidence that they actually *are* protecting plaintiffs.

Illinois law provides defendants with the tools they need to protect plaintiffs from serious risk of harm. However, what their laundry list of tools, coupled with the paucity of results, demonstrates is the desperate need for the court to intervene to prod the defendants to actually make use of these tools to protect as many of the plaintiffs as possible—and particularly the members of subclasses 1 and 2 which are the subject of the motion currently before the Court— before it is too late.

## II. Plaintiffs' Motion for a TRO/PI Should Be Granted

Defendants' attacks on the currently-pending motion are based largely on strawman arguments, without regard to the fact that the relief plaintiffs seek on the pending TRO/PI motion

is limited. As plaintiff has explained in prior briefing, the currently-pending motion seeks relief on behalf of subclasses 1 and 2 only. *See* Doc. 24. Likewise, plaintiffs do *not* ask this Court to put every member of these subclasses out on the street without individualized safety assessments. To the contrary, plaintiff have proposed a remedial plan, *see* Doc. 24-1, that affords defendants significant deference to make safety assessments and approve host sites. With that reality in mind, plaintiffs address defendants' specific arguments below.

### A.  Subclasses 1 and 2 Are Likely To Succeed on The Merits of Their Claims

Defendants advance three sets of arguments as to the likelihood that plaintiffs will succeed on the merits of their claims. First, defendants contend that plaintiffs' claims are procedurally barred. Second, defendants contend that plaintiffs' Eighth Amendment claim fails because plaintiffs cannot establish deliberate indifference. Third, defendants contend that plaintiffs' Americans with Disabilities Act (ADA) claim fails. Defendants are wrong on each of these points, as plaintiffs explain.

### 1.  The Claims of Subclasses 1 and 2 are Not Procedurally Barred

At the outset, defendants argue that several procedural hurdles block plaintiffs' claims entirely, but careful examination shows that these hurdles either do not exist at all or else plaintiffs easily clear them.

### a.  Subclasses 1 and 2 Do Not Seek a § 3626 "Prisoner Release Order"

Defendants' first argument is that plaintiffs have not and cannot meet the requirements for obtaining a "prisoner release order" as that term is defined in 18 U.S.C. § 3626. For all the reasons plaintiffs already set forth in prior briefing, *see* Doc. 24, which plaintiffs incorporate by reference, plaintiffs are not seeking a "prisoner release order." Without repeating all of those arguments here, plaintiffs make only a few points in reply.

First, this case is not about prison overcrowding. Defendants use the word "crowding" as if this statute is simply referencing congregate settings. That is not correct; overcrowding refers to facilities housing more people than they have the capacity to house, such as that which ultimately resulted in the *Brown v. Plata* case, as well as significant litigation throughout the 1980s/90s challenging unconstitutional conditions of confinement that result from overcrowding and caused federal courts to order population caps as a remedy. In contrast, here, the facilities where plaintiffs are housed are all operating within their operational capacity (according to IDOC's own website), including Stateville. The issue is not overcrowding, but the inherent congregate, or communal, nature of prison housing and daily life activities which, like nursing homes, make them susceptible to contagion.

Contrary to defendants' argument, Doc. 26 at 14, the three-judge panel did not hold otherwise in its decision last week in *Plata v. Newsom*, No. 01 C 1351. *See* Exhibit C (Apr. 4, 2020 Order), Doc. 361. In that case, the plaintiffs asked their existing three judge court, which has been in place for at least a decade, to modify the existing order to require further population reductions to protect against the threat of the coronavirus. The court declined to do so, not for the reasons defendants argue, but because modifying the existing order was only allowable as needed to remedy the underlying constitutional violations that the original order addressed. Preventive measures responsive to the outbreak do not, however, relate to the overcrowding orders, "but rather new relief based on the new threat of harm posed by COVID-19." *Id.* at 7. The court went on to explain, "the harm Plaintiffs face is not dependent on the existence of a constitutionally inadequate health care delivery system is strong evidence that it is rooted in a

significantly different underlying cause than what was before us in the prior three-judge court proceedings." *Id.* at 8.[2]

Second, defendants' argument about the application of section 3626 mischaracterizes plaintiffs' request for relief. As already explained, plaintiffs do not seek an order immediately releasing 16,000 people from IDOC custody. Instead they seek a process through which IDOC expeditiously evaluates subclass members for medical furlough and then uses its discretion to transfer those subclass members who are particularly vulnerable to COVID-19 and who can safely quarantine in their home communities. *See* Doc. 24-1.

### b. The Claims of Subclasses 1 and 2 are not *Heck* Barred

Defendants next contend that plaintiffs' claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). This argument misunderstands the *Heck* case line and misconstrues the relief sought by subclasses 1 and 2. Because these subclasses do not seek relief from any criminal conviction or speedier release from custody, their suits are not barred by *Heck*. Instead, their requests to be removed temporarily from highly dangerous settings where their health and lives are in imminent danger are classic conditions of confinement suits, which the Supreme Court's decision in *Muhammad v. Close* makes clear are not barred by *Heck*. *See Muhammad v. Close*, 540 U.S. 749 (2004).

A brief review of the *Heck* case line illustrates why the relief sought by the subclasses is not barred. Starting with *Preiser v. Rodriguez*, the Supreme Court held that when a state prisoner challenges "the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus." 411 U.S. 475, 500 (1973). The

---

[2] Also noteworthy is that as of the time of this decision, the California DOC was planning to release around 6,500 prisoners over the coming weeks. *Id.* at 6.

Court's concern throughout the whole *Heck* case line is that the types of relief typically sought via habeas corpus cannot be sought via section 1983 prior to favorable termination of the criminal case. Specifically, there are two types of relief typically sought via habeas corpus that are barred in section 1983 actions by the *Heck* case line: (1) relief from a criminal conviction; and (2) speedier release from custody. *See Heck*, 512 U.S. at 484-85 (extending *Preiser* to damages actions "challenging the validity of outstanding criminal judgments . . . that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement"); *Edwards v. Balisok*, 520 U.S. 641, 648 (1997) (extending the rule to prison disciplinary proceedings, where the section 1983 suit "necessarily impl[ies] the invalidity of the punishment imposed").

Defendants assert that plaintiffs "are challenging the *fact* of their current confinement," Doc. 26 at 18, but to characterize the relief sought by the subclasses that way misconstrues the scope of *Heck*, the relief sought by the Plaintiffs, or both. When the Supreme Court says repeatedly in the *Heck* case line that plaintiffs cannot use section 1983 to challenge the "fact or duration" of their confinement, it plainly means that section 1983 cannot be used to set aside an extant criminal (or disciplinary) judgment or to secure a speedier release from ongoing custody. It does not mean that all suits that relate to the fact of confinement are barred by *Heck*, a point the Court made crystal clear in *Muhammad v. Close*, 540 U.S. 749 (2004), which summarized the rule as follows:

> In *Heck* . . . we held that where success in a prisoner's section 1983 damages action would implicitly question the validity of conviction or duration of sentence, the litigant must first achieve favorable termination of his available state, or federal habeas, opportunities to challenge the underlying conviction or sentence.
>
> * * *
>
> *Heck*'s requirement to resort to state litigation and federal habeas before § 1983 is not, however, implicated by a prisoner's challenge that threatens no consequence for his conviction or the duration of his sentence.

*Id.* at 751. Accordingly, where a suit challenges the conditions of prison confinement—and not the validity of a conviction or the length of custody—the *Heck* bar simply does not apply. *See Savory v. Cannon*, 947 F.3d 409, 422-23 (7th Cir. 2020) (en banc) (discussing *Muhammad* and reaffirming that section 1983 challenges "related only to the conditions of confinement and that do[] not implicate the validity of the underlying conviction or the duration of the sentence . . . is not subject to *Heck*'s favorable termination requirement").

Here plaintiffs challenge only the conditions of their confinement. They contend that if they are not furloughed or moved out of the congregate prison population during this emergency, they will suffer catastrophic health consequences, including death. Critically, they do not seek relief from the underlying criminal judgments that are the basis for their incarceration or any adverse disciplinary ruling. Nor do they seek speedier release from custody. Properly construed, the relief requested if granted will not require this Court to set aside any state criminal conviction or shorten any state custody. Because the relief that plaintiffs seek does not necessarily require invalidation of their criminal convictions or any shortening of their ongoing sentence, *Heck* does not apply, just as the *Heck* bar did not apply to bar the suits in *Muhammad*, *Nelson v. Campbell*, 541 U.S. 637 (2004), *Wilkinson v. Dotson*, 544 U.S. 74 (2005), and *Skinner v. Switzer*, 562 U.S. 521 (2011).

Defendants' argument that cases seeking medical furloughs are barred by *Heck* would eliminate large portions of this Court's docket. The plurality of cases filed by prisoners in Illinois include a claim about lack of proper medical care. In many of those cases, the relief sought is referral to an outside specialist, an operation, or hospitalization for some other procedure. Each such outside hospitalization is a "medical furlough" as the prisoner is temporarily somewhere other than an IDOC prison for medical purposes. The relief sought in the current motion is no

different in kind (although the relief is sought for a class, rather than an individual). Plaintiffs seek nothing more than a process through which they can be evaluated for temporary relocation to a site where they can practice social distancing, isolation, shelter in place, and all of the other requirements established by defendant Pritzker and others as means of staying safe and slowing the spread of the coronavirus. If defendants' arguments were accepted, every prisoner who sought outside medical treatment would be required to file a federal habeas corpus action. That is not what *Heck* requires.

None of the cases cited by defendants say otherwise. The Seventh Circuit sitting *en banc* recently reiterated the rule of *Muhammad*, reaffirming its decisions that hold that a challenge to conditions of confinement that does not spell invalidation of a conviction or speedier release from custody is not barred by *Heck*. *Savory*, 947 F.3d at 422-23.

Defendants' reliance on *Graham v. Broglin*, 922 F.2d 379, 380-81 (7th Cir. 1991) is misplaced. In *Graham*, the court held that a prisoner suit brought to "shorten the term of [] imprisonment" must be brought under habeas corpus, because the prisoner "is challenging the state's custody over him." 922 F.2d 379, 380-81 (7th Cir. 1991). But, if a prisoner is seeking a different "location or environment," section 1983 is proper. *Id.* at 381. In other words, *Graham* supports plaintiffs' position, not defendants' position. Defendants' reliance on *Pischke v. Litscher*, 178 F.3d 497 (7th Cir. 1999) is likewise misplaced. Doc. 26 at 20. In *Pischke*, prisoners challenged a Wisconsin statute allowing the state to transfer them to private prisons in other states. The court held that prisoners should use section 1983, and not habeas corpus, to challenge the transfer between prisons, unless they are challenging a change in restriction that amounted to "a quantum change in the level of custody." *Id.* at 499-500 (*quoting Graham*, 922 F.2d at 381); *see also Moran v. Sondalle*, 218 F.3d 647, 650 (7th Cir. 2000) (holding that inmates must use

Section 1983 to challenge transfer to out-of-state prisons because they are not challenging "their convictions, their sentences, or administrative orders revoking good-time credits or equivalent sentence-shortening devices"). Compare this with *Gonzalez-Fuentes v. Molina*, where habeas corpus was the appropriate path to relief because the plaintiffs were challenging the fact of their incarceration, specifically, their reincarceration. 607 F.3d 864, 873 (1st Cir. 2010).

Analyzing the requested relief of plaintiffs in subclasses 1 and 2 makes clear that they do not seek to shorten the duration or fact of their custody. They do not challenge convictions, sentences, or orders against them, nor does their challenge require an inquiry into the validity of their custody—they challenge the conditions. The very nature of confinement in a congregate environment like an IDOC prison will not allow plaintiffs to properly mitigate the spread of COVID-19.

Defendants fault plaintiffs for not seeking a remedy that would improve conditions inside of prisons, *see* Doc. 26 at 21, but plaintiffs have adduced ample evidence to show there is simply no way to make conditions safe within the congregate prison setting, *see e.g.*, Doc. 9 at 41-43. Karen McCarron, a prisoner at Logan Correctional Center who has an M.D. provides a concrete illustration of the problem inside her living quarters. *See* Exhibit D (McCarron declaration). McCarron lives in a housing unit with approximately 60 other women, many of whom are sick or elderly. *Id.* They live in dorms, with 4-6 women sleeping in one room, and all 60 women sharing the same set of toilets and showers. *Id.* As McCarron explains, people at Logan want to do their part to help "flatten the curve" of infection, but they are simply not able to do so on account of the congregate living environment. *Id.* When COVID-19 reaches Logan, it will spread rapidly, and the sick and elderly women with whom she lives will face a very serious risk of illness and death. *Id.* Plaintiffs' section 1983 claim rests on these unsafe conditions and is not *Heck*-barred.

### c. *Rizzo* Abstention Does Not Apply

Defendants further argue that this Court should abstain from granting relief under *Rizzo v. Goode*, 423 U.S. 362 (1976). To make this argument, defendants overstate *Rizzo*'s holding and grossly mischaracterize the relief plaintiffs seek.

In *Rizzo*, the Supreme Court reversed the district court's complete "overhaul" of a police department's internal disciplinary procedures. *Id.* at 373. The Court found that the proof of liability amounted a few isolated cases of misconduct by individual officers, which in no way justified a complete overhaul of the department under federal court supervision. *Id.*

There is no comparison between this case and the isolated instances of misconduct by individual police officers found in *Rizzo*. In this case, plaintiffs do not allege that a few correctional officers failed to wear protective masks, or failed to take appropriate measures to prevent transmission of the coronavirus. Rather, plaintiffs allege a statewide failure by the top state officials to protect prisoners from a crisis of unprecedented proportions. The evidence of this failure is largely undisputed. Two prisoners have died at Stateville; the number of prisoners with confirmed cases of COVID-19 has exploded even in the five days since plaintiffs filed this case. While the parties have been drafting briefs, the first confirmed cases have appeared among prisoners at Logan and Pontiac, and the virus is now confirmed to have breached the walls of Menard. If nothing is done, the disaster at Stateville will be repeated at prison after prison across the state. This is nothing like *Rizzo*.

Defendants also misstate the relief sought by plaintiffs. There is no comparison between Plaintiffs' narrowly drawn request for relief in this case and the sweeping changes mandated by the district court in *Rizzo*. Plaintiffs do not seek to place IDOC under the supervision of this Court. Plaintiffs do not seek any change at all in Illinois law, the Illinois Administrative Code, or

any of IDOC's Administrative Directives. Rather, plaintiffs have carefully narrowed their subclasses, their requests for relief, and most relevantly, the instant motion, to mirror the paths for relief established by state law. All plaintiffs seek is a rebalancing of the way defendants exercise their discretion under the existing law and procedures, to ensure that plaintiffs' constitutional right to be protected from the substantial risk of harm (including potentially death) posed by the coronavirus pandemic is preserved. *See* Doc. 24-1 (Plaintiffs' Proposed Remedial Plan). But plaintiffs' proposed plan is just an example of how the defendants could comply with their constitutional obligation. Defendants may well have other means which would be equally effective, which they are free to proffer to the Court. Further, the proposed plan affords defendants the opportunity to make legitimate safety assessments and to transfer only those who have approved host sites. *Id.* Thus, the plan in no way "bypass[es]" the State's interest and expertise, as defendants claim it would. Doc. 26 at 24 (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491-92 (1973)). What defendants cannot do is continue along the path they are on, slowly transferring or releasing only a handful of prisoners, leaving almost the entire plaintiff class exposed to an imminent deadly threat.

Plaintiffs' requested relief fully complies with the mandate of *Rizzo*, which has since been codified in the Prison Litigation Reform Act and decisions of the Seventh Circuit. The PLRA requires that an injunction be "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. §3626(a)(1)(A). The PLRA further prevents federal courts from entering injunctions which would require government officials to violate state law. 18 U.S.C. §3626(a)(1)(B). The relief proposed by plaintiffs in this case carefully adheres to these mandates. *See also Westefer v. Neal*, 682 F.3d 679 (7th Cir. 2012) (cautioning district courts that

13

prison officials should be given an opportunity to draft remedial plans once a court finds a constitutional violation). Again, plaintiffs have carefully adhered to this admonition. While they have submitted a proposed remedial plan, it is only a suggestion of the type of relief they believe would remedy the constitutional violation. Defendants may well have alternative plans which would protect plaintiffs' constitutional rights and the Court should consider any such plans.

Since *Rizzo*, numerous courts have issued orders requiring prison officials to take action to protect prisoners' constitutional rights.[3] The U.S. Supreme Court even affirmed an order requiring prison officials in California to release prisoners in *Plata v. Brown*, 563 U.S. 493 (2011). Clearly, *Rizzo* does not stand for the proposition asserted by defendants, that the federal courts can no longer intervene to force prison officials to protect the rights of prisoners.

Tellingly, defendants cite only a single Seventh Circuit case where *Rizzo* has been invoked to bar injunctive relief, *Courthouse News Services v. Brown*, 908 F.3d 1063, 1071 (7th Cir. 2018).[4] *Courthouse News* concerned an injunction won by journalists to force the Clerk of

---

[3] *See Mitchell v. Baker*, No. 13-cv-0860-MJR-SCW, 2015 U.S. Dist. LEXIS 6689 (S.D. Ill. Jan. 21, 2015) (granting preliminary injunctive relief to a prisoner seeking a transfer); *Reaves v. Dep't of Corr.*, 392 F. Supp. 3d 195, 209-10 (D. Mass. 2019) (ordering prison to either transfer prisoner to facility equipped to provide for his medical needs or to ensure he is provided with adequate care as remedy for prison's deliberate indifference to his serious medical needs); *United States v. Wallen*, 177 F. Supp. 2d 455, 458 (D. Md. 2001) (ordering transfer of pretrial detainee to a hospital since "the Marshal's Service cannot assure this Court that it will provide the medical care that the Constitution mandates so long as he is held at MCAC"); *see also* ABA Standards for Criminal Justice, 23-6.2 (3d ed. 2011) ("A prisoner who requires care not available in the correctional facility should be transferred to a hospital or other appropriate place for care."); *cf. Murphy v. Lane*, 833 F.2d 106 (7th Cir. 1987) (allowing plaintiff's claim for retaliatory transfer to go forward based on prison officials' transfer of plaintiff to prison more poorly-equipped to handle his psychiatric needs).

[4] Defendants point to district court opinions rejecting prisoner transfers to support their contention that this Court should decline to grant injunctive relief pursuant to *Rizzo*. In each of these cases, however, the court made only a passing reference to *Rizzo* before rejecting otherwise deficient claims. *See Boykin v. Fischer*, No. 16-CV-50160, 2019 WL 6117580, at *14 (N.D. Ill. Nov. 18, 2019) (plaintiff offered no evidence that his assignment to a psychiatric unit violated his constitutional rights); *Cornille v. Lashbrook*, No. 19-CV-002, 2019 WL 366562, at *6 (S.D. Ill. Jan 30, 2019) (plaintiff's vague claims of physical and mental harm from double celling were

14

the Circuit Court of Cook County to release filings to the public immediately—a course of action incompatible with the state court's standing order, *see id.* at 1067. *Courthouse News* has no application here. This case concerns imminent risk to the lives of medically vulnerable people in IDOC custody. Plaintiffs are not asking this Court to tell a state court system how to operate, nor are plaintiffs asking this Court to direct IDOC to take action inconsistent with its own rules. Neither *Rizzo* nor *Courthouse News* preclude the relief plaintiff seeks.

### d. Defendants Will Lose an Exhaustion Affirmative Defense

Finally, defendants argue that plaintiffs' motion should be denied because they do not and cannot allege that they exhausted their administrative remedies. This argument is a non-starter. First and foremost, plaintiffs have no obligation to plead exhaustion—failure to exhaust is an affirmative defense that defendants have the burden of pleading and proving. *Kaba v. Stepp*, 458 F.3d 678, 681 (7th Cir. 2006). Furthermore, even if defendants were to assert a failure to exhaust defense, it would fail.

To comply with the PLRA's exhaustion requirement, prisoners must follow the prison's established grievance process. *See Woodford v. Ngo*, 548 U.S. 81, 88-90 (2006); *Maddox v. Love*, 655 F.3d 709, 721 (7th Cir. 2011) ("The 'applicable procedural rules' that a prisoner must properly exhaust are defined not by the PLRA, but by the prison grievance process itself."). A prisoner is required to exhaust only the remedies that are actually available to them. *Ross v. Blake*, 136 S. Ct. 1850 (2016); *Hernandez v. Dart*, 814 F.3d 836, 842 (7th Cir. 2016). The unavailability of the grievance process "lifts the PLRA exhaustion requirement entirely and

---

inadequate to justify a grant of a TRO); *Conway v. Wagnor*, No. 19-CV-036, 2019 WL 183903, at *1-2 (S.D. Ill. Jan. 14, 2019) (TRO not warranted because plaintiff did not allege that he was not currently receiving treatment at the facility from which he sought transfer nor explain why immediate treatment was warranted, among other deficiencies); *Boykin v. Dixon Mental Health Servs.*, No. 16-CV-50160, 2018 WL 8806095, at *3 (N.D. Ill. Oct.15, 2018) (preliminary injunction denied because plaintiff demonstrated low likelihood of success on the merits).

provides immediate entry into federal court." *Ramirez v. Young*, 906 F.3d 530, 539 (7th Cir. 2018) (quoting *Hernandez*, 814 F.3d at 840).

Illinois regulations expressly prohibit use of the grievance process to address the kinds of placement matters at issue in this case: "The grievance procedure shall *not* be utilized for complaints regarding decisions that have been rendered by the Director, such as, but not limited to, facility placement, awards of supplemental sentence credit or transfer denials, or decisions that are outside the authority of the Department, such as parole decisions, clemency or orders regarding length of sentence." 20 Ill. Admin. Code § 504.810(b) (emphasis added). Under Illinois rules, transfers and placements are non-grievable, period. No grievance process was available to plaintiffs, and there is no legitimate exhaustion issue in this case.

### 2. Subclasses 1 and 2 Have Pled a Plausible Eighth Amendment Claim

#### a. Deliberate Indifference Does Not Require Plaintiffs To Prove Defendants Subjectively Intend to Harm Them

In order to prevail on their Eighth Amendment claim, plaintiffs must show that they face an objectively serious risk of harm, that defendants acted with deliberate indifference to that risk. *Greeno v. Daley*, 414 F. 3d 645, 653 (7th Cir. 2005); *see also Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016). There is no dispute in this case about the objectively serious risks posed by COVID-19 to those in custody—particularly subclasses 1 and 2 who are medically vulnerable due to age or medical condition. Likewise, there is no dispute defendants' awareness of that risk.

Defendants contend that plaintiffs' lawsuit amounts to a disagreement about their response. But there is virtually no disagreement about the appropriate action here: those who are medically and chronologically vulnerable must be transferred to a place where they can self-isolate. The Governor's April 6 Executive Order demonstrates his awareness of—and agreement with—this fact. Exhibit E (Executive Order 2020-21). Leaving prisoners locked in small cells,

often with cellmates, in congregate settings where they cannot engage in social distancing and must rely on staff for all aspects of daily life is, in the era of COVID-19, is akin to leaving them in a cell with a cobra. As the Seventh Circuit has stated, if prison officials place a prisoner in a cell when "they know that there is a cobra there or at least that there is a high probability of a cobra there, and do nothing, that is deliberate indifference." *Billman v. Ind. Dep't of Corr.*, 56 F.3d 785, 788 (7th Cir. 1995).

Notably, deliberate indifference does *not* require plaintiffs to prove that defendants intend them harm, or even know that harm is a certain result. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996); *Dixon v. County of Cook*, 819 F.3d 343, 350 (7th Cir. 2016). The test instead requires a showing that the defendant is actually aware of and disregarded an obvious risk to the plaintiff's health or safety. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). In injunctive cases like this one, deliberate indifference "should be determined in light of the prison authorities' current attitudes and conduct . . . ." *Farmer*, 511 U.S. at 827; *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

### b. The Continued Placement of Medically Vulnerable Plaintiffs in Highly Dangerous Settings Where Safety and Health Standards Cannot Be Achieved Meets the Deliberate Indifference Standard

Respondents argue that they cannot possibly be deliberately indifferent to Petitioners' risk of harm from COVID-19—the subjective component of the deliberate indifference analysis—because they have begun to review and furlough or transfer a very small number of IDOC prisoners. *See* Doc. 26 at 6. But defendants' contention that they are taking *some* small action does not defeat plaintiffs' claims of deliberate indifference when, by their own admission, such action has not meaningfully reduced the imminent risk of harm that subclasses 1 and 2—all of whom remain in custody—face because of the IDOC's inability to implement CDC Guidance.

17

*See Gray*, 826 F.3d at 1009 ("[k]nowingly persisting in an approach that does not make a dent in the problem is evidence from which a jury could infer deliberate indifference").

In the very unique circumstances of this case, the Governor's own orders admit that the prison environment inherently puts people in subclasses 1 and 2 at risk. And yet defendants have re-located only a small percentage of class members, leaving thousands more in need of an urgent response. While the situation at hand is unique, it fits precisely into the well-established Eighth Amendment jurisprudence of deliberate indifference.

In *LaBrec v. Walker*, 948 F.3d 836, 843 (7th Cir. 2020), the Seventh Circuit explained that courts assessing the deliberate indifference of defendants must look to "the circumstances as a whole . . . ." The risk of harm may come from "a single source or multiple sources," and it is thus irrelevant "whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Sinn v. Lemmon*, 911 F.3d 412, 421 (7th Cir. 2018); *see also Farmer v. Brennan*, 511 U.S. 825, 842 (1994). What matters instead is whether defendants know of the risk (which they do), and whether their response meaningfully responds to that risk (which it does not).

Defendants' deliberate indifference to the plight of those most vulnerable in our prison population is demonstrated by the continued placement—despite the availability of relocation options—of thousands of vulnerable people. For example, William Richard and his oxygen tank remain in a 4-person 12-foot x 15-foot cell, relying on a chain of other people—both staff and prison workers—to prepare and deliver his meals and medications, each a point of contact, and potential infection, along the way. The CDC, however, recommends that people with asthma not

18

even share household items like cups and towels.[5] Those kinds of limitations on limitations on shared contact are not possible in correctional settings. Plaintiffs not only share physical spaces that often do not allow for social distancing, but daily operations of the facilities involve countless points of contact among numerous people, including staff who come daily.

Plaintiffs are essentially "sitting ducks," whose terms of incarcerations risk becoming death sentences if defendants do not change course to expedite and substantially increase the relocation processes. By doing so, Defendants are "persist[ing] in a course of treatment known to be ineffective." *Petties*, 836 F.3d at 730. *See also Gray v. Hardy*, 826 F.3d 1000, 1009 (7th Cir. 2016) ("Knowingly persisting in an approach that does not make a dent in the problem is evidence from which a jury could infer deliberate indifference."); *Sellers v. Henman*, 41 F.3d 1100, 1103 (7th Cir. 1994) ("The more negligent acts they commit in a circumscribed interval, the likelier it is that they know they are creating *some* risk, and if the negligence is sufficiently widespread relative to the prison population the cumulative risk to an individual prisoner may be excessive"); *see also Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983) (in systemic cases, "as a practical matter, 'deliberate indifference' can be evidenced by 'repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff' or it can be demonstrated by 'proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care.'"). Continuation of these inadequate efforts is analogous to giving aspirin to the patient at risk of appendicitis and returning him to his cell, *Sherrod v. Lingle*, 223 F.3d 605, 612

---

[5] CDC, COVID-19, People Who Need Extra Precautions, People with Moderate to Severe Asthma, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html

(7th Cir. 2000), or continuing to treat severe vomiting with antacids over three years, *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005).

### c. The Court Need Not, and Cannot, Wait for the Named Plaintiffs to Test Positive for COVID-19 to Act

Defendants also assert that plaintiffs cannot establish deliberate indifference because none of them has tested positive for COVID-19. Doc. 26 at 27. This assertion is wholly without merit. It is well-established that an Eight Amendment claim can be founded upon risk of future harm, especially where the harm is certain and imminent. In *Helling*, a plaintiff alleged that he was assigned to a cell with another inmate who smoked five packs of cigarettes per day. *Helling v. McKinney*, 509 U.S. 25, 28 (1993). At issue was whether this exposure to environmental tobacco smoke (ETS) could constitute a valid claim under the Eighth Amendment, even though the plaintiff had not yet suffered harm. *Id.* at 30. The Supreme Court upheld the decision of the Court of Appeals, finding that the plaintiff stated "a cause of action under the Eighth Amendment by alleging that petitioners have, with deliberate indifference, exposed him to levels of ETS that pose an unreasonable risk of serious damage to his future health." *Id.* at 35. *Helling* has also contaminated water, *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001); *see also id.* 472 (probabilistic for future harm can form the basis of an Eighth Amendment claim).

It is widely understood that COVID-19 is a highly contagious disease that spreads rapidly in congregate settings--indeed it is the entire basis for the Governor's currently-pending shelter-in-place order. The fact that the individual named plaintiffs do not yet have COVID-19 does defeat their Eighth Amendment claim.

### 3. Subclass 1 Has Pled a Plausible ADA Claim

Unlike the Eighth Amendment claim, the Americans with Disabilities Act (ADA) does not require any finding of intent for the Court to act to remedy the discriminatory treatment of

20

people with disabilities through injunctive relief. *Washington v. Indiana High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 846-47 (7th Cir. 1999). Here, the prohibited discrimination is occurring in two ways, regardless of the Defendants' subjective intentions: first, people with disabilities (due to underlying medical conditions) are disparately impacted by the IDOC's practice of maintaining their placement in dangerous settings; and, second, IDOC has denied and continues to deny a reasonable accommodation that is available but not being fully utilized to protect medically vulnerable class members.

People with underlying medical conditions are at significant risk to the COVID-19 virus and the state has acknowledged that the conditions inherent to prisons make it difficult, if not impossible, to effectively mitigate or prevent the virus's spread once it enters a prison—as is tragically occurring at Stateville where the numbers of confirmed cases have soared from a handful to over a hundred in the course of a week. Defendants concede that IDOC has mechanisms available which would be more effective at protecting against the significant risk of harm (including furlough), but it has only utilized them for a very small percentage. Plaintiffs remain stranded in conditions that now jeopardize their lives. The fact that IDOC has not taken the requisite action for Plaintiffs demonstrates a more than plausible violation of the ADA.

### a. Plaintiffs are Otherwise Qualified

The term "qualified individual with a disability" is specifically defined in the statute as "an individual with a disability who, with or without reasonable modifications . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). Plaintiffs easily satisfy the otherwise qualified standard. The relevant service or program—as explained in plaintiffs' opening brief—is IDOC's program/service of providing safe custody.

21

Ignoring the service of "providing safe custody" in the pleading, defendants reframe the relevant program/service as furlough and argue that plaintiffs are not otherwise qualified despite the significant medical needs. Defendants' argument is wrong on the law and the facts. While a furlough is a program/service of the IDOC in a general sense, it is not the specific one at issue here; rather, it is the method of accommodation available to IDOC. That said, even if furlough was the program/service in question, defendants' argument remains a non-starter because, as a factual matter, plaintiffs easily qualify for the program/service of furlough.

> **i.    Members of Subclass 1 are Otherwise Qualified for the IDOC Program/Service at Issue: Safe Custody**

The issue challenged by plaintiffs is IDOC's failure to take the requisite action to ensure the safety of individuals within its custody and control; thus, the appropriate program/service to consider is IDOC's program/service of providing safe custody.[6] A "program or activity" under Title II "applies to anything a public entity does." *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 782 (7th Cir. 2002); *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (cautioning against "needless hair splitting arguments" and holding that Title II of the ADA applies to "anything a public entity does").

There is no reason to redefine the program/service at issue here. The Supreme Court has cautioned against defining the scope of a public benefit so as to avoid questions of discriminatory effects. In *Alexander v. Choate*, 469 U.S. 287, 301 (1985), a case brought under the ADA's predecessor the Rehabilitation Act, the Supreme Court in a unanimous decision

---

[6] Indeed, the stated mission of IDOC is to "[t]o serve justice in Illinois and increase public safety by promoting positive change in offender behavior, operating successful reentry programs, and reducing victimization." Among the ways that IDOC pursues its mission is to offer a program of "safe, secure, and humane correctional facilities" in which "[s]afety is at the forefront of agency operations with an emphasis on frontline staff to protect and control inmates." *See* IDOC Agency Overview, https://www2.illinois.gov/idoc/aboutus/Pages/IDOCOverview.aspx

explained that when assessing the benefit at issue, caution should be taken to ensure that the "benefit [is not] defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled." *See also id.* at n.21 (citing with approval the government's statement that "[a]ntidiscrimination legislation can obviously be emptied of meaning if every discriminatory policy is 'collapsed' into one's definition of what is the relevant benefit").

Moreover, ensuring the safety of individuals has been recognized as a requirement under Title II of the ADA, as well as a service, program or activity. *See, e.g.*, *Arenas v. Georgia Dep't of Corr.*, 2018 WL 988099, at *8 (S.D. Ga. Feb. 20, 2018) (denying motion to dismiss regarding plaintiff's request for an appropriate cell assignment to access the prison's benefits/services of "safe housing"); *Cox v. Mass. Dep't of Corr.*, 18 F. Supp. 3d 38, 46 (D. Mass. 2014) (plaintiff properly alleged an ADA claim for the denial of "the benefits of the facility ('safe' housing and supervision)").

Defendants do not – and cannot – dispute that they are responsible for the program/service of safe custody of individuals within its control. Thus, members of subclass 1 are "qualified individuals with disabilities" by virtue of their current incarceration.[7]

### ii. Plaintiffs are also "Otherwise Qualified" and Eligible for Medical Furlough

Plaintiffs are eligible for furlough under the statute, both before and after the Governor's April 6, 2020 Executive Order. *See* Exhibit E (Executive Order 2020-21). The statute sets forth a range of purposes for which IDOC may place an individual on furlough, including to obtain medical services not otherwise available. 730 ILCS 5/3-11-1(a)(2). Plaintiffs meet the statutory

---

[7] Defendants do not dispute that plaintiffs are individuals with disabilities within the meaning of the ADA, as set forth in Plaintiffs' Complaint, at ¶ 122. *See* 42 U.S.C. § 12102(1); *see also* 28 C.F.R. § 35.104.

requirement (even prior to the amendment by Executive Order) in two ways. First, due to the current COVID-19 pandemic, increased social distancing, as well as rigorous cleaning and hygiene practices are all an essential component of the medical care standards for people with these conditions – standards that cannot be effectively achieved in their current settings.[8] Therefore, medical furlough is appropriately utilized to allow them to comply with standards of care (treatment) for these medical conditions. Second, by definition, members of subclass 1 all have significant medical conditions for which they require ongoing medical treatment. Due to the pandemic IDOC is currently limited in its ability to provide care (not to mention the ongoing staffing shortages or denials of care that have plagued the system for years). *See* Doc. 1, Complaint ¶¶ 86-89. IDOC warned class members days ago that their medical resources were already "stretched thin." *See* Doc. 1-10.

Moreover, with the April 6 Executive Order, all members of subclass 1 are eligible for medical furlough regardless of whether they are currently receiving medical treatment for their conditions, because it specifically allows for the use of furlough for any medical purpose for exactly this reason, to allow medical furloughs for the medically vulnerable population more broadly due the specific limitations of the prison system. *See* Exhibit E. As a result, each of the named plaintiffs for subclass 1 are all "qualified individuals with disabilities" for the medical furlough program. *See* Doc. 1, Complaint ¶¶ 93-101 (describing medical circumstances of James Money, William Richard, Gerald Reed, Tewkunzi Green, Danny Labosette, Amber Watters, Carl Reed, and Carl "Tay Tay" Tate).

---

[8] Northwestern Medicine, High Risk Conditions and COVID-19, at https://www.nm.org/conditions-and-care-areas/infectious-disease/covid-19/high-risk-conditions

### b. Disparate Impact

Subclass 1 is defined to conform to the CDC's findings as to medical vulnerability based on specific underlying medical conditions; therefore, all subclass members fall into these established high-risk categories. Moreover, outside of this litigation, the Governor has admitted to the increased vulnerability of this subclass. The April 6 Executive Order plainly acknowledges the disparate impact of the incarcerated population of medically vulnerable people, which defendants nonetheless dispute in these pleadings.

> WHEREAS certain populations are at a higher risk of experiencing more severe illness as a result of COVID-19, including older adults and people with serious chronic health conditions such as heart disease, lung disease, or other conditions;

> WHEREAS, the Illinois Department of Corrections (IDOC) currently has a population of more than 36,000 . . . the vast majority of whom, because of their close proximity and contact with each other . . . are especially vulnerable to contacting and spreading COVID-19

Exhibit E; *see also* Doc. 1, Complaint, at ¶ 73 (quoting March 26, 2020 press briefing, including that "certain populations are at a higher risk of experiencing more severe illness as a result of COVID-19, including older adults and people who have serious chronic health conditions, such as heart disease, diabetes, lung disease or other mental or physical conditions.").

Nonetheless, defendants here challenge the existence of a disparate impact on people with these underlying conditions, arguing that more detailed statistical evidence is required. While plaintiffs disagree that is more required, the statistical evidence showing disparate impact is readily available.

The CDC is issuing Morbidity and Mortality Reports with detailed data and statistical analysis, summarized here:

> The percentage of COVID-19 patients with at least one underlying health condition or risk factor was higher among those requiring intensive care unit (ICU) admission (358 of 457, 78%) and those requiring hospitalization without ICU admission (732 of 1,037,

71%) than that among those who were not hospitalized (1,388 of 5,143, 27%). The most commonly reported conditions were diabetes mellitus, chronic lung disease, and cardiovascular disease. These preliminary findings suggest that in the United States, persons with underlying health conditions or other recognized risk factors for severe outcomes from respiratory infections appear to be at a higher risk for severe disease from COVID-19 than are persons without these conditions. . . . These results are consistent with findings from China and Italy, which suggest that patients with underlying health conditions and risk factors, including, but not limited to, diabetes mellitus, hypertension, COPD, coronary artery disease, cerebrovascular disease, chronic renal disease, and smoking, might be at higher risk for severe disease or death from COVID-19 (3,4).

The Morbidity and Mortality Reports also include detailed tables showing the data for each specific condition.[9] In New York, 4,089 of the 4,758 deaths were of patients with at least one other chronic disease, including hypertension in 55% of deaths and diabetes which was diagnosed in 1,755 deaths (about 37% of the cases).[10] Again, because plaintiffs have defined the class as premised on the CDC's findings of vulnerability due to underlying medical conditions, this is sufficient evidence of disparate impact.

### c. Plaintiffs State a Meritorious Discrimination Claim for Failure to Accommodate

Incarceration in an Illinois prison is not intended to be a death sentence. For reasons outside of IDOC's control—the COVID-19 pandemic—IDOC's program/service of providing safe custody is not available to people in subclass 1 without the provision of reasonable accommodations. Due to age and underlying medical conditions, members of subclass 1 face two related obstacles to their safety. First, most are at heightened risk to contract COVID-19, due to underlying medical conditions or to immune suppressing drugs taken to address medical

---

[9] CDC COVID-19 Response Team: Morbidity and Mortality Weekly Report, "Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February 12–March 28, 2020.
[10] USA Today, New data on New York coronavirus deaths: Most had these underlying illnesses; 61% were men https://www.usatoday.com/story/news/health/2020/04/07/new-york-coronavirus-deaths-data-shows-most-had-underlying-illnesses/2960151001/ (Apr. 7, 2020)

conditions. Second, all are at extremely heightened risk to experience a more severe case of COVID-19 due to underlying medical conditions.

To provide the service or program of safe custody, IDOC normally houses those in custody in one of the 28 facilities around the state. However, because of current conditions, it can no longer do so. The Governor's April 6 Executive Order acknowledged:

> WHEREAS certain populations are at a higher risk of experiencing more severe illness as a result of COVID-19, including older adults and people with serious chronic health conditions such as heart disease, lung disease, or other conditions;
>
> WHEREAS, the Illinois Department of Corrections (IDOC) currently has a population of more than 36,000 . . . the vast majority of whom, because of their close proximity and contact with each other . . . are especially vulnerable to contacting and spreading COVID-19; and
>
> WHEREAS, the IDOC currently has limited housing capacity to isolate and quarantine inmates who present as symptomatic of, or test positive for COVID-19"

Exhibit E. If the IDOC does not have sufficient housing to appropriately quarantine those who actually developed symptoms and confirmed cases, they certainly do not have the capacity to provide the level of quarantine needed to protect these medically vulnerable class members in the event of an outbreak in their facilities.

As a result, defendants must provide medically vulnerable class members with the reasonable accommodation of medical furlough. 28 C.F.R. §§ 35.130(b)(7) ("public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."). Contrary to defendants' argument, the failure to provide an accommodation needed to prevent the disparate impact on Plaintiffs is itself discrimination based on disability. Direct, or intentional, discrimination is not the only form of discrimination

27

prohibited by the ADA. *See Alexander v. Choate*, 469 U.S. 287, 297 & n. 12 (1985) (Congress recognized that discrimination on the basis of a disability is "most often the product, not of invidious animus, but rather of thoughtlessness and indifference--of benign neglect.").Thus, equally violative of the statute is the failure to make reasonable modifications or accommodations that would allow people with disabilities to participate in the same programs in which nondisabled people participate. As defendants themselves note, plaintiffs "may establish discrimination by presenting evidence that the defendant intentionally acted on the basis of the disability, the defendant refused to provide a reasonable modification, **or** the defendant's denial of benefits disproportionately impacts disabled people." Doc. 26 at 31, citing *Culvahouse v. City of LaPorte*, 679 F. Supp. 2d 931, 937 (N.D. Ind. 2009).

Moreover, allowing subclass members the accommodation of participating in an existing program is not a "fundamental alteration." *Radaszewski v. Maram*, 383 F.3d 599, 609-611 (7th Cir. 2004) (explaining that Title II of the ADA "may well require the State to make reasonable modifications to the form of existing services" … but that "a State is not obliged to create entirely new services" or fundamentally alter the substance of the services it provides). Plaintiffs do not ask defendants to create a new program or to change eligibility criteria for a program. Likewise, defendants' contention that it would be an undue burden to fully utilize this accommodation for our most vulnerable class members cannot be accepted. This accommodation is needed to save lives, and will further also serve to decrease the risk to other prisoners, to prison staff, and to the surrounding communities. *See e.g. Radaszewski*, 383 F.3d at 613-14 (explaining that while the initial cost of community based care, even if greater than cost of institutionalized care, is not enough to establish fundamental alteration: "If every alteration in a

program or service that required the outlay of funds were tantamount to a fundamental alteration, the ADA's integration mandate would be hollow indeed.").

In sum, plaintiffs have demonstrated a likelihood to succeed on the merits of their Eighth Amendment and ADA claims.

## B.    Plaintiffs Have Demonstrated That They Face Irreparable Harm

Defendants' next argument, that plaintiffs have not demonstrated irreparable harm, is preposterous. They argue that Plaintiffs have only demonstrated "the possibility that a substantial risk might arise from COVID-19 generally, not that any named plaintiff faces a particular probable harm." Doc 26 at 34. Defendants are simply wrong. At least two prisoners have already died from COVID-19. Currently 110 prisoners are infected with the virus in 7 different correctional centers—including 95 prisoners at Stateville.  And 70 staff from 13 different correctional centers are infected. It is not just possible that more prisoners will contract COVID-19, it is certain. And as described in detail above, if members of subclasses 1 and 2—and in particular named Plaintiffs Money, Richard, Gerald Reed, Green, Labosette, Carl Reed, and Tate—contract the virus, they will likely suffer severe illness or death because of their age and/or serious underlying medical conditions. There is no doubt that the risk of severe illness or death constitutes irreparable harm. *See, e.g.*, *Jones'El v. Burge*, 164 F. Supp. 2d 1096, 1123 (W.D. Wis. 2001) ("Put more specifically, pain, suffering and the risk of death constitute irreparable harm sufficient to support a preliminary injunction in prison cases." (internal quotation marks omitted)); *Flynn v. Doyle*, 630 F. Supp. 2d 987, 993 (E.D. Wis. 2009) (granting a preliminary injunction in a prison medical care case where the irreparable harm constituted continued medication errors and delays, which will result in life-threatening risks, the exacerbation of chronic and acute serious medical conditions, and unnecessary pain and suffering); *Farnam v.*

29

*Walker*, 593 F. Supp. 2d 1000, 1012-13 (C.D. Ill. 2009) (finding irreparable harm where a doctor testified that "the care the plaintiff was receiving at Graham, if continued, would significantly decrease the quality as well as the quantity of the plaintiff's life").

The named plaintiffs do not have to wait until they contract the virus to demonstrate irreparable harm and request relief. As defendants recognize, the risk of irreparable injury simply has to be "likely" in the absence of an injunction. *See Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017). Here it is certainly likely that when the virus enters the named plaintiffs' prisons—indeed it has already entered Stateville NRC where Gerald Reed is housed, Logan where Green and Watters are housed, Graham where Carl Reed is housed, and Danville where Tate is housed—and inevitably begins to spread due to the congregate environment of prisons and the highly contagious nature of the virus, they are at risk of contracting COVID-19 and becoming severely ill and/or dying. Defendants' reliance on *Orr v. Shicker*, -- F.3d --, 2020 WL 1329659 (7th Cir. 2020) is misplaced, as that case involved the hepatitis C virus (HCV), which the court noted "is a slow-moving disease and that rates of progression vary between individuals," and that "sometimes hepatitis C does not progress for years in patients who do not undergo treatment." *Id*. at *9 (finding that given the nature of HCV and the fact that IDOC was treating inmates with HCV, the individual plaintiffs did not show that the treatment protocol would likely cause them irreparable harm). Here, COVID-19 is very different from HCV—particularly because COVID-19 is much more contagious, the rates of infection are higher, the symptoms can escalate very quickly, and entire medical systems are becoming overwhelmed by critically ill COVID-19 patients. COVID-19 is uniquely and extremely dangerous to members of subclasses 1 and 2.

The Seventh Circuit has explained that a prisoner faces a substantial risk of harm when prison officials place a prisoner in a cell in which "they know that there is a cobra there or at least that there is a high probability of a cobra there." *Brown v. Budz*, 398 F.3d 904, 911 (7th Cir. 2005) (citation omitted). Here, COVID-19 is the hypothetical cobra and the named plaintiffs and members of subclasses 1 and 2 face a substantial risk of getting bit by the cobra. Accordingly, the named plaintiffs and members of subclasses 1 and 2 clearly face irreparable harm if injunctive relief is not granted.

## C. The Balance of Equities Weighs in Favor of Plaintiffs

Defendants' argument that the balance of harms weighs in their favor is likewise unavailing. Yet again relying on a straw man argument, defendants assert that plaintiffs seek to have thousands of dangerous people cast out onto the street to wreak havoc in their communities. Doc. 26 at 35. Plaintiffs request no such thing. Plaintiffs seek transfer of prisoners severe illness or death from exposure to COVID-19 on account of underlying medical issues or age to their homes via medical furlough.[11] These prisoners would be subject to a risk assessment and host site approval and would remain in the custody of the IDOC, under restrictions set by the IDOC, including, for example, electronic monitoring. Doc. 24-1. Defendants' safety concerns are significantly overstated.[12]

In addition to wrongly speculating about the danger plaintiffs present to the public, defendant completely overlook the risks posed to the public without relief from this court.

---

[11] Throughout their brief, defendants assert that plaintiffs are seeking to release 16,000 prisoners. While the estimated number of people in each of subclasses 1 and 2 adds up to 16,000, the number of prisoners seeking relief is actually much lower. As defendants are aware, there is significant overlap in these subclasses.

[12] Many of the individuals in subclasses 1 and 2 are also within a year of their out dates (and fall into one or more of subclasses 3-6), which further weakens the defendants' position relating to safety concerns. Defendants will be hard-pressed to articulate a safety concern to justify refusing furlough to those already scheduled for release in the near future.

Prisons are not closed environments. As the outbreak at Stateville shows, the rapid spread of COVID-19 in congregate correctional settings completely overwhelmed the local hospital, prompting a local official to declare the situation a "disaster." Furthermore, COVID-19 infection in IDOC has not been limited only to prisoners. As of April 8, 2020, there are 39 confirmed cases among Stateville staff, and that number is on the rise, and more than 10 IDOC facilities have at least one confirmed staff case.

It is only a matter of time before the situation at Stateville replicates in prison communities throughout the state. Unfortunately for those communities, they do not enjoy the same medical resources as the communities near Stateville. The chart below shows the number of ICU beds in communities surrounding just a few of IDOC's facilities.[13]

| Correctional Center | Prison Population | Local Population | Total ICU Beds in the Area |
|---|---|---|---|
| Graham | 1,919 | 6,156 (Hillsboro) | 4 |
| Lawrence | 2,166 | 5326 (Sumner) | 12 |
| Dixon | 2,051 | 17,253 (Dixon) | 14 |
| Danville | 1,724 | 33,158 (Danville) | 20 |
| Menard | 2,213 | 10,727 (Chester) | 23 |
| Shawnee | 1,682 | 4,496 (Vienna) | 26 |

---

[13] Hospital bed data obtained from Illinois Department of Public Health, Inventory of Health Care Facilities and Services and Need Determinations (2019), available at https://www2.illinois.gov/sites/hfsrb/InventoriesData/HealthCareFacilities/Documents/Hospital%20Inventory%202019%20E.pdf

| Logan | 1,657 | 15,473 (Lincoln) | 105 |
| Stateville | 2,674 | 23,511 (Crest Hill) | 115 |

Defendants completely ignore the strong public interest in preventing these local communities and their hospitals from becoming overburdened with COVID-19 cases. It is not possible to flatten the curve outside of prisons if it is not also flattened inside prisons. As defendants fail to acknowledge, it is not only the health and welfare of prisoners at stake, but also the health and welfare of those who live and work in the surrounding communities. The balance of equities weighs in favor of granting the relief that plaintiffs seek.

## III.    The Court Should Preliminarily Certify Subclasses 1 and 2

Defendants do not dispute that subclasses 1 and 2 satisfy the numerosity and adequacy requirements of Federal Rule of Civil Procedure 23. Instead, in an attempt to defeat plaintiffs' request for preliminary class certification, defendants argue that plaintiffs' have proffered insufficient evidence to meet their burden and that the putative class lacks commonality and typicality. These arguments fail—and ignore that subclasses one and two request only preliminary certification/and or class wide injunctive relief.

### A.  Plaintiffs Seek Preliminary Class Certification for the Limited Purpose of Ensuring that Emergency Relief Benefits Each Member of Subclasses 1 and 2

At this time, plaintiffs do not seek a final order from this Court certifying the putative class and each subclass. Instead, plaintiffs seek a mechanism to ensure that any emergency relief this Court orders benefits members of subclasses 1 and 2. When confronting the issue of class certification in the context of a motion for preliminary injunction, courts generally take one of two approaches. The first approach is to "provisionally" or "preliminarily" certify a class. The

second approach is to use the court's equitable powers to order class-wide relief. Either approach would satisfy the Plaintiffs' request here.

Courts regularly certify classes on a provisional or preliminary basis when granting a preliminary injunction or a temporary restraining order. *See Lee v. Orr*, 2013 WL 6490577, at *2 (N.D. Ill. 2013) (quoting *Newberg on Class Actions*) ("The court may conditionally certify the class or otherwise order a broad preliminary injunction, without a formal class ruling, under its general equity powers. The lack of formal class certification does not create an obstacle to class wide preliminary injunctive relief when activities of the defendant are directed generally against a class of persons.") (quoting *Ill. League of Advocates for the Developmentally Disabled v. Ill. Dept. of Human Services*, 2013 WL 3287145, at *3 (N.D. Ill. 2013), subsequent determination, 2013 WL 3776962 (N.D. Ill. 2013)) (internal quotation marks omitted). The Ninth Circuit explicitly approved of this practice when it upheld a district court's decision to provisionally certify a class and issue a preliminary injunction in litigation related to the Telephone Consumer Protection Act. *See Meyer v. Portfolio Recovery Associates*, LLC, 707 F.3d 1036, 1043 (9th Cir. 2012) (finding the plain language of FRCP 23(b)(2) permits provisional class certification). *See also Ligon v. City of New York*, 288 F.R.D. 72 (S.D.N.Y. 2013) (granting preliminary injunction class certification to a class of plaintiffs challenging police practices in New York City); *Morrison v. Heckler*, 602 F. Supp. 1485, 1485-86 (D.C. Minn. 1985) (preliminarily certifying a class and granting a temporary restraining order in litigation concerning public benefits); *Harris v. Graddick*, 593 F. Supp. 128 (M.D. Ala. 1984) (certifying a plaintiff and defendant class concurrently with issuing a preliminary injunction).

Courts also regularly grant class-wide relief through a preliminary injunction, without making explicit findings related to Rule 23. "Under appropriate circumstances, a court may grant

34

preliminary injunctive relief in favor of putative class members before class certification, and correspondingly, assess the harm to putative class members when considering the preliminary injunction motion." 2 *Newberg on Class Actions* § 4:30 (5th ed.). Numerous courts have taken this path when granting a class-wide preliminary injunctive relief. *See Gooch v. Life Investors Ins. Co. of America*, 672 F.3d 402, 433 (6th Cir. 2012) (there is nothing improper about a preliminary injunction preceding a ruling on class certification); *Fish v. Kobach*, 189 F. Supp. 3d 1107, 1148 n.163 (D. Kan. 2016) (stating, in context of a class action challenge to Kansas motor voter statute, that "case law supports this Court's authority to issue class-wide injunctive relief based on its general equity powers before deciding the class certification motion"); *Abdi v. Duke*, 280 F. Supp. 3d 373, 400 (W.D.N.Y. 2017) (granting a class-wide injunction where named plaintiffs demonstrated irreparable harm and that those harms were representative of putative class members); *Rodriguez v. Providence Community Corrections*, *Inc.*, 155 F. Supp. 3d 758, 767 (M.D. Tenn. 2015) (a district court may award appropriate class-wide injunctive relief prior to a formal ruling on the class certification issue based upon either a conditional certification of the class or its general equity powers).

### B. Plaintiffs Have Proffered Sufficient Evidence To Carry Their Burden Under Rule 23

Defendants assert that the plaintiffs "have presented no actual evidence" about the proposed class and that on this basis alone, the Court should deny their request for preliminary class certification. Defendants also attempt to attack the evidence plaintiffs present as "inadmissible hearsay." Doc 26 at 37. Not only does this argument misrepresent Plaintiff's filings, it also ignores the "well-established rule that hearsay is admissible in preliminary injunction hearings." *See SEC v. Cherif*, 933 F.2d 403, 412 n.8 (7th Cir. 1991); *LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48 (2d Cir. 2004) (affirming the district court's grant of

preliminary injunctive relief in favor of the putative class, which the district court granted in reliance on affidavits from unnamed plaintiffs); *FTC v. Lifewatch Inc.*, 176 F. Supp. 3d 757, 761-62 (N.D. Ill. 2016) ("Affidavits and other hearsay materials are often received in preliminary injunction proceedings. The dispositive question is not their classification as hearsay but whether, weighing all the attendant factors, including the need for expedition, this type of evidence was appropriate given the character and objectives of the injunctive proceeding.").

Subclass 1 is defined as "people who have serious underlying medical conditions that put them at particular risk of serious harm or death from COVID-19, including but not limited to people with respiratory conditions including chronic lung disease or moderate to severe asthma; people with heart disease or other heart conditions; people who are immunocompromised as a result of cancer, HIV/AIDS, or any other condition or related to treatment for a medical condition; people with chronic liver or kidney disease or renal failure (including hepatitis and dialysis patients); people with diabetes, epilepsy, hypertension, blood disorders (including sickle cell disease), inherited metabolic disorders; people who have had or are at risk of stroke; and people with any other condition specifically identified by CDC either now or in the future as being a particular risk for severe illness and/or death caused by COVID-19, and who are eligible for medical furlough pursuant to 75 ILCS 5/3-11-1." Subclass 2 is comprised of people who are medically vulnerable to COVID-19 because they are 55 years of age and older and who are eligible for medical furlough pursuant to 75 ILCS 5/3-11-1.

In support of their request to preliminarily certify these subclasses, plaintiffs request that the Court take judicial notice of a number of well-established facts, specifically: (1) World Health Organization data demonstrating people in these subclasses have a significantly increased

chance of dying if they contract COVID-19;[14] (2) United States Department of Justice Data

regarding the increased prevalence of medical vulnerabilities among people in prison;[15] and (3)

the IDOC's own data establishing that there are 4,807 people in its custody who are 55 or

older.[16] *See* Fed. R. Evid. 201 ("The court may judicially notice a fact that is not subject to

reasonable dispute because it . . . can be accurately and readily determined from sources whose

accuracy cannot reasonably be questioned.").[17]

---

[14] Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19),
World Health Organization (Feb. 28, 2020), at 12, *available at*
https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-
final-report.pdf (last visited Apr. 1, 2020).

[15] Laura M. Marushack et al., *Medical Problems of State and Federal Prisoners and Jail
Inmates, 2011-12*, U.S. Dept. of Justice (2014).

[16] Population Data Sets, Illinois Department of Corrections, available at
https://www2.illinois.gov/idoc/reportsandstatistics/Pages/PopulationDataSets.aspx

[17] Plaintiffs further request that this Court take judicial notice of the numerous federal
district decisions finding the subclasses' ages and medical conditions such as Mr. Ramos's risk of
serious health consequences or even death if infected with COVID-19 and that there exists a high
risk of contracting COVID-19 in correctional facilities. *See United States v. Perez*, 2020 WL
1546422, at *4 (S.D.N.Y. 2020) (ordering a prisoner's early release after finding that a prisoner's
recent surgeries compromised his immune system, where he was housed in a small cell and he
could not "protect himself from the spread of a dangerous and highly contagious virus.); *United
States v. Ramos*, 2020 WL 1478307, at *1 (D. Mass. 2020) (ordering the release of a detainee
who had asthma and diabetes from a facility where there were no known cases of COVID-19
after finding that "it is not possible for a medically vulnerable inmate such as Mr. Ramos to
isolate himself in this institutional setting as recommended by the CDC); *United States v.
Rodriguez*, 2020 WL 1627331, at *8 (E.D. Pa. 2020) (finding that "prisons are ill-equipped to
prevent the spread of COVID-19" and ordering the release of a prisoner with diabetes); *United
States v. Fellela*, 2020 WL 1457877, at *1 (D. Conn. 2020) (releasing from custody a 62-year-
old, overweight detainee after finding that "all levels of government nationwide have recently
taken drastic measures in light of the COVID-19 pandemic to promote "social distancing" and to
prohibit the congregation of large numbers of people with one another. But, as is true for most
jails and prisons, the conditions of confinement at Wyatt are not compatible with these
safeguards."); *United States v. Cubie*, 2020 WL 1669400, at *2 (E.D. Wis. 2020) (releasing 54
year old prisoner because of the threat of COVID-19); *Basank v. Decker*, 2020 WL 1481503, at
*3 (S.D.N.Y. 2020) (ordering the release of immigrant detainees who asthma, diabetes, heart
disease, hypertension and obesity after taking judicial notice that "for people of advanced age,
with underlying health problems, or both, COVID-19 causes severe medical conditions and has
increased lethality" and that COVID-19 presents a "health risk. . .of constitutional significance—
for inmates who are elderly or have underlying illnesses." ); *Thakker et al v. Doll*, 2020 WL
1671563, at *7 (M.D. Pa. 2020) (releasing from detention immigrant petitioners who were over

With regard to information about the named plaintiffs and putative class, attached to Plaintiffs' Motion for a Preliminary Injunction, *see* Doc. 9-11 (and attached here as Exhibit F), are a number of declarations from the families of putative class members. These declarations set forth the health conditions class members live with including asthma,[18] and hypertension[19] the prevalence of people in prison exhibiting symptoms of COVID-19,[20] and the inability to socially distance in prison.[21] Family members also assert that they would welcome their loved one into their homes upon a grant of medical furlough.[22]

Declarations from the family members of named plaintiffs are also attached to this motion describing the named plaintiffs' medical conditions which include hypertension,[23]

---

50 and/or had hypertension, kidney failure, diabetes, hepatitis b, anemia, and leukemia after finding that the nature of "detention facilities makes them uniquely vulnerable to the rapid spread of highly contagious diseases like COVID-19" and that petitioners' continued detention may end in "catastrophic results."); *Jones et al, v Wolf et al.*, 2020 WL 1643857, at *8 (W.D.N.Y. 2020) (taking "judicial notice that, for people of advanced age, with underlying health problems, or both, COVID-19 causes severe medical conditions and has increased lethality."); *United States v. Davis*, 2020 WL 1529158, at *6 (D. Md. 2020) (releasing a pretrial detainee with bronchitis upon finding that "incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement."); *Malam v. Adducci,*, 2020 WL 1672662, at *8 (E.D. Mich. 2020) (releasing a 56-year-old immigrant detainee after finding *inter alia* that "petitioner's involuntary interaction with purportedly asymptomatic guards who rotate shifts is also a significant exposure factor.")

[18] Declaration of Amy Cochran (mother of putative class member Brice Mixon, Shawnee Correctional Center) at 1; Declaration of Beverly Bennet (mother of putative class member Jamal Bennett, Centralia Correctional Center) at 1; Declaration of LaTonya Jenkins Lucas (mother of putative class member Frank Sykes, Stateville Correctional Center) at 1.

[19] Declaration of Ohlibamah Clark (finance of putative class member Duane Moore, Dixon Correctional Center) at 1.

[20] Declaration of Carla Felton (partner of putative class member Carlvosier Smith, Stateville Correctional Center) at 1.

[21] Declaration of Kaye Thomas (wife of putative class member Luther Thomas, Big Muddy Correctional Center) at 1; Declaration of Sharon Gray (mother of putative class member John Shores, Hill Correctional Center) at 1.

[22] Thomas Dec at 1; Jenkins-Lucas Dec at 1; Clark Dec at 1; Gray Dec at 1; Bennet Dec at 1.

[23] Declaration of Prestina Tate (sister of named plaintiff Carl Tay Tay Tate, Danville Correctional Center) at 1.

diabetes,[24] Hepatitis C[25] and cancer.[26] Each family member declarant affirms that they have a space in their homes for their currently incarcerated loved one to safely quarantine upon release and that they will support their loved one in complying with IDOC supervision requirements and obtaining medical care.[27]

Defendants have custody and control over each of the named plaintiffs as well as all of the medical and other records that corroborate the allegations counsel has made about them. Defendants can access and verify the contents of those records themselves, and plaintiffs' counsel is prepared to elicit testimony from each of the named class representatives at the preliminary injunction hearing. Plaintiffs hereby requests that defendants make each of the named plaintiffs available to testify by telephone at the hearing.[28]

Plaintiffs' evidence is sufficient to support a finding of preliminary class certification—particularly because this evidence demonstrates the significant harm the putative subclasses will face in the absence of class wide relief. *See Doe v. Trump*, 418 F. Supp. 3d 573, 604 (D. Or. 2019) ("Having putative class members suffer [an] alleged irreparable harm merely because the preliminary injunction had to be litigated in an expedited fashion before class certification could be fully litigated is contrary to the purposes behind class actions and preliminary injunctive relief.").

---

[24] Declaration of Kim Reed (sister of named Plaintiff Carl Reed, Graham Correctional Center at 1.

[25] Declaration of Valerie Ott (mother of named plaintiff Danny Labosette, Robinson Correctional Center) at 1.

[26] Declaration of Patty Best (fiancee of named Plaintiff James Money, Illinois River Correctional Center) at 1.

[27] Tate Dec at 1; Reed Dec at 1; Best Dec at 1; Ott Dec at 1; Declaration of LaDonna Sipes (mother of named Plaintiff Amber Watters, Logan Correctional Center) at 1; Declaration of Siovhan Tucker (niece of named Plaintiffs Gerald Reed, Northern Reception Center) at 1; Declaration of Sarah Wild (family friend of Gerald Reed, Northern Reception Center at 1.

[28] If the Court prefers, plaintiff can file motions for writs to secure plaintiffs' phone appearances.

### C. Plaintiffs Meet the Commonality and Typicality Requirements of Rule 23

Defendants argue that factual variances between members of the subclasses undermine the Plaintiffs' assertion that their claims share a common question that drive the resolution of the litigation and that the named plaintiffs' injuries are atypical. *See* Doc. 26 at 38. These arguments hinge on defendants' mischaracterization of plaintiffs' position. As noted repeatedly, plaintiffs do not seek a blanket release order. *See* Doc. 24-1 (Plaintiffs' Proposed Remedial Plan).

In an attempt to defeat commonality, the defendants describe a list of individualized factors that IDOC should consider prior to making a decision about a class member's eligibility for medical furlough. Doc 26 at 38. The plaintiffs agree that some evaluation regarding individuals' health and safety which balances public safety concerns must occur prior to any determination regarding medical furlough. The fact that, after an evaluation, some class members may be suitable for furlough while others may have to remain in IDOC's physical custody does not destroy commonality. The commonality requirement does not require perfect uniformity. *See e.g.*, *Robert L. Meinders D.C., Ltd v. Emery Wilson Corp.*, 2016 WL 3402621, at *4 (S.D. Ill. June 21, 2016) ("'Rule 23(a)(2) does not demand that every member of the class have an identical claim,' and some degree of factual variation will not defeat commonality") (quoting *Spano v. The Boeing Co*., 633 F.3d 574, 585 (7th Cir. 2011)); *Rench v. TD Bank, N.A.*, 2018 WL 264121, at *3 (S.D. Ill. Jan. 2, 2018) (same); *Braggs v. Dunn*, 317 F.R.D. 634, 656 (M.D. Ala. 2016). Further, the individualized nature of the relief plaintiffs seek is entirely consistent with Rule 23. *See DL v. D.C.*, 860 F.3d 713, 726 (D.C. Cir. 2017) (certifying a subclass of special education students under Rule 23(b)(2) when they sued for individualized assessments and educational programming to meet their specific needs because a single injunction was suitable to

"provide relief to each member of the class" (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011)); *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010) (approving certification for a class of individuals detained without bond hearings and seeking injunctive relief in the form of individual bond hearings even though some members of the class may not have been entitled to this relief and may not have suffered an actually cognizable injury); *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 896 (7th Cir. 1999) (approving class certification in race discrimination case where plaintiffs sought individualized relief in the form of back pay); *Eubanks v. Billington*, 110 F.3d 87 (D.C. Cir. 1997) (approving the certification of a Title VII class action for plaintiffs seeking individualized monetary relief in the form of back pay and front pay); *Franco-Gonzales v. Napolitano*, No. CV 10-02211 DMG DTBX, 2011 WL 11705815, at *14-15 (C.D. Cal. Nov. 21, 2011) (certifying a class of individuals in Department of Homeland Security custody alleging inadequate procedures in place to assess the mental competence of aliens in custody and provide them with safeguards even though relief would "vary based on the circumstances" of each case); *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 601 (N.D. Cal. 2015) (finding certification of an injunctive and declaratory relief class under Rule 23(b)(2) proper even though relief "might differ from individual to individual" because the class sought a "uniform relief from a common policy that… applies to all class members"); *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378, 388 (D. Colo. 1993) (certifying a "medical monitoring class" seeking relief for damages from radioactive and nonradioactive substances when relief would be based on "the individualized nature of each individual's claim").

The claims of the named plaintiffs are also typical of the subclasses they seek to represent. Named Plaintiffs and the members of the putative class meet the typicality requirement because they have all suffered from the same violations of their constitutional rights. *See* Rule 23(a)(3).

41

Each named plaintiff here has a heighted chance of becoming critically ill or dying if they contract COVID-19 and each is currently subjected to a substantial risk of harm because of the IDOC's failure to act with urgency regarding the medical furlough related evaluations and determinations. This is sufficient to satisfy typicality. *See Oshana v. Coca-Cola, Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (typicality is "meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large" (internal quotations omitted)). Certain factual distinctions between named plaintiffs and the class members do not defeat typicality. *See Young v. Cnty of Cook*, No. 06 C 552, 2007 WL 1238920, at *6 (N.D. Ill. Apr. 25, 2007) ("The likelihood of some range of variations in how different groups of new detainees were treated does not undermine the fact that the claims of each class share common factual basis and legal theories."); *Phipps v. Sheriff of Cook Ctny*, 249 F.R.D. 298, 301 (N.D. Ill. 2008) ("That the particular conditions may differ slightly from one cell block to the next, or that there are factual distinctions between the actual injuries suffered by the [the named plaintiff] and the class members, does not defeat typicality under Rule 23(a)(3).").

Plaintiffs have demonstrated that their class claims present common questions susceptible to class-wide resolution, that those common questions predominate over individualized ones, and that the experience of the named plaintiffs is typical of the class, and defendants do not dispute that the proposed class is sufficiently numerous and adequately represented by class counsel. Accordingly, this Court should grant plaintiffs' request to preliminarily certify the class and grant class-wide relief should the Court approve plaintiffs' motion for a temporary restraining order or preliminary injunction.

Dated: April 8, 2020

Respectfully submitted,

/s/Elizabeth Mazur
One of the Attorneys for the Plaintiffs


Sheila A. Bedi
Luke Fernbach*
Emily M. Grant*
Terah Tollner*
Community Justice Civil Rights Clinic
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-2492
*Law student licensed pursuant to Illinois
 Supreme Court Rule 711

Vanessa del Valle
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-5932

Jennifer Soble
Illinois Prison Project
53 W. Jackson, Suite 1056
Chicago, IL 60616
(312) 324-4465

Amanda Antholt
Samantha Reed
Equip for Equality
20 N. Michigan Avenue, Suite 300
Chicago, IL 60602
(312) 241-0020

Sarah Grady
Steve Weil
Loevy & Loevy
311 N. Aberdeen Street, 3rd Floor
Chicago, IL 60607
(312) 243-5900

Alan Mills
Elizabeth Mazur
Uptown People's Law Center
4413 N. Sheridan
Chicago, IL 60640
(773) 769-1411

*Counsel for Plaintiffs*


## CERTIFICATE OF SERVICE

I, Elizabeth Mazur, an attorney, certify that I served this pleading on all counsel of record by filing it through CMECF system.


/s/Elizabeth Mazur


43