**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES MONEY, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 20-cv-2093 |
| | ) | |
| v. | ) | Judge Steven C. Seeger, assigned |
| | ) | |
| J.B. PRITZKER, *et al.* | ) | Judge Robert M. Dow, Jr., emergency |
| | ) | |
| Defendants. | ) | |

---

| | | |
|---|---|---|
| JAMES MONEY, *et al.* | ) | |
| | ) | |
| Petitioners, | ) | Case No. 20-cv-2094 |
| | ) | |
| v. | ) | Judge John F. Kness, assigned |
| | ) | |
| ROB JEFFREYS, in his official capacity | ) | Judge Robert M. Dow, Jr., emergency |
| as DIRECTOR OF THE ILLINOIS | ) | |
| DEPARTMENT OF CORRECTIONS, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER[1]

In these two cases, Plaintiffs have raised issues of great importance concerning the safety

and well-being of inmates in the custody of the Illinois Department of Corrections during the

current national crisis occasioned by the COVID-19 pandemic.  As myriad citations in both sides'

briefs confirm, this issue has occupied all three branches of government in both the federal and

state governments in recent weeks.  News reports are replete with actions taken by Governors,

---

[1] Judge Dow is addressing this matter as emergency judge pursuant to paragraph 5 of Second Amended General Order 20-0012.

Attorneys General, state Supreme Courts, and individual trial judges to accelerate the release of inmates and detainees where consistent with overall public safety and to protect those who remain in custodial settings. And rightly so, for the stakes are incredibly high for Plaintiffs, their families, and the public at large. As emphasized by the medical experts whose appearances at daily press briefings rivet the nation, nobody is immune from this virus. However, due to the way in which the virus spreads, individuals living in congregate settings—such as nursing homes and prisons—are especially vulnerable because of difficulty of observing social distancing and recommended hygiene practices in close quarters.

At the outset, it is worth mentioning that Plaintiffs do not ask this Court to order the Illinois Department of Corrections to improve the conditions of confinement. That is, Plaintiffs do not ask to improve the cleanliness of the prisons, or increase the amount of space between inmates at each facility, and so on. Instead, Plaintiffs ask this Court to force the state executive branch to start a process for the potential release of thousands of inmates, through medical furlough or home detention under state law, and do so within one week. The scope of the potential release is sweeping. By their own admission, Plaintiffs want a process to potentially release at least 12,000 inmates, almost one-third of the prison population in Illinois. Defendants submit that they have a process and already are doing most of what Plaintiffs are requesting in their proposed remedial plan—albeit not at the pace Plaintiffs would like to see.

The immediate question before the Court is whether Plaintiffs are entitled to some form of immediate relief—in the form of a temporary restraining order, a preliminary injunction, or writs of habeas corpus—imposed by a federal court on state officials. For several reasons explained below, the Court answers that question in the negative and denies the requested relief. Plaintiffs are correct in asserting that the issue of inmate health and safety is deserving of the highest degree

of attention.  And the record here shows that the authorities in this state are doing just that, with constantly evolving procedures increasing the number of inmates released on a daily basis.  But the release of inmates requires a process that gives close attention to detail, for the safety of each inmate, his or her family, and the community at large demands a sensible and individualized release plan—especially during a pandemic.  Even if the steps Illinois has taken and the pace with which they are proceeding is not exactly what Plaintiffs want, those steps and that pace plainly pass constitutional muster.  Plaintiffs have provided no convincing reason for a federal court to intrude here and now—either to issue a blanket order for the release of thousands of inmates or to superimpose a court-mandated and court-superintended process on the mechanisms currently in place to determine which IDOC inmates can and should be safely removed from prison facilities at this time.

The care of state inmates is entrusted, in the first instance, to state officials, unless the conditions rise to the level of constitutional violations.  And state law empowers state officials with the discretion to release individual inmates for medical furlough or home detention, if they deem it appropriate.  This Court concludes that Plaintiffs have no likelihood of success on their constitutional claims because the record does not support the notion that the Defendants are showing deliberate indifference to the inmates' plight or discriminating against inmates with disabilities.  Even if they had a colorable claim, Plaintiffs' request for release is untenable on a class-wide basis because the possibility of release is an inherently inmate-specific inquiry.  Other considerations – such as the public interest from the potential release of thousands of inmates – weigh heavily in the analysis, too.  In the end, this Court concludes that Plaintiffs are not entitled to their request for extraordinary relief, even in these extraordinary times.

# I.    Background[2]

The named Plaintiffs are ten individuals convicted of a range of felonies, including murder, aggravated kidnapping, and attempted robbery.  See *Money v. Pritzker*, 20-cv-2093 (hereinafter "*Pritzker*"), [26 at ¶¶ 93-102].  They are currently serving sentences in various Illinois Department of Corrections ("IDOC") facilities, none of which are in Cook County.  See [*id.* at ¶¶ 8-17.]  IDOC operates 28 adult correctional facilities throughout the State of Illinois, houses around 37,000 individuals, and has 11,600 employees.  [*Id.* at ¶ 69.]  Plaintiffs have brought two purported class action lawsuits—*Pritzker* and *Money v. Jeffreys* (hereinafter "*Jeffreys*"), 20-cv-2094—seeking release of prisoners from IDOC facilities in light of the COVID-19 pandemic.

*Money v. Pritzker*, 20-cv-2093, contains three counts, of which the first two are brought under 42 U.S.C. § 1983.  Count I asserts that Defendants are violating the Eighth Amendment through deliberate indifference to a serious risk of harm, while Count II asserts a violation of Plaintiffs' right to due process under the Fourteenth Amendment.  Count III asserts violations of the Americans with Disabilities Act ("ADA").  The complaint names as defendants J.B. Pritzker, Governor of Illinois, and Rob Jeffreys, Director of the Illinois Department of Corrections.  *Money v. Jeffreys*, 20-cv-2094, is a petition for writs of habeas corpus under 28 U.S.C. § 2254 for relief from custody in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution.  It names Rob Jeffreys as the respondent.  Both suits are purportedly brought on behalf of the named plaintiffs and all similarly situated individuals.

---

[2] The facts are taken from the plaintiffs' complaints and from materials cited by the parties that are the proper subject of judicial notice.  The Court may take judicial notice of material whose contents are "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned," *Driebel v. City of Milwaukee*, 298 F.3d 622, 622 n.2 (7th Cir. 2002) (*quoting* Fed. R. Evid. 201(b)), and documents incorporated in a complaint, *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002).

The foundation of each suit is essentially the same: Plaintiffs argue that the prison setting makes them (and other purported class members) especially vulnerable to COVID-19, that the state government's responses to the danger are insufficient or not fast enough or both, and that the only way to solve the problem is moving prisoners out of prisons.

### A.    Factual Background

COVID-19 is a disease caused by a novel coronavirus that began infecting humans in late 2019.  Symptoms include fever, cough, shortness of breath, congestion, sneezing, fatigue, and diarrhea.  *Pritzker,* [1 at ¶ 25.][3]  While some cases are mild, others require medical intervention, including hospitalization and intensive care.  [*Id.*]  The virus spreads from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.  [*Id.*]  It is highly contagious.

Currently, there is no vaccine to protect against infection by COVID-19.  To prevent infection and mitigate the spread of the virus, the Center for Disease Control ("CDC") and other public health agencies have universally prescribed social distancing—every person should remain at a distance of at least six feet from every other person—and rigorous hygiene—including regular and thorough hand washing with soap and water, the use of alcohol-based hand sanitizer, proper sneeze and cough etiquette, and frequent cleaning of all surfaces.  [1. at ¶ 31.]  The CDC recommends avoiding gatherings of more than 10 people.  [*Id.* at ¶ 32.]  Individuals in congregate environments—places where people live, eat, and sleep in close proximity—face increased danger of contracting COVID-19, as demonstrated by the rapid spread of the virus through cruise ships and nursing homes. [*Id.*]

---

[3] The complaints in the *Pritzker* Section 1983 action and the *Jeffreys* habeas action are quite similar, and in some places identical.  For simplicity and to avoid duplication, where a fact applies to both matters and is cited in both complaints, the Court cites to the *Pritzker* complaint, as it was filed first.

Despite social distancing recommendations, the disease has continued to spread. The World Health Organization has declared COVID-19 to be a global pandemic. [1 at ¶ 20.] On March 9, 2020, Illinois Governor J.B. Pritzker issued a proclamation declaring a disaster in the State of Illinois. [*Id.*] On March 13, 2020, President Trump declared a national emergency. [*Id.*] In the United States alone, as of April 1, 2020, there were over 186,000 confirmed cases and over 3,600 deaths. In Illinois, there were over 6,900 confirmed cases and 141 deaths. [*Id.* at ¶ 21.] On the same date, 52 prisoners in IDOC facilities in two different correctional centers (Stateville and North Lawndale ATC) had confirmed cases of COVID-19, and 25 staff in seven different correctional centers (Stateville NRC, Stateville, Sheridan, North Lawndale ATC, Menard, Joliet Treatment Center, and Crossroads ATC) had confirmed cases. [*Id.* at ¶ 71.] St. Joseph Hospital in Joliet, Illinois was, at the time the parties filed briefs in these matters, caring for 17 prisoners from Stateville, 9 of whom are in intensive care on ventilators. [*Id.* at ¶ 44.] On March 30, 2020, health officials announced that a prisoner in his 50s housed at Stateville Correctional Center had died from COVID-19. [*Id.* at ¶ 72.][4]

As things stand, the coronavirus continues to spread. According to the Coronavirus Resource Center of Johns Hopkins University, the United States has reported 461,437 cases, and 16,478 deaths, as of yesterday evening. See https://coronavirus.jhu.edu/data/new-cases (last visited April 10, 2020). According to the Illinois Department of Health, there are 16,422 confirmed cases in Illinois, including 528 deaths. See https://coronavirus.illinois.gov (last visited April 10, 2020).

---

[4] As of today, IDOC reports 134 confirmed cases of COVID-19 among the population of incarcerated individuals in all of its facilities [see 36, at 3]. 118 of those cases involve inmates at Stateville, with the remaining 16 spread out among a handful of the 27 other facilities in the IDOC system. See https://www2.illinois.gov/idoc/facilities/Pages/Covid19Response.aspx (last visited April 10, 2020).

Plaintiffs attached to both complaints a series of affidavits from medical professionals describing the seriousness of COVID-19 in a prison context and the limits of correctional facilities' ability to prevent or mitigate the spread of the disease. See *Pritzker*, [2]; *Jeffreys*, [1-1 through 1-10]. Among the primary points of those declarations are the following. Plaintiffs allege that none of the recommended measures for mitigating the spread of COVID-19 are available for persons confined in correctional facilities and for those who must interact with them. Correctional facilities are congregate environments, where large groups of people live, eat, and sleep in close contact with one another, making social distancing impossible. *Pritzker*, [1 at ¶ 36.] People share toilets, sinks, and showers, and often have limited access to soap, hand sanitizer, hot water, and other necessary hygiene items. Surfaces are infrequently washed, if at all, and cleaning supplies are limited. [*Id.* at ¶ 37.]

**B.      Responses by the State of Illinois to the COVID-19 Crisis**

The State of Illinois has taken a variety of actions in response to the COVID-19 crisis, including Governor Pritzker's March 20, 2020 "stay at home" order directing all non-essential business operations to cease and all residents to stay in their homes except for essential activities. [1 at ¶ 33.] The order is currently in place through April 30, 2020. [*Id.*]

IDOC has enacted measures consistent with CDC guidelines to protect those who are housed and work in Illinois prisons, including a pandemic response plan (including a plan specific to Stateville), enhanced screening and testing for COVID-19, increased hygiene and sanitation, new limits (and now a prohibition) on outside visitors, and increased separation of prisoners through an administrative quarantine. *Pritzker*, [26, at 2.] Governor Pritzker and IDOC have taken a number of actions to address COVID-19 in Illinois' prisons, the most relevant of which are listed below. See [*id.* at 4-6.]

- Governor Pritzker suspended admissions of new prisoners from all Illinois county jails, with limited exceptions (Executive Order 2020-13; see also Executive Order 2020-18 (extending Executive Order 2020-13 through April 30, 2020).

- Governor Pritzker activated the Illinois National Guard to provide additional medical support at Stateville. *Pritzker*, [1 at ¶ 91], [9 at 48].

- Governor Pritzker continues to review and grant commutation petitions.

- To allow for faster releases of prisoners, Governor Pritzker suspended the required 14-day notification to State's Attorneys for inmates released early as a result of earned sentence credit for good conduct. Executive Order 2020-11; see also Executive Order 2020-18 (extending Executive Order 2020-11 through April 30, 2020).

- On April 6, 2020, Governor Pritzker suspended the 14-day limit for medical furloughs and allowed furloughs for medical purposes at the Director's discretion and consistent with the guidance of IDOC's medical director. Executive Order 2020-21.

- IDOC created a population management task force for the purpose of prioritizing the review of individuals for possible release through statutorily permissible means.

- IDOC, as of April 6, 2020, had released approximately 450 prisoners through various forms of sentence credit, restoration of credit and electronic detention and had provided an additional 65 furloughs.

- Between March 2 and April 6, 2020, IDOC reduced its population by more than 1,000 prisoners.

- IDOC continues to award up to 180 days of Earned Discretionary Sentencing Credit (EDSC) for eligible offenders pursuant to 730 ILCS 5/3-6-3(a)(3).[5]

- On a daily basis, IDOC identifies offenders within nine months of their release date and conducts individualized reviews to determine whether they are eligible for early release. This process requires examining an offender's file for disciplinary history, commitment to rehabilitation, and criminal history.[6]

---

[5] The sentencing credit is within the sole discretion of the Director, but must be based on the results of a risk or needs assessment, circumstances of the crime, any history of conviction for a forcible felony, the offender's behavior and disciplinary history, and the inmate's commitment to rehabilitation, including participation in programming. 730 ILCS 5/3-6-3(a)(3). The Director is prohibited from awarding discretionary sentencing credit to any inmate unless the inmate has served a minimum of 60 days. *Id.*

[6] Offenders with forcible felonies, violent criminal histories, significant disciplinary issues, and outstanding warrants are not approved for the sentencing credit.

- IDOC continues to place offenders on electronic monitoring or home detention pursuant to 730 ILCS 5/5-8A-3, including 16 of 21 pregnant and postpartum offenders on home detention. IDOC is now concentrating on inmates who are 55 years or older, have served at least 25% of their sentence and are within 12 months of release. This process also requires individual assessments to determine whether placement outside of a secure facility is appropriate.

- The Prison Review Board ("PRB") continues to conduct release revocation hearings and make individualized assessments that include the alleged violations, the safety of those in custody, and overall public health concerns.

- The Governor's Office is working with outside groups such as the SAFER Foundation[7] and TASC[8] to identify and secure safe host sites and provide wrap-around services to support potential releasees.

- Lt. Governor Juliana Stratton, along with the SAFER Foundation, developed the Prison Emergency Early Release Response (PEERR) team, which is creating a referral network of human services, healthcare, housing, and reentry providers that are open, whether in person or remotely, and can deliver services to people being released from IDOC custody.

- Effective March 14, 2020, all correctional facilities, impact incarceration programs, and work camps are under administrative quarantine with no visitors permitted.

- Facilities with confirmed COVID-19 cases are placed on lockdown, which means there is no movement around the facility except for medical care.

- Staff who work with individuals in isolation and quarantine, as well as in healthcare units, are wearing full personal protective equipment (PPE) and all staff are wearing some PPE.

- Staff members' temperatures are checked daily as they enter the facility.

- IDOC has (1) educated staff on infection control, (2) promoted good health habits that interrupt transmission, (3) conducted frequent environmental cleaning of high touch surfaces and high volume locations, (4) made efforts to separate the sick from the well and employ social distancing and (5) provided ongoing infection control education to prisoners.

---

[7] The SAFER Foundation is a nonprofit social impact organization that focuses on human capital development for people with criminal records.

[8] TASC is a nonprofit organization that provides direct services and performs advocacy and consulting work for individuals and families affected by substance abuse and mental health issues.

It also bears mentioning that as of today at noon, 644 inmates have been released from IDOC custody using all of the methods available and the total IDOC inmate population has been reduced by 1,441 since March 2, 2020. [See 36, at 2.] Included within these totals are the commutations of two of the named Plaintiffs, James Money and Carl Reed, announced by Governor Pritzker on April 8, 2020. [34, at 4.]

Plaintiffs assert that reducing the prison population is the only meaningful way to prevent the harms posed by COVID-19 in the prison setting, writing:

> Public health experts with experience in correctional settings have similarly recommended *the release from custody* of people most vulnerable to COVID-19 to protect the communities inside and outside the prisons, and to slow the spread of the COVID-19 infection. *Population reduction* protects the people with the greatest vulnerability to COVID-19 from transmission of the virus, and also allows for greater risk mitigation for all people held or working in a correctional facility. Because prisons are often located in small rural communities, *removing the most vulnerable people from custody* also reduces the burden on those region's limited health care infrastructure by reducing the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time and require hospitalization in these small communities.

*Pritzker*, [1 at ¶46] (emphasis added).

## C. Procedural Background

On April 2, 2020, plaintiffs filed a purported class action complaint under 42 U.S.C. § 1983 alleging violations of the Eighth Amendment and the due process clause of the Fourteenth Amendment, as well as violations of the ADA. *Pritzker*, [1]. Plaintiffs also filed a motion for class certification, *Pritzker*, [8], seeking to certify a class of "all people who are currently or who will in the future be housed in an IDOC prison during the duration of the COVID-19 pandemic," [*id.* at 5-6], with the following subclasses:

> **Subclass 1**: People who have serious underlying medical conditions that put them at particular risk of serious harm or death from COVID-19 * * * and who are eligible for medical furlough pursuant to 730 ILCS 5/3-11-1.

**Subclass 2**: People who are medically vulnerable to COVID-19 because they are 55 years of age and older and who are eligible for medical furlough pursuant to 730 ILCS 5/3-11-1.

**Subclass 3**: People who are 55 years of age and older with less than one year remaining on their sentence and eligible for home detention pursuant to 730 ILCS 5/5-8A-3(d).

**Subclass 4**: People who are currently in custody for Class 2, 3, or 4 offenses and who are eligible for home detention pursuant to 730 ILCS 5/5-8A-3(e).

**Subclass 5**: People who are currently in custody for Class 1 or Class X offenses with less than 90 days remaining on their sentence and eligible for home detention pursuant to 730 ILCS 5/5-8A-3(b) and (c).

**Subclass 6**: People who are scheduled to be released within 180 days and eligible to receive sentencing credit pursuant to 20 Ill. Admin. Code 107.210.

[*Id.* at 6-7]. Subclass 1 contains approximately 12,000 individuals, and subclass 2 contains approximately 4,800 individuals. *Pritzker*, [1 at ¶105].

Plaintiffs also filed a motion for a temporary restraining order ("TRO") or a preliminary injunction. *Pritzker*, [9]. That motion asks the Court to preliminarily certify Plaintiffs' proposed subclasses 1 and 2 and to order Defendants to transfer members of subclasses 1 and 2 to their homes to self-isolate via a temporary medical furlough. [*Id.* at 70-71].

On the same day that the Section 1983 complaint was filed, Plaintiffs also filed a petition for writs of habeas corpus, *Jeffreys*, [1], purportedly on behalf of themselves and all other similarly situated individuals. They seek to represent a class consisting of "all people who are currently or who will in the future be housed in an IDOC prison during the duration of the COVID-19 pandemic." [*Id.* at ¶ 111.] Plaintiffs (or Petitioners in habeas parlance) articulate the same six subclasses they claim to represent as are laid out in the Section 1983 complaint. See [*id.*]. The petition seeks immediate medical furlough for individuals in subclasses 1 and 2, immediate transfer to home detention of members of subclasses 3, 4, and 5, and immediate award of 180 days

of sentencing credit to members of subclass 6. [*Id.*]  With the petition, Plaintiffs filed a motion for an expedited hearing. *Jeffreys*, [3].

## II.       Legal Standard

Preliminary injunctive relief is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (quotation marks and citation omitted); see also *Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 823 (7th Cir. 1998) (same).   The Seventh Circuit uses a two-step analysis to assess whether preliminary injunctive relief is warranted.  See *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of USA, Inc.*, 549 F.3d 1079, 1085–86 (7th Cir. 2008).  This analysis is the same one that is used to determine if a TRO is warranted.  *Gray v. Orr*, 4 F. Supp. 3d 984, 989 n.2 (N.D. Ill. 2013).  "In the first phase, the party seeking a preliminary injunction must make a threshold showing that: (1) absent preliminary injunctive relief, he will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) he has a reasonable likelihood of success on the merits." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661–62 (7th Cir. 2015).  If the movant makes the required threshold showing, then the court moves on to the second stage and considers: "(4) the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted; and (5) the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties," *i.e.*, the public interest. *Id*. at 662.  The court must pay "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008).  The Court balances the potential harms on a sliding scale against the movant's likelihood of success.  The greater the movant's likelihood of success, "the less strong

a showing" the movant "must make that the balance of harm is in its favor." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003).

Plaintiffs seek a mandatory preliminary injunction—that is, an injunction requiring an affirmative act by the defendant. Because a mandatory injunction requires the court to command the defendant to take a particular action, it is "cautiously viewed and sparingly issued." *Knox v. Shearing*, 637 F. App'x 226, 228 (7th Cir. 2016) (quoting *Graham v. Med. Mut. of Ohio,* 130 F.3d 293, 295 (7th Cir. 1997)); see also *W. A. Mack, Inc. v. Gen. Motors Corp.*, 260 F.2d 886, 890 (7th Cir. 1958) ("mandatory injunctions are rarely issued and interlocutory mandatory injunctions are even more rarely issued, and neither except upon the clearest equitable grounds" (quotation marks and citation omitted)); *ChoiceParts, LLC v. Gen. Motors Corp.*, 203 F. Supp. 2d 905, 914 (N.D. Ill. 2002) (same).

The preliminary injunction, or even TRO, that Plaintiffs seek would give them much of the relief the *Pritzker* action requests, and likely all of the relief that subclasses 1 and 2 request. This type of request, which "give[s] the movant substantially all the relief he seeks," "is disfavored, and courts have imposed a higher burden on a movant in such cases." *Boucher*, 134 F.3d at 827 (citing *Selchow & Righter Co. v. Western Printing and Lithographing Co.,* 112 F.2d 430, 431 (7th Cir. 1940); *Phillip v. Fairfield University,* 118 F.3d 131, 133 (2d Cir.1997); *SCFC ILC, Inc. v. Visa USA, Inc.,* 936 F.2d 1096, 1098–99 (10th Cir. 1991); *Dakota Indus., Inc. v. Ever Best Ltd.,* 944 F.2d 438, 440 (8th Cir. 1991); and *Tanner Motor Livery, Ltd. v. Avis, Inc.,* 316 F.2d 804, 808 (9th Cir. 1963)); see also *W.A. Mack, Inc. v. General Motors Corp.*, 260 F.2d 886, 890 (7th Cir. 1958) ("A preliminary injunction does not issue which gives to a plaintiff the actual advantage which would be obtained in a final decree."); *Hanover Ins. Grp. v. Singles Roofing Co.*, 2012 WL 2368328, at *11 (N.D. Ill. June 21, 2012) (because the plaintiff amended the complaint to seek

both preliminary and permanent relief, granting a TRO or preliminary injunction would not give the plaintiff "the actual advantage which would be obtained in the final decree" (quoting *W.A. Mack,* 260 F.2d at 890)); *Harlem Algonquin LLC v. Canadian Funding Corp.*, 742 F. Supp. 2d 957, 962 (N.D. Ill. 2010) ("'[i]t is one thing for a court to preserve its power to grant effectual relief by preventing parties from making unilateral and irremediable changes during the course of litigation, and quite another for a court to force the parties to make significant alterations in their practices' before a trial on the merits. So much more so if the alteration would amount to irreversible final relief." (citation omitted)).

## III.    Discussion

### A.    Section 1983, Habeas, or Both?

Since the initiation of this litigation the question of why Plaintiffs filed two separate lawsuits advancing essentially the same allegations and requesting essentially the same relief has perplexed the Court. It appears to have challenged the parties as well. In their reply brief, Plaintiffs complain that "Respondent cannot have it both ways." [24, at 8.] Indeed, a careful review of the briefs shows that both sides are guilty of taking somewhat inconsistent positions across the two cases. This observation is not surprising, nor is it meant disparagingly, for the briefs were remarkable both in their quantity and quality—and all the more so in the time frame given to accommodate the exigent circumstances. But the question remains, is it even proper to bring a Section 1983 action and a petition for writ of habeas corpus at the same time on the same facts seeking the same remedy? As explained below, the answer (though not without doubt) seems to be yes.

It is an accepted practice to plead alternative—and even inconsistent—theories of relief, but ordinarily this takes place within a single action. Nonetheless, as the declaration of Professor

Resnik filed with Plaintiffs' reply brief explains, "the intersection of habeas and civil rights claims brought under 42 U.S.C. § 1983" constitutes "a dense area of law and doctrine that can be daunting for litigants and jurists alike."[9] [24-3 at 5-6.] As Professor Resnik notes, the "shorthand" version of the divide between habeas and Section 1983 goes like this: "when the fact or duration of confinement is at issue and release is the remedy, habeas is the preferred route. If prisoners are challenging conditions of confinement, § 1983 is the method." [*Id.* at 6.] This shorthand is a bit too simple, however, because a habeas petitioner seeks release from *custody*. See 28 U.S.C. § 2254(a) (habeas statute allows challenges to "custody in violation of the Constitution or laws or treaties of the United States"). This is an important point, because Plaintiffs here stress that "they do not seek relief from the underlying criminal judgments * * * [n]or do they seek speedier release from custody." [28, at 9.] See *Graham v. Broglin*, 922 F.2d 379, 381 (7th Cir. 1991) (explaining that a claim seeking to reinstate "work release" with "less confinement than ordinary imprisonment" was a Section 1983 claim because it did not challenge the inmate's custodial status). Instead, they are asking to be released from prison temporarily, "while remaining in the custody and control of IDOC." [24, at 2.] They also emphasize that they "challenge only the conditions of their confinement." [28, at 9.] Those concessions support the proposition that Section 1983 provides a proper rubric for analysis. Yet, Plaintiffs do seek as a remedy at least temporary release from the physical confines of not only their cells, but the entire prison environment, which they contend is unsafe because (in Professor Resnik's words) "density puts people at medical risk." [24-3 at 6.]

---

[9] Professor Resnik's work is well-known to the Court. She is unquestionably one of the nation's leading experts in civil procedure and prison litigation, both as an academic and as a practitioner on behalf of plaintiffs. Her succinct discussion of the "legal thicket" in which the parties find themselves in these two cases has provided the equivalent of an amicus brief for which the Court is most appreciative.

This conundrum is not simply an academic exercise, for "Congress has channeled and circumscribed some of federal judicial authority" in this area, through the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) and the Prison Litigation Reform Act (PLRA) of 1996, and the Supreme Court too has provided guidance in this area. [24-3 at 5.] The case law clearly holds that the PLRA applies in Section 1983 suits, but not to habeas petitions. See, e.g., *Jones v. Bock*, 549 U.S. 199, 200 (2007) ("PLRA claims are typically brought under 42 U.S.C. § 1983[.]"); *Walker v. O'Brien*, 216 F.3d 626, 639 (7th Cir. 2000) ("the requirements of the PLRA do not apply to properly characterized habeas corpus actions"). And it expressly reflects the traditional shorthand understanding of the differences between the two types of actions, as its provisions apply to civil actions "arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison," but expressly exclude "habeas proceedings challenging the fact or duration of confinement in prison." 18 U.S.C. § 3626(g)(2).

Together, the statutes and case law weave a thick and tangled web. As Professor Resnik further explains, "because state prisoners who rely on 28 U.S.C. § 2254 have to exhaust state judicial remedies, they may seek to use § 1983, to which that requirement does not apply. And, because the PLRA affects § 1983 litigants, prisoners may hope to avoid its strictures by filing under habeas." [24-3 at 6.] Those two sentences identify the precise dilemma that faced counsel for Plaintiffs as they contemplated their legal options in the present circumstances. On the one hand, many cases view Eighth Amendment claims like those asserted here "to be appropriate for § 1983 because they relate to conditions." [*Id.*] On the other hand, the unique context in which litigation over COVID-19 arises may cast some doubt on that seemingly obvious proposition because the sudden threat to mortality from the spread of the virus in a congregate setting may

affect the fact or duration of confinement. These unprecedented circumstances, Professor Resnik posits, "collapse the utility and purpose of drawing distinctions between what once could be coherently distinguished" and lead to the conclusion that "COVID-19 claims ought to be cognizable under both provisions." [*Id*.]

The upshot of the foregoing analysis is that it is abundantly clear that Plaintiffs may proceed on their claims under Section 1983 and at least plausible—though far less certain—that they also have a right to seek habeas relief as well. To test the latter proposition, the Court looks to the controlling decisions of the Supreme Court and the Seventh Circuit. Those cases reveal neither a ringing endorsement nor an outright prohibition. See, e.g., *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862 (U.S. 2017) ("we have left open the question whether [detainees] might be able to challenge their confinement conditions via a petition for a writ of habeas corpus"); *Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("we leave to another day the question off the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement"); *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973) ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the constraints making custody illegal"); *Glaus v. Anderson,* 408 F.3d 382, 387 (7th Cir. 2005) ("While the Supreme Court left the door open a crack for habeas corpus claims challenging prison conditions, it has never found anything that qualified"). As Petitioners recognize [24, at 17], the Seventh Circuit's reading of *Preiser* "is narrower than that of other circuits." Still, given (1) *Ziglar*'s continued recognition that the question remains open and (2) the exigent circumstances present in this litigation, the Court will consider Petitioners' habeas claim after assessing Plaintiffs' request for the same relief under Section 1983.

### B.    Direct Release or a "Process"?

There is a second threshold issue to note at the outset. In their complaint—and likewise in the habeas action—Plaintiffs requested immediate medical furloughs for subclasses 1 and 2, immediate transfers to home detention for subclasses 3, 4, and 5, and an immediate award of good time credit for subclass 6, along with the appointment of a special master. Their opening brief in support of emergency injunctive relief on behalf of subclasses 1 and 2 likewise sought a direct transfer order [see 9, at 55.] In their reply, Plaintiffs complain that Defendants have "mischaracterize[d] the relief plaintiffs are seeking, suggesting that plaintiffs seek to unleash a tsunami of dangerous 'felons' on unwitting communities, when in reality no such thing is true." [28, at 1.] Perhaps that is not what Plaintiffs intended by initiating this lawsuit, but one can hardly blame Defendants for drawing that conclusion based on how Plaintiffs' request for relief was framed at the start of this litigation.

In an ordinary case, a significant transformation in how the plaintiff frames the object of the case often is dealt with by the filing of an amended complaint that puts Defendants on notice that the game has changed. Needless to say, this is no ordinary case and allowance must be made for adjustments on the fly. As of this Monday, Plaintiffs had provided a clear indication of such a change in direction, explaining that they do not assert a right to an order directly commanding an immediate furlough—as the complaint stated—but instead "seek a process through which subclass members eligible for medical furlough will be identified and evaluated based on a balancing of public safety and public health needs, and transferred accordingly" [24, at 6.] Plaintiffs have further proposed a "remedial plan" pursuant to which this court-ordered and court-supervised process would unfold. [*Id.* at 5.] Given the disconnect between Plaintiffs' initial filings last week and their briefs filed this week, one cannot fault Defendants for characterizing Plaintiffs' revised position as "backpedaling" [26, at 16] or for seeking leave to file a sur-reply [32], which the Court

has accepted. Nor can one cast aspersions on Plaintiffs for crafting an evolving proposal to deal with an evolving situation on the ground. The important thing for purposes of the litigation is that the parties have had an adequate opportunity to understand the claims as they exist today and to state their positions in advance of a ruling. The extensive briefs reflect a fair—indeed, an extensive—exposition of the issues, both as presented in the complaint and initial brief and as modified in the later briefs. In the interest of completeness, the Court will address both iterations of Plaintiffs' claims.

### C.      Section 1983 Claim

#### 1.      The PLRA

Turning first to Plaintiffs' Section 1983 claims, the Court must confront yet another threshold issue which the parties have briefed extensively—namely, the application of the PLRA to Plaintiffs' claims. As noted above, through the PLRA, Congress "channeled and circumscribed some of federal judicial authority" in ways that "affect[] § 1983 litigants." [24-3 at 5.] Although the PLRA is codified at 42 U.S.C. § 1997e, it encompasses the provisions of 18 U.S.C. § 3626, which is titled "appropriate remedies with respect to prison conditions." Section 3626 begins by stating that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1). It also directs courts to "give substantial weight to any adverse impact on public safety or the operation of the criminal justice system caused by the relief." *Id*. The term "civil action with respect to prison conditions" is defined broadly to include "any civil proceeding arising under Federal law with respect to the conditions of confinement and the effects of actions by government officials on the lives of persons confined in prison," but explicitly "does not include habeas corpus proceedings challenging the fact or duration of confinement in prison."

18 U.S.C. § 3626(g)(2).  The statute specifically addresses preliminary injunctive relief, mandating that any such relief in a case involving prison conditions "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm."  18 U.S.C. § 3626(a)(2).

The application of the provisions discussed in the preceding paragraph is not disputed between the parties.  The parties part ways, however, in regard to whether the relief requested falls within the meaning of the PLRA's special procedures for consideration of a "prisoner release order."  18 U.S.C. § 3626(a)(3).  The statute defines that term to "include[] any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison."  18 U.S.C. § 3626(g)(4).  No court may enter a prisoner release order unless it "has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied" and "the defendant has had a reasonable amount of time to comply with the previous court orders."  18 U.S.C. § 3626(a)(1)-(2).  If those strictures have been satisfied, only a three-judge court can actually consider and issue a prisoner release order—and even then only if it finds by clear and convincing evidence that "crowding is the primary cause of the violation of a Federal right" and "no other relief will remedy the violation."  18 U.S.C. § 3626(a)(3)(E)(i)-(ii).

## 2.  Prisoner Release Orders Under the PLRA

In looking for guidance on how to address the parties' dispute concerning the reach of the PLRA's limitations on "prisoner release orders," the Court has endeavored to locate prior decisions in which a federal court has been asked to get involved in the potential transfer of thousands of state inmates out of state prisons through any available vehicle on the basis of their conditions of

confinement. The Court has found—and the parties have cited—just two, which went together from the federal district courts in California all the way to the Supreme Court and then back again, and still remain open today, though in a largely dormant phase. See *Coleman v. Newsom*, Case No. 2:90-cv-0520 KJM DB P (E.D. Cal.) & *Plata v. Newsom*, Case No. 4:01-cv-01351-JST (N.D. Cal.), --- F. Supp. 3d. ---, 2020 WL 1675775, at *3 (Three-Judge Court April 4, 2020) (explaining that since 2015, the three-judge court has "largely stepped back as the individual *Coleman* and *Plata* courts have continued to work" on the compliance phase of the cases). Because of the uniqueness of the relief requested here, a discussion of the most analogous cases appears in order.

In *Brown v. Plata*, 563 U.S. 493 (2011), the Supreme Court upheld an order of a three-judge district court requiring California to reduce its prison population to 137.5 percent of design capacity within two years. In that case, two lawsuits were brought by California prisoners with serious mental disorders challenging prison crowding and inadequate mental health care as Eighth Amendment violations. In one of the cases, a special master was appointed to oversee development and implementation of a remedial plan. In the other case, the state stipulated to a remedial injunction, but failed to comply with the injunction, after which the district court appointed a receiver to oversee remedial efforts. The plaintiffs in both cases requested that a three-judge panel of the district court be convened pursuant to the PLRA, 18 U.S.C. § 3626(a)(3). Both district courts granted the motions and the cases were consolidated before a three-judge panel. The three-judge court, after determining that plaintiffs suffered from constitutional violations that were caused primarily by overcrowding, entered a remedial order requiring the State of California to reduce its prison population to 137.5 percent of design capacity within two years.

The Governor appealed and the Supreme Court affirmed. The Court determined that the PLRA's requirement of allowing the state a reasonable amount of time to comply with previous

court orders was satisfied where, when the three-judge district court was convened, 12 years had passed since the appointment of a special master to oversee development and implementation of a remedial plan and the basic plan to solve the crisis through construction, hiring, and procedural reforms had remained unchanged for years. *Plata*, 563 U.S. at 514-15. The Court also held that the evidence supported the three-judge court's determination that crowding was the primary cause of the Eighth Amendment violations and that no other relief would remedy the violations. The evidence showed that there were severe, months-long delays and backlogs for prisoners needing urgent mental health and physical care, as well as unsafe and unsanitary living conditions caused by crowding. *Id.* at 519-20. Further, the Court determined that the three-judge court properly gave substantial weight to public safety, finding various available methods of reducing overcrowding that would have little or no impact on public safety, such as expansion of good-time credits and diversion of low-risk offenders to community programs such as drug treatment, day reporting centers, and electronic monitoring. The Court noted that the three-judge court's order "took account of public safety concerns by giving the State substantial flexibility to select among these and other means of reducing overcrowding." *Id.* at 537. Finally, the Court concluded that the cap of 137.5 percent capacity was supported by evidence in the record, including expert witnesses who recommended a 130 percent population limit and the federal BOP's own long-term goal of 130 percent. *Id.* at 539-40.

As the foregoing illustrates, the only instance of which the Court is aware that a federal court has been involved in ordering the release of thousands of state prisoners took place in radically different circumstances—after the passage of 12 years, the development of a full record, the input of both a special master and a receiver, and a trial lasting almost three weeks. Clearly there is no time for even a fraction of that attention, so the *Coleman/Plata* experience may have

little to offer in the way of guidance, except in its application of the order of operations under the PLRA—the preliminary requirements for issuing a less intrusive order, the reasonable opportunity to comply, and what type of claim requires the appointment of a three-judge court. But there is a recent postscript that may offer greater insight on how the PLRA should apply in this case.

Less than a week ago, the same three-judge panel in California whose work was reviewed by the Supreme Court in *Plata* issued an order denying an emergency motion seeking release of "an unspecified, but significant, number of prisoners so that the prison population can be reduced to a level sufficient to allow physical distancing to prevent the spread of COVID-19." *Coleman & Plata*, 2020 WL 1675775, at *1. As in this case, the plaintiffs there sought an order directing the Governor of California and other state officials "to release to parole or post-release community supervision" certain categories of inmates who were low risk, non-violent, and/or close to their release dates and "to release or relocate inmates who, because of their age or other medical conditions, are at a high risk of developing a severe form of COVID-19." *Id*. at *3. Although the plaintiffs did not specify a number of inmates who fall within those categories, they argued that the number should be sufficient "to allow all remaining inmates to practice physical distancing, especially those who reside in crowded dorm housing." *Id*. They requested that specific relief based on the CDC's guidance that "[t]hus far, the only way to stop [COVID-19's] spread is through preventive measures—principal among them maintaining *** physical distancing sufficient to hinder airborne person-to-person transmission," which is "uniquely difficult in a congregate environment like a prison." *Id*. at *5 (citing CDC guidance).

The panel determined that it lacked authority to consider the request because it was "not actually a modification of the 2009 order but rather *new* relief based on the *new* threat of harm posed by COVID-19." *Coleman & Plata*, 2020 WL 1675775, at *4. But perhaps significantly for

present purposes, the panel gave every indication that all phases of the PLRA's remedial scheme—including the appointment of a new three-judge court—could apply to the type of relief sought by the Plaintiffs in California, which closely mirrors the relief sought for subclasses 1 and 2 in the complaint here—especially in regard to the request to "release or relocate" older inmates and those who are especially vulnerable due to medical conditions. To begin, the panel noted that as of the time of its ruling the Plaintiffs "likely cannot satisfy the [PLRA's] prior order requirement because there have not yet been any orders requiring Defendants to take measures short of release to address the threat of the virus; nor have Defendants had a reasonable time in which to comply." *Id*. at *4.[10] The panel further observed that the plaintiffs retained the option to "go before a single judge to press their claim that Defendants' response to the COVID-19 epidemic is constitutionally inadequate." *Id*. at *7. It added that "[i]f a single-judge court finds a constitutional violation, it may order Defendants to take steps short of release necessary to remedy that violation." *Id*. However, "if that less intrusive process proves inadequate," the Court concluded, "Plaintiffs may request, or the district court may order sua sponte, the convening of a three-judge court to determine whether a release order is appropriate." *Id*. In this Court's view, the clear impression to be drawn from the California panel's opinion is that, in its view, claims seeking an order to "release or relocate" inmates on account of the COVID-19 pandemic may implicate every aspect of the PLRA's remedial scheme, including the appointment of a three-judge court.

### 3.    Are Plaintiffs Requesting a "Prisoner Release Order"?

With that discussion as prelude, the next question is whether Plaintiffs seek a "prisoner release order" within the meaning of Section 3626(a)(3) and (g)(4). If one focuses on Plaintiffs' complaint and initial brief, this is obvious. Plaintiffs devote pages to describing the congregate

---

[10] The panel recognized, as does this Court, "that what is reasonable in ordinary times may be quite different from what is reasonable in these extraordinary times." *Id*. n.9.

conditions in IDOC facilities in support of the proposition that crowded conditions inherent in living arrangements in a prison setting are unsafe during a pandemic. They then offer the opinions of numerous affiants who universally advance one message: the only solution is the immediate release of inmates in large numbers. A fair summary of the bulk of the complaint and brief in support of immediate injunctive relief is that the crowded conditions of IDOC facilities require the Court to issue an order immediately reducing the prison population in Illinois by ordering the members of proposed subclasses 1 and 2 to medical furloughs. In the Court's view, if that were the relief Plaintiffs seek in this litigation, it unquestionably could be awarded only by a three-judge court under the PLRA.

As noted above, in their more recent filings, Plaintiffs submit that are *not* seeking a "mass release order." Instead, Plaintiffs seek a "process through which subclass members eligible for medical furlough will be identified and evaluated based on a balancing of public safety and public health needs, and transferred accordingly." [24, at 5.] All of Defendants' briefs in this matter contend that such a process already is in place. But Plaintiffs find Defendants' efforts wanting, and thus they request the Court's involvement in the creation and oversight of a remedial plan that would result in "an expedited, individualized review and relocation" of inmates who qualify. [*Id.* at 10.] The order that the Court would issue to set that process in motion, Plaintiffs say, is not a "prisoner release order" within the meaning of the PLRA. Such orders, they argue, involve mass prisoner releases or population caps and issue only to remedy violations primarily caused by overcrowding. [See 24, at 7.] And that is not the kind of order they want.

The Court must look to the language of the PLRA, which speaks in detail and uses broad and categorical language in defining its scope. It does not speak of "mass" releases, "population caps," or even "overcrowding"—though it does refer to "crowding," which must be the "primary

cause of the violation of a Federal right" to serve as the predicate for a release order under the statute. 18 U.S.C. § 3626(a)(3)(E). What it does say is that any order "that has the purpose or effect of reducing or limiting a prison population, or that directs the release from or nonadmission of prisoners to a prison" lies exclusively within the province of three-judge courts. 18 U.S.C. § 3626(g)(4). The reference to "crowding" may have the effect of removing single-plaintiff cases from within the ambit of Section 3626(a)(3), because an order involving only one inmate might not be viewed as reducing a prison population in any meaningful way.[11]

Plaintiffs stress that the transfers they hope to accomplish would not release any class members from custody; they would simply effectuate changes in the inmates' physical locations, and the changes would be of a limited duration. Plaintiffs rely on Illinois statutes to show that they would remain in custody within the meaning of state law. But the PLRA does not focus on custodial status under state law, nor does it say anything about whether the reduction of population is temporary or permanent. The question is not whether Plaintiffs would remain in custody under state law. The question is whether the requested relief would have the "purpose" or the "effect" of "reducing or limiting the prison population," or whether it would "direct[] the release from * * * a prison." 18 U.S.C. § 3626(g)(4). There is no doubt that Plaintiffs' request – even if couched in terms of a process – would have the purpose and the effect of reducing the population in Illinois prisons.

---

[11] A single judge in California did order an "exclusionary order for medically vulnerable prisoners" during a "Valley Fever" epidemic several years ago. *Plata v. Brown*, 2013 WL 3200587, at *9 (N.D. Cal. June 24, 2013). In so doing, the judge rejected the notion that "a court could only order that prisoners be transferred from one prison to another if overcrowding were the primary cause of the violation." *Id.* That seems correct and consistent with the orders entered not infrequently in cases involving inmate medical problems that may require hospitalization. [See 24, at 10]. But it does not help Plaintiffs, because there was no crowding issue at all raised in that instance.

Plaintiffs also suggest that they do not seek a remedy for crowding (as the statute frames the issue) or overcrowding (as Plaintiffs frame it). But that contradicts the allegations of their complaint and their entire theory of the case. One of the central allegations in the complaint is that inmates are particularly vulnerable because they live in "congregate settings" in "close quarters" with each other. See Cmplt. at ¶ 1 (alleging that "[n]early 37,000 people are incarcerated in Illinois, living in close quarters"); *id.* ("social distancing guidelines can never be fully or effectively implemented in prison"); *id.* at ¶ 32 (alleging that "[p]eople in congregate environments, which are places where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19."); *id.* at ¶ 36 ("Correctional facilities are inherently congregate environments, where large groups of people live, eat, and sleep in close contact with one another."); *id.* at ¶¶ 37-38 (alleging that inmates are "all congregated together" and cannot "adequately distance themselves"); *id.* at ¶ 43 (alleging the "heightened risk posed by correctional settings" because of the close proximity); *id.* at ¶ 45 (alleging that there is a need to "eliminat[e] close contact in congregate environments").

In addition, as the ultimate aim of these lawsuits Plaintiffs unmistakably seek to reduce the prison population. Reducing the prison population is not just a side effect of the case – it is the whole point. They want to remove inmates from prison because they are vulnerable in those facilities. See Cmplt. at ¶ 1 (alleging that the Governor and the IDOC need to "drastically reduce Illinois's prison population"); *id.* at ¶ 3 ("[T]he state must take urgent steps to reduce, furlough, or transfer to home detention all that qualify."); *id.* at ¶ 4 (alleging that the IDOC is "refusing to reduce the number of people living in IDOC"); *id.* at ¶ 5 ("Class members . . . must be released now."); *id.* at ¶ 103 (discussing "Plaintiffs' request for release from physical custody"). The Complaint cites declarations from five public health and correctional experts, all of whom

"recommend[] the release from custody" of certain individuals. *Id*. at ¶ 46; see also *id*. at ¶ 47 (Dr. Robert Greifinger discussing the "release of individuals"); *id*. at ¶ 49 (Dr. Craig Haney discussing that "adult prisons must reduce their populations"); *id*. at ¶ 50 (Prof. Chris Breyer discussing the need to "reduce the number of persons in detention as quickly as possible"); *id*. at ¶ 51 (Dr. Jaimie Meyer discussing "[r]educing the size of the population in jails"); *id*. at ¶ 52 (Dan Pacholke discussing the need to "reduce the prison population").

Moreover, the impetus for Plaintiffs' claims is the living conditions inherent in a congregate setting during the COVID-19 epidemic. They do not distinguish in any respect among the 28 facilities and the myriad living arrangements within those facilities. All prison facilities, by definition, have living conditions that prevent inmates from practicing the social distancing required by current guidance from the CDC and our state government. As Plaintiffs write in their reply brief, there is "no way to make conditions safe within the congregate prison setting." [24, at 11.] Defendants do not contest these allegations; in fact, they have repeated them publicly. But in asking that inmates be physically transferred from inside the prison to outside of it on the basis of these conditions, Plaintiffs plainly are implicating "crowding" as the primary cause of their concern. If prisons could be reconfigured to permit social distancing and observance of the CDC's hygiene recommendations, Plaintiffs would have no claim.

Finally, shifting the focus from an order directly releasing subclasses 1 and 2 (as the complaint requested) to an order imposing a court-ordered and court-managed "process" for determining who should be released (as the briefs request) does not place this case outside of Section 3626(a)(3). Although there is a dispute over the exact number of inmates within proposed subclasses 1 and 2—because some inmates are members of both subclasses—the minimum number of inmates who would be subject to the procedures in any remedial plan is approximately

12,000. See Cmplt. at ¶ 105 ("Plaintiffs estimate that Subclass 1 contains approximately 12,000 inmates").[12] Plaintiffs insist that Defendants must act faster to move as many of those individuals to medical furlough as possible. The "purpose" of any order compelling the State to engage in that process would be to reduce the prison population, and the "effect" of its successful implementation would be the same, albeit indirectly. As Plaintiffs' acknowledge, Defendants already have in place several mechanisms to reduce the IDOC census and hundreds of inmates have already been released. An order granting the requested relief would simply accelerate that process, placing the request squarely within Section 3626(a)(3)—which forbids this Court from granting it.

The upshot is that the PLRA prevents this Court from granting the temporary restraining order on the Section 1983 claim, for a number of reasons. First, the statute provides that "no court shall enter a prisoner release order unless * * * a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right," and the defendants have "had a reasonable amount of time to comply with the previous court orders." 18 U.S.C. § 3626(a)(3)(A)(i), (ii). Here, there is no such "previous court order[]." *Id.* Second, the statute provides that "only" a "three-judge court" can enter a prisoner release order. 18 U.S.C. § 3626(a)(3)(B). So, this Court, standing alone, lacks the authority to issue any order that has the "purpose or effect of reducing or limiting the prison population." *Id.*; 18 U.S.C. § 3626(g)(4). Third, the statute provides that "[p]reliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). Plaintiffs' proposed

---

[12] That figure is the floor, assuming that subclass 1 contains all of the inmates in subclasses 2-6. In reality, the number of eligible inmates covered by Plaintiffs' plan is probably much higher. Subclass 1 contains 12,000 inmates. See Cmplt. at ¶ 105. Subclass 2 contains 4,807 inmates. *Id.* Subclass 3 contains 700 inmates. *Id.* Subclass 4 contains over 9,000 inmates. *Id.* Subclass 5 contains 2,401 inmates. *Id.* Subclass 6 contains 5,308 inmates. *Id.*

plan does the opposite. Instead of proposing interim steps, Plaintiffs seek the most sweeping form of relief – a process to potentially release 12,000 inmates – right off the bat.

### 4.     Provisional Class Certification

Even if the Court were incorrect in its conclusion that all of the relief that Plaintiffs request falls within the scope of Section 3626(a)(3), and thus only could be granted by a three-judge court (after Plaintiffs obtain a less intrusive order and Defendants have a reasonable amount of time to comply), Plaintiffs would need to clear other serious obstacles before the Court could even reach the merits of their claims. One is Plaintiffs' request that the Court consider granting conditional relief on a classwide basis.

Federal Rule of Civil Procedure 23 governs class actions. The basic requirements are well-known and simply stated: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy. There are other requirements for money damages classes, but those do not apply here because the relief sought is injunctive only. See FRCP 23(a)(2). The first and fourth factors are essentially uncontested; the putative class numbers more than 10,000 individuals, the named Plaintiffs are appropriate, and class counsel are extremely well qualified for this type of litigation. Typicality is satisfied if the named plaintiff's claims "arise from the same event or practice or course of conduct that gives rise to the claims of the other class members and [are] based on the same legal theory." *Lacy v. Cook County*, 897 F.3d 847, 866 (7th Cir. 2018). Plaintiffs have made enough of a showing to clear that hurdle, too, at least for conditional certification on a motion for preliminary relief. That leaves the second element, commonality.

Commonality requires at least one question common to all of the class members, the answer to which is "apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). For present purposes, the quoted language is key. There are many questions

common to the putative class members that bear on the subject of this litigation. Consideration of those questions undoubtedly drove the decisions of counsel in sorting Plaintiffs into six subclasses with particular characteristics held in common. But none of those questions is likely to drive the resolution of the case. The central dispute is not whether aged, infirm, and vulnerable inmates as a group should be given consideration for transfer or release. Defendants agree and by Plaintiffs' own admission "are taking many actions on the list" of mechanisms available under state law for moving inmates out of IDOC facilities. [24, at 1.] Plaintiffs simply want the Court to "prod the defendants to act more quickly." [*Id.* at 2.] And they acknowledge that any plan to do just that would require "individualized safety assessments" and "approve[d] home sites." [28 at 5.]

The Court agrees. Indeed, the public interest—which must be taken into account when considering a TRO or preliminary injunction—mandates individualized consideration of any inmate's suitability for release and on what conditions, for the safety of the inmate, the inmate's family, and the public at large. From the inmate's perspective, his or her own health status at the relevant time is paramount. Any inmate who is exhibiting symptoms of infection may be more suitable for quarantine or even transfer to a hospital. From the family perspective, an inmate who has been exposed to someone (inmate or IDOC personnel) who has tested positive may not be suitable for furlough, particularly if the inmate's proposed destination is a residence already occupied by someone equally or more vulnerable. And from the public's perspective, it is important to bear in mind that some portion of the incarcerated population has been convicted of the most serious crimes—murder, rape, domestic battery, and so on. Seven of the ten named Plaintiffs in fact are serving time for murder. As Plaintiffs rightly acknowledge, some release orders would be appropriate only with conditions, such as home detention or lesser forms of supervision. And those conditions can only be imposed with resources (*e.g.*, electronic monitors)

and personnel, who are both limited in supply and also subject to the same social distancing imperatives as everyone else.

The imperative of individualized determinations, recognized by both sides in this case, makes this case inappropriate for class treatment. Each putative class member comes with a unique situation—different crimes, sentences, outdates, disciplinary histories, age, medical history, places of incarceration, proximity to infected inmates, availability of a home landing spot, likelihood of transmitting the virus to someone at home detention, likelihood of violation or recidivism, and danger to the community. As Plaintiffs point out, commonality "does not require perfect uniformity." [28, at 46 (citing cases).] But it does require more uniformity that these Plaintiffs would have on the only matter "apt to drive the resolution of the litigation" (*Wal-Mart*, 564 U.S. at 350)—namely, which class members should actually be given a furlough? And any attempt to use the class device even to formulate standards is destined to fail, because those standards largely are governed by the various state statutes authorizing different forms of release, which then are subject to wide discretion in their application.

Plaintiffs' own plan underscores that they are seeking a highly individualized, inmate-by-inmate form of relief. See Plaintiffs' Draft Proposed Remedial Plan Related to their Request for a Temporary Restraining Order/Preliminary Injunction [24-1]. Plaintiffs want the IDOC to identify, "[w]ithin three days of the date of the order," all inmates who fall within the broad parameters of a list of medical conditions. *Id.* So, the IDOC would need to identify which of the 37,000 inmates have a medical condition that qualifies. Then, "[w]ithin 7 days of the date of this order," the IDOC "will use its discretion to transfer inmates" to medical furlough or home detention, unless the IDOC determines that it would poses a substantial danger to an identified person that outweighs the threat to the inmate's health from incarceration. *Id.* As Plaintiffs acknowledge, an "[a]ssessment of the

safety risk must be based on an individualized analysis, and not categorical exclusions (except those excluded offenses for furlough or transfer under the law)." By its very nature, the process would entail a highly individualized inquiry that is ill-suited to class treatment. Simply put, there is no way to decide which inmates should stay, and which inmates should go, without diving into an inmate-specific inquiry.

Although the press of time does not permit deep reflection on the point, the Court can imagine that the analysis might be different if this were a more typical case. Class treatment might be appropriate where the Court has months or years to make decisions on individual aspects of a case—for example, an action arising out a common occurrence where liability would be established on a classwide basis, followed by individual damages assessments—or if the number of permutations were confined in some reasonable manner. But the permutations here are endless, as rarely, if ever, will any two plaintiffs be alike on the factors that matter at the point of decision. These differences are so vast and fundamental that class treatment, especially in the compressed time frame that would allow for effective relief at the height of the pandemic in Illinois, is completely unworkable.

### 5. Federalism and Separation of Powers Concerns

Plaintiffs' motion also raises serious concerns under core principles of federalism and the separation of powers, especially given their request for sweeping relief in the form of a mandatory injunction. See *Missouri v. Jenkins*, 495 U.S. 33, 51 (1990) ("[O]ne of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local government institutions."). The Supreme Court repeatedly has cautioned that federal courts must tread lightly when it comes to questions of managing prisons, particularly state prisons. The Court has gone so far as to opine that "[i]t is difficult to imagine an activity in which

a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of prisons." *Preiser*, 411 U.S. at 492-92; *see also Turner v. Safley*, 482 U.S. 78, 85 (1987) ("[W]here a state penal system is involved, federal courts have * * * additional reason to accord deference to the appropriate prison authorities."); *Meachum v. Fano*, 427 U.S. 215, 229 (1976) ("Federal courts do not sit to supervise state prisons, the administration of which is of acute interest to the States.").

There are serious separation of powers concerns, too, because running and overseeing prisons is traditionally the province of the executive and legislative branches. See *Turner*, 482 U.S. at 84-85 ("Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint."). The judiciary is ill-equipped to manage decisions about how best to manage any inmate population—let alone a statewide population of tens of thousands of people scattered across more than a dozen facilities. And the concern about institutional competence is especially great where, as here, there is an ongoing, fast-moving public health emergency.

It is no accident that the federal judiciary only rarely intrudes into the management of state prisons, and only once in history has actually ordered the release of prisoners on a scale anywhere near what Plaintiffs hope to accomplish through this litigation. And in that instance, inmates were released only after a painstakingly long process, informed by voluminous expert testimony and a weeks-long trial. This is why the Supreme Court too has noted how "ill equipped" the courts are to deal with the "complex and intractable" problems of prisons and remarked that "[j]udicial

recognition of that fact reflects no more than a healthy sense of realism." *Rhodes v. Chapman*, 101 S. Ct. 2392, 2401 n.16 (1981).

Plaintiffs insist that they "do not seek to place IDOC under the supervision of this Court." [24, at 12.] But they do intend to place the Court squarely in the middle of refereeing whose plan can best ensure release of inmates and on what conditions. As Plaintiffs note, if their proposal is not agreeable to Defendants, they "are free to proffer other plans to the Court." [*Id.* at 13.] In saying that the Court should hesitate before venturing into such an arrangement, the Court does not mean to say it never is appropriate. *Plata* holds otherwise. But here, and now, even if Plaintiffs could establish a right to the relief they want—and they cannot for reasons stated above (Section 3626(a)(3)) and below (the absence of a likelihood of success on the merits)—any effort for the Court to insert itself into this process likely would be ineffectual in dealing with the actual situation at hand. The statistical experts on whose work both the federal and state governments have relied in shaping their expectations estimate that the peak for the current wave of COVID-19 will hit in Illinois within the next few days, and that the number of deaths and the need for invasive medical equipment will decline rapidly in the weeks that follow. See Institute for Health Metrics and Evaluation, University of Washington Medicine, "COVID-19 projections assuming full social distancing through May 2020," available at https://covid19.healthdata.org/united-states-of-america/illinois (last visited Apr. 10, 2020). To be sure, for the reasons acknowledged above, the prison environment presents special challenges and may not bend to the same curve as the rest of the state collectively. Yet today's information shows that only one IDOC facility has more that ten confirmed cases, and IDOC has in place measures to deal with suspected and confirmed cases within its facilities and to limit the chance of the virus being brought into the facility by outsiders.

By the time the Court could develop even a partially-informed plan for dealing with an infectious disease in the prison system, the current wave likely will have passed.[13]

Finally, there are potential separation of powers problems, too, with forcing the executive branch to exercise its discretion in a particular way. Here, Plaintiffs want this Court to direct—or, at a minimum, strongly influence—the Governor and an administrative agency to make discretionary decisions under state law to grant a medical furlough or a home detention. See 730 ILCS 5/3-11-1(a)(2) (providing that the IDOC "may" grant a 14-day medical furlough); 730 ILCS 5/5-8A-3(d) (providing that certain inmates "may" be placed in home detention under certain conditions); 730 ILCS 5/5-8A-3(e) (same). Just as the "Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case," *United States v. Nixon*, 418 U.S. 683, 693 (1974), so too the executive branch has the discretion to decide whether to end incarceration early.

### 6. The Merits

In the interest of completeness—and in the event that any or all of the foregoing analysis is incorrect—the Court now turns to the applicable factors for considering a request for preliminary injunctive relief on the merits. As noted at the outset, "[i]n the first phase, the party seeking a preliminary injunction must make a threshold showing that: (1) absent preliminary injunctive relief, he will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) he has a reasonable likelihood of success on the merits." *Turnell*, 796 F.3d at 661-62. If the movant makes the required threshold showing, then the court moves on to the second stage and considers: "(4) the irreparable harm the moving party will endure if the

---

[13] The Court is aware that experts have warned of a possible second (or third) wave, perhaps in the late fall or early winter when the normal flu season arrives. Nothing in today's ruling forecloses a later request for relief based on future circumstances.

preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted; and (5) the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties," *i.e.*, the public interest. *Id.* at 662. The court must pay "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.

As a concession to the press of time, the Court will move directly to the third part of the first phase analysis, for it is sufficient to end the inquiry. As explained below, Plaintiffs cannot show a reasonable likelihood of success on the merits on either of their substantive claims.

### a.    Likelihood of success on the merits

To state a claim under § 1983, a plaintiff must show: (1) his constitutional rights were violated (2) by a person acting under color of state law. *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007). Plaintiffs advance two claims under the Eighth Amendment and the ADA. Defendants plainly are state actors, so the only question on the table is whether Plaintiffs' constitutional rights have been violated—or, more precisely, whether Plaintiffs have a reasonable chance of showing that they have been.

### i.    Eighth Amendment claim

In cases involving the conditions of confinement in a prison, two elements are required to establish a violation of the Eighth Amendment's prohibition against cruel and unusual punishment: "first, an objective showing that the conditions are sufficiently serious—*i.e.*, that they deny the inmate the minimal civilized measure of life's necessities creating an excessive risk to the inmate's health and safety—and second, a subjective showing of a defendant's culpable state of mind." *Isby v. Brown*, 856 F.3d 508, 521 (7th Cir. 2017) (internal citations and quotation marks omitted). The culpable mental state required to state a claim under the Eighth Amendment is "one of deliberate

indifference to inmate health and safety." *Daugherty v. Page*, 906 F.3d 606, 611 (7th Cir. 2018) (quoting *Haywood v. Hathaway*, 842 F.3d 1026, 1031 (7th Cir. 2016)) (internal quotation marks omitted).

Again, the analysis can be truncated, because nobody contests the serious risk that COVID-19 poses to all inmates and prison staff, and even more so to the most vulnerable inmates like those who comprise the two subclasses encompassed within the instant motion. Likewise, nobody contests Defendants' knowledge of this grave situation. The lead Defendant, Governor Pritzker, has repeatedly made reference to the unique risks faced by incarcerated individuals in his daily press briefings. So, deliberate indifference is the whole ball game on the merits of Plaintiffs' Eighth Amendment claim.

Deliberate indifference, as the Seventh Circuit has explained, imposes a "high hurdle," for it requires a showing "approaching total unconcern for the prisoner's welfare." *Rosario v. Brown*, 670 F.3d 816, 821 (7th Cir. 2012) (internal quotations and citation omitted). Neither "negligence [n]or even gross negligence is enough; the conduct must be reckless in the criminal sense." *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008). And, given the constantly shifting parameters and guidance regarding how to combat a previously little known virus, it is worth pointing out that "the mere failure * * * to choose the best course of action does not amount to a constitutional violation." *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002).

Under this standard, Plaintiffs have no chance of success. Defendants have come forward with a lengthy list of the actions they have taken to protect IDOC inmates. Some are designed to protect inmates in the prison environment; others to consider release under several different programs. On an almost daily basis, the Governor and/or the Department have expanded or modified their procedures, including earlier this week through an executive order making it easier

for the Director to approve furloughs. Plaintiffs acknowledge that Defendants "are taking many actions on the list." [24, at 1.] And the numbers prove it—as 644 inmates have been released since March 2. [36, at 2.]

Plaintiffs' complaint is that Defendants "are simply not moving quickly or broadly enough," and that "the Court's intervention is necessary to prod the defendants to act more quickly." [24, at 1-2.] Setting aside the concerns raised above whether judicial intervention would be effective—probably not in the short term; perhaps in the long term—objections about the speed or scope of action and suggestions for altering it through a "prod" do not support either half of the phrase "deliberate indifference." Clearly Defendants are trying, very hard, to protect inmates against the virus and to treat those who have contracted it. The record simply does not support any suggestion that Defendants have turned the kind of blind eye and deaf ear to a known problem that would indicate "total unconcern" for the inmates' welfare. *Rosario*, 670 F.3d at 821. Nor would the record support any claim that Defendants lack a plan for implementing exactly what Plaintiffs have requested—individualized decisions on release through a panoply of vehicles guided by administrative discretion. It may not be the plan that Plaintiffs think best; it may not even be the plan that the Court would choose, if it were sufficiently informed to offer an opinion on the subject. But the Eighth Amendment does not afford litigants and courts an avenue for *de novo* review of the decisions of prison officials, and the actions of Defendants here in the face of the COVID-19 outbreak easily pass constitutional muster.

### ii.     ADA claim

Title II of the ADA prohibits public entities from discriminating against qualified individuals with disabilities by depriving them of opportunity to participate in the services, programs, or activities of the public entity because of their disabilities. 42 U.S.C. § 12132. Title

II of the ADA applies to prisons, as "[s]tate prisons fall squarely within the statutory definition of "public entity" under the ADA. *Pennsylvania Dep't of Corr. v. Yeskey,* 524 U.S. 206, 210 (1998). To make out a claim under Title II of the ADA, Plaintiffs must show that: (1) each Plaintiff is a "qualified individual with a disability;" (2) Defendants denied Plaintiffs "the benefits of the services, programs, or activities of a public entity;" and (3) Plaintiffs were discriminated against "by reason of" their disabilities. *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996) (quoting 42 U.S.C. § 12132). Plaintiffs may establish discrimination in one of three ways: "(1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people." *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 847 (7th Cir. 1999).

Here, there is no allegation of intentional discrimination on the basis of disability—*i.e.*, that Defendants have singled out disabled inmates and excluded them from consideration for release. And nothing on the face of the many vehicles identified in Defendants' brief for effectuating release even mentions disabilities, much less bars disabled inmates from accessing them. As Plaintiffs recognize, all decisions on release—under the furlough program that is the focus for subclasses 1 and 2 and otherwise—must be made on an individualized basis and subject to the exercise of discretion. Nothing in the record supports the notion that any member of the proposed class, including one who is a qualified individual with a disability, has been denied the reasonable modification of consideration for release—which Plaintiffs now concede is the most they can ask for. Nor is there any basis for concluding that the discretionary decisions on whom to release (and not to release) have a disproportionate impact on disabled inmates, especially when one considers the large number of non-disabled inmates who also may have strong claims to priority for release on account of their susceptibility to COVID-19, such as elderly inmates. In

short, Plaintiffs do not have a reasonable likelihood of success under any of the three ways of establishing an ADA discrimination claim.[14]

**b.      Second stage factors**

Having concluded that Plaintiffs do not have a reasonable likelihood of success on either of their Section 1983 claims, the Court need not move on to the "second stage" of the TRO/preliminary injunction analysis. Nevertheless—and very briefly—the answer to the question "to release or not to release" is by no means obvious. Setting aside Stateville, the current rate of incidence of COVID-19 infection inside the IDOC is mercifully low, and the counties in which the facilities housing the named Plaintiffs (apart from Will) are far less densely populated than the urban areas in which the virus is more prevalent. To the extent that members of the subclasses would be released to homes in those areas, they may have a similar risk of contracting the virus whether they remain in custody or are released in the near future.

The final factor in the "second stage," the public interest, also cuts both ways. As Plaintiffs stress, the public interest surely is served by avoiding widespread outbreaks of COVID-19 infection, and prison environments present a heightened risk of such outbreaks occurring, as evidenced at Stateville and the Cook County Jail. These are good reasons for Defendants to work hard to reduce the prison population, and especially to remove the highest-risk inmates, either though outright release or transfer to some other location while still in custody, provided that doing

---

[14] Plaintiffs also have no plausible allegations that ADA-qualified inmates have been discriminated against *because of* their disabilities. As noted above, review of the numerous vehicles that Defendants have identified and/or that are authorized by statute reveals none that singles out disabled persons for discrimination. To the contrary, it is likely that the programs in place will have a disparate impact in their favor, as disabled individuals are more likely to be able to demonstrate a need for the services that justify a medical furlough. The fact that disabled persons may be more susceptible to contract or suffer serious consequences from COVID-19 is not disputed, but that disparate impact is not a consequence of "Defendant's rule" or any action by Defendants. As explained above, the "rule" is individual, discretionary decisions on eligibility for release.

so is consistent with the public interest. But every release order carries with it some risk to the rest of the community. Has the inmate been exposed to the virus while in custody? Does another vulnerable person—perhaps an 80-year old mother with emphysema—live at the residence where the inmate will be released? Does the inmate have a history of mental instability or domestic violence? Are there adequate safeguards—monitoring or supervision—for releasees who are both vulnerable and dangerous? How does the increased activity associated with release orders in the quantities sought by Plaintiffs comport with the mandate for social distancing? Finally, as alluded to above, the public interest also commands respect for federalism and comity, which means that courts must approach the entire enterprise of federal judicial intrusion into the core activities of the state cautiously and with humility. This is not to say that intrusion would not be justified if the state government sat silently during a pandemic; if that were the case, the Court would be prepared to request *sua sponte* the formation of a three-judge court to take up Plaintiffs' complaint. But the absence of a plausible case on the merits and doubts about the balancing of the harms and public interest reinforce the decision to deny injunctive relief at this time.

Other compelling public interest considerations come into play too. Plaintiffs seek a process that could result in the release of at least 12,000 inmates. That is almost one-third of the prison population in Illinois. See Cmplt. at ¶¶ 1, 105. All of them are incarcerated because a jury convicted them of committing crimes, including some of the most serious crimes against our community. Many of them are violent offenders. Compelling a process to potentially release thousands of inmates on an expedited basis could pose a serious threat to public safety and welfare. The risk of recidivism comes into play, as do concerns about victims' rights. The question is not simply what is best for the inmates – the public has vital interests at stake, too. See Brief of *Amicus*

*Curiae* City of Chicago in *Mays v. Dart*, Case No. 20-cv-2134, Docket Entry [45-1], at 2 (submitted on April 9, 2020).

### D.    Petition for Writs of Habeas Corpus

As referenced above, Plaintiffs (or, in this context, Petitioners) also have brought a habeas petition under 28 U.S.C. § 2254 arguing that Respondent is "violating Petitioners' Eighth Amendment rights by continuing to incarcerate them in conditions where it is virtually impossible to take steps to prevent transmission of an infectious disease that will prove deadly because of Petitioners' vulnerable condition and/or age." *Jeffreys*, [1, at ¶ 124].

Prior to filing a habeas petition in federal court, a petitioner seeking relief from state custody must exhaust available state remedies, which means that the petitioner has "fully and fairly presented his claims to the state appellate courts, thus giving the state courts a meaningful opportunity to consider the substance of the claims that he later presents in his federal challenge." *Bintz v. Bertrand,* 403 F.3d 859, 863 (7th Cir. 2005); see also 28 U.S.C. § 2254(b), (c); *O'Sullivan v. Boerckel,* 526 U.S. 838, 845 (1999).  This exhaustion requirement "serves an interest in federal-state comity by giving state courts the first opportunity to address and correct potential violations of a prisoner's federal rights."  *Perruquet v. Briley,* 390 F.3d 505, 513 (7th Cir .2004) (citing *Picard v. Connor,* 404 U.S. 270, 275 (1972)).  It requires the petitioner to assert each of his or her federal claims through one complete round of state-court review, either on direct appeal of his or her conviction or in post-conviction proceedings, before proceeding to federal court. See *O'Sullivan,* 526 U.S. at 845; see also *Lewis v. Sternes,* 390 F.3d 1019, 1025 (7th Cir. 2004).  This includes presentation of the claims to appellate courts where review is discretionary and such review is part of the ordinary appellate procedure in the State.  *O'Sullivan,* 526 U.S. at 847

(requiring a petitioner to present his claims to the Illinois Supreme Court in a petition for leave to file an appeal even though that Court's review was discretionary).

To fairly present a claim in state court, the petitioner must include both the operative facts and the controlling legal principles on which the claim is based, and must also alert the state court that the claim raised is based on federal law. *Chambers v. McCaughtry,* 264 F.3d 732, 737 (7th Cir. 2001); *Sweeney v. Carter,* 361 F.3d 327, 332 (7th Cir. 2004). If the federal court reviewing the habeas petition is not satisfied that the petitioner gave the state courts "a meaningful opportunity to pass upon the substance of the claims [ ] presented in federal court," the Court cannot reach the merits. *Chambers,* 264 F.3d at 737; see also *Sweeney,* 361 F.3d at 332.

"Where state remedies remain available to a habeas petitioner who has not fairly presented his constitutional claim(s) to the state courts, the exhaustion doctrine precludes a federal court from granting him relief on that claim: although a federal court now has the option of denying the claim on its merits, 28 U.S.C. § 2254(d) (2), it must otherwise dismiss his habeas petition without prejudice so that the petitioner may return to state court in order to litigate the claim(s)." *Perruquet,* 390 F.3d at 514 (citing *Castille v. Peoples,* 489 U.S. 346, 349 (1989); *Rose v. Lundy,* 455 U.S. 509, 522 (1982)); see also 28 U.S.C. § 2254(b)(1) (A); *Coleman v. Thompson,* 501 U.S. 722, 731 (1991); *Dressler v. McCaughtry,* 238 F.3d 908, 912 (7th Cir. 2001). However, where a petitioner already has pursued state court remedies (but without presenting the federal claims in state court) and there is no longer any state corrective process available to him or her, "it is not the exhaustion doctrine that stands in the path of habeas relief, see 28 U.S.C. § 2254(b)(1)(B)(i), but rather the separate but related doctrine of procedural default." *Perruquet,* 390 F.3d at 514.

It is undisputed that Petitioners have not complied with the exhaustion requirement. They did institute a direct action in the Illinois Supreme Court. Had that Court exercised its authority

to take action on these matters, various abstention doctrines would have come into play and might have compelled (or at least counseled) this Court to stand down. The Court is not aware of any action that the Illinois Supreme Court has taken. Petitioners do not contend that the filing of their direct action to the state High Court satisfies the exhaustion doctrine. Rather, they submit that exhaustion should be excused because of the unavailability of the Circuit Court of Cook County, where Petitioners apparently would have preferred to file within the state court system.

As an initial matter, that may not have been a valid choice in any event, for none of the Petitioners is housed in a facility within Cook County. In general, a habeas petitioner must bring suit against the warden of the facility in which he is detained. See, e.g., *Rumsfeld v. Padilla*, 542 U.S. 426, 434–35 (2004). As the Supreme Court has explained, "[t]he federal habeas statute straightforwardly provides that the proper respondent to a habeas petition is 'the person who has custody over [the petitioner]'" and "[t]he consistent use of the definite article in reference to the custodian indicates that there is generally only one proper respondent to a given prisoner's habeas petition." *Id.* (citing 28 U.S.C. § 2242); see also *W.S.R. v. Sessions*, 318 F. Supp. 3d 1116, 1123 (N.D. Ill. 2018) ("the typical habeas petition requires that the warden of the custodial facility, rather than supervisory government officials, be named as the respondents"); *Payne v. Illinois*, 485 F. Supp. 2d 952, 952 (N.D. Ill. 2007) ("the proper habeas respondent is neither a disembodied governmental unit nor the "people" who are collectively the constituents of that unit, but rather the person who has custody over the habeas petitioner"). The presence of multiple petitioners may have afforded a choice in selecting a proper respondent, but it is doubtful that someone other than a warden of a facility housing a petitioner should have been named, for the general rule is that a petitioner may not sue the director of the jail system. See, *e.g.*, *Bridges v. Chambers*, 425 F.3d 1048, 1049 (7th Cir. 2005). Petitioners apparently sued Respondent

Jeffreys, the IDOC Director, because they are proceeding on a representative theory, for which there is some support in Supreme Court and Seventh Circuit law. *Bijeol v. Benson*, 513 F.2d 965, 968 (7th Cir. 1975) (although Rule 23 "does not apply to habeas corpus proceedings," "a representative procedure analogous to the class action provided for in Rule 23 may be appropriate in a habeas corpus action under some circumstances) (citing Fed. R. Civ. P. 23); compare *Jennings v. Rodriguez*, 138 S. Ct. 830, 858 n.7 (U.S. 2018) (Thomas, J., concurring in part) ("This Court has never addressed whether habeas relief can be pursued in a class action." (citing *Schall v. Martin,* 467 U.S. 253, 261, n. 10 (1984) (reserving this question)).[15]

There is no need to resolve the question of the proper respondent, because Plaintiffs have not made a satisfactory showing that the state court system was not every bit as available as the federal courts, if not more so. Assuming that filing in Cook County would have been proper, "Cook County's courts are still available for emergency matters," as Judge Kennelly found earlier this week. *Mays v. Dart*, 2020 WL 1812381, at *5 (N.D. Ill. Apr. 9, 2020). Petitioners have made no effort to establish that the trial courts in the numerous other counties where they are housed are unavailable and were so last week when this action was filed. Stateville Correctional Center, where the COVID-19 crisis was most acute within the IDOC system, is located less than five miles from the Will County Courthouse in Joliet, where the Circuit Court for the Twelfth Judicial Circuit sits. Under that court's operative Administrative Order No. 2020-08, effective from March 18, 2020 through April 30, 2020, "[w]ith the exception of Branch Courts, all court facilities will be open normal business hours." Administrative Order No. 2020-08, available at

---

[15] Although the Court denies habeas relief based on Petitioners' failure to exhaust their available state remedies, it adds that for all of the reasons stated above (see 30-33, *supra*), this habeas action would be no more suitable for representative or class treatment than the Section 1983 lawsuit is, as release determinations must be made on an individual basis regardless of the vehicle for considering and effectuating them.

https://www.circuitclerkofwillcounty.com/Portals/0/Covid%20AO%2020-08.pdf (last checked Apr. 10, 2020). Within the Civil Division, where this matter likely would have been assigned, the General Order provides that "[m]atters determined by the Court to be of an emergency nature will be heard in-person, by telephone conference, or by videoconference if possible." *Id.* ¶ 6A.

To be sure, exhaustion requirements can (and should) be waived when relief is truly unavailable. But waiving them here—when state courts clearly were available at least in the two counties identified above and for all Petitioners have shown, every other county and circuit as well—would turn the habeas system upside down. Accordingly, the Court denies Petitioners' request for expedited release pursuant to the issuance of writs of habeas corpus.[16]

* * * * *

In closing, the Court can do no better than to quote the three-judge panel from California before whom a group of plaintiffs in a similarly hard-hit state presented a claim seeking release (or relocation) due to the inability to observe social distancing during the COVID-19 pandemic: "We emphasize that Defendants have broad authority to voluntarily take steps that may prevent the life-threatening spread of COVID-19 within their prisons, and we recognize the deference that is due to prison authorities to determine which additional measures must be taken to avoid catastrophic results. * * * Defendants have represented to us that they are continuously evaluating what more they can do to protect the inmates within their prisons, and we urge them to leave no stone unturned. It is likely that only through significant effort will California's prisons be able to

---

[16] Because Petitioners asked for expedition, which was justified in the circumstances, the Court is reluctant to dismiss the Petition altogether without allowing Petitioners time for reflection on the ruling and the basis for it. However, following Judge Kennelly's approach in *Mays*, 2020 WL 1812381, at *6 n.5, the Court is willing to consider entering a final order of dismissal (or any other viable approach of allowing Petitioners to seek further review) upon the filing of a motion requesting such relief. Any such motion should be presented to the undersigned judge in his capacity as emergency judge, although the motion may be referred to the assigned judge after filing.

minimize the spread of COVID-19." *Coleman & Plata*, 2020 WL 1675775, at *8. So, too, here in Illinois.

## IV. Conclusion

For the reasons set forth above, Plaintiffs' motion for temporary restraining order and preliminary injunction in *Money v. Pritzker*, Case No. 20-cv-2093 [9] is denied. Plaintiffs' motions for leave to file oversized brief [5] and for expedited treatment [12] in that same case are granted. Defendants' motion for leave to file sur-reply in that case [32] is granted. Petitioners' motion for expedited treatment in *Money v. Jeffreys*, Case No. 20-cv-2094 [3] is granted, but the Court denies Petitioners' request for expedited release. The petition [1] remains open on the docket, subject to further action by the parties and the judges, both assigned and emergency (see above). No further status hearings will be set at this time by the emergency judge.

Dated: April 10, 2020

_____
Robert M. Dow, Jr.
United States District Judge