**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| WILLIAM RICHARD, GERALD REED, TEWKUNZI GREEN, DANNY LABOSETTE, CARL "TAY TAY" TATE, BRITTANY HALL, KIMBERLY CARTER, LORI THOMPSON, KIMBERLY DUNTEMAN, LYNWOOD ELLIS, DANNY WICKER, ADAM GRUNIN, ANDREW HINES, ANTWAN FREEMAN, CARLTON WHITE, SHARDON GAY, ERIC VALDEZ, ANTHONY BUCHANAN, WILLIE HOLLOWAY, TIM WALTON, ADRIAN TORRES, and LUCIOUS ROGERS, on behalf of themselves and all similarly situated individuals, <br><br>       Plaintiffs, <br><br>       v. <br><br> J.B. PRITZKER, in his official capacity as GOVERNOR OF THE STATE OF ILLINOIS, and ROB JEFFREYS, in his official capacities as DIRECTOR OF THE DEPARTMENT OF CORRECTIONS, <br><br>       Defendants. | ) ) ) ) ) ) ) )     Case No. 1:20-cv-02093 ) ) ) )     Hon. Steven C. Seeger ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiffs William Richard, Gerald Reed, Tewkunzi Green, Danny Labosette, Carl "Tay Tay" Tate, Brittany Hall, Kimberly Carter, Lori Thompson, Kimberly Dunteman, Lynwood Ellis, Danny Wicker, Adam Grunin, Andrew Hines, Antwan Freeman, Carlton White, Shardon Gay, Eric Valdez, Anthony Buchanan, Willie Holloway, Tim Walton, Adrian Torres, and Lucious Rogers, individually and on behalf of a class of similarly situated individuals, by their undersigned attorneys, file this First Amended Complaint for declaratory and injunctive relief

against Defendants, Governor of the State of Illinois J.B Pritzker and Illinois Department of Corrections Director Rob Jeffreys, and allege as follows:

**INTRODUCTION**

1.      Plaintiffs are medically vulnerable to the novel coronavirus due to age and/or underlying medical conditions.  They face a substantially greater risk of more severe illness and outcomes if they contract the virus, including requiring ICU care and ventilation, and death. Despite this greater risk, the Governor and the Illinois Department of Corrections ("IDOC") have failed to take the urgent action needed to protect them.

2.      COVID-19 continues to spread inside the walls of Illinois's prisons, and throughout prison communities as well.  Plaintiffs reside among nearly 37,000 people incarcerated in Illinois, living in close quarters where all aspects of daily life, including showers, food service, and health care take place.  Hundreds of staff members come and go from each of their facilities three times a day to prepare their meals, distribute their medications, escort them for any movement, and more.  Prisons pose a particular risk of spreading the virus, with catastrophic consequences to the medically vulnerable prisoners within each facility who have no ability to follow health and safety standards.

3.      To understand the devastating impact that COVID-19 is having and will continue to have on the Illinois prison system and the communities that surround those prisons, one need look no further than Joliet, Illinois.  On March 25, 2020, the IDOC announced the first confirmed case of COVID-19 at Stateville Correctional Center.  Just five days later, the number of coronavirus cases had swelled and St. Joseph Hospital was "overwhelmed" and "maxed out" by Stateville prisoners.  The hospital's medical director characterized the situation as "a disaster."

4.      Since then, at least 154 prisoners from Stateville have contracted the virus and 12 prisoners have died, the majority of whom, on information and belief, were medically vulnerable.  In addition to Stateville, the virus has now spread to 13 more prisons.

5.       Defendants have an obligation to keep Plaintiffs in safe custody, particularly during a pandemic that particularly places them at greater risk of harm.  Yet, they have failed to protect those most vulnerable to this virus.  In fact, the State has retreated from statements made earlier in the crisis, failing to live up to its initial promise to protect this population.  The State's slow, inconsistent, and ineffective responses evidences deliberate indifference to a serious risk to Plaintiffs' health and life.  Without intervention from this Court, Plaintiffs and the class they represent face a real risk that they are going to die unnecessarily.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).  This Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

7.      Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this judicial district.

## PARTIES

8.      Plaintiff William Richard is, and has been at all relevant times, an Illinois Department of Corrections prisoner.  He is currently confined at Dixon Correctional Center in Dixon, Illinois.

9.      Plaintiff Gerald Reed is, and has been at all relevant times, an Illinois Department of Corrections prisoner.  He is currently confined at the Northern Reception Center in Crest Hill, Illinois.

10.     Plaintiff Tewkunzi Green is, and has been at all relevant times, an Illinois Department of Corrections prisoner.  She is currently confined at Logan Correctional Center in Lincoln, Illinois.

11.     Plaintiff Danny Labosette is, and has been at all relevant times, an Illinois Department of Corrections prisoner.  He is currently confined at Robinson Correctional Center in Robinson, Illinois.

12.     Plaintiff Carl "Tay Tay" Tate is, and has been at all relevant times, an Illinois Department of Corrections prisoner.  She is currently confined at Danville Correctional Center in Danville, Illinois.

13.     Plaintiff Brittany Hill is, and has been at all relevant times, an Illinois Department of Corrections prisoner.  She is currently confined at Logan Correctional Center in Lincoln, Illinois.

14.     Plaintiff Kimberly Carter is, and has been at all relevant times, an Illinois Department of Corrections prisoner.  She is currently confined at Logan Correctional Center in Lincoln, Illinois.

15.     Plaintiff Lori Thompson is, and has been at all relevant times, an Illinois Department of Corrections prisoner.  She is currently confined at Logan Correctional Center in Lincoln, Illinois.

16.     Plaintiff Kimberly Dunteman is, and has been at all relevant times, an Illinois Department of Corrections prisoner. She is currently confined at Logan Correctional Center in Lincoln, Illinois.

17.     Plaintiff Lynwood Ellis is, and has been at all relevant times, an Illinois Department of Corrections prisoner.  He is currently confined at Stateville Correctional Center in Crest Hill, Illinois.

18.     Plaintiff Danny Wicker is, and has been at all relevant times, an Illinois Department of Corrections prisoner.  He is currently confined at the Northern Reception and Classification Center (NRC) in Crest Hill, Illinois.

19.     Plaintiff Adam Grunin is, and has been at all relevant times, an Illinois Department of Corrections prisoner.  He is currently confined at the Northern Reception and Classification Center (NRC) in Crest Hill, Illinois.

20.     Plaintiff Andrew Hines is, and has been at all relevant times, an Illinois Department of Corrections prisoner.  He is currently confined at Jacksonville Correctional Center in Jacksonville, Illinois.

21.     Plaintiff Antwan Freeman is, and has been at all relevant times, an Illinois Department of Corrections prisoner.  He is currently confined at Jacksonville Correctional Center in Jacksonville, Illinois.

22.     Plaintiff Carlton White is, and has been at all relevant times, an Illinois Department of Corrections prisoner.  He is currently confined at Jacksonville Correctional Center in Jacksonville, Illinois.

23.     Plaintiff Shardon Gay is, and has been at all relevant times, an Illinois Department of Corrections prisoner.  He is currently confined at Danville Correctional Center in Danville, Illinois.

24.     Plaintiff Eric Valdez is, and has been at all relevant times, an Illinois Department of Corrections prisoner.  He is currently confined at Vienna Correctional Center in Vienna, Illinois.

25.     Plaintiff Anthony Buchanan is, and has been at all relevant times, an Illinois Department of Corrections prisoner.  He is currently confined at Vienna Correctional Center in Vienna, Illinois.

26.     Plaintiff Willie Holloway is, and has been at all relevant times, an Illinois Department of Corrections prisoner.  He is currently confined at Pinckneyville Correctional Center in Pinckneyville, Illinois.

27.     Plaintiff Tim Walton is, and has been at all relevant times, an Illinois Department of Corrections prisoner.  He is currently confined at Graham Reception and Classification Center in Hillsboro, Illinois.

28.     Plaintiff Adrian Torres is, and has been at all relevant times, an Illinois Department of Corrections prisoner.  He is currently confined at Sheridan Correctional Center in Sheridan, Illinois.

29.     Plaintiff Lucious Rogers is, and has been at all relevant times, an Illinois Department of Corrections prisoner.  He is currently confined at the Medium Security Unit of Menard Correctional Center in Chester, Illinois.

30.     Defendant Rob Jeffreys is the Director of the Illinois Department of Corrections ("IDOC").  As such, he was acting under color of law.  At all relevant times to the events at issue in this case, Defendant Jeffreys maintained administrative and supervisory authority over the operations of all prisons in Illinois.  At all relevant times, Defendant Jeffreys promulgated rules,

regulations, policies, and procedures of the IDOC. Defendant Jeffreys is sued in his official capacity.

31.     Defendant Governor of Illinois J.B. Pritzker has, pursuant to the Illinois Constitution, Article V, Section 8, "the supreme executive power, and shall be responsible for the faithful executive of the laws." Governor Pritzker has the ultimate authority for ensuring that all executive agencies, including the Department of Corrections, function in compliance with state and federal law.

## FACTUAL ALLEGATIONS

### I.     The COVID-19 Outbreak Has Created a National and Global Health Emergency

32.     We are living in the midst of an extreme, unprecedented worldwide health emergency caused by the rapid spread of the coronavirus, COVID-19. The World Health Organization has declared COVID-19 to be a global pandemic. On March 9, 2020, Illinois Governor J.B. Pritzker issued a proclamation declaring a disaster in the State of Illinois. On March 13, 2020, President Trump declared a national emergency.

33.     The number of known COVID-19 infections is increasing daily. As of April 1, 2020, there were more than 823,000 reported COVID-19 cases throughout the world and more than 40,500 people had died as a result of the virus.[1] As of May 19, 2020, those numbers have increased to over 4.7 million confirmed cases and over 316,000 deaths.[2] In the United States alone, on April 1, 2020 there were over 186,000 confirmed cases and over 3,600 deaths.[3] As of

---

[1] Coronavirus Disease 2019 (COVID-19) Situation Report – 72, World Health Organization (Apr. 1, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200401-sitrep-72-covid-19.pdf?sfvrsn=3dd8971b_2

[2] Coronavirus Disease (COVID-19) Situation Report - 120, World Health Organization (May 19, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200519-covid-19-sitrep-120.pdf?sfvrsn=515cabfb_2.

[3] Coronavirus Disease 2019 (COVID-19): Cases in U.S., Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-

May 19, 2020, the United States numbers have increased to over 1.5 million confirmed cases and over 90,000 deaths.[4]  In Illinois, on April 1, 2020, there were over 6,900 confirmed cases and 141 deaths.[5]  As of May 19, 2020, the Illinois numbers have increased to over 98,000 confirmed cases and over 4,300 deaths.[6]  The number of COVID-19 cases in the United States is expected to grow exponentially.  The Centers for Disease Control and Prevention ("CDC") projects that without swift and effective public health interventions, over 200 million people in the U.S. could be infected with COVID-19 over the course of the epidemic, with as many as 1.7 million deaths.

34.     Governor Pritzker himself has admitted that Illinois is unlikely to see a decrease in new cases anytime soon.  Recent projections from the Illinois Department of Public Health indicate that Illinois has not yet reached its peak.

35.     There is no known vaccine or cure for COVID-19.

36.     Common symptoms of COVID-19 include fever, cough, and shortness of breath. Other symptoms include congestion, sneezing, fatigue, or diarrhea.  Many individuals who become infected with COVID-19 may have mild or moderate symptoms; some may experience no symptoms at all.  Other patients may experience severe symptoms requiring intensive medical intervention.  However, even with hospitalization and intensive treatment, thousands of individuals have died as a result of this infection.

37.     Regardless of the type of severity of symptoms, all infected persons are contagious and can rapidly transmit the virus from person to person without proper public health

---

us.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fcases-in-us.html (last visited Apr. 1, 2020).
[4]  Coronavirus Disease 2019 (COVID-19): Cases in U.S., Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited May 20, 2020).
[5]  Coronavirus Disease 2019 (COVID-19), Ill. Dept. of Pub. Health, http://www.dph.illinois.gov/topics-services/diseases-and-conditions/diseases-a-z-list/coronavirus (last visited Apr. 1, 2020).
[6]  Coronavirus Disease 2019 (COVID-19), Ill. Dept. of Pub. Health, https://www.dph.illinois.gov/covid19/covid19-statistics (last visited May 20, 2020).

interventions.  The virus is known to spread from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.

38.     Controlling the spread of COVID-19 is made even more difficult because of the prominence of asymptomatic transmission—people who are contagious but who exhibit no symptoms, rendering ineffective any screening tools dependent on identifying disease symptoms.

## II.     COVID-19 Poses a Grave Risk of Serious Illness or Death to Those Who Are Elderly or Have Underlying Medical Conditions

39.      People over the age of fifty-five face greater chances of serious illness or death from COVID-19.

40.     People of any age who suffer from certain underlying medical conditions are also at elevated risk, including people with respiratory conditions including chronic lung disease or moderate to severe asthma; people with heart disease or other heart conditions; people who are immunocompromised as a result of cancer, HIV/AIDS, or any other condition or related to treatment for a medical condition; people with chronic liver or kidney disease or renal failure (including hepatitis and dialysis patients); people with diabetes, epilepsy, hypertension, blood disorders (including sickle cell disease), inherited metabolic disorders; and people who have had or are at risk of stroke.  At least one recent report indicated that the mortality rate for those with cardiovascular disease was 13.2%, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.[7]

41.     For these vulnerable populations, the symptoms of COVID-19, particularly shortness of breath, can be severe, and complications can manifest at an alarming pace.  Most people in higher risk categories who develop serious illness will need advanced support.  This

---

[7] Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World Health Organization (Feb. 28, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf

level of supportive care requires highly expensive and specialized equipment, including

ventilators, that are in limited supply.

42. The CDC's Morbidity and Mortality Reports gives detailed data and statistical

analysis, summarized here:

> The percentage of COVID-19 patients with at least one underlying health condition or risk
> factor was higher among those requiring intensive care unit (ICU) admission (358 of 457,
> 78%) and those requiring hospitalization without ICU admission (732 of 1,037, 71%) than
> that among those who were not hospitalized (1,388 of 5,143, 27%). The most commonly
> reported conditions were diabetes mellitus, chronic lung disease, and cardiovascular
> disease. These preliminary findings suggest that in the United States, persons with
> underlying health conditions or other recognized risk factors for severe outcomes from
> respiratory infections appear to be at a higher risk for severe disease from COVID-19 than
> are persons without these conditions . . . These results are consistent with findings from
> China and Italy, which suggest that patients with underlying health conditions and risk
> factors, including, but not limited to, diabetes mellitus, hypertension, COPD, coronary
> artery disease, cerebrovascular disease, chronic renal disease, and smoking, might be at
> higher risk for severe disease or death from COVID-19 (3,4).[8]

43. In New York, 4,089 of the 4,758 deaths due to COVID-19 between March 14 and

April 7, 2020, were of patients with at least one other chronic disease, including hypertension in

55% of deaths and diabetes which was diagnosed in 1,755 deaths (about 37% of the cases).[9]

44. Those medically vulnerable individuals who survive COVID-19 nevertheless face

a greater risk of long-term damage to organs such as the heart, the liver, and the kidneys, as well

as to organ systems such as the blood and the immune system. This damage is extensive and

severe, including permanent damage to the walls and air sacs of their lungs, leaving debris in the

lungs and causing the walls of lung capillaries to thicken so that they are less able to transfer

oxygen going forward.

---

[8] CDC COVID-19 Response Team: Morbidity and Mortality Weekly Report, "Preliminary Estimates of
the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019
— United States, February 12–March 28, 2020."
[9] USA Today, New data on New York coronavirus deaths: Most had these underlying illnesses; 61% were
men https://www.usatoday.com/story/news/health/2020/04/07/new-york-coronavirus-deaths-data-shows-
most-had-underlying-illnesses/2960151001/ (Apr. 7, 2020)

### III.    Public Health and Safety Measures to Protect Against COVID-19

45.    The only way to prevent complications and enormous risk to medically vulnerable people is to prevent them from becoming infected.  The CDC and other public health agencies have universally prescribed widespread testing, social distancing, rigorous hygiene and sanitation, personal protective equipment, and quarantining as the only ways to meaningfully mitigate the spread of this virus.

46.    The CDC has issued a guidance that gatherings of more than 10 people must not occur.  People in congregate environments, which are places where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19, as evidenced by the rapid spread of the virus in cruise ships and nursing homes.  The CDC also warns of "community spread" where the virus spreads easily and sustainably within a community where the source of the infection is unknown.

47.     A "stay at home" executive order for all residents, which became effective starting March 21, 2020, remains in effect statewide at least through May 29, 2020.  All non-essential businesses and operations have shut down.  People are allowed to leave their homes only for essential activities.  Any gathering larger than 10 people is prohibited, and people are required by law to stay at least six feet away from others, or if they cannot, to wear a mask.  Governor Pritzker has admitted that these steps are necessary "to avoid the loss of potentially tens of thousands of lives" at the strong recommendation of "some of the best medical experts, epidemiologists, mathematicians, and modelers" available.

48.    Medical and public health experts agree that the critical steps to control the spread of the virus include widespread testing for those with signs or symptoms of COVID-19, and those who have been exposed to a person with COVID-19; unrestricted access to soap and hand

11

sanitizer; unrestricted access to EPA-registered disinfectant and/or bleach mixture with at least

one-third bleach per gallon of water, as well as paper towels or clean cloths to permit frequent

sanitation of surfaces; sanitation of common-use surfaces between each use; personal protective

equipment (PPE), including masks and gloves; and social distancing.

49.     On May 5, 2020, a five-phase plan was announced to inform the public how the

State of Illinois might begin to loosen restrictions on the stay-at-home order.  Governor Pritzker

has made clear, however, that the state of the emergency throughout Illinois still requires social

distancing, even at businesses that are permitted to reopen.  The five-phase plan further

establishes that wider reopenings cannot begin until the rate of infection among those tested, the

number of patients admitted to the hospital, and the number of patients needing ICU is stable or

declining.  There is currently no area in the State of Illinois that meets this threshold.

### IV.     Class Members Face Increased Risk of Harm Due to Their Placement in IDOC Facilities Where Public Health and Safety Measures Cannot be Effectively Implemented

50.     None of the imperative measures for mitigating the spread of COVID-19 are

available for Class Members and those who must interact with them.  Correctional facilities are

inherently congregate environments, where large groups of people live, eat, and sleep in close

contact with one another.  It is difficult if not impossible to achieve social distancing standards in

these settings.[10]  Therefore infectious diseases, particularly airborne diseases like COVID-19, are

more likely to spread rapidly between individuals in correctional facilities.[11]

51.     COVID-19 is a particularly contagious disease because the virus can survive for up

to three hours in the air, four hours on copper, up to twenty-four hours on cardboard, and up to

---

[10]  Greifinger Aff., Exhibit 1; Haney Decl., Exhibit 3.
[11]  Beyrer Aff., Exhibit 4; Meyer Decl., Exhibit 2.

two to three days on plastic and stainless steel. A study of an early cluster of COVID-19 cases in Wuhan, China revealed the dangers of indirect transmission resulting from infected people contaminating common surfaces—in the study, it was a communal mall bathroom. These unique characteristics of COVID-19 make it particularly dangerous in prisons where many of the common surfaces are plastic, plexiglass, and steel, and where large numbers of people share communal bathrooms and other communal spaces.

52.     The risk of contracting an infectious disease like COVID-19 is also higher in correctional facilities because the facilities are not sanitary environments. People share toilets, sinks, and showers, and have limited access to soap, hand sanitizer, hot water, and other necessary hygiene items. Surfaces are infrequently washed, if at all, and cleaning supplies and towels are in short supply.[12] As such, people, including Class Members, who are medically vulnerable are congregated together in a setting where fighting the spread of COVID-19 is nearly impossible.

53.     Like prior outbreaks in correctional facilities, such as tuberculosis, influenza, and MRSA, COVID-19 has also readily spread in prisons, in part because people cannot engage in proper hygiene and sanitation, wear necessary PPE, and/or adequately distance themselves from infected residents or staff. [13]

54.     Dr. Craig Haney, a correctional health expert, explains that prisoners are "unusually vulnerable to stress-related and communicable diseases. Formerly incarcerated persons suffer higher rates of certain kinds of psychiatric and medical problems. Incarceration leads to higher rates of morbidity (illness rates) and mortality (i.e., it lowers the age at which people die)."[14]

---

[12] Greifinger Aff., Exhibit 1; Meyer Decl., Exhibit 2; Beyrer Decl., Exhibit 4; Haney Decl., Exhibit 3.
[13] Beyrer Decl., Exhibit 4.
[14] Haney Aff., Exhibit 3.

55.     Additionally, many correctional facilities lack an adequate medical care infrastructure to address the spread of infectious disease, like COVID-19, and treat high-risk people in custody.[15]  Prison health units are not equipped with sufficient emergency medical equipment, such as oxygen tanks, nasal cannulae, and oxygen face masks, to respond to an outbreak of patients with respiratory distress.  For these reasons, among others, experts have warned that rampant transmission of COVID-19 in correctional facilities is likely to result in a disproportionately high mortality rate.  Prisons and jails rely on outside community hospitals to provide more advanced and intensive medical care, but many of these community hospitals are already at or near capacity, due in part to COVID-19 patients not in prison.[16]

56.     Prisons are not closed environments.  By necessity, members of the free community, including correctional officers, social workers, medical personnel, and many others must enter and leave IDOC prisons on a daily basis.  Correctional staff arrive and leave each facility three times a day in large numbers, and there is little to no ability to adequately screen staff for new, asymptomatic infection.  When the COVID-19 virus occurs and spreads within an IDOC prison, all persons, staff and prisoners alike, are at heightened risk of contracting the virus and, in turn, spreading the virus to others with whom they come in contact in their own homes and neighborhoods.[17]

57.     IDPH Director Dr. Ngozi Ezike has expressly acknowledged the present danger facing prisons throughout the State of Illinois, predicting that once the virus enters an IDOC prison it would spread quickly with a high rate of infection.

---

[15]  Greifinger Aff., Exhibit 1; Meyer Decl., Exhibit 2.
[16]  Meyer Decl., Exhibit 2.
[17]  Greifinger Aff., Exhibit 1.

58.     On March 30, 2020, following the first death of a COVID-19 patient at Stateville, Dr. Ezike again acknowledged the heightened risk posed by correctional settings and the inability to conform them to public health standards:

> Congregate settings such as Stateville, any other correctional center, pose unique challenges in stopping the spread of disease and protecting the health of individuals who live and work there.  Those who are incarcerated obviously live and work and eat and study and recreate all within that same environment, heightening the potential for COVID-19 to spread really quickly once it's introduced.

> The options for isolation of COVID-19 cases are limited in this focused setting and it becomes very difficult depending on the size of the facility and the population that's already in the facility.  Ideally, all cases should be isolated individually and close contact should be quarantined individually.  I know our partners at the Department of Corrections are working innovatively to try to create the best situations for these, for these facilities. But some facilities and correctional centers do not have enough individual cells, and so we are considering isolating multiple laboratory confirmed COVID-19 cases together as a group, or quarantining close contacts of a particular case together as a group.[18]

59.     The Governor has likewise acknowledged in multiple executive orders both that Plaintiffs and the putative class are at higher risk of experiencing more severe outcomes from COVID-19, and that Plaintiffs and the putative class are especially vulnerable to contracting and spreading COVID-19.  Nonetheless, neither the Governor nor the IDOC Director have in fact taken any action to protect the medically vulnerable Plaintiffs or the putative class.

60.     As Plaintiffs' experiences described below demonstrate, health and safety measures imperative to protecting against COVID-19 have not been implemented in IDOC prisons.

61.     Illinois prisons are an outlier in the country.  All of Illinois's maximum security prisons were built before 1930.  IDOC medium security prisons were mostly built during the 1980s. Illinois's newest prison is Lawrence, which opened in 2001.  The older prisons, and

---

[18] Daily COVID-19 Press Briefings, Ill. Dept. of Pub. Health, http://www.dph.illinois.gov/topics-services/diseases-and-conditions/diseases-a-z-list/coronavirus/media-publications/daily-press-briefings?page=6.

particularly the maximum security prisons, were built at a time when corrections operated very differently. They are labor intensive (for example, cell doors cannot be remotely controlled—each has to be opened individually by a guard). They were designed with large congregate spaces—expansive dining halls designed to hold hundreds of prisoners, large gyms, and recreation spaces designed to be used by several hundreds of prisoners at a time.

62.     Many of Illinois's nine minimum security prisons include large dormitory housing. The medium and maximum security prisons house prisoners in cells on galleries, often housing several hundred people on each gallery, in two-person cells, with a shared dayroom and showers. The vast majority of cells are occupied by two (or more) people, even in the solitary confinement units.

63.     Air circulation in these IDOC prisons is also antiquated. Nearly all were built without modern heating and air conditioning. The oldest prisons rely on systems designed to pull air from the galleries into the cells (positive air pressure). These systems actually *increase* the spread of aerosols and droplets (including aerosolized and droplet forms of COVID-19) as they affirmatively press the air from common spaces into the cells of Class Members and other prisoners. In the summer, because the prisons are not air conditioned, large industrial fans are often placed on a gallery, blowing air around the unit, further enhancing the positive air pressure that flows into cells.

64.     When people are moved out of their cell houses, they are moved in large groups (called lines). This includes movement to attend law library, recreation, and dining hall, and to receive medication. Since COVID-19, many prisons are now delivering meals to housing units, which requires close personal contact with guards who deliver the trays, moving from cell to cell, with a high risk of cross contamination.

65.      Surfaces and objects throughout IDOC facilities are used by numerous people, both prisoners and staff, throughout each day, including for example phones, tables, shower fixtures, and cell doors.  For meal distribution, including during medical quarantine, multiple staff and prison workers are involved in preparing the food and meal tray, as well touching the tray in the process of delivering it through the facility, into the housing unit, and finally into the cell or dorm.  In some facilities, for prisoners to enter or exit their cells, their cell door, chuckhole, and sometimes handcuffs on their bodies have to be physically handled by staff.

66.      At some facilities, when prisoners need to be moved out of their cells, they are often held with other prisoners in a small holding cell at the front of the unit—often holding 10 or more prisoners in a very small space.  Upon information and belief, even during the height of the outbreak at Stateville, the staff continued these practices, particularly holding groups of prisoners in the small holding cells for regular "shakedowns" and searches of the unit's cells.

67.      Many areas of Illinois's prisons are designed for clustering of staff or prisoners in ways that do not allow for social distancing.  Examples include small sally ports through which staff pass at shift changes and "bubbles" and office space where security staff congregate.

68.      Under these conditions, there is no ability to prevent surfaces from becoming cross-contaminated.

**V.      IDOC's Placement of Medically Vulnerable Plaintiffs Puts Them At Unacceptable Risk of Significant Harm**

69.      William Richard (M52774) is 66 years old and lives in the Health Care Unit at Dixon Correctional Center.  Mr. Richard has less than 3 months left on his sentence. Mr. Richard uses a wheelchair for movement and has chronic obstructive pulmonary disease (COPD), emphysema, and heart conditions, which place him at exponentially higher risk of medical

complications and death if he contracts COVID-19. His respiratory conditions require the use of continuous oxygen and a breathing treatment two to three times per day.

70.     Because IDOC considers his oxygen tank to be a security hazard (if he were located among the general population), he is housed in the Health Care Unit, where he shares his roughly 12 feet by 15 feet cell with three other individuals, making social distancing impossible—his bunk is less than five feet from his cellmate's bunk, and all four men share a toilet, sink, and the chuckhole through which they receive their meals.

71.     Mr. Richard has less than three months remaining on his sentence, but IDOC has refused to transfer him to home detention or to release him. In contrast to his placement at Dixon, he could reside and quarantine safely in his family home. He also has long-time medical care providers in his home community who are able to continue and manage his ongoing medical treatment. IDOC has identified Mr. Richard as medically vulnerable to COVID-19, and is aware that he has a family home awaiting him, but has not transferred him there via either medical furlough or electronic detention. Mr. Richard is eligible for medical furlough under the statute and Executive Order; however, IDOC will not consider him under the new, more restrictive procedures. IDOC's continued placement of Mr. Richard puts him at increased risk of contracting COVID-19.

72.     Gerald Reed (N32920) is 57 years old and is housed at the Northern Reception Center ("NRC"), where there have been 37 confirmed staff cases of COVID-19 and one confirmed prisoner case. Mr. Reed has heart failure, hypertension, and is pre-diabetic. Mr. Reed uses a wheelchair for mobility because of a decades-old leg injury that adversely affects his mobility. Within the last year, Mr. Reed has been hospitalized for a heart attack and for pneumonia. Mr. Reed recently experienced symptoms consistent with COVID-19—he was

fatigued, had headaches, and was vomiting blood. However, despite exhibiting these symptoms, IDOC did not test him for the virus.

73. At the NRC, Mr. Reed is prohibited from accessing commissary and is only provided a single, small bar of soap each week. Mr. Reed has a pending petition for executive clemency.

74. If released, Mr. Reed would return to live with his niece, who has space to allow him to safely quarantine and the ability to provide him with any necessary medical care. Mr. Reed is eligible for medical furlough under the statute and Executive Order; however, IDOC's new medical furlough procedures exclude him even though he uses a wheelchair, is severely ill, and is at high risk for medical complications and/or death should he contract COVID-19. IDOC's continued placement of Mr. Reed puts him at increased risk of contracting COVID-19.

75. Tewkunzi Green (R84568) is 38 years old and is housed at Logan Correctional Center, where there have been four confirmed staff cases of COVID-19 and one confirmed prisoner case. Ms. Green has a pending commutation petition, which was filed by the January 23, 2020 filing deadline; her hearing date of April 7, 2020 was postponed and she is now being scheduled for a non-public hearing. She has asthma and severe hypertension for which she takes multiple medications. In January 2019, she fainted related to hypertension and was held in the cardiology unit of an off-site hospital for several days.

76. At Logan, Ms. Green shares a room with three other women, which makes it impossible for her to practice social distancing.

77. Ms. Green has a stable housing plan; her mother, who owns her own home in Peoria, Illinois, where she also cares for Tewkunzi's 13-year-old son, is willing and able to receive Ms. Green at any time. Ms. Green is eligible for medical furlough under the statute and

19

Executive Order; however, IDOC will not consider her under the new, more restrictive procedures. IDOC's continued placement of Ms. Green puts her at increased risk of contracting COVID-19.

78.     Danny Labosette (B23629) is 56 years old and is housed at Robinson Correctional Center in Robinson, Illinois. Mr. Labosette has less than six months remaining on his sentence. Mr. Labosette is a double amputee; his left leg has been amputated above the knee, and his right foot has been amputated. Mr. Labosette uses a wheelchair. Mr. Labosette also has untreated Hepatitis C.

79.     Mr. Labosette is housed in the Transitions Unit, a treatment facility within Robinson. Social distancing is impossible for Mr. Labosette—he resides in a dorm with roughly 20 other men. He sleeps in the bottom bunk of a bunk bed, which is 3 feet away from the neighboring beds.

80.     Mr. Labosette has a stable housing plan in place for when he is released: he will live with his mother at her home in Florida, which has already been modified to accommodate his disabilities. Mr. Labosette is eligible for medical furlough under the statute and Executive Order; however, IDOC's new medical furlough procedures exclude him even though he is a double amputee who uses a wheelchair. IDOC's continued placement of Mr. Labosette puts him at increased risk of contracting COVID-19.

81.     Carl "Tay Tay" Tate (R12529) is a 40-year-old transgender woman diagnosed with Gender Dysphoria who is housed at Danville Correctional Center, where there has been one confirmed staff case of COVID-19. Ms. Tate has almost six years left of her sentence to serve, but has a pending clemency petition which has the support of 40 organizations across the state. Ms. Tate has been diagnosed as prediabetic and lives with hypertension, for which she takes

medication.  Ms. Tate also lives with severe anxiety, and the COVID-19 outbreak has only increased her anxiety.  An IDOC doctor recently increased Ms. Tate's medication because her blood pressure is too high.

82.     It is impossible for Ms. Tate to practice social distancing in her living situation. Ms. Tate shares a small cell with one other person. She and her cellmate sleep on bunk beds and only one person can move around comfortably in the cell at a time.  Even with current limits on the number of people in the unit who are allowed out of their cells to use the communal dayroom for 30 minutes a day, Ms. Tate estimates that around eight to ten people may be in the dayroom at a time.  She estimates that around 75 to 80 people at a time may be in the yard for 30 minutes a day.  She also estimates that around 24 people at a time come out of their cell three times a day to line up to get their food trays, which are plastic and often handed out by either inmates or officers who do not wear gloves.  Around 20 people at a time come out of their cell to line up to receive their medication.  Ms. Tate has also observed officers frequently congregating in the core or in the bubble of her housing wing, not practicing social distancing.  Additionally, Ms. Tate works as a laundry porter, which places her in frequent contact with other prisoners and staff and their clothing.  She has asked for gloves to use, and has been denied.  She has also asked for more cleaning supplies to clean the dayroom, including the phones, and has been denied.  The phones in the day room are not properly cleaned after each person uses them.  The showers are also not cleaned after each use.  Officers often do not wear their masks or gloves.  Officers consistently pass out mail to prisoners without wearing gloves.  Ms. Tate asked to be tested for COVID-19, and she was denied because she did not have flu-like symptoms or a fever.  Ms. Tate is aware that other prisoners have also asked to be tested and all were denied testing.

83.     Ms. Tate has a stable housing plan in place for when she is released: she will live with her sister, who resides in Lansing, Illinois.  Ms. Tate is eligible for medical furlough for ongoing care that IDOC cannot currently provide, but IDOC will not consider her under the new, more restrictive procedures.  IDOC's continued placement of Ms. Tate puts her at increased risk of contracting COVID-19.

84.     Brittany Hill (Y38532) is 25 years old and is confined at Logan Correctional Center, where there have been four confirmed staff cases of COVID-19 and one confirmed prisoner case.  Her Mandatory Supervised Release date is in August 2020.  Ms. Hill has severe asthma and since the COVID-19 epidemic began, medical staff have been slower than usual responding to her requests for an inhaler and for the medications she takes for her mental illness. Because of her medical condition, Ms. Hill is at heightened risk of serious illness or death should she contract COVID-19.

85.     Ms. Hill lives in a cell that is approximately 15 feet by 10 feet with two other women.  Physical distancing is impossible in her cell.  Social distancing is also impossible when she uses the phone, receives her food, and uses the bathroom.  In late April 2020, one of Ms. Hill's cellmates spent days with high fevers and chills; Ms. Hill acted as her caregiver while she was sick by providing her with extra sheets, Tylenol, and water.  Even though Ms. Hill's cellmate demonstrated symptoms of COVID-19, IDOC officials failed to provide Ms. Hill with adequate cleaning supplies to keep her living areas disinfected and sanitary.  To this day, Ms. Hill's cell has not been disinfected, and officers at Logan fail to use personal protective equipment consistently.

86.     Ms. Hills has a stable housing plan in place for when she is released: she will live with her mother, who resides in Rockford, Illinois.  Ms. Hill is eligible for medical furlough for ongoing care that IDOC cannot currently provide, but IDOC will not consider her under the new,

more restrictive procedures. IDOC's continued placement of Ms. Hill puts her at increased risk of contracting COVID-19.

87.     Kimberly Carter (K94361) is 47 years old and is confined at Logan Correctional Center, where there have been four confirmed staff cases of COVID-19 and one confirmed prisoner case. She lives with Bone Marrow disease and as a result is highly susceptible to infections. Prior to the COVID-19 pandemic, Ms. Carter was enrolled in school where she was earning good time credits. Her classes have now been canceled and she has been denied the opportunity to earn good time. As a result, she will spend more than three additional months in IDOC custody.

88.     Ms. Carter cannot physically distance herself from her cellmate, nor can she physically distance herself from other women. Ms. Carter is housed in a two-person cell. In the bathroom, the toilets are very close to each other and women cannot physically distance while using the restroom. Additionally, the entire living unit uses the same common resources, and none of the points of contact are regularly sanitized. Up until recently, the women were in close contact when they ate meals, when they were in the day room, and when they were in the yard. IDOC officials fail to provide Ms. Carter with the supplies required to disinfect and sanitize her cell and living areas. She receives two small bars of soap per week and no hand sanitizer. She is thus unable to adequately protect herself from the risk of COVID-19.

89.     Ms. Carter has a stable housing plan in place for when she is released: she will live with her daughter who resides in Chicago, Illinois. Ms. Carter is eligible for medical furlough under the statute and Executive Order; however, IDOC will not consider her under the new, more restrictive procedures. IDOC's continued placement of Ms. Carter puts her at increased risk of contracting COVID-19.

90.     Lori Thompson (Y38234) is 57 years old and is confined at Logan Correctional Center, where there have been four confirmed staff cases and one confirmed prison case of COVID-19.  She has serious asthma and has been hospitalized with pneumonia twice during the past two years.

91.     Ms. Thompson is housed in a four-person cell, where it is impossible to physically distance.  She has no access to the supplies necessary to adequately sanitize her living areas. Officers use personal protective equipment inconsistently, and she has repeatedly received her food tray from an officer who was not wearing gloves or a mask.

92.     Ms. Thompson has a stable housing plan in place for when she is released: she will live with her mother who resides in Illinois.  Ms. Thompson is eligible for medical furlough under the statute and Executive Order, but IDOC will not consider her under the new, more restrictive procedures.  IDOC's continued placement of Ms. Thompson puts her at increased risk of contracting COVID-19.

93.     Kimberly Dunteman (Y41252) is 50 years old and is confined at Logan Correctional Center in Lincoln, Illinois, where there have been four confirmed staff cases of COVID-19 and one confirmed prisoner case.  Ms. Dunteman has anxiety and chronic bronchitis and has had multiple severe cases of pneumonia, including a case in September 2019 that required hospitalization.  Approximately three to four weeks ago, Ms. Dunteman became extremely ill, coughing and feeling both chilled and feverish.  Ms. Dunteman was put on a sick call list, but by the time a nurse practitioner came to see her, her fever had broken.  The nurse practitioner told Ms. Dunteman that nothing could be done because she did not have a fever, and gave her only Tylenol for her symptoms.  After some delay, Ms. Dunteman was seen again on sick call, but was told that nothing could be done and that she could not be tested for COVID-19 because she did

not have a fever. Ms. Dunteman continues to suffer from a cough, and her health condition, as well as the conditions of lockdown, have exacerbated her anxiety.

94. Ms. Dunteman shares a cell with three other women and has been unable to socially distance, even when she was severely ill. Ms. Dunteman was not quarantined away from her cellmates, who in fact helped care for her during her illness. Ms. Dunteman has not been provided with adequate cleaning supplies for her room, and phones are not cleaned between uses. The use of masks and gloves by correctional officers remains inconsistent, and Ms. Dunteman must stand only inches away from correctional officers in order to communicate with them at the cell door. Social distancing is also impossible in the bathroom, as toilets are right next to each other, and other conditions like standing water in the showers and mold on the shower curtains raise further sanitation concerns.

95. Ms. Dunteman has a stable housing plan if she is released: she would live with her fiance in Joliet, Illinois. Ms. Dunteman is eligible for medical furlough under the statute and Executive Order, but IDOC will not consider her under the new, more restrictive procedures. IDOC's continued placement of Ms. Dunteman puts her at increased risk of contracting COVID-19.

96. Lynwood Ellis (Y40094) is 62 years old and is confined at Stateville Correctional Center, which has had 154 confirmed prisoner cases and 75 confirmed staff cases of COVID-19. Mr. Ellis's MRS date is in December 2021. Prior to the pandemic, Mr. Ellis was approved for work release. Mr. Ellis has high blood pressure for which he takes medication. Mr. Ellis has not received any type of testing for COVID-19.

97. Mr. Ellis is housed in a dormitory-style environment where it is impossible to physically distance. Each dormitory room is approximately the size of a basketball court, and

houses 40 people in bunk beds with communal bathrooms.  People living in the dormitory can freely go to the day room, where they can walk around or sit at tables together in close proximity, there is no limit to how many people can be in the day room together.  Mr. Ellis has not been provided any cleaning materials nor personal soap.  Mr. Ellis also works in the kitchen every day with 20 other workers serving food, washing dishes, and cleaning, and is given gloves and masks for working in the kitchen.

98.     Mr. Ellis has a stable housing plan in place: with his wife who resides in Aurora, Illinois, a home site that has already been approved by IDOC.  Mr. Ellis is eligible for medical furlough under the statute and Executive Order, but IDOC will not consider him under the new, more restrictive procedures.  IDOC's continued placement of Mr. Ellis puts him at increased risk of contracting COVID-19.

99.     Danny Wicker (N91831) is 50 years old and is confined at Northern Reception Center ("NRC"), where there have been 37 confirmed staff cases of COVID-19 and one confirmed prisoner case.  Mr. Wicker suffers from hypertension, for which he takes medication. There have been times during the pandemic where IDOC has been delayed in refilling his medication.  Prior to his incarceration, Mr. Wicker's doctor informed him that he may have kidney damage, and he required a follow-up appointment with a specialist.  When Mr. Wicker entered IDOC custody in February 2020, he informed IDOC about his kidney issues during his medical intake, but he has yet to see a doctor about this.

100.     Mr. Wicker lives in a small cell with one other person where it is impossible to socially distance.  He is locked in his cell all day, and is only let out four times a week to shower. The officers let out large groups of people at a time to shower, and Mr. Wicker has to wait in the bullpen with 20 to 30 other people until it is his turn to shower.  The showers are not clean and

have not been cleaned since Mr. Wicker arrived at NRC. Mr. Wicker gets one bar of soap each week, which he has to use to clean himself, his clothes, and his cell. He has only been given a broom to clean his cell; he has not received any bleach. Mr. Wicker receives his plastic food tray through the chuckhole, and not all the officers who pass out trays wear gloves. Many officers do not wear their masks or gloves. Officers allow prisoners to use the phone by bringing the phone to each cell, but they do not clean the phones before passing them to the next prisoner.

101.     Mr. Wicker has a stable housing plan in place for when he is released: he will return to live with his wife at their home in Wheeling, Illinois. Mr. Wicker is eligible for medical furlough for ongoing care that IDOC cannot currently provide, but IDOC will not consider him under the new, more restrictive procedures. IDOC's continued placement of Mr. Wicker puts him at increased risk of contracting COVID-19.

102.     Plaintiff Adam Grunin (Y41727) is 32 years old and is confined at the Northern Reception and Classification Center (NRC), where there have been 37 confirmed staff cases of COVID-19 and one confirmed prisoner case. Mr. Grunin has epilepsy, sleep apnea, and chronic bronchitis that makes him vulnerable to pneumonia. Mr. Grunin has experienced weeks-long delays in receiving his epilepsy medication, and has not been given a CPAP machine for his sleep apnea. These lapses in medication, poor sleep due to sleep apnea, and the stress and anxiety of the COVID-19 pandemic and being confined to his cell for 24 hours a day have led Mr. Grunin to suffer from six seizures in the past month.

103.     Mr. Grunin is housed in a small cell with one other person and is unable to socially distance. Mr. Grunin spends 24 hours a day in his cell, and is only let out two to three times per week to shower. It is impossible to socially distance in the group shower, where prisoners are only two feet apart. Mr. Grunin is given a rag with bleach on it only once a week to clean his cell,

and phones are not sanitized between uses. Mr. Gruin has been given only two masks, and has been using the same mask for about a month and a half. Correctional officers do not consistently wear masks, and frequently congregate with one another, failing to maintain a distance of six feet from one another and from prisoners.

104. Mr. Grunin has a stable housing plan in place for when he is released: he will live with his mother in Morton Grove, Illinois. Mr. Grunin's Mandatory Supervised Release date is in July, and he has already submitted his mother's address as a parole site. Mr. Grunin is eligible for medical furlough under the statute and Executive Order; however, IDOC will not consider him under the new, more restrictive procedures. IDOC's continued placement of Mr. Grunin puts him at increased risk for contracting COVID-19.

105. Andrew Hines (K75292) is 39 years old and is confined at Jacksonville Correctional Center, where there has been one confirmed staff case of COVID-19. Mr. Hines has less than five months left on his sentence. Mr. Hines suffers from hypertension, and medical staff is not performing regular checks of his blood pressure. Mr. Hines also has a lump in his groin that has returned after a 2012 surgery to remove a cyst in his groin. The lump is painful and has been growing rapidly, from the size of a bb to the size of a marble in a month and a half. Mr. Hines was told in late April that he needed an ultrasound to check the lump, but the facility has not sent him out for the test due to COVID-19.

106. Mr. Hines is housed in a dormitory-style setting that makes it impossible to physically distance. There are 100 prisoners per dormitory, with 20 double-bunked individuals in each 20 foot by 27 foot room. The bunk beds are about three feet apart. When someone shows symptoms of COVID-19, they are not removed from the wing; rather the entire side of the wing is quarantined together with the potentially sick individual.

28

107.    Mr. Hines has a stable housing plan in place for when he is released: he will live with his son, who resides in Springfield Illinois (this housing plan has already been approved by IDOC).  Mr. Hines is eligible for medical furlough under the statute and Executive Order; however, IDOC will not consider him under the new, more restrictive procedures.  IDOC's continued placement of Mr. Hines puts him at increased risk of contracting COVID-19.

108.    Antwan Freeman (K97905) is 38 years old and is confined at Jacksonville Correctional Center, where there has been one confirmed staff case of COVID-19.  Mr. Freeman is currently scheduled for Mandatory Supervised Release in October 2020.  In February, Mr. Freeman was approved for a work-release program close to his home that would allow him to have an outside job and take 48-hour passes home to see his family.  Despite being approved for this release program, Mr. Freeman has not been transferred to the work-release facility because Jacksonville Correctional Center has been on lockdown since February, first due to an influenza outbreak and now due to COVID-19.  Mr. Freeman has asthma and hypertension, takes blood pressure medication, and has an inhaler.

109.    Mr. Freeman is housed in a dormitory setting that makes physical distancing impossible.  Despite a staff member recently testing positive for COVID-19, correctional officers at Jacksonville do not always wear their masks and continue to congregate in groups outside of the housing unit and in the chow hall.  After the staff member tested positive, a few prisoners asked to be tested but were denied tests because they did not have a high enough fever.

110.    Mr. Freeman has a stable housing plan in place for when he is released: he will return home to live with his wife and children.  Mr. Freeman is eligible for medical furlough under the statute and Executive Order; however, IDOC will not consider him under the new, more

restrictive procedures.  IDOC's continued placement of Mr. Freeman puts him at increased risk of contracting COVID-19.

111.    Carlton White (B20358) is 46 years old and is confined at Jacksonville Correctional Center, where there has been one confirmed staff case of COVID-19.  Mr. White has hypertension, sleep apnea, and a heart condition.  He uses a CPAP machine for his sleep apnea, which may increase his vulnerability to the coronavirus.  Prior to his incarceration, he underwent heart surgery, and he has recently started having chest pains that cause shortness of breath.  While facility medical staff have indicated that Mr. White needs to see an outside cardiologist for his chest pain, this visit still has not taken place, presumably because of COVID-related lockdown.

112.    Mr. White lives in a dorm-room with 19 other individuals at Jacksonville Correctional Center.  He shares a bunk with another prisoner in a room with 4 other bunk beds, all spaced about three feet apart.  Prison staff do not wear their face masks at all times.  Hand soap is only passed out once every week or two.

113.    Mr. White has a stable housing plan in place for when he is released: he will live with his wife, who resides in Alton, Illinois.  Mr. White is eligible for medical furlough for ongoing care that IDOC cannot currently provide, but IDOC will not consider him under the new, more restrictive procedures.  IDOC's continued placement of Mr. White puts him at increased risk of contracting COVID-19.

114.    Shardon Gay (R09017) is 38 years old and is confined at Danville Correctional Center, where there has been one confirmed case of COVID-19.  Mr. Gay has asthma, anxiety, and is overweight.  His asthma is frequently exacerbated by colds or allergies.  Indeed, he has had cough symptoms for 3-4 weeks without being tested.  He also has experienced heightened anxiety due to being locked down for 23.5 hours per day, resulting in panic attacks and shortness of

breath. Since the COVID-19 response began in mid-March, Danville Correctional Center has stopped providing nebulizer treatments for prisoners with breathing conditions, including Mr. Gay, possibly due to fear about aerosoling the virus.

115. Mr. Gay lives in a two person cell that is approximately 8 feet by 10 feet. His meals are delivered to his cell by prisoner workers who rarely wear masks or gloves. Mr. Gay is allowed out of his cell for only 1 hour a day for 30 minutes in the day room with approximately 10 other people and for 30 minutes for yard with approximately 100 other people, most of whom congregate around the phone banks.

116. Mr. Gay has a stable housing plan in place for when he is released: he will live with his mother who resides in Rockford, Illinois. Mr. Gay is eligible for medical furlough for ongoing care that IDOC cannot currently provide, but IDOC will not consider him under the new, more restrictive procedures. IDOC's continued placement of Mr. Gay puts him at increased risk of contracting COVID-19.

117. Eric Valdez (Y38189) is 31 years old and is incarcerated at Vienna Correctional Center. Mr. Valdez has less than a year remaining on his sentence. Mr. Valdez has hypertension and a liver disorder. Mr. Valdez is prescribed high blood pressure medication, but did not receive his medication for a month and a half after Vienna went on lockdown due to the pandemic..

118. At Vienna, Mr. Valdez is bunked with another cellmate in a cell that does not have its own bathroom—rather, Mr. Valdez and his cellmate must share a communal bathroom with the 40 other individuals that live in their wing of the housing unit. In the wing's dayroom, prisoners continue playing cards at communal tables and are not practicing social distancing, despite being unable to go to yard for fresh air. The staff at Vienna wear their face masks when their supervisors are present—otherwise, the masks hang below their chins. Staff continue to

congregate in groups right outside the housing unit. Despite several individuals showing cold symptoms in the last few weeks, none were moved off the unit.

119. Mr. Valdez has a stable housing plan in place for when he is released: he will live with his mother, who resides in Chicago, Illinois. Mr. Valdez is eligible for medical furlough for ongoing care that IDOC cannot currently provide, but IDOC will not consider him under the new, more restrictive procedures. IDOC's continued placement of Mr. Valdez puts him at increased risk of contracting COVID-19.

120. Anthony Buchanan (M45778) is 47-years old and is incarcerated at Vienna Correctional Center. He has a year and a half left on his sentence, but has not been able to participate in any good-time programming for which he would otherwise qualify because all the programming is suspended due to the pandemic shut down. He has asthma, anxiety, and hypertension. Being locked down without outside recreation exacerbates his anxiety and causes him shortness of breath, which then triggers his asthma symptoms. As a result, he uses an inhaler two to three times every day.

121. Mr. Buchanan shares a cell with one other person and a communal bathroom with 41 other individuals on his wing. He only receives 30 minutes of outdoor recreation time a day and is otherwise confined to his cell block. Both the prisoners and staff congregate in the unit's day room on a regular basis.

122. Mr. Buchanan has a stable housing plan in place for when he is released: he will live with his mother, who resides in Lawler, Illinois. Mr. Buchanan is eligible for medical furlough for ongoing care that IDOC cannot currently provide, but IDOC will not consider him under the new, more restrictive procedures. IDOC's continued placement of Mr. Buchanan puts him at increased risk of contracting COVID-19.

123.    Willie Holloway (M45996) is 26-years old and is incarcerated at Pinckneyville

Correctional Center.  Mr. Holloway has just six months remaining until his Mandatory Supervised

Release date.  He has asthma, a seizure disorder, and serious mental illness.  He uses an inhaler

and typically takes nightly breathing treatments, but medical staff have not been providing his

breathing treatments for the last few weeks.  His asthma attacks are so severe to have required

hospitalization in the past.

124.    At Pinckneyville, prisoners are unable to keep a minimum of six feet between

them.  Mr. Holloway is housed in segregation, where he must share a cell with another prisoner.

If he attends yard, he must share a small segregation yard cage with three other prisoners who are

not able to maintain six feet of distance.  Staff continue to congregate in the "bubble" in the cell

house and in other areas throughout the facility, often with their masks pulled down under their

chins rather than covering their faces.

125.    Mr. Halloway has a stable housing plan in place for when he is released: he will

live with family in Illinois.  Mr. Halloway is eligible for medical furlough for ongoing care that

IDOC cannot currently provide, but IDOC will not consider him under the new, more restrictive

procedures.  IDOC's continued placement of Mr. Halloway puts him at increased risk of

contracting COVID-19.

126.    Tim Walton (K95244) is 41-years old and has been incarcerated at the Graham

Classification and Reception Center since February 28, 2020.  He is within six months of his

Mandatory Supervised Release date.  Mr. Walton has high blood pressure and suffers from

depression and anxiety.  He receives medications for all of these conditions, however, almost

daily, there is something missing from his medication—often his blood pressure medication.  Mr.

Walton has difficulty accessing medical care at Graham, as it often takes up to 5 days for an

appointment to be scheduled after a sick call request. Being locked down and in his cell almost 23 hours a day has made his depression and anxiety worse.

127.     Mr. Walton lives with a cellmate in a space in which it is impossible to socially distance. Three days a week he receives about 5 minutes to shower in the unit's communal showers. He only receives approximately one hour a day outside of his cell for either dayroom or yard with approximately 12 other prisoners. Mr. Walton's meals are delivered to his cell by prisoner workers who do not wear masks or gloves. Staff only wear masks when under supervision and 5-6 staff people regularly congregate in the "bubble" talking and playing cards. While Graham was taking people's temperatures for a few days in March, that practice ended in April and May.

128.     Mr. Walton has a stable housing plan in place for when he is released: he will live with his mother, who resides in Macomb, Illinois. Mr. Walton is eligible for medical furlough for ongoing care that IDOC cannot currently provide, but IDOC will not consider him under the new, more restrictive procedures. IDOC's continued placement of Mr. Walton puts him at increased risk of contracting COVID-19.

129.     Adrian Torres (Y38227) is 41 years old and is incarcerated at Sheridan Correctional Center, where there have been thirteen confirmed prisoner and seven confirmed staff cases of COVID-19. He has a year left on his sentence. Mr. Torres has diabetes, high blood pressure and suffers from sleep apnea requiring the use of a CPAP machine. He has not received new CPAP supplies in the past 9 months, which results in an increased risk of infection from unmaintained equipment. Mr. Torres also has anxiety for which he takes medications. Due to the current pandemic and increased isolation, his anxiety has gotten worse over the past several

months, but he has not received any increased mental health treatment.  Mr. Torres has not been offered a COVID-19 test.

130.    Mr. Torres is single celled and only leaves his cell for 30 minutes three times a week to shower or use the phone.  He has not had any meaningful interaction with people since mid-March.

131.    Mr. Torres has a stable housing plan in place for when he is released: he will live with his mother, who resides in Illinois.  Mr. Torres is eligible for medical furlough for ongoing care that IDOC cannot currently provide, but IDOC will not consider him under the new, more restrictive procedures.  IDOC's continued placement of Mr. Torres puts him at increased risk of contracting COVID-19.

132.    Lucious Rogers (B83280) is 43 years old and is incarcerated at the Medium Security Unit of Menard Correctional Center.  He has suffered from severe asthma since childhood, and had to be resuscitated as a teenager due to an asthma attack.  As an adult, he has required hospitalization for asthma-related complications.  He requires an inhaler and has also been diagnosed with a heart murmur.  Mr. Rogers works in the Menard slaughterhouse and has attempted to sign up for classes, but the programs are not running due to COVID-19.

133.    Due to his incarceration, Mr. Rogers is unable to social distance or take proper precautions to avoid a COVID-19 infection.  Mr. Rogers shares a cell with one other person and must endure crowded conditions every time he goes to yard, where it is impossible to physically distance.  Like other prisoners at Menard, Mr. Rogers is given a single disposable face mask to use for an entire week.  Correctional officers often do not wear their face masks and congregate with one another, talking and playing cards.  Staff members and inmate porters who deliver food do not consistently wear masks and gloves.

134.    Mr. Rogers has a stable housing plan in place for when he is released.  If released, Mr. Rogers will live with his wife and three stepchildren at their home in Caseyville, Illinois. There is ample space in their home for Mr. Rogers to self-isolate from the rest of the household and Mr. Rogers can receive healthcare in the community.  He is a skilled laborer and was employed as a union carpenter prior to his incarceration.  Mr. Rogers is eligible for medical furlough under the statute and Executive Order; however, IDOC will not consider him under the new, more restrictive procedures.  IDOC's continued placement of Mr. Rogers puts him at increased risk of contracting COVID-19.

## VI.    IDOC and Governor Pritzker Are Failing to Take Necessary Precautions to Reduce the Spread of COVID-19 Within Prisons and Protect the Medically Vulnerable Population

135.    The IDOC operates 28 adult correctional facilities throughout the State of Illinois and houses around 37,000 individuals.  There are 11,600 individuals employed by the IDOC.

136.    The first confirmed cases of COVID-19 in IDOC occurred on Wednesday, March 25, 2020—three prisoners and three staff tested positive for COVID-19.

137.    On April 1, 2020, the day before this lawsuit was filed, there were 52 confirmed prisoners who had COVID-19 in 2 different correctional centers (Stateville and North Lawndale ATC) and 25 confirmed staff who had the virus in 7 different correctional centers (Stateville NRC, Stateville, Sheridan, North Lawndale ATC, Menard, Joliet Treatment Center, and Crossroads ATC).

138.    As of May 19, 2020, there are 197 confirmed prisoners who have contracted COVID-19 in 9 different correctional centers (Stateville, Stateville NRC, Sheridan, Pontiac, Hill, Logan, North Lawndale ATC, Fox Valley ATC, and Crossroads ATC) and 163 confirmed staff who have contracted the virus in 18 different correctional centers (Stateville, Stateville NRC,

Western Illinois, Southwestern Illinois, Sheridan, Pontiac, Menard, Logan, Jacksonville, Hill, Graham, Danville, Joliet Treatment Center, Kewanee LSRC, North Lawndale ATC, Fox Valley ATC, Elgin Treatment Center, and Crossroads ATC).

139.     The actual number of individuals with COVID-19 in IDOC is likely much higher. IDOC is not administering comprehensive testing at each prison—often denying prisoner requests for testing if prisoners do not have fevers, regardless of how many other signs or symptoms of the virus they report.

140.     Fewer than 2% of Illinois's prisoners have been tested for COVID-19.

141.     Additionally, IDOC does not track employee testing.  Staff are tested at a variety of locations, mostly through their private providers, and they are not required to report this information to IDOC.

142.     Without more testing of prisoners and staff, and accurate tracking of the testing, the actual numbers of prisoners and staff who have the virus remain unknown.  And without mass testing, among other vital preventative measures, it will be impossible to contain the spread of the virus in Illinois's prisons.  For example, mass testing at state prisons in Ohio have provided evidence of just how quickly and easily COVID-19 can spread in prisons.  At two Ohio prisons where all prisoners were tested, nearly 80% of prisoners at each prison tested positive for the virus—many who were asymptomatic.

143.     Because of the conditions at IDOC facilities, widespread testing is critical to protect the health and safety of individuals in custody, and particularly Plaintiffs and Class Members at heightened risk of negative outcomes from the virus.  Testing should be done for any individual who presents with more than one sign *or* symptom of COVID-19, as well as those who have been exposed to an individual with COVID-19, whether directly or through staff.

144.    On March 30, 2020, Illinois health officials announced that the first prisoner—a man in his 50s housed at Stateville Correctional Center—had died from COVID-19.  Since that time, IDOC has confirmed that at least 11 more Stateville prisoners have died from the virus. Upon information and belief, the actual number of total deaths from COVID-19 at Stateville may be 14.  Upon information and belief, the majority of these deaths have been people who were medically vulnerable due to age or underlying medical condition.

145.    Days before the first prisoner death, the Governor admitted that older individuals and those with serious chronic health conditions (including heart disease, diabetes, lung disease, among others) are at the highest risk for severe illness from COVID-19.  The Governor has also publicly acknowledged the close proximity that those in IDOC custody are forced to live make them particularly vulnerable to COVID-19.  And although the Governor has admitted that the IDOC is largely unable to isolate and quarantine those who are symptomatic and/or have COVID-19, neither he nor Defendant Jeffreys has taken any action to ensure that preventative measures like adequate hygiene and sanitation, PPE, and social distancing are implemented in IDOC facilities.

146.    Plaintiffs and Class Members must be given unrestricted access to soap so that they can practice frequent hygiene.  Defendants must require and ensure that Plaintiffs' and Class Member's access to soap is not limited as it has been to date.

147.    Frequent sanitation of all shared surfaces is also necessary to protect the health and safety of Plaintiffs and Class Members.  Plaintiffs and Class Members must have access to undiluted disinfectants and paper towels or clean cloths (rather than dirty shirts or towels). Common-use areas (*i.e.* railings, doors, chuckholes) must be frequently sanitized and items such

as telephones, gym equipment, and other items used serially by multiple individuals must be cleaned between each use.

148.     Similarly, staff must avoid cross contamination of prisoners.  For example, staff should be required to wash their hands and change masks after coming into close contact with one prisoner, before contacting another prisoner.  This currently is a frequent problem, for example staff may shakedown a prisoner's cell and strip search them, and then move directly to another cell and repeat the process without taking any steps to decontaminate themselves.  Similar danger is posed when a guard escorts a prisoner, and then contacts other prisoners without decontaminating, or handcuffs a series of prisoners without decontaminating between each cuffing procedure.

149.     Defendants must require and ensure that PPE is available and used by both individuals in custody and staff.  This includes a requirement that staff wear masks and gloves at all times, along with an enforcement mechanism to ensure that staff are not permitted to disregard any such requirements when in proximity of Class Members.  Clean masks must also be provided to individuals in custody with sufficient frequency.

150.     Social distancing is necessary.  It is critical that Defendants not only announce a general policy of social distancing, but that they implement and enforce it among staff throughout the facilities.  It is particularly important that staff practice and maintain social distancing to prevent the spread of the virus and protect vulnerable prisoners.  Staff should be required to socially distance from one another and from prisoners except in cases of emergencies, and must be required to disinfect any objects that they handle with or pass to prisoners (such as property and meal trays).

151.   As to social distancing requirements for medically vulnerable prisoners, the procedures must be carefully crafted in order to avoid placing Plaintiffs and Class Members in solitary confinement-like conditions or other punitive results.  Measures that prohibit typically congregate activities (such as yard, gym, and dining) without alternative activities are not acceptable long-term solutions as they will cause other significant harms to the class.  However, specific measures must be taken to avoid contamination for medically vulnerable prisoners, including increased social distancing and the option of single cell placement (with the individual's consent).  Prisoners should not be placed in groups in bull pens or holding cells in a manner which prevents maintaining a six foot separation.

152.   A medical quarantine should involve frequent contact with medical staff, and should be provided in the least restrictive environment possible to avoid the negative effects of extreme isolation.  Currently, medical quarantine in IDOC prisons is far more restrictive than even disciplinary segregation and is often experienced as punitive.  Unlike those quarantining with symptoms on the outside, IDOC prisoners are often shut out from the world entirely, some with no television or radio, and infrequent or no concerned phone calls with loved ones.  This level of solitary confinement itself can cause devastating harm to both physical and mental health and must be avoided.

153.   Further, Illinois law provides several established mechanisms for removing people in IDOC custody from the now-unsafe facilities, all of which are available to the Governor and Director in this emergency.  Despite pressure from advocates, and despite the Governor's own admissions that medically vulnerable people in IDOC custody are especially vulnerable to contracting and spreading COVID-19, the IDOC has refused even to consider whether to apply these mechanisms to Plaintiffs and other medically vulnerable putative class members.

154. Pursuant to the Electronic Monitoring and Home Detention Law, 730 ILCS 5/5-8A-1 *et seq.* ("Home Detention Law"), IDOC has the authority and obligation to implement procedures through which eligible prisoners may serve a portion or all of their custodial sentence in home detention. The Home Detention Law directs the Department to issue administrative directives to allow for specifically enumerated categories of state prisoners to serve portions of their sentence in home detention. Pursuant to 730 ILCS 5/5-8A-3(d), IDOC may place a prisoner in an electronic monitoring or home detention program if that person is over 55 years old, has 12 months or less to serve on their sentence, has served at least 25% of their sentenced prison term, and is serving a sentence for conviction of an offense other than for certain sex offenses. Pursuant to 730 ILCS 5/5-8A-3(e), IDOC may place a person of any age serving a sentence for conviction of a Class 2, 3, or 4 felony offense which is not an excluded offense in an electronic monitoring or home detention program at any time. Pursuant to 730 ILCS 5/5-8A-3(b) and (c), IDOC may place a person of any age serving a sentence for conviction of a Class 1 or Class X felony offense, other than an excluded offense, in an electronic monitoring or home detention program for a period not to exceed the last 90 days of incarceration.

155. Pursuant to 730 ILCS 5/3-6-3(a)(3) and Administrative Code, 20 Ill. Adm. Code 107.210, the Director of IDOC may award to eligible prisoners up to 180 days of discretionary earned sentence credit for good conduct.

156. Pursuant to 730 ILCS 5/3-11-1(a)(2), the IDOC may transfer a person from a prison to medical furlough "to obtain medical, psychiatric or psychological services when adequate services are not otherwise available." The IDOC therefore has statutory authority to release on medical furlough individuals who are medically vulnerable to COVID-19 either due to age or pre-existing medical conditions.

157.    Although the Governor expanded IDOC's statutory authority to grant medical furlough, that Executive Order—issued on April 6, 2020, after Plaintiffs initiated this lawsuit—has not been utilized to protect Plaintiffs.  In fact, on April 29, 2020—after the Court denied Plaintiff's motion for a temporary restraining order—IDOC issued procedures that substantially narrowed the scope of the authority purportedly expanded with the Executive Order so as to exclude most of the medically vulnerable people in custody, including even those like Plaintiffs who could safely be transferred to their homes.  Under IDOC's new policy, the only prisoners eligible for medical furlough now are those not serving life sentences and who (1) have limited physical mobility and require rehabilitative and/or ongoing assistance to complete activities of daily living, such as bathing, dressing, transferring, toileting, and eating; or (2) are terminally ill and require end of life care.   This protocol limiting furlough to those in need of that level of care renders medical furlough useless for the vast majority of people in need.  As a result of this new policy, thousands of prisoners who could have been eligible for medical furlough—even before the Governor expanded the Director's discretion—are now no longer even being considered by the IDOC.  Defendants have acknowledged the risk to the medically vulnerable, but at the same time, they are refusing even to consider whether to medically furlough Plaintiffs and other members of the putative class.

158.    Before Plaintiffs filed this lawsuit, on March 31, 2020, officials publicly announced that IDOC had released around 300 individuals—or less than one percent of the prison population.

159.    From March 1, 2020, to May 19, 2020, IDOC has transferred home or released around 1261 people, but those efforts did not target the medically vulnerable population who should be prioritized.  Instead, IDOC has limited its response to a relatively small number of

releases (relative to its population) of only those who were approaching their release date anyway. More than 85% (1079) were released through a grant of earned discretionary sentence credit pursuant to 730 ILCS 5/3-6-3(a)(3) (meaning that these individuals were already within six months of their release date); and only 76 people have been transferred to electronic detention pursuant to 730 ILCS 5/5-8A-3 (all but 2 of these individuals have release dates within a year). Only 106 people have been transferred to medical furlough (all but 14 of these individuals have release dates within a year).[19] Only 10 of the individuals released either via earned discretionary sentence credit or electronic detention are age 55 or older, and only 19 of the individuals released on medical furlough are age 55 or older—meaning IDOC has released only 29 of the 4,807 people in its custody who are age 55 or older, or 0.6%. Moreover, many prisoners who are medically vulnerable due to age or underlying medical condition remain in custody, including named Plaintiffs here, putting their lives in jeopardy.

160. Shortly after Plaintiffs initiated this lawsuit, the Governor commuted the sentences of a handful of prisoners using his executive clemency power; however, only two were, to Plaintiffs' knowledge, medically vulnerable due to an underlying medical condition (and those were two of the original named Plaintiffs). Since the court's denial of Plaintiff's motion for a temporary restraining order, the Governor has stopped granting clemency petitions. Only 20 people have been granted clemency since the beginning of March 2020, while there are likely hundreds of current clemency petitions awaiting the Governor's approval, many of whom are for prisoners who are medically vulnerable.

161. Dan Pacholke, a corrections expert with more than 37 years of experience, has specific recommendations for steps IDOC can take to proactively respond to COVID-19 to

---

[19] Data available at
https://www2.illinois.gov/idoc/Offender/Pages/CommunityNotificationofInmateEarlyRelease.aspx.

protect the health and safety of medically vulnerable people in IDOC custody.[20]  Mr. Pacholke

explains: "Among those steps is considering how IDOC can exercise its authority and discretion

. . . to reduce the prison population.  This includes awarding good time credits, transferring people

to home detention, and authorizing medical furloughs."[21]  Mr. Pacholke further explains that

"[a]ll of these and any other options should be fully utilized to allow individuals to maintain

social distancing and have better access to testing and treatment.  This will also help mitigate the

impact of staff shortages and lessens the burden on prison medical services."[22]

162.    Dr. Robert Greifinger, a correctional health expert, has concluded that "[r]isk

mitigation is the only viable public health strategy available to limit transmission of infection,

morbidity and mortality in prisons, and to decrease the likely public health impact outside of the

prisons.  Even with the best-laid plans to address the spread of COVID-19 in prisons, the release

of individuals, prioritizing the most medically vulnerable individuals, is a key part of a risk

mitigation strategy."[23]  Dr. Greifinger explains that reducing the prison population "has a number

of valuable effects on public health and public safety: it allows for greater social distancing,

which reduces the chance of spread if virus is introduced; it allows easier provision of preventive

measures such as soap for handwashing, disinfecting supplies for surfaces, frequent laundering

and showers, etc.; and it helps prevent overloading the work of detention staff, which will likely

be reduced by illness, such that they can continue to ensure the safety of detainees."[24]

---

[20]  Pacholke Decl., Exhibit 5.
[21]  *Id.*
[22]  *Id.*
[23]  Greifinger Aff., Exhibit 1.
[24]  *Id.*

### VII. IDOC's Medical Care Program is Gravely Under-Resourced and Under-Functioning, and is Not Capable of Managing COVID-19

163.    Plaintiffs each require ongoing medical care in a system that was strained to provide the care they needed even prior to the COVID-19 outbreak.  When their facilities have an outbreak, the medical staff and resources that Plaintiffs are forced to rely on (even for something as simple as receiving their daily medications) are stretched even thinner, placing Plaintiffs at greater risk of harm from both their underlying medical conditions and from the spread of the virus.

164.    Even before COVID-19, IDOC's medical care program was ill-equipped to meet the medical needs of prisoners in its care.  For over a decade, IDOC has been mired in litigation over its consistent failure to maintain a minimally adequate system.  *See Lippert v. Jeffreys*, No. 10 cv 4603 (N.D. Ill.).  In 2014 and again 2018, the *Lippert* court appointed teams of independent experts to conduct exhaustive reviews of IDOC's medical system, both of which exposed a system in dire need of reform.  In October 2018, the team of experts issued a 1200-page report, reaching the following the conclusions:

a)   The clinical care provided within IDOC was "extremely poor" and "resulted in preventable morbidity and mortality";

b)   IDOC lacked an adequate infections disease control program;

c)   IDOC's Infectious Disease Coordinator position was vacant and had been vacant since at least 2014;

d)   Systemic sanitation problems existed at multiple IDOC facilities;

e)   IDOC's medical staff vacancy rates were "very high" and staffing was a "critical problem" throughout IDOC;

f) Physician staffing at IDOC was "very poor," with "persistent and ongoing vacancies" in site medical director positions, high rates of turnover, and an over-reliance on "traveling" medical directors who go from site to site;

g) Physicians who worked at IDOC were improperly credentialed, which was "a major factor in preventable morbidity and mortality" and "significantly increase[ed] the risk of harm to patients within IDOC."[25]

165.    Less than one year ago, IDOC agreed to a consent decree, which was approved and entered by the Court in May 2019, to begin needed reforms. *See Lippert v. Jeffreys*, No. 10 cv 4603 (N.D. Ill.), Doc. No. 1238 (consent decree). The consent decree called for the appointment of an independent monitor and a near complete overhaul of IDOC's medical system.

166.    In the nine months since the *Lippert* consent decree was entered, IDOC has taken preliminary steps to comply, but circumstances within the facilities remain largely unchanged. IDOC is still only in early stages of developing a compliance plan. There has been no meaningful on the ground change yet; facilities are still critically under-staffed and under-resourced. IDOC is simply unable to adequately meet the serious medical needs of IDOC's population even under non-pandemic circumstances.

167.    Even before the COVID-19 outbreak, in November 2019, the *Lippert* court monitor warned that the prevalence of elderly and infirm individuals in IDOC was straining the system.[26] Regarding this population, the monitor noted: "It is the position of the monitor that in the short term additional IDOC resources must be directed to properly house and care for this population but in the near future the IDOC must take the lead to create a pathway to discharge

---

[25] Exhibit 6 (*Lippert* Expert Report, October 2018) at 9-10, 21-31, 84-91.
[26] Exhibit 7 (*Lippert* Court Monitor Report, November 24, 2019) at 9-10.

those men and women whose mental and medical conditions make them no longer a risk to society to appropriate settings in the community."[27]

168.     Since the outbreak of COVID-19, IDOC administrators have issued memos to prisoners notifying them that their medical resources were "stretched thin" and that they needed to focus "on [their] most vulnerable patients at this time."[28]

169.     When Plaintiffs initiated this lawsuit, there were 48 confirmed COVID-19 cases at Stateville, with approximately 19 Stateville prisoners in outside hospitals—so many that they overwhelmed the outside hospital that typically serves Stateville residents.  The hospital's medical director, Dr. John Walsh, said,

> This is a disaster because what I most fear is that without some resolution, the number of cases coming in from Stateville will become excessive.  We currently have nine inmates on ventilators, critically ill.  There was [sic] four in the emergency department a couple of hours ago, and I believe the volume of patients there is huge.  In addition, something has to be done at Stateville.  You will have a huge epidemic, remembering that 20% of the people who contract this virus are probably gonna end up in hospital and a number of them are gonna die.  This could end with up to 100 inmates dying if this is out of control, and they are not isolated well at this point.[29]

170.     The situation at Stateville became so grave that the Governor had to activate Illinois National Guard service members to provide additional medical support at the prison.  However, even after the Illinois National Guard was activated, a second surge in confirmed COVID-19 cases at Stateville began on May 5, 2020, and the number of infections at Stateville continues to slowly but steadily rise.

171.     As of the date of this filing, there have been 154 confirmed prisoners at Stateville who have contracted the virus.  Since filing this lawsuit, the virus has spread to prisoners at Hill

---

[27]  *Id.*
[28]  Exhibit 8 (IDOC Memorandum, COVID-19 Response).
[29]  abc7 Chicago, Illinois Prisoners Sick with COVID-19 Overwhelm Juliet Hospital (video),  available at https://abc7chicago.com/health/illinois-prisoners-sick-with-covid-19-overwhelm-joliet-hospital/6064085/ (last visited Mar. 31, 2020).

(14 confirmed cases), Logan (1 confirmed case), Pontiac (1 confirmed cases), Sheridan (14 confirmed cases), and Stateville NRC (1 confirmed case). By the Governor's own admissions, COVID-19 continues to spread within the State of Illinois, posing a clear and present danger to Class Members within facilities where there are already one or more confirmed COVID-19 cases and those where the virus has not yet been introduced.

## CLASS ACTION ALLEGATIONS

172.    Pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, the individual named Plaintiff bring this action on behalf of themselves and a class consisting of all medically vulnerable people who are currently or who will in the future be housed in an IDOC prison during the duration of the COVID-19 pandemic. Class Members are people in custody who are medically vulnerable to COVID-19 because they are 55 years of age and older, or medically vulnerable because they have serious underlying medical conditions that put them at particular risk of serious harm or death from COVID-19, including but not limited to people with respiratory conditions including chronic lung disease or moderate to severe asthma; people with heart disease or other heart conditions; people who are immunocompromised as a result of cancer, HIV/AIDS, or any other condition or related to treatment for a medical condition; people with chronic liver or kidney disease or renal failure (including hepatitis and dialysis patients); people with diabetes, epilepsy, hypertension, blood disorders (including sickle cell disease), inherited metabolic disorders; people who have had or are at risk of stroke; and people with any other condition specifically identified by CDC either now or in the future as being a particular risk for severe illness and/or death caused by COVID-19.

173.    Plaintiffs also seek relief on behalf of the following two subclasses:

a) *Subclass 1*: Class members in prisons with one or more confirmed active COVID-19 cases among either prisoners or staff.

b) *Subclass 2*: Class members in prisons where there are not yet any confirmed active COVID-19 cases.

174. A class action is the only practicable means by which the individual named Plaintiffs and the class members can challenge the Defendants' unconstitutional actions. Many members of the class are without the means to retain an attorney to represent them in a civil rights lawsuit.

175. The class is so numerous that joinder of all members is impractical. Plaintiffs estimate that there are approximately 12,000 people in custody who are medically vulnerable to COVID-19 because they live with an underlying medical condition, and 4,807 people who are medically vulnerable to COVID-19 because they are 55 and older.

176. There are questions of law and fact common to all class members, including: (1) does COVID-19 present a substantial risk of harm to medically vulnerable Class Members in IDOC custody; (2) are Defendants aware of the substantial risk of harm posed to medically vulnerable Class Members; (3) have the Defendants failed to act reasonably to mitigate the spread of COVID-19 and protect medically vulnerable Class Members; (4) have the Defendants failed to respond reasonably to the serious risk of harm posed by COVID-19 to medically vulnerable Class Members by requiring them to live in conditions that put them at substantial risk; (5) are Defendants exposing medically vulnerable Class Members to an unreasonable risk of contracting COVID-19 by failing to provide a means for them to maintain social distancing adequate to reduce the risk of becoming infected; (6) are Defendants exposing medically vulnerable Class Members to an unreasonable risk of contracting COVID-19 by not requiring prison staff to use

masks, gloves, and other personal protective equipment at all times when they interact with other members of the staff or with prisoners, including changing such equipment after potential exposure to the virus (for example, when entering and leaving medical isolation areas or after shaking down a prisoner or a cell); (7) are Defendants exposing medically vulnerable Class Members to an unreasonable risk of contracting COVID-19 by failing to properly clean and disinfect high touch areas (e.g., telephones, handcuffs, and crisis cells) before and after use by a prisoner or staff; and (8) are Defendants exposing medically vulnerable Class Members to an unreasonable risk of contracting COVID-19 by failing to conduct a sufficient number of tests and sufficient contact tracing to identify and isolate all staff and prisoners who are infected with COVID-19 to effectively contain the spread of the virus?

177.    The claims of the named Plaintiffs are typical of those of the class as a whole. That typicality stems from their claim that Defendants have placed them at significant risk of harm by failing to take appropriate steps to address the risk of COVID-19 posed to class members as a whole throughout the IDOC.  All class members in IDOC custody face a heightened risk of becoming severely ill or dying from COVID-19 if the IDOC fails to take meaningful action to contain the spread of the virus.

178.    The individual named Plaintiffs will fairly and adequately represent the interests of the class and subclasses.  The named Plaintiffs have no conflicts with the unnamed members of the proposed class.  In addition, their lawyers are experienced in federal court civil rights class actions, particularly those involving prisons and jails.

179.    Defendants have refused to act in a manner that applies generally to the class as a whole, rendering class-wide injunctive and declaratory relief appropriate.

**COUNT I**
**42 U.S.C. § 1983 Deliberate Indifference to the Serious Risk of Harm Posed by COVID-19**
**(Alleged by all Plaintiffs on Behalf of Themselves and the Class Against all Defendants)**

180. Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

181. Plaintiffs and the class they represent have been deprived and continue to be deprived by the Defendants of their rights under the Eighth Amendment to adequately safe living conditions. Specifically, Defendants are aware of the substantial risk of harm that COVID-19 poses to all individuals, and are further aware of the particular risks of severe illness and possible death that Plaintiffs face as a result of their age or medical condition in Defendants' correctional facilities. Despite this knowledge, Defendants have failed to take reasonable measures to protect Plaintiffs and the class they represent.

182. As a result of the Defendants' actions and inactions, Plaintiffs and Class Members face a substantial risk of contracting COVID-19 and sustaining a serious illness that could lead to death. This harm manifests in two ways: 1) Class Members who are eligible for release are unnecessarily exposed to an exponentially increased risk of contracting COVID-19 and suffering a serious illness that could lead to death for so long as they remain in IDOC's physical custody; and 2) Class Members who are likely to remain in IDOC custody because they lack a statutory pathway to release are exposed to an exponentially increased risk of contracting COVID-19 and suffering a serious illness that could lead to death because prisoners are not able to practice sufficient social distancing and IDOC has insufficient medical and sanitation resources to both prevent the spread of COVID-19 and to adequately treat those who contract the virus.

183. The Defendants' failures to take appropriate steps to curb the substantial threat posed by COVID-19 to medically vulnerable people in IDOC custody, as described more fully

above, constitutes deliberate indifference to Plaintiffs' rights to be free from cruel and unusual punishment. Defendants know of and are disregarding a substantial risk of serious illness and/or death medically vulnerable people face as a result of the pandemic.

184.  Plaintiffs seek injunctive and declaratory relief against all Defendants to prevent the continued violation of the rights of Plaintiffs and the class they represent.

## COUNT II
### Americans with Disabilities Act ("ADA")
**(Alleged by all Plaintiffs on Behalf of Themselves and the Class Against Defendant Jeffreys)**

185.  Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

186.  Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.

187.  The Illinois Department of Corrections is a public entity covered by Title II of the ADA. 42 U.S.C. § 12131.

188.  Members of Subclass 1 are qualified individuals with disabilities within the meaning of the ADA in that they have physical and/or mental impairments that substantially limit one or more major life activities. 42 U.S.C. § 12102(2). Major life activities of class members that are limited include respiratory and other functions of the body such as the immune system, circulatory system, endocrine (to regulate blood sugar), kidney (the ability to cleanse and eliminate body waste), normal cell growth, digestive, bowel, bladder, neurological, brain, circulatory, as well as limitations in breathing, eating, sleeping, thinking, concentrating, standing, and walking, among others.

189.    Defendant Jeffreys is violating Title II of the ADA by holding subclass members in unduly dangerous conditions that place them at a disproportionate risk of medical complication and death because of their disability.

190.    Safe custody and housing for those incarcerated is a program, service or activity of IDOC.

191.    Defendant Jeffreys is violating Title II of the ADA by failing to provide subclass members the reasonable accommodations that are needed and available to protect their lives by denying them medical furlough, release and/or transfer to home detention to allow subclass members to quarantine more safely in their homes.

192.    Plaintiffs seek injunctive and declaratory relief against all Defendants to prevent the continued violation of the rights of Plaintiffs and the class they represent.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs on behalf of themselves and the putative class they seek to represent, request that this Court enter judgment in their favor and against Defendants J.B. Pritzker and Rob Jeffreys and order the following relief:

a)  Issue an injunctive order requiring the Defendants to implement constitutionally sufficient procedures to protect medically vulnerable Plaintiffs' and Class Members' health and safety that are consistent with the expert judgment of correctional, public health, and health care specialists.

b)  Issue an injunctive order requiring IDOC to develop a plan to prioritize medically vulnerable Plaintiffs and Class Members for consideration of transfer or release through one of the available mechanisms, including medical furlough (as expanded under the Executive Order), home detention, or early release.

c) Appoint a Special Masters to assist the IDOC in developing and implementing procedures to protect medically vulnerable Class Members.

d) Issue an order and judgment granting reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 1988 and the Americans with Disabilities Act.

e) Grant such other relief as this Court deems just and proper.

Dated: May 20, 2020

Respectfully submitted,

/s/ Vanessa del Valle
One of the Attorneys for the Plaintiffs

Sheila A. Bedi
Community Justice Civil Rights Clinic
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-2492
sheila.bedi@law.northwestern.edu

Vanessa del Valle
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-5932
vanessa.delvalle@law.northwestern.edu

Jennifer Soble
Illinois Prison Project
53 W. Jackson, Suite 1056
Chicago, IL 60616
(312) 324-4465
jennifer@illinoisprisonproject.org

Carolyn E. Shapiro
565 W. Adams
Chicago, IL 60661
(773) 341-520-7533
cshapiro1@kentlaw.iit.edu

Alan Mills
Elizabeth Mazur
Nicole Schult
Uptown People's Law Center
4413 N. Sheridan
Chicago, IL 60640
(773) 769-1411
alan@uplcchicago.org
liz@uplcchicago.org
nicole@uplchicago.org

Sarah C. Grady
Loevy & Loevy
311 North Aberdeen St., 3rd Fl.
Chicago, IL 60607
(312) 243-5900
sarah@loevy.com

Amanda Antholt
Samantha Reed
Equip for Equality
20 N. Michigan Ave, Suite 300
Chicago, IL 60602
(312) 341-0022
amanda@equipforequality.org
samantha@equipforequality.org

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that she served the foregoing document upon all persons who have filed appearances in this case via the Court's CM/ECF system on May 20, 2020.

/s/ Vanessa del Valle